# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA
450 Fifth Street NW
Washington, DC 20530,

                    Plaintiff;

    v.

CARGILL MEAT SOLUTIONS
CORPORATION
825 East Douglas Avenue, 9th Floor
Wichita, KS 67202,

CARGILL, INC.
15407 McGinty Road West
Wayzata, MN 55391,

G. JONATHAN MENG
734 Wild Rose Road
Silverthorne, CO 80498,

SANDERSON FARMS, INC.
127 Flynt Road
Laurel, MS 39443,

WAYNE FARMS, LLC
4110 Continental Drive
Oakwood, GA 30566,

WEBBER, MENG, SAHL AND
COMPANY, INC. d/b/a/ WMS &
COMPANY, INC.
1200 E. High Street, Suite 104
Pottstown, PA 19464,

                    Defendants.

Civil Action No.:

# COMPLAINT

Americans consume more poultry than any other animal protein. Before poultry is prepared for consumption, it passes through a complex supply chain that includes hatcheries that hatch chicks from eggs; growers that raise poultry until the birds are ready for slaughter; and poultry processing plants where workers perform dangerous tasks under difficult conditions to slaughter and pack chickens and turkeys for distribution to consumers.

Poultry processing plant workers deserve the benefits of free market competition for their labor. For at least two decades, however, poultry processors that employ more than 90 percent of all poultry processing plant workers in the United States conspired to (i) collaborate with and assist their competitors in making decisions about worker compensation, including wages and benefits; (ii) exchange information about current and future compensation plans; and (iii) facilitate their collaboration and information exchanges through data consultants. This conspiracy distorted the normal bargaining and compensation-setting processes that would have existed in the relevant labor markets, and it harmed a generation of poultry processing plant workers by artificially suppressing their compensation.

Poultry processors have also engaged in deceptive practices associated with the "tournament system." Under this system, growers are penalized if they underperform other growers, but poultry processors control the key inputs (like chicks and seed) that often determine a grower's success. Poultry processors often fail to disclose the information that growers would need to evaluate and manage their financial risk or compare offers from competing processors.

The United States of America brings this civil action under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 202(a) of the Packers and Stockyards Act, 7 U.S.C. § 192(a), to enjoin this unlawful conduct.

i

**TABLE OF CONTENTS**

I.   NATURE OF THE ACTION ................................................................................. 1

II.  JURISDICTION AND VENUE ......................................................................... 6

III. TERMS OF REFERENCE ................................................................................ 8

IV. DEFENDANTS .............................................................................................. 10

   A.  Cargill ...................................................................................................... 10

   B.  Wayne ...................................................................................................... 11

   C.  Sanderson ................................................................................................ 11

   D.  WMS ........................................................................................................ 12

   E.  Jonathan Meng ........................................................................................ 13

   F.  Co-conspirators ...................................................................................... 14

V.  FACTUAL ALLEGATIONS .......................................................................... 14

   A.  Poultry Industry Background .................................................................. 14

     1.  Hatcheries and Growers .................................................................... 14

     2.  Poultry Processing Plants .................................................................. 16

     3.  Poultry Processing Plant Workers and Compensation ..................... 17

       a.  Poultry Processing Plant Work and Workers................................ 17

       b.  Competition for Poultry Processing Plant Workers.................... 20

       c.  Setting and Adjusting Plant Worker Compensation ................. 20

   B.  Defendants' Conspiracy to Collaborate on Compensation Decisions, Share Compensation Information, and Use Consultants to Facilitate Their Conspiracy ................................. 21

     1.  WMS Poultry Industry Survey Group.............................................. 24

       a.  WMS Survey Group History, Rules, and Control by Processor Conspirators ....... 25

       b.  Compensation Data Exchanged Through WMS Survey Group ............................. 27

       c.  WMS Survey Group Exchanges by Year, Defendant, and Type of Information Exchanged in Surveys and In-Person Meetings................................. 31

     2.  Direct Processor-to-Processor Collaboration and Information Exchanges.................... 36

       a.  Chicken Industry Wage Index ("CHIWI") Exchange ............................................ 37

       b.  U.S. Poultry & Egg Association Member Processors' Exchanges........................ 39

       c.  Processor Conspirators' Ad Hoc Direct Exchanges ................................. 40

     3.  Exchange of Compensation Information Through Consultant Co-Conspirator 1.......... 41

     4.  Processors' Collaboration and Assistance on Compensation ....................................... 42

5.   Processors Recognize Their Agreement Likely Violated the Antitrust Laws and Attempt to Cover It Up ................................................................................................ 49

C.   Defendants Sanderson's and Wayne's Deceptive Practices Toward Growers ................. 51

VI.  ELEMENTS OF THE SHERMAN ACT CLAIM ................................................... 52

A.   The Agreement to Collaborate on Compensation Decisions, Exchange Compensation Information, and Facilitate Such Collaboration and Exchanges ................................................. 52

B.   Primary Poultry Processing Plant Employment is a Relevant Labor Market .................. 53

C.   The Geographic Markets for Poultry Processing Plant Labor .......................................... 56

D.   Market Power ............................................................................................................................ 63

E.   Anticompetitive Effects: Processor Conspirators' Conspiracy Anticompetitively Affected Decisions About Compensation for Plant Processing Workers ................................................. 63

VII. VIOLATIONS ALLEGED........................................................................................... 69

A.   COUNT I:  SHERMAN ACT SECTION 1 (ALL DEFENDANTS) .................................... 69

B.   COUNT II: PACKERS AND STOCKYARD ACT SECTION 202(a) (DEFENDANTS SANDERSON AND WAYNE ONLY) ................................................................................................ 71

VIII.      REQUESTED RELIEF ......................................................................................... 72

## I.      NATURE OF THE ACTION

1.      From chicken noodle soup to golden-roasted Thanksgiving turkey, Americans

love to eat poultry. Americans consume more poultry than any other animal protein, including

beef and pork.

2.      By the time poultry is served in a home kitchen, restaurant, or school cafeteria, it

has passed through a complex supply chain that includes hatcheries, growers (i.e., farmers who

raise live poultry for meat or eggs), and poultry processors, which employ hundreds of thousands

of workers who process chicken or turkey for distribution to customers or secondary processing

plants.

3.      Poultry processing plant workers play a vital role in the poultry meat supply

chain. These workers catch, slaughter, gut, clean, debone, section, and pack chickens and turkeys

into saleable meat. Many of them withstand physically demanding and often dangerous working

conditions. For example, a "live hanger" in a poultry processing plant grabs, lifts, and hangs for

slaughter about 30 living birds per minute, as each bird claws, bites, and flaps its wings. These

workers risk injuries ranging from exhaustion to mutilation to provide for themselves and their

families. In doing so, they help make food available to families nationwide.

4.      Like all workers, poultry processing plant workers deserve the benefits of free

market competition for their labor, including wages and benefits that are set through a

competitive process that is free from anticompetitive coordination between employers. Instead,

for at least the past 20 years, poultry processors that dominate local employment markets for

poultry processing plant workers and employ more than 90 percent of all such workers in the

United States collaborated on and assisted each other with compensation decisions. Their

conspiracy included sharing data and other information—directly and through consultants—

about their current and future compensation plans. Rather than make compensation decisions

1

independently, these processors chose to help each other at the expense of their workers. As a result, they artificially suppressed compensation in the labor markets in which they compete for poultry processing plant workers, and deprived a generation of poultry processing plant workers of fair pay set in a free and competitive labor market.

5.      Through communications over decades, which occurred in large groups, small groups, and one-to-one, these poultry processors agreed that they would assist each other by discussing and sharing information about how to compensate their poultry processing plant workers. As one poultry processor wrote to another about sharing wage rates, "I am interested in sharing this information with you. . . . I am hoping we can develop a collaborative working relationship." The poultry processors' collaboration on compensation decisions, including their exchange of compensation information, took many forms over the years of the conspiracy. For example:

        a.      An employee of one poultry processor emailed eight competitors that "It's that time of year already" and requested "your companies projected salary budget increase recommendation." Her coworker added, "Seriously -any info you can give us will be helpful."[1]

        b.      A group of competing poultry processors exchanged "disaggregated raw [identifiable] data regarding the compensation of hourly-paid workers . . . broken down by plant and location"; base pay and bonuses "for each specific salaried position" included in their survey; any "planned increase in the salary range for the current budget year"; any "planned increase in the salary range for the next budget year"; the dates of planned future increases; and "disaggregated, raw data for some benefits." Employees of these poultry processors then met in

_____

[1] In quotes throughout the Complaint, all spelling and grammatical errors are transcribed as they were found in the primary source text, without [*sic*] notions.

person and discussed specific compensation, including attendance bonuses and overtime work payments.

c.      When one poultry processor human resources employee emailed two competitors to ask "what your starting rate is for these kids hired right out of college," she noted in the same correspondence that her employer was "in the midst of completely revamping our Plant Management Trainee program." Without further prompting, her competitor shared detailed wage information for its Beginner and Advanced Trainee program.

d.      One poultry processor emailed others, "I had a question for the group also. We are trying to determine what is reasonable for salaried employee to be compensated for working 6 and/or 7 days in a work week when the plant is running. . . Do you pay extra for these extra days worked for salaried (exempt) employees?" and "If so, how is that calculated?"

e.      Nearly the entire poultry industry has subscribed to exchanges of information through a data consultant that includes compensation information that is so disaggregated that industry participants could determine the wages and benefits their competitors pay for specific positions at specific plants across the country.

6.      These collaborations demonstrate a clear agreement between competitors to ask for help with compensation decisions and to provide such help to others upon request. As part of this agreement to collaborate, the poultry processors shared information about *current* and *future* compensation decisions. They also shared *disaggregated* and *identifiable* information, which could readily be traced to a particular competitor or even a particular plant.

7.      Even apart from their collaboration on compensation decisions, the poultry processors' information exchanges—standing alone—also violated the Sherman Act. The poultry processors, both directly and through data consultants, shared compensation information so

detailed and granular that the poultry processors could determine the wages and benefits their competitors were paying—and planning to pay—for specific job categories at specific plants. The compensation information the poultry processors exchanged allowed them to make compensation decisions that benefited themselves as employers and suppressed competition among them for workers.

8.     Defendants Cargill Meat Solutions Corporation and Cargill, Inc. (together, "Cargill"), Sanderson Farms, Inc. ("Sanderson"), Wayne Farms, LLC ("Wayne"), Webber, Meng, Sahl & Co., Inc. ("WMS"), and WMS President G. Jonathan Meng participated in this unlawful conspiracy, together with other poultry processors and another consulting firm.[2]

9.     The poultry processors kept their collaboration and information exchanges secret in an attempt to hide their anticompetitive conduct. As a condition for membership in the survey exchange facilitated by one data consultant, the poultry processors promised that they would keep the compensation information exchanged confidential. When the survey group members met to collaborate on compensation decisions, they asked and expected the data consultant to leave the room when they discussed current and future compensation decisions. Even when one processor left the survey due to legal concerns in 2012, the poultry processors did not end their anticompetitive conduct; the other survey participants continued collaborating and exchanging information.

10.     When antitrust authorities and private class-actions began to surface anticompetitive conduct in other parts of the poultry industry, the poultry processors grew alarmed about the risk that their conspiracy would be found out. One of them warned the others

---

[2] The Complaint labels conspirators other than the Defendants with pseudonyms because the United States has an ongoing investigation into this conduct.

about "a private investigator" who was asking "questions about the types of information we shared at our meeting, the survey and other questions that I will simply call 'general anti-trust fishing' questions. . . . So just a little reminder that the bad-guys are still out there, and why we hold strict confidences about discussing wages."

11.     For at least two decades, poultry processors that dominated local markets for poultry processing plant work and controlled more than 90 percent of poultry processing plant jobs nationwide agreed to help each other make decisions about current and future compensation for their hourly and salaried plant workers, to exchange information about current and future compensation decisions, and to facilitate such exchanges through data consultants. The processors used the information they received through their collaboration and exchanges to make decisions on compensation for their workers. Indeed, they found it so useful that when fear of antitrust liability finally motivated several poultry processors to remove disaggregated compensation information from their exchanges, one processor complained that the new survey "has suffered significant obscuring of results . . . and I would ask – is it still useful information any longer?"

12.     The agreement to collaborate on compensation decisions and exchange information had the tendency and effect of suppressing competition for poultry processing workers and thereby suppressing these workers' compensation. The poultry processors' conspiracy is a scheme among competing buyers of labor that collectively possess market power over the purchase of poultry processing plant labor. By conspiring on decisions about compensation, these firms, with the assistance of consultants, collaborated to control the terms of employment of poultry processing plant jobs. Ultimately, the conspiracy gave the poultry

processors the ability to suppress competition and lower compensation below the levels that would have prevailed in a free market.

13.     The agreement to collaborate with and assist competing poultry processors in making compensation decisions, to exchange compensation information, and to facilitate this conduct through consultants is an unlawful restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. It should be enjoined.

14.     Defendants Sanderson and Wayne have further acted deceptively to their growers, the farmers responsible for raising the poultry for slaughter. These Defendants compensate their growers through the "tournament system," under which growers' base compensation is adjusted up or down depending on how each grower performs relative to others on defined metrics. But Sanderson and Wayne supply growers with the major inputs that contribute to growers' performance, such as chicks and feed, and these Defendants' contracts with growers omit material information about the variability of the inputs provided to growers. Because Sanderson and Wayne do not adequately disclose the risk inherent in their tournament systems to growers, growers cannot reasonably evaluate the range of potential financial outcomes, manage their risks, or compare competing poultry processors. This failure to disclose is deceptive and violates the Section 202(a) of the Packers and Stockyards Act, 1921, as amended and supplemented, 7 U.S.C. § 192(a). These deceptions should be enjoined.

## II.     JURISDICTION AND VENUE

15.     Each Defendant has consented to personal jurisdiction and venue in the District of Maryland.[3]

---

[3] In addition, Defendant Cargill, Inc. owns and operates facilities, and employs workers, in Maryland. Processor Co-Conspirator 14a and Processor Co-Conspirator 14b reside in Maryland. Processor Co-Conspirator 14b owns poultry processing plants and employs and compensates the

16.     Defendants WMS and Meng sell services to clients throughout the United States, including in Maryland. WMS's and Meng's services included collecting, compiling, and providing data on poultry processing worker compensation across the United States, including information about poultry processing workers in Maryland.

17.     Defendants Cargill, Sanderson, and Wayne sell poultry meat throughout the United States. As of 2022, poultry processing in the U.S. was a $30 billion industry. Each of these three Defendants is engaged in interstate commerce and activities that substantially affect interstate commerce. The collaboration between these Defendants in making compensation decisions, including through exchanges of processing plant compensation information that involved all Defendants, also substantially affects interstate commerce.

18.     The Court has subject matter jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1337, and Section 4 of the Sherman Act, 15 U.S.C. § 4, to prevent and restrain Defendants from violating Section 1 of the Sherman Act, 15 U.S.C. § 1.

19.     Venue is proper in this judicial district under Section 12 of the Clayton Act, 15 U.S.C. § 22 and 28 U.S.C. § 1391(b), and (c) because one or more of the Defendants and co-conspirators transacted business, was found, and/or resided in this District; a substantial part of the events giving rise to the United States' claim arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District. The Court has personal jurisdiction over each Defendant under 15 U.S.C. §§ 22, 5.

---

company's plant workers located in Maryland, while Processor Co-Conspirator 14a sets compensation for its plant workers working in Maryland. Processor Co-Conspirator 2 also owns and operates poultry plants in Maryland, at which it compensates its plant workers. Defendants WMS and Meng sold services to Processor Co-Conspirators 14a, 14b, and 2.

20.     Regarding violations by Defendants Sanderson and Wayne of the Packers and Stockyard Act, 1921, as amended and supplemented, 7 U.S.C. § 181 *et seq*., the Court has jurisdiction under 28 U.S.C. § 1345 and 7 U.S.C. § 224.

### III.     TERMS OF REFERENCE

21.     This Complaint refers to the consultants and poultry processors involved in the conspiracy as follows:

22.     The consultant conspirators include Defendants WMS and G. Jonathan Meng (together, the "Consultant Defendants") and Consultant Co-Conspirator 1.[4]

23.     The poultry processor conspirators include Cargill, Sanderson, and Wayne (together, the "Processor Defendants"), and Processor Co-Conspirators 1 through 18, inclusive, which are distinct poultry processing companies. Processor Co-Conspirators 8, 14, and 18 include subsidiaries that were also involved in the conspiracy. These subsidiaries are identified, when relevant, through letter notation (e.g., Processor Co-Conspirator 8a or 14b).

24.     The Processor Defendants, together with Processor Co-Conspirators 1 through 18, inclusive, are the "Processor Conspirators."

25.     Acts in furtherance of the conspiracy to collaborate with and assist competitors, to exchange information, and to facilitate such collaboration and exchanges can be summarized as detailed on the following page:

---

[4] As noted above, co-conspirators have been designated with pseudonyms because the United States has an ongoing investigation into this conduct.

| CONDUCT INVOLVED IN CONSPIRACY | |
|---|---|
| **Descriptor** | **Anticompetitive Conduct** |
| Collaboration on Compensation Decisions<br><br>("Collaboration Conduct") | Poultry processors attended in-person meetings and engaged in direct communications with their competitors to collaborate with and assist each other in making compensation decisions, including through the direct exchange of compensation information and the indirect exchange of such information facilitated by consultants WMS and Consultant Co-Conspirator 1.<br><br>Such compensation decisions and compensation information exchanges included current and future, disaggregated, and identifiable confidential compensation information related to poultry processing plant workers.<br><br>This collaboration was anticompetitive, and it suppressed poultry processing plant worker compensation.<br><br>*Period*: 2000 or earlier to present |
| Exchange of Compensation Information Facilitated by WMS<br><br>("WMS Exchange") | As part of the Processor Conspirators' conspiracy to collaborate on compensation decisions, they paid Defendants WMS and Jonathan Meng to facilitate a poultry processing plant worker compensation survey, designed and with rules set by the Processor Conspirators, which included the exchange of current and future, disaggregated, and identifiable confidential compensation information related to poultry processing plant workers.<br><br>This exchange was anticompetitive, and it suppressed poultry processing plant worker compensation.<br><br>*Period*: 2000 or earlier to 2020 |
| Exchange of Compensation Information Facilitated by Consultant Co-Conspirator 1<br><br>("Consultant Co-Conspirator 1 Exchange") | As part of the Processor Conspirators' conspiracy to collaborate on compensation decisions, they submitted to and purchased from Consultant Co-Conspirator 1 current, disaggregated, and identifiable confidential compensation information related to poultry processing plant workers.<br><br>This exchange was anticompetitive, and it suppressed poultry processing plant worker compensation.<br><br>*Period*: 2010 or earlier to present |

## IV.   DEFENDANTS

### A.   Cargill

26.   Cargill Meat Solutions Corporation is a Delaware company headquartered in Wichita, Kansas. Cargill Meat Solutions Corporation owns poultry processing plants, employs and compensates the workers in these plants, and employs executives and other representatives that set compensation for its plant workers throughout the United States. Cargill Meat Solutions Corporation participated in the anticompetitive compensation information exchanges with representatives of its competitors for poultry processing plant workers.

27.   Cargill, Inc. is a privately-held company headquartered in Wayzata, Minnesota. Cargill, Inc. is the parent company of Cargill Meat Solutions Corporation. Cargill, Inc. participated in the anticompetitive compensation information exchanges with representatives of its competitors for poultry processing plant workers.

28.   Defendants Cargill, Inc. and Cargill Meat Solutions Corporation are referred to collectively as "Cargill," unless otherwise noted for specificity.

29.   From at least 2000 until the present, Cargill participated in the anticompetitive agreement to collaborate with and assist its competitors in making decisions about compensation for poultry processing plant workers, including through the exchange of current and future, disaggregated, and identifiable wage and benefit information, by engaging in the following conduct in the following years:

    a.   Collaboration Conduct: at least 2000 to present;

    b.   WMS Exchange: 2000-2019; and

    c.   Consultant Co-Conspirator 1 Exchange: 2010 to present.

30.     As a result of its anticompetitive conduct, Cargill set and paid artificially suppressed wages and benefits for its hourly and salaried poultry processing plant workers.

**B.      Wayne**

31.     Wayne is a Delaware company headquartered in Oakwood, Georgia. Continental Grain Company is the controlling shareholder of Wayne. Wayne owns poultry processing plants, employs and compensates the workers in these plants, and employs executives and other representatives that set compensation for its plant workers throughout the United States.

32.     From at least 2000 until the present, Wayne participated in the anticompetitive agreement to collaborate with and assist its competitors in making decisions about compensation for poultry processing plant workers, including through the exchange of current and future, disaggregated, and identifiable wage and benefit information, by engaging in the following conduct in the following years:

    a.   Collaboration Conduct: at least 2000 to present;

    b.   WMS Exchange: 2000-2019; and

    c.   Consultant Co-Conspirator 1 Exchange: 2010 to present.

33.     As a result of its anticompetitive conduct, Wayne set and paid artificially suppressed wages and benefits for its hourly and salaried poultry processing plant workers.

**C.      Sanderson**

34.     Sanderson is a publicly-held Mississippi company headquartered in Laurel, Mississippi. Sanderson owns poultry processing plants, employs and compensates the workers in

these plants, and employs executives and other representatives that set compensation for its plant workers throughout the United States.

35.     From at least 2000 until the present, Sanderson participated in the anticompetitive agreement to collaborate with and assist its competitors in making decisions about compensation for poultry processing plant workers, including through the exchange of current and future, disaggregated, and identifiable wage and benefit information, by engaging in the following conduct in the following years:

    a.   <u>Collaboration Conduct</u>: at least 2000 to present;

    b.   <u>WMS Exchange</u>: 2000-2011; and

    c.   <u>Consultant Co-Conspirator 1 Exchange</u>: 2010 to present.

36.     As a result of its anticompetitive conduct, Sanderson set and paid artificially suppressed wages and benefits for its hourly and salaried poultry processing plant workers.

**D.     WMS**

37.     WMS is a Pennsylvania corporation located in Pottstown, Pennsylvania. WMS provides compensation consulting services, including through the use of compensation surveys, for clients in a broad range of industries.

38.     From 2000 to 2020, WMS administered surveys that facilitated the Processor Conspirators' conspiracy by gathering, sorting, and disseminating disaggregated and identifiable information about current and future compensation for poultry processing plant workers.

39.     From 2000 to 2002 and 2004 to 2019, WMS also facilitated, supervised, and participated in in-person meetings at which the Processor Conspirators assembled to discuss current and future, disaggregated, and identifiable poultry processing plant worker compensation decisions and information.

40.     Through its administration of surveys and participation at annual in-person meetings of the Processor Conspirators, WMS facilitated the Processor Conspirators' sharing of their confidential, competitively sensitive information about compensation for poultry processing plant workers.

41.     WMS's involvement in this conspiracy artificially suppressed compensation for poultry processing plant workers.

**E.     Jonathan Meng**

42.     G. Jonathan Meng is an individual residing in the State of Colorado. Since 2000, Meng has been the President of WMS.

43.     From 2000 to the present, Meng has had primary responsibility at WMS for designing and presenting compensation surveys, collecting survey data, developing new clients, maintaining client relationships, and obtaining payment for services rendered.

44.     Meng personally administered and supervised WMS's surveys, which disseminated the Processor Conspirators' current and future, disaggregated, and identifiable information about compensation for poultry processing plant workers.

45.     From 2000 until 2019, Meng, representing WMS, also facilitated, supervised, and participated in in-person meetings at which the Processor Conspirators assembled to discuss current and future, disaggregated, and identifiable poultry processing plant worker compensation information.

46.     By administering and supervising the surveys and meetings of the poultry processing defendants, Meng facilitated the Processor Conspirators' sharing of confidential, competitively sensitive information about compensation for poultry processing plant workers.

47.     Meng's facilitation of this conspiracy artificially suppressed compensation for poultry processing plant workers.

**F.     Co-conspirators**

48.     Several entities conspired with the Defendants during the following years to collaborate with and assist competing poultry processors in making compensation decisions, to exchange compensation information, and to facilitate this conduct: Consultant Co-Conspirator 1 (at least 2010 to the present); Processor Co-Conspirator 1 (at least 2002 to the present); Processor Co-Conspirator 2 (at least 2015 to the present); Processor Co-Conspirator 3 (at least 2010 to the present); Processor Co-Conspirator 4 (at least 2004 to the present); Processor Co-Conspirator 5 (at least 2014 to the present); Processor Co-Conspirator 6 (at least 2000 to the present); Processor Co-Conspirator 7 (at least 2000 to the present); Processor Co-Conspirator 8 (at least 2005 to the present); Processor Co-Conspirator 9 (at least 2014-2015); Processor Co-Conspirator 10 (at least 2009 to the present); Processor Co-Conspirator 11 (at least 2005 to the present); Processor Co-Conspirator 12 (at least 2010 to the present); Processor Co-Conspirator 13 (at least 2009 to the present); Processor Co-Conspirator 14 (at least 2000 to the present); Processor Co-Conspirator 15 (at least 2000 to the present); Processor Co-Conspirator 16 (at least 2014 to the present); Processor Co-Conspirator 17 (at least 2019 to the present); and Processor Co-Conspirator 18 (at least 2000 to the present).

## V.     FACTUAL ALLEGATIONS

**A.     Poultry Industry Background**

**1.     Hatcheries and Growers**

49.     Poultry are domesticated fowl, including chicken and turkey, bred for their meat and eggs.

50.     Poultry processors own hatcheries, in which they hatch chicks or poults (baby turkeys) from eggs. Poultry processors supply these young birds to growers. Growers are farmers who raise the birds to specifications set by, and with feed and supplies provided by, the poultry processors with which they contract. When the growers have finished raising the birds and the birds are ready for slaughter, the processors pay the growers for their services per pound of poultry.

51.     This arrangement allocates substantial risk to growers. Many poultry processors historically compensate growers through a tournament system. Processors control the chicks or poults, feed, and other inputs that are supplied to growers. The grower, in addition to raising the chicks, often must make substantial financial investments to build or improve chicken barns to meet the processor's specifications. Growers are compensated through a base payment set in a contract between the processor and the grower. But the processor can adjust the base payment up or down based on how a grower compares to other growers (which the processor selects) on production and efficiency metrics. In practice, these "performance" adjustments make it very difficult for growers to project and manage the risk they face when entering a contract with a processor—particularly since processors control the key inputs to poultry growing.

52.     Growers' contracts often do not disclose the true financial risk that the grower faces, including basic information like the number and size of flocks they are guaranteed. Similarly, growers often do not receive disclosures that would allow them to assess the tournament system. Growers often have little or no choice in which processor they contract with because there are limits to how far live poultry can be transported, and therefore only processors with nearby facilities are reasonable options.

## 2.    Poultry Processing Plants

53.    Once grown, the birds are packed into trucks and driven to primary poultry processing plants. Primary poultry processing plants tend to be built near hatcheries and growing facilities, which are usually in rural areas.

54.    Once the birds arrive at primary processing plants, poultry processing plant workers take the birds from the trucks and hang, slaughter, clean, segment, and pack the meat. This work is generally performed on a poultry processing line, where workers perform the same task repeatedly. Poultry processing plants are kept at cold temperatures to preserve the meat processed inside. The machinery necessary to process poultry carcasses and meat products is very loud, making it difficult for workers on the poultry processing line to hear and communicate. Slaughtering and packing poultry often results in blood and gore covering work surfaces and workers' protective gear. Moreover, the meat and byproducts of the slaughter process create a foul-smelling atmosphere that is slippery from fat, blood, and other byproducts and waste from the slaughter process.

55.    Processing plants employ salaried workers to manage this slaughter process and ensure that the processing plants comply with relevant health and safety laws, among other things.

56.    Meat from the birds slaughtered in primary processing plants is either sold to customers (e.g., grocery stores, restaurants, and other retailers) or sent to secondary processing plants at which the meat is further prepared for consumption, such as being sliced for deli packs or breaded.

3.      **Poultry Processing Plant Workers and Compensation**

a.      **Poultry Processing Plant Work and Workers**

57.      According to the U.S. Bureau of Labor Statistics, over 240,000 people worked in the U.S. poultry processing industry as of June 2020. Some of these workers worked in Maryland.

58.      Many poultry processing plant jobs require physical stamina because they are performed standing on the poultry processing line. These jobs also demand tolerance of unpleasant conditions including low temperatures, bad odors, blood and viscera, loud machinery noise, and, in some cases, dim lighting. Poultry processing plant work also can be dangerous, including because of the risk of injury from cutting instruments and repetitive-motion tasks. Many workers must stand on the processing line repeating the same rapid motions continuously. These motions can involve handling live, clawed birds, heavy lifting, and the use of sharp cutting instruments, all of which are physically demanding and involve a high risk of injury.

59.      In a competitive labor market, employers compete to attract and retain workers— much like manufacturers compete to attract potential customers in a downstream product market. Poultry processing plants compete with each other to attract workers who can perform this difficult work, and potential and current poultry processing plant workers seek out employers that will provide the best compensation for their labor.

60.      Many jobs in poultry processing plants present unique characteristics that make it difficult for workers to switch to a different kind of job. The difficulty of switching to other jobs is enhanced by the specific skills developed and circumstances faced by workers in poultry processing firms. Workers in poultry processing plants often face constraints that reduce the number of jobs and employers available to them, limiting the number of competitors for their

17

labor. Poultry processing plant workers also share common attributes that they bring with them to their jobs and develop common skills when performing these jobs. As a result of these poultry processing plant workers' common constraints, attributes, and skills, poultry processors are distinguishable from other kinds of employers from the perspective of poultry processing plant workers.

61.   <u>Common constraints facing poultry processing plant workers</u>: Many poultry processing plant workers face constraints in finding employment that greatly restrict their job options. For these workers, poultry processing plants offer opportunities that are not available in other industries. Workers who cannot speak, read, or write English or Spanish, for example, can still perform poultry processing plant line work, which is primarily physical labor and done under conditions so loud as to make speaking and hearing difficult. Similarly, workers with criminal records, probation status, or lack of high school or college education are often able to work at poultry processing plants even when other jobs are not available to them. These workers distinguish poultry processors, whose doors remain open to them, from employers in other industries, in which jobs are not available to them.

62.   In addition, many poultry processing plants are located in rural areas, in which workers often have fewer job alternatives—especially for full-time, year-round work—as compared to workers in other areas.

63.   Poultry processing workers' inability to access jobs in many, and sometimes any, other industries that would provide them with steady and year-round work is evidenced by the conditions these workers tolerate.

64.   <u>Common attributes of poultry processing plant jobs</u>: As discussed above, poultry processing plant workers must be able to tolerate particularly challenging working conditions.

An employer that requires a particular trait in its employees will generally recruit and retain workers with that trait by offering compensation or other inducements that are more attractive than those offered to these workers by employers that do not value that trait. This makes such an employer distinguishable and more appealing to such employees, who have that trait. The physical stamina and other attributes required for poultry processing plant work mean that poultry processors will compensate or otherwise reward workers who possess those attributes more highly than employers in other industries. From the perspective of the prospective poultry processing plant worker, poultry processing plant jobs are distinguishable from and likely more valuable than other lower-paid work that does not value and reward such attributes. In other words, other jobs are not reasonable substitutes for poultry processing plant jobs.

65.     Common skills of poultry processing plant workers: Poultry processing plant workers develop special skills on the job. Workers learn these skills through the repetitive and, at times, difficult or dangerous tasks they perform on the poultry processing line. Poultry processing plant workers learn how to handle and slaughter live birds, wield knives and blades, section poultry carcasses, clean meat in a manner consistent with health and safety standards, manage other workers performing these tasks, examine and repair the necessary machinery, maintain health and safety standards, and, crucially, perform these tasks efficiently so as not to slow down the plant line. Workers in management or other less physically demanding jobs also build industry-specific skills, including expertise in effective plant management and retention of employees. Just as with the common attributes of poultry processing plant workers who take plant jobs, the common skills of workers who stay and learn plant jobs help to define the relevant labor market. Not all potential workers can develop these important skills, and many fail out of poultry processing plant jobs within weeks. A worker with the skills to succeed on the line is

most valuable to other poultry processing plants—and thus will receive the most compensation from poultry processors. Thus, from the workers' perspective, poultry processing plants are not reasonable substitutes for other employers.

**b.      Competition for Poultry Processing Plant Workers**

66.      The Processor Conspirators, which compete to hire and retain poultry processing plant workers, control more than 90 percent of poultry processing plant jobs nationwide. In some local areas, they control more than 80 percent of these jobs.

67.      These poultry processors use similar facilities, materials, tools, methods, and vertically-integrated processes to produce processed poultry and downstream products in which they compete for sales to similar sets of customers. They also compete with each other for processing plant workers.

68.      Poultry processors recruit workers in many different ways. They advertise for workers, use recruitment agencies, and rely on word of mouth or personal connections, sometimes offering referral bonuses, to attract friends or family of existing workers to come to their plants. The processors recruit workers in their plants' local areas but also more broadly. For example, poultry processors sometimes target workers in other states and even internationally.

**c.      Setting and Adjusting Plant Worker Compensation**

69.      Poultry processors compensate hourly and salaried plant workers through wages and benefits.

70.      Hourly poultry processing plant workers' wages typically consist of a base pay rate set according to their role, with upward adjustments or bonuses offered based on factors including seniority, skill, productivity, and shift time. Salaried poultry processing plant workers' wages typically consist of annual salaries and may include annual or performance bonuses.

71.     Processing plants also typically offer benefits to their hourly and salaried workers. These benefits can include personal leave, sick leave, health and medical insurance, other types of insurance, and retirement plans or pensions, among others.

72.     Poultry processors also control working conditions within their plants, which can affect a poultry processing plant worker's job experience. These conditions include the quality of mechanical and safety equipment at the plant, temperature, and the speed at which the plant line moves, which determines the speed at which the workers have to perform their work.

73.     Poultry processors typically make certain compensation-related decisions at the corporate level, which affect their workers nationwide. For example, poultry processors generally set overall labor compensation budgets, some plant worker wages, and some plant worker benefits in a centralized manner and at the national level. To illustrate, an executive at a poultry processor who manages compensation for the entire company may determine the health benefits for all of the line workers at all of the company's plants.

74.     Poultry processors also typically adjust some wages and benefits at the corporate level, but for a regional or local area, on the basis of local factors. For example, an executive managing compensation for an entire poultry processing company may consider a particular plant's needs and the pay at other nearby plants when deciding the base rate per hour for shoulder cutters on the plant line. As a result, shoulder cutters across all of the processor's plants may receive different base rates.

**B.      Defendants' Conspiracy to Collaborate on Compensation Decisions, Share Compensation Information, and Use Consultants to Facilitate Their Conspiracy**

75.     The Processor Conspirators, facilitated by the Consultant Defendants and Consultant Co-Conspirator 1, collaborated on compensation decisions, including by exchanging competitively sensitive information about plant worker compensation. The exchange of such

compensation information, much of it current or future, disaggregated, or identifiable in nature, allowed the poultry processors to discuss the wages and benefits they paid their poultry processing plant workers. This section of the Complaint first describes the nature of their conspiracy in broad terms and then details some specific examples of the conspirators' collaboration and exchanges of information.

76.     The Processor Conspirators collaborated with and sought assistance from each other when making decisions about wages and benefits for their poultry processing plant workers. These decisions should have been made independently. As a result, rather than competing for workers through better wages or benefits, the Processor Conspirators helped each other make compensation decisions.

77.     The compensation information that poultry processors exchanged included information for both hourly and salaried plant jobs. Through the exchanges, a poultry processor could learn its competitors' base wage rates for a host of different poultry processing plant jobs, from live hangers to shoulder cutters to plant mechanics.

78.     Through emails, surveys, data compilations, and meetings, the Processor Conspirators assembled a "map" of poultry processing plant worker compensation across the country. This "map" was broad enough to show nationwide budgets and granular enough to show compensation at individual poultry processing plants. The exchanges allowed the poultry processors to learn not only the current state of compensation in their industry but also, in some cases, plans for the next year's compensation. The poultry processors exchanged information about nationwide, regional, and local wages and benefits.

79.     As one example, in December 2009, Processor Co-Conspirator 18's Director of HR emailed Processor Co-Conspirator 14's Compensation Manager seeking a chart of

information about Processor Co-Conspirator 14's current start rates and base rates for certain workers at specific Processor Co-Conspirator 14 plants in Maryland, Delaware, Virginia, North Carolina, South Carolina, Tennessee, Kentucky, and Alabama. Processor Co-Conspirator 18's Director of HR also asked Processor Co-Conspirator 14's Compensation Manager, "if you have negotiated, scheduled increases please list, or if it is a non-union facility and they have an annual increase just tell me that and what month." In the Processor Co-Conspirator 18 employee's own words, the purpose of this request, and the survey Processor Co-Conspirator 18 was building at the time (the Chicken Industry Wage Index, discussed below), was "to use the data to set wage rates and use when negotiating with the Union. . . . I am interested in sharing this information with you. . . . *I am hoping we can develop a collaborative working relationship*. I appreciate you taking the time to speak to me today and supplying this information to me" (emphasis added). Processor Co-Conspirator 14 responded, "See completed information below," filling out the chart as its competitor and collaborator Processor Co-Conspirator 18 requested.

80.     The conspiracy reduced incentives for the Processor Conspirators to bid up salaries to attract experienced workers or retain workers that might have left for other processing plants. The detailed knowledge of their competitors' current and future compensation gave each Processor Conspirator a path to paying its own poultry processing plant workers less than it would have absent the on-demand access they possessed to current and future, disaggregated, and identifiable information about its competitors.

81.     The Processor Conspirators took pains to keep their collaboration secret, and they controlled which processors could participate in their information exchanges.

82.     The conspiracy brought together rival poultry processors that competed with each other for workers. In a functioning labor market, the Processor Conspirators would have *avoided*

sharing such confidential compensation information. Thus, their agreement distorted the

mechanism of competition between poultry processors for poultry processing plant workers. This

competitive distortion resulted in compensation that was not determined competitively but rather

was suppressed—less than what workers would have been paid but for the anticompetitive

conduct.

83.     Unlike the Processor Conspirators, many of which are large, sophisticated

corporate entities, the poultry processing plant workers lacked access to a comparable "map" of

poultry processing plant compensation. To understand the wages they could earn, whether at

plants in their local region or far across the country, workers had to rely on word-of-mouth or

their own time- and labor-intensive research. These workers suffered from deep information

asymmetries as a result of the Processor Conspirators' and Consultant Defendants'

anticompetitive conduct.

**1.      WMS Poultry Industry Survey Group**

84.     From at least 2000 to 2020, a group of poultry processors, including all Processor

Conspirators, agreed to participate in an exchange of compensation information facilitated by

Defendant WMS (the "WMS Survey Group").

85.     Through the WMS Survey Group, all of the Processor Conspirators exchanged

current and future, disaggregated, and identifiable information about their plant workers' wages

and benefits. They also met annually in person to discuss these exchanges. At these meetings, the

Processor Defendants shared additional compensation information and collaborated on

compensation decisions.

a.   **WMS Survey Group History, Rules, and Control by Processor Conspirators**

86.   Before 2000 and potentially as early as the 1980s, many of the Processor Conspirators, including Defendants Cargill, Sanderson, and Wayne, as well as Processor Co-Conspirators 6, 7, 14, 15, 17, and 18, participated in a group similar to the WMS Survey Group, but in which they directly exchanged compensation data with each other without the participation of WMS.

87.   Beginning in 2000, the Processor Conspirators hired WMS and Defendant Jonathan Meng to provide a veneer of legitimacy for their collaboration and information exchange.

88.   Meng believed that in hiring him and WMS, the Processor Conspirators were not trying to comply with the antitrust laws, but instead were trying "to establish the *appearance* of compliance with the Safe Harbor guidelines and antitrust law and obtain compensation data in a matter that sometimes *seemed* permissible." By "Safe Harbor," Meng was referring to guidance antitrust authorities have provided about how companies can reduce the likelihood that an exchange of information between competitors is unlawful. Although this guidance does not immunize any competitor information exchange from the antitrust laws (and has never done so), the Defendants and Co-Conspirators were sharing the type of information that the guidance specifically identified as likely to violate the antitrust laws.

89.   While Defendant WMS began administering the survey in 2000—issuing the survey forms, receiving responses from the participants, distributing the results, and presenting them in person every year at their annual meeting—the Processor Conspirators together controlled the categories of compensation information included in the survey and the requirements for group membership. The processors made these decisions through the WMS

Survey Group's Steering Committee, on which Processor Co-Conspirators 6, 7, 14, 15, and 18 sat on a rotating basis from 2000 through 2020. The Steering Committee, along with the other WMS Survey Group participants, including Defendants Cargill, Sanderson, and Wayne and Processor Co-Conspirators 3, 8, 17, voted on potential new members in the WMS Survey Group. Thus, while WMS facilitated this scheme, including by collecting the information and tabulating the results, the Processor Conspirators themselves decided to collaborate on compensation decisions and exchange anticompetitive compensation information.

90.     Processor Co-Conspirator 5's successful attempt to join the WMS Survey Group in October 2014 highlights the group's membership standards and what motivated poultry processors from across the country to join. Processor Co-Conspirator 5's representative emailed Defendant WMS and Processor Co-Conspirators 6, 7, and 18, explaining, "I was recently told of a committee/group that had gotten together in the past to talk about compensation in the poultry industry. I know we deal with a slightly different bird here at [Processor Co-Conspirator 5] than [Processor Co-Conspirator 6] and probably the majority in your group, but I would be interested in participating in that group if you think it would be appropriate. . . . If you're open to Midwestern Turkey company participating in this . . . I'd love to be considered." An executive from Processor Co-Conspirator 6 responded, volunteering to send the request to the Steering Committee and noting that participants in the survey "need[ ] to meet certain requirements that indicate you fit into the data study (ex. Number of plants, etc…)." After some discussion among Defendant WMS and Processor Co-Conspirators 6, 7, 14, and 18, an executive from Processor Co-Conspirator 7 noted, "Traditionally, if they meet the size criteria and there are no 'naysayers' from the existing party, they get the welcome handshake, no?"

91.     In contrast, Meng detailed what occurred when, in 2014, some of the WMS participants considered including "red meat processing complexes" in the survey: the "processors ultimately rejected that possibility." Meng stated in a sworn declaration to this Court, "The reason why those processors declined to include the red meat processors in the [WMS Survey Group] is because the poultry processing labor market is distinct from the red meat processing labor market. Several of those processors told me this, and it is also evident to me from my own review of the markets."[5]

92.     Members of the WMS Survey Group were required to attend each annual in-person meeting as a condition of participating in the compensation collaboration and information-exchange group. If a poultry processor did not attend regularly, it could be kicked out. As an executive for Processor Co-Conspirator 7 explained, "Normally, any company that doesn't participate in the survey *and* attend for 2 consecutive years is removed from participation." This policy demonstrates that the opportunity to collaborate in person was an important feature of the WMS Survey Group.

### b.     Compensation Data Exchanged Through WMS Survey Group

93.     Attendees at the annual WMS Survey Group in-person meeting brought their current and future, disaggregated, and identifiable compensation data with them. The attendees then discussed that information confidentially. As one 2009 communication from Processor Co-Conspirator 6 to Defendants Cargill, Sanderson, Wayne, Processor Co-Conspirators 1, 4, 7, 8, 15, and 18, and Former Processor Co-Conspirator 2 put it: "Hope all are planning to be there for the meeting. Just a reminder to bring you Data manual in case others have questions for you

---

[5] Meng filed his declaration before this Court on February 4, 2022 as ECF No. 580-4 in *Jien v. Perdue Farms, Inc.*, 19-cv-2521 (D. Md.).

concerning your data. Please be prepared to discuss survey issues, questions, and details with WMS. We will also be sharing information in a round table discussion. *These discussions are expected to be kept confidential*" (emphasis added). As Meng explained, "In earlier years, the attendees typically brought this data to the roundtable sessions in hard-copy form using large binders. In later years, the attendees brought their laptop computers, which contained all the compensation data in electronic form."

94.     Through the WMS Survey Group, the Processor Defendants, facilitated by Defendant WMS, exchanged current and future, disaggregated, and identifiable data about their poultry processing plant worker compensation on an annual basis. The Processor Defendants gave each other accurate, detailed, and confidential information: as Processor Co-Conspirator 8 put it, "The information obtained through participation can't be overstated."

95.     Through a single annual WMS survey or potentially a single in-person meeting, a processor could understand trends in poultry processing plant worker compensation nationwide. This information was especially important to processors competing for workers willing to move, even internationally, for plant work. But the Processor Conspirators also could compare notes on plant compensation in a particular local area to understand, for example, how one processor's base wage rate for line workers in a particular county compared to a nearby competitor's.

96.     As detailed below, over many years, the poultry processors in the WMS Survey Group used the surveys and in-person meetings to compare planned future raises or changes in plant worker compensation. WMS's Meng explained that "members of the [WMS Survey Group] said they wanted to know how much and when their competitors were planning to increase salaries and salary ranges." Comparing processors' compensation projections from the past year against their actual compensation levels in the current year revealed whether the

Processor Conspirators had held to the prior year's projections, making any deviations from prior exchanged information easily detectible. This ability to check the information shared across time encouraged the participants to submit accurate information, because deviations between projected and actual compensation levels would be apparent. The Processor Conspirators' sharing of future compensation plans could also have disincentivized them from making real-time compensation changes to better compete against each other, maintaining wages at their projected levels and suppressing wages that might otherwise have risen through natural, dynamic competition.

97.     From 2005 through 2017, the WMS survey showed future data, such as the median and average future salary merit increase for each company involved in the survey. From 2006 through 2019, the surveys included an additional column that allowed for easy comparison between the actual current year's percentage changes and the changes that had been projected in the previous year's survey. This enabled the survey participants to monitor whether their competitors adhered to the previous year's forecasts.

98.     The Processor Conspirators discussed other compensation information during their face-to-face meetings. A 2015 email from Processor Co-Conspirator 18 to fellow WMS Steering Committee members and Processor Co-Conspirators 6, 7, and 14, stated, "As you know the survey results do not provide hourly production projected budgets"—i.e., future compensation information for hourly production line workers—"and this is typically a discussion during the roundtable sessions." Even more explicit is an internal Processor Co-Conspirator 18 email from 2005, in which one executive explained to another, "The survey results will be shared at the meeting and we can get the 10th percentile and the other company's avg minimum of the range. I believe there are other poultry companies paying below our lowest salary. Although it

29

won't be published in the survey results [the Processor Co-Conspirator 18 meeting participant]

can also informally ask what minimum starting rates are." Again, this email exchange

demonstrates that the opportunity to collaborate with their competitors in person was a key

feature of the WMS Survey Group.

99.     Meng's presentations at the WMS in-person meetings also featured current

compensation information. For example, he explained in his sworn declaration, "Specifically,

those PowerPoint presentations focused on how the compensation data reported in the current

year for both salaried and hourly-paid workers compared to the prior year or two years."

100.    Further, Meng stated that at the in-person WMS meetings, "the private roundtable

sessions that excluded me involved discussions between members of the [Processor

Conspirators] regarding their compensation practices. Those discussions addressed, among other

issues, the results of the [WMS surveys], the compensation data that particular individual

processors had reported to the Survey, and plans for future compensation rates for salaried and

hourly-paid workers."

101.    The Group's 2009 "Operating Standards" provided that each participating poultry

processor must "[a]gree and ensure that shared survey data or other information from discussions

will be used and treated in a 'confidential' manner and definitely should not be shared with

companies not participating in the survey. Failure to meet these requirements will result in

immediate removal from the survey group." This condition for joining the WMS Survey Group

shows that the participants considered the information exchanged to be nonpublic and restricted

to survey participants.

102.    Meng willingly participated in the processors' violation of antitrust law. To help

create a false veneer of compliance with the antitrust laws, Meng would occasionally make

statements that WMS's product "complied with legal requirements." In August 2012, when the

Steering Committee decided to make a change to the survey to distribute disaggregated and

identifiable data regarding hourly workers, Meng raised a concern that this would not comply

with antitrust agency guidance on information exchanges. Rather than forego exchanging this

information, the Processor Conspirators on the Steering Committee asked that Meng not mention

his concern to the other processors: "what about just letting them respond as to any concerns as

opposed to calling it out?"

      **c.**      **WMS Survey Group Exchanges by Year, Defendant, and Type of Information Exchanged in Surveys and In-Person Meetings**

103.    The following chart lists the Processor Defendants that participated in the WMS

Survey Group by year.

| PROCESSOR DEFENDANTS' WMS SURVEY GROUP PARTICIPATION BY YEAR | |
| --- | --- |
| 2000 – 2011 | Cargill, Sanderson, and Wayne |
| 2012 – 2019 | Cargill and Wayne |

104.    In the remainder of this section, allegations about events or conduct in each year

of the WMS Survey Group apply to all of the Processor Defendants participating in the WMS

Survey Group for that year, except where otherwise noted.

105.    From at least 2000 through 2019, the members of the WMS Survey Group

submitted their confidential compensation data to the WMS-run survey and received survey

results containing their competitors' confidential compensation data. The types of data gathered

and shared changed during the WMS Survey Group's over-20-year existence. In the following

years, the WMS survey solicited, and the WMS survey results included:

a. <u>2000</u>: Confidential information about wages, salaries, benefits, and bonuses related to "dozens of positions at poultry complexes," including plants, hatcheries, and feed mills;

b. <u>2001 – 2004</u>: Current and future, disaggregated, and identifiable salary and benefits information, as well as current, disaggregated, and identifiable hourly wage information, including "what each member of the [WMS Survey Group] paid, on average, in hourly wages to poultry processing workers at each of their processing plants." The information was identifiable because the WMS survey included what was "in effect, a key for identifying the identity of each poultry processor";

c. <u>2005 – 2012</u>: Future salary information, including the dates and ranges of planned raises in salary by position, confidential information about hourly wages, and current and disaggregated benefits information;

d. <u>2013 – 2016</u>: Future salary information, including the dates and ranges of planned raises in salary by position; current, disaggregated, and identifiable hourly wage information, which enabled participants to determine specific competitors' current hourly compensation by plant; and current and disaggregated benefits information;

e. <u>2017</u>: Future salary information, including the dates and ranges of planned raises in salary by position, confidential information about hourly wages, and current and disaggregated benefits information; and

f. <u>2018 – 2019</u>: Confidential compensation information.

106. As discussed above, from 2001 through 2019, the members of the WMS Survey Group met in person annually to discuss poultry processing plant compensation. All participants were instructed by the Steering Committee to bring their individual compensation data with them

to these meetings. From 2001 through 2017, the members of the WMS Survey Group held roundtable discussions about compensation practices from which they excluded any third parties, including Meng. In 2018 and 2019, Meng attended all sessions of the in-person meeting.

107.    At these in-person WMS Survey Group meetings, the members of the WMS Survey Group collaborated on, assisted each other with, and exchanged current and future, disaggregated, and identifiable information about compensation for poultry processing workers, as described below:

a.      2007: An "agenda and group discussion topics" list for the 2007 WMS Survey Group meeting states "Are Smoking Cessation Programs included in your Health benefits? If not, do you have plans to implement? If currently included, please share your schedule of benefits."

b.      2008: Later correspondence between WMS Survey Group Members states that at the 2008 WMS Survey Group meeting, "we discussed companies that are now charging higher insurance premiums for smokers."

c.      2011: In 2012, Meng emailed the WMS Survey Group members about notes they had taken at the prior year's in-person meeting, warning them that the notes disclosed details that put the processors at risk of having violated the antitrust laws. Meng wrote to the processors, "you reference certain positions not included in the survey where 'we will all agree to contact each other for general position.' That comment and action goes against the Safe Harbor Guidelines." Thus, it appears that during the 2011 meeting, the Defendants present directly shared information that violated the antitrust laws.

d.      2015: At the 2015 WMS Survey Group meeting, the participants discussed "whether to distribute disaggregated, raw, plant-level data concerning hourly-paid workers"

33

through the WMS survey and that "all members of the [WMS Survey Group] in attendance at the Meeting agreed to the continued distribution of such data." Notes taken at the 2015 WMS Survey Group roundtable meeting by Processor Co-Conspirator 18 record what each participant shared with the group in columns next to each processor's name. These notes suggest the processors openly and directly shared with each other a wide range of detailed, non-anonymous, and current- or future compensation information, with a special focus on their rates of overtime pay (i.e., pay for the 6th and 7th days of the week):[6]

  i.    Processor Co-Conspirator 3's column notes, "6th and 7th day pay $150 flat rate"; "Compress scales over 1 yr rate to start rate. Startign in Feb 2015";

  ii.   Processor Co-Conspirator 6's column notes, "Added seniority pay instead of doing an hourly increase. . . . Rolls w/ vacation, up to 6% increase. It is a seniority premium";

  iii.  Processor Co-Conspirator 8's column notes, "Staffing plants is a big issue down 290 positions at springdale locations. $500 signing bonus $300 first 30 days $200 30 days";

  iv.   Processor Co-Conspirator 14's column notes, "NO 6th and 7th incentive";

  v.    Processor Co-Conspirator 15's column notes, "HOurly bonus program 17K employees";

  vi.   Processor Co-Conspirator 17's column notes, "6th and 7th day pay for weekly paid frequency $150 or comp day";

---

[6] As described above, all spelling and grammatical errors in documents quoted in this Complaint are *sic*.

vii.     Defendant Wayne's column notes, "$200 6th / $300 7th; some facilities if you work in 6 hours you get the full day based base pay";

viii.     Processor Co-Conspirator 2's column notes, "$1.00 Attendnance bonus up from $0.25 . . . . Shoulder can earn up to $150 week. . . Benefits – Taking a harder look at their package"

ix.     Processor Co-Conspirator 9's column—in its sole year of participation in the WMS Survey Group—notes, "6th / 7th day up to 6 hours, get ½ for 4 hours half day";

x.     The column for Processor Co-Conspirator 18b (now owned by Processor Co-Conspirator 18) notes, "200 6th 275 7th day."

xi.     Processor Co-Conspirator 10's column notes, "$1.00 Attendance bonus up from $0.25 / Negotiated contract $55. 30. .30 3 Yr. / . . . . Supervisor offering 5000 – 8000";

xii.     The column for Former Processor Co-Conspirator 3, now owned by Processor Co-Conspirator 16, notes, "Line Team Members want more money; based on survey we are in the middle" and "No Weekend Pay. But will be looking"; and

xiii.     Processor Co-Conspirator 13's column notes, "Currently does not have Weekend Pay for Supervisors."

e.     2017: The 2017 WMS Survey Group meeting marked a turning point for the WMS Survey Group. That year, after the filing of a private antitrust class-action suit in the Northern District of Illinois alleging price-fixing by many participants in the downstream sale of chicken products, the processors and Meng became more concerned about antitrust risk. At least one executive from Processor Co-Conspirator 7—a Steering Committee member—traveled all

35

the way to the 2017 meeting only to learn that his employer's legal counsel had directed him not to attend the sessions. At the 2017 meeting, the Defendants and Processor Conspirators in attendance "all agreed," in the words of WMS's Jonathan Meng, "that moving forward all questions about future increases would be removed from the survey."

### 2. Direct Processor-to-Processor Collaboration and Information Exchanges

108. In addition to collaborating on setting compensation for plant workers through the WMS Survey Group, including through in-person meetings that involved direct exchanges of identifiable compensation information, the Processor Conspirators collaborated on and directly exchanged current and future, disaggregated, and identifiable information about plant workers' wages and benefits. These interactions occurred ad hoc and involved information about both local and nationwide compensation decisions.

109. That the conspirators repeatedly contacted each other to seek non-public competitive information shows the mutual understanding among these Processor Conspirators that they would collaborate with and assist each other on compensation decisions.

110. The relationships poultry processors established with their labor market competitors through groups like the WMS Survey Group created the opportunity to engage in ad hoc direct exchanges of compensation information. By exchanging large amounts of current and future, disaggregated, and identifiable data, the processors collaborated to accumulate a set of industry compensation information they could use to set their workers' wages and benefits at a nationwide level (for example, to set budgets on plant worker spending across the country) or locally (for example, to determine pay for shoulder cutters in a specific plant).

a.      Chicken Industry Wage Index ("CHIWI") Exchange

111.    The collaboration and direct exchanges among processors included a survey that was designed and run by Processor Co-Conspirator 18, the Chicken Industry Wage Index or "CHIWI." Through this survey, Defendant Wayne, along with Co-Conspirators 6, 7, 8, 14, 15, 17 and others, exchanged current and future, disaggregated, and identifiable compensation data from 2010 to 2013. The survey results were so disaggregated that they showed wages for each participant's specific processing plants. Processor Co-Conspirator 18 disclosed wages by region of the country, as defined by Consultant Co-Conspirator 1, making it easy for the processors to compare the CHIWI results with the current, disaggregated, and identifiable Consultant Co-Conspirator 1 compensation information discussed below.

112.    A Processor Co-Conspirator 18 employee described CHIWI to others inside the company in 2013, noting that it was a "survey with competing poultry companies. With this information, we feel that we are in a better position to strategically evaluate wages on a location by location level."

113.    In 2013, Processor Co-Conspirator 18 transferred the running of CHIWI, which it continued funding, to Defendant WMS. In a February 2013 letter from WMS to Processor Co-Conspirator 18 describing its planned administration of CHIWI, Meng noted "WMS will develop the survey document for your approval based upon the templates provided earlier by [Processor Co-Conspirator 18]."

114.    WMS administered the "Hourly Survey" (the renamed CHIWI) to the WMS Survey Group participants from 2013 to 2015, with all participants in the WMS Survey Group for those years submitting and receiving CHIWI-format compensation data. In 2016, WMS distributed a substantially similar survey of plant-level data for hourly workers along with its

2016 annual survey to Defendants Cargill and Wayne and Processor Co-Conspirators 1, 2, 3, 4, 5, 6, 7, 8, 10, 13, 14, 15, 17, and 18.

115.     During Defendant WMS's administration of the Hourly Survey, WMS assisted Processor Co-Conspirator 18 in identifying some of the Processor Conspirators' exchanged compensation information presented in WMS surveys. In October 2014, a Processor Co-Conspirator 18 employee emailed WMS's Jonathan Meng, asking "We need to know the number of [Processor Co-Conspirator 15] locations that participated in our last Hrly Prod Maint survey. Can you provide this as soon as you get a chance?" Another WMS employee responded to this email that same day, writing "29 locations were reported by [Processor Co-Conspirator 15]." Telling Processor Co-Conspirator 18 the number of locations of another processor's plants reported in a survey would assist Processor Co-Conspirator 18 in identifying the disaggregated survey results, which were broken out by plant. If Processor Co-Conspirator 18 knew how many plants a given processor had reported, Processor Co-Conspirator 18 could match the number of plants reported for a specific (anonymized) competing processor to crack the code and identify the processor.

116.     Processor Co-Conspirator 18 and Defendants WMS and Meng were cognizant of, and worried about, the antitrust risk posed by CHIWI. After WMS took over the administration of CHIWI, a Processor Co-Conspirator 18 employee requested that Meng remove the note "Sponsored by: [Processor Co-Conspirator 18]" in the circulated report and replace it with the title "WMS Poultry Hourly Wage Survey." Meng did not comply with this request, stating that "I did not want the Poultry Industry Survey Group to conclude that WMS approved of the format of the [Processor Co-Conspirator 18] sponsored survey." On another occasion, Meng explained to Processor Co-Conspirator 18 executives that CHIWI included clear risk factors for a potentially

anticompetitive exchange of information, noting that participating poultry processing firms were likely to be able to identify which processor operated which plant based on the details about the plants disclosed in the survey. Despite his warning, the Processor Co-Conspirator 18 executives requested that WMS proceed, and WMS willingly complied.

**b.**    **U.S. Poultry & Egg Association Member Processors' Exchanges**

117.    Some Processor Conspirators used their involvement with the U.S. Poultry & Egg Association, a nonprofit trade association for the poultry industry, to collaborate with other poultry processors on compensation decisions.

118.    In November 2016, Processor Co-Conspirator 12's Director of Human Resources emailed, among others, Defendants Sanderson and Wayne and co-conspirators including Processor Co-Conspirators 1, 3, 5, 6, 8, 10, 11, 14, and 18, noting "I understand Paul is out of the country"—likely a reference to the Director of the Association's HR and Safety Program— "so I hope you do not mind me reaching out to you directly. With the news on the new OT rule injunction, I am curious on how you plan to proceed? Wait and see or stay the course for any 12/1/16 plans you have already made?" This question was a reference to a court order staying a federal rule mandating a change to overtime pay. Defendant Sanderson's Human Resource Manager replied, copying all recipients, "We are in the process of implementing the new wages and I don't see that we will stop or change it," thus sharing Sanderson's future wage plans with its competitors directly.

119.    In June 2017, the Director of the Association's HR and Safety Program emailed Defendants Cargill, Sanderson, and Wayne; Processor Co-Conspirators 3, 6, 7, 8, 9, 10, 12, 14, 15, 17, and 18; Consultant Co-Conspirator 1; as well as others, the results of a survey "on pay ranges of Live Hang employees versus General Production employees," noting that "sixteen

sites" participated. The survey questions sought the "average per hour rate that you pay," meaning the current pay rate, of both Live Hang employees and General Production employees.

120.    The U.S. Poultry & Egg Association also conducted in-person meetings between the processor competitors, similar to the WMS Survey Group. In fact, enough participants attended both in-person meetings that in September 2012, Processor Co-Conspirator 18 and Processor Co-Conspirator 7 discussed scheduling the WMS Survey Group meeting at the same location and around the same dates as the U.S. Poultry & Egg Association in-person meeting due to "the people that attend both." In December 2016, Defendant Sanderson attended the U.S. Poultry & Egg Association meeting, four years after Sanderson's departure from the WMS Survey Group.

### c.    Processor Conspirators' Ad Hoc Direct Exchanges

121.    The Processor Defendants also collaborated to exchange and discuss confidential compensation information directly in an ad hoc fashion. These direct exchanges were often between two or three competitors. Some processor-to-processor communications were between senior employees in processors' corporate offices and concerned nationwide compensation. Others were between processor employees at the local plant level, such as exchanges between competing plant managers that were then reported to processor executives at the national level.

122.    In January 2009, an employee of Processor Co-Conspirator 14 emailed Defendants Cargill, Sanderson, and Wayne and Processor Co-Conspirators 6, 7, 8, 15, and 18, asking, "I am curious to find out if anyone has (or is in discussions) about postponing plant or merit increases." In addition, in the same email, she noted, "I know there has been some previous dialogue about plant and merit increases."

123.    In September 2013, an employee of Defendant Cargill sent Processor Co-Conspirator 18 her company's internal medical leave policy, which included a detailed description of benefits.

124.    In January 2015, an employee of co-conspirator Processor Co-Conspirator 8 emailed his supervisors to tell them he had spoken with the HR Manager of a particular Processor Co-Conspirator 18 plant, who told him that "[t]he $13.90 starting pay is for Breast Debone at their Green Forrest facility. The $13.90 is available once they qualify and then they are eligible for incentive pay on top of that. So in fact an experienced Shoulder Cutter could go there and get a $13.90 starting pay rate. He said that the normal starting rate was $10.50 per hour with $0.40 extra of 2nd shift and $0.45 extra for 3rd shift." This Processor Co-Conspirator 8 employee then mentioned he would contact HR managers at another Processor Co-Conspirator 18 plant, as well as a plant owned by Processor Co-Conspirator 17.

   **3.    Exchange of Compensation Information Through Consultant Co-Conspirator 1**

125.    From at least 2010 to the present, the Processor Defendants also used another data consultant, Consultant Co-Conspirator 1, to collaborate with each other on compensation decisions through the exchange of current, disaggregated, and identifiable information about their poultry processing plant workers' wages and benefits, artificially and anticompetitively suppressing this compensation.

126.    Consultant Co-Conspirator 1 gathers data from companies and distributes it to paying customers. Consultant Co-Conspirator 1 does not sell this data to the public; its reports are only available to its subscribers.

127.    Publicly available information dating from both 2011 and 2020 shows Consultant Co-Conspirator 1 gathered data from over 95 percent of U.S. poultry processors, including all of

the Processor Conspirators. Consultant Co-Conspirator 1 also admitted in *Jien* (19-cv-2521) that its subscribers have included all of the Processor Conspirators. Thus, it is likely that all Processor Defendants exchanged compensation information through Consultant Co-Conspirator 1 from at least 2010 to present.

128.    The data Consultant Co-Conspirator 1 gathers and sells is current, disaggregated, and identifiable. Consultant Co-Conspirator 1 claims that it can minimize those risks to make this data "safer" to distribute by anonymizing the companies and processing plants for which it reports specific wages and salaries per job role. Although the plants reported in Consultant Co-Conspirator 1's data reports are not identified by name, they are grouped by region, and the list of all participants in the region is provided. Accordingly, the number of employees and other data provided per plant makes this data identifiable to other processors.

129.    Processors are thus likely able to use Consultant Co-Conspirator 1's data reports to identify the wage and salary rates, as well as benefits, that each of their competitors is currently setting for each of its plants.

130.    In addition to permitting competing poultry processors to collaborate on their wages and benefits at the individual plant level, Consultant Co-Conspirator 1's data reports also provide a means for processors to monitor whether their collaborators are following through on the compensation decisions they reported through the WMS Survey Group and the ad hoc compensation exchanges.

### 4.    Processors' Collaboration and Assistance on Compensation

131.    In a patchwork of different combinations, through different methods, and with respect to different types of compensation information, the Processor Defendants built a

42

pervasive conspiracy across the poultry processing industry to collaborate on, and not merely exchange, poultry processing plant worker wages and benefits information.

132.     As described above, many of the Processor Conspirators, including Defendants Cargill, Sanderson, and Wayne, as well as Processor Co-Conspirators 6, 7, 14, 15, 17, and 18, began exchanging compensation information directly, without involvement from WMS, as long ago as the 1980s. One employee of Processor Co-Conspirator 6 told WMS's Jonathan Meng that "executives from each of those poultry processors would meet in a private room and bring enough copies of their salary and wage data to distribute to all the other attendees," and "the attendees would then exchange and discuss their compensation schedules." According to one participant, these pre-2000 exchanges included an understanding between participants that they would not use the information they exchanged about each other's salaried compensation to attempt to hire away each other's salaried employees. This early conspiracy to collaborate helped foster the mutual understanding in which processors agreed to collaborate on, rather than compete over, poultry processing plant worker compensation.

133.     In December 2008, for example, an executive at Processor Co-Conspirator 4 emailed Defendants Cargill, Sanderson, and Wayne and Processor Co-Conspirators 6, 7, 8, and 14, seeking details of each competitor's dental plan benefits, which her company was "currently reviewing." The Processor Co-Conspirator 4 executive made clear that her company would use the information provided by its competitors to shape its own compensation decisions, explaining that "[y]our responses to the questions below would greatly help us ensure we stay competitive within the industry." The questions she included related to eligibility for coverage, services included in the plan, "annual deductible," and "annual max per person."

43

134.    In September 2009, an executive at Defendant Wayne emailed Defendants Cargill, and Sanderson and Processor Co-Conspirators 6, 7, 8, 14, 15, and 18 informing them that "[i]t's that time of year already" because Wayne was "working on 2010 budget increase recommendations." The executive then asked Wayne's competitors to send future, disaggregated, directly-exchanged (and thus identifiable) compensation information: "What is your companies projected salary budget increase recommendation for 2010?" Later in this email chain to the same group, the Wayne executive noted that her colleague's "sanity is depending on your response. Seriously -any info you can give us will be helpful, we appreciate your help." Processor Co-Conspirator 14 and Processor Co-Conspirator 8 both responded to this email chain with their competitors and directly disclosed a projected (future) recommendation to increase their budgets for salaries by three percent.

135.    In July 2015, an executive for Processor Co-Conspirator 14 emailed her peers at Defendant Sanderson and Processor Co-Conspirator 18, explaining that Processor Co-Conspirator 14 was "in the midst of completely revamping our Plant Management Trainee program." Her email continued, "and I was wondering if you would be willing to share with me . . . what your starting rate is for these kids hired right out of college?" The Processor Co-Conspirator 14 employee sought current, disaggregated, and identifiable wage information from her competitors for the explicit purpose of assisting Processor Co-Conspirator 14 to make its own wage decisions for this cohort. Her peer at Sanderson responded the very next day to both Processor Co-Conspirator 14 and Processor Co-Conspirator 18, disclosing, among other information, that Sanderson's Beginning Trainee Program paid "from 36,000 to 38,000, no signing bonuses" and that Sanderson's Advance Trainee program paid "from $48,000 to $87,000, no signing bonuses."

44

136.     In February 2016, the Director of Compensation at Processor Co-Conspirator 4 emailed Defendants Cargill and Wayne, as well as Processor Co-Conspirators 3, 6, 7, 8, 14, 15, 17, and 18. She thanked a Wayne employee and noted, "that reminded me that I had a question for the group also. We are trying to determine what is reasonable for salaried employee to be compensated for working 6 and/or 7 days in a work week when the plant is running." The questions she asked included "Do you pay extra for these extra days worked for salaried (exempt) employees?" and "If so, how is that calculated?" The statement that Processor Co-Conspirator 4 was in the midst of "trying to determine" overtime pay decisions, and wanted to know what its competitors did in the same circumstances, likely made clear to the recipients that Processor Co-Conspirator 4 planned to use the information it gathered in its own decision-making. An employee from Processor Co-Conspirator 10 responded to all recipients, noting, "We pay 1/5 of the weekly salary for the sixty and seventh days if working due to production. This includes supervisors and managers below the plant manager level and all are paid the same. If the day off is compensated by a paid benefit, other than sick time, we pay the sixth and seventh days. Sanitation and maintenance only get paid for the seventh day worked."

137.     In September 2016, an executive from Processor Co-Conspirator 7 sought future compensation information from Defendants Cargill and Wayne and Processor Co-Conspirators 3, 6, 8, 14, 15, 17, and 18 related to a new Fair Labor Standards Act salary threshold for exempt status, a federal requirement determining to which workers the processors would have to pay overtime wages based on salary. The Processor Co-Conspirator 7 executive asked his competitors to fill out a directly-exchanged survey form to indicate how they would change compensation plans for all employees and, more specifically, for first-line supervisor roles. Within a week, Defendant Cargill and Processor Co-Conspirators 6, 8, 15, and 17 responded by

45

sharing their future compensation plans, which the Processor Co-Conspirator 7 executive passed on (labeled by processor) to the entire group, reflecting, "If more respond, I'll republish, but the target grouping pattern already appears pretty tight." The chart attached to the executive's email showed that eight of the ten processors selected "most employees are receiving base salary increases to bring them to the threshold salary," thus ending the processors' obligation to provide these workers with overtime pay, and "a smaller number will not receive a base increase but will receive overtime." Similarly, eight of the ten respondents selected, as to the first-line supervisors, "are either above the salary threshold or will receive a base salary increase to the threshold."

138.    The Processor Defendants' collaboration also involved forms of compensation other than wages. In January 2010, an executive for Processor Co-Conspirator 18 wrote to Defendants Cargill, Sanderson, Wayne, and WMS and Processor Co-Conspirators 6, 7, 8, 15, and 17 for help because Processor Co-Conspirator 18 was "considering a change to convert" some of its plant worker jobs to a category that would provide them with fewer benefits: "Production workers on the line do not get quite the same as our technical support jobs, nurses and clerical. The difference is 5 days daily sick pay, better vacation schedule, higher short-term disability pay and the ability to use our flexible (pre-tax) benefits saving plan." Processor Co-Conspirator 18 noted that a "prompt response would be much appreciated" from its competitors about whether "any of you have a difference in benefits between" these two job categories, to assist it in making this decision. Processor Co-Conspirator 7 responded to Processor Co-Conspirator 18's question, stating it did not.

139.    A 2015 email exchange between Processor Co-Conspirators 8 and 18 provides detail on how the competitors may have viewed their relationships with each other as collaborators. On October 6, 2015, Processor Co-Conspirator 18 received an email from a

Processor Co-Conspirator 8 executive asking, "Would you mind sending me your current Health Insurance Rates? Also do you plan on raising them in 2016? Thanks you so much for your help." Processor Co-Conspirator 18 then discussed this request internally, noting, "We don't count on them [Processor Co-Conspirator 8] for much so we don't owe them anything from our side." This view of the request for future and directly exchanged compensation information as part of a quid pro quo calculation—that to get the helpful information, you have to give the helpful information—helps explain why the competing processors were so willing to share compensation information when their competitors asked for it.

140.    In designing the WMS survey, the WMS Survey Group participants collaborated to ensure the exchanged data included the type of disaggregated compensation information that antitrust agencies warned against as a risk factor for identifying information exchanges not designed in accordance with the antitrust laws. For example, in 2012, the Steering Committee, which then included Processor Co-Conspirators 6, 7, 14, 15, and 18, decided to distribute disaggregated and identifiable data regarding hourly plant workers. WMS's Jonathan Meng warned the Steering Committee that distributing this data would violate the guidance and proposed ways of presenting the data that would make it less identifiable. Processor Co-Conspirator 18, however, instructed Meng to let the WMS survey group know of the change to the survey design but not to "call out" Meng's concerns. Meng followed Processor Co-Conspirator 18's instructions and simply advised the Survey Group of the changes, stating that "The Steering Committee has requested that the hourly wage information included in the report be expanded to include the raw data for each state. . . . The steering committee needs to know if you are in agreement with the proposed changes." Meng noted that under this plan, which he asked each WMS Group Participant to agree to explicitly, he would include disaggregated,

identifiable wage data from Alabama, Arkansas, Georgia, Missouri, Mississippi, North Carolina, Tennessee, and Virginia. Later, Meng stated that "everyone is in agreement with the change except [Processor Co-Conspirator 4] and [Processor Co-Conspirator 13], who have not responded yet."

141.     The WMS Survey Group participants, competitors in the market for poultry processing plant labor, also collaborated to standardize the job categories for which they each reported compensation data, ensuring they could match each other's compensation decisions. The Processor Defendants also may have worked, with assistance from Defendant WMS, to standardize job types and categories across their different enterprises. This made a comparison between each participant's jobs easier, and thus made the information swapped about each job category's compensation more accessible for use. With respect to salaried positions, the annual survey questionnaire was intended to permit participants to match all jobs to defined job categories while indicating when the matched job was, in the view of the participant, "larger" or "smaller" than the job as described in the questionnaire. Survey results reported the percentages of respondents indicating inexact job matches. In 2012, an employee for Processor Co-Conspirator 14 employee described in an email to a Processor Co-Conspirator 18 employee the prior year's WMS Survey Group in-person meeting, at which "the discussion around the room was that some companies call this single incumbent job a Plant Safety Manager and some a Complex Safety Manager." This standardization for purposes of collaboration, enabled by WMS, made it easier for the Processor Defendants to determine and monitor consensus among themselves for compensation, enabling their conspiracy, which suppressed compensation.

5.      **Processors Recognize Their Agreement Likely Violated the Antitrust Laws and Attempt to Cover It Up**

142.    The Defendants at times expressed concern that their agreement was unlawful. Sometimes, fear of discovery or other outside events prompted them to change their views of the risk they were each engaged in. Nonetheless, they maintained secrecy throughout the conspiracy.

143.    On February 14, 2012, Defendant Sanderson's HR Manager emailed Defendants Cargill and Wayne and Processor Co-Conspirators 7, 8, 15, and 17 along with Defendant WMS, notifying them that Sanderson would be ending its relationship with the WMS Survey Group. The HR Manager stated, "On the advice of legal counsel, our Executives have decided that we can no longer participate in this type of survey." If the Defendants had not been previously aware of the legal risk involved in the WMS Survey Group exchange, this email put them on notice.

144.    Private class actions related to this conduct and other allegedly anticompetitive behavior in the poultry industry caused the members of the WMS Survey Group to change some of their behavior. As noted above, at their 2017 in-person meeting, the participating Processor Conspirators, in the words of WMS's Jonathan Meng, "all agreed that moving forward all questions about future increases would be removed from the survey. . . . It was also recommended by counsel for [Processor Co-Conspirator 7] to have an Antitrust Attorney present for the general group discussions (post survey results)."

145.    As Processor Co-Conspirator 7 described in October 2017, the Processor Conspirators would thereafter treat Meng as an "Antitrust Guidon." In military terminology, a guidon is a flag flown at the head of a unit to signify that the commander is present. An executive at Processor Co-Conspirator 8 put it more bluntly, commenting that "One thing that has changed is that the group will now have an attorney present for the full meeting to make sure no collusion and that the Safe Harbor provisions are all met and followed." Meng acknowledged

in January 2018 to an executive for Processor Co-Conspirator 17 that "I will be present at all sessions this year (which did satisfy [Processor Co-Conspirator 7's] counsel)."

146.    But Meng's presence at meetings did not ultimately quell the Processor Conspirators' fears that their conduct was unlawful. From 2017 to 2020, spooked processors began dropping out of the WMS Survey Group due to, as an employee of Processor Co-Conspirator 14 put it, "the 'big scare'" – i.e., a private class action alleging a broiler chickens price-fixing conspiracy.

147.    In response to the elimination of disaggregated data from the survey, an executive for Processor Co-Conspirator 7 complained, "how useful is the 'average rate report' now anyway? It has suffered significant obscuring of results due to aggregating, and I would ask—Is it still useful information any longer?"

148.    Processor Co-Conspirator 13 left in 2018; that year, Defendant Wayne also considered leaving, but decided to remain in the group after heavy lobbying by Meng. Processor Co-Conspirators 1, 8, and 17 left in 2019.

149.    In a 2019 email, an executive for Processor Co-Conspirator 7 noted that "[Processor Co-Conspirator 8] was skittish very early on in the anti-trust concerns, including their attorneys contacting other companies to warn about attending our conference."

150.    In July 2019, an executive from Processor Co-Conspirator 7 sent an alert to Processor Co-Conspirator 14 and WMS describing a call his colleague received "from someone representing themselves as a private investigator from New York. The caller had questions about the types of information we shared at our meeting, the survey and other questions that I will simply call 'general anti-trust fishing' questions. . . . So just a little reminder that the bad-guys are still out there, and why we hold strict confidences about discussing wages – and have Jon

[Meng] at our entire meeting." Notably, the Processor Co-Conspirator 7 executive did not say the competing processors should take care not to discuss wages, but rather take care to keep such discussions in "strict confidence."

151.    And if there were any question whom the WMS participants considered the "bad-guys," Defendant WMS's presentation for the 2019 WMS Survey Group meeting features, at the top of the presentation's first slide, a quote from Shakespeare: "The first thing we do, let's kill all the lawyers."

152.    The WMS Survey Group did not meet again after this 2019 meeting.

**C.    Defendants Sanderson's and Wayne's Deceptive Practices Toward Growers**

153.    Growers sign contracts with Sanderson and Wayne, respectively, to raise chickens. Growers often make substantial financial investments including building or upgrading their facilities. The success of those investments depends on the compensation system they receive.

154.    Under the compensation system known as the tournament system, each contract provides an average or base price that the grower receives. But the average or base price is not necessarily what the grower actually receives. The growers' compensation depends on how each grower performs relative to other growers—in particular, on their performance relative to other growers at converting the inputs to bird weight. Growers who overperform the average are paid a bonus, while those that underperform the average are penalized. Sanderson and Wayne, however, control the major inputs the grower receives, including the chicks and feed. As a result, growers cannot reasonably assess the range of expected financial outcomes, effectively manage their risks, and properly compare contracts from competing processors.

155.     Sanderson and Wayne do not adequately disclose the risk inherent in this system to the growers. Their contracts with growers omit or inadequately describe material key terms and risks that mislead, camouflage, conceal, or otherwise inhibit growers' ability to assess the financial risks and expected return on investment. For example, the grower contracts disclose neither the minimum number of placements nor the minimum stocking density that the grower is guaranteed. The contracts also lack material financial disclosures regarding poultry grower performance, including the range of that performance, and other terms relevant to the financial impact of the grower's investment.

156.     Similarly, the contracts omit material information relating to the variability of inputs that can influence grower performance, including breed, sex, breeder flock age, and health impairments, on an ongoing basis, including at input delivery and at settlement (including information to determine the fairness of the tournament). Without this information, growers are impaired in their ability to manage any differences in inputs, or evaluate whether to invest in new infrastructure, that may arise from the Sanderson's and Wayne's operation of the tournament system. This failure to disclose is deceptive and violates the Section 202(a) of the Packers and Stockyards Act, 1921, as amended and supplemented, 7 U.S.C. § 192(a). These deceptions should be enjoined.

## VI.     ELEMENTS OF THE SHERMAN ACT CLAIM

### A.     The Agreement to Collaborate on Compensation Decisions, Exchange Compensation Information, and Facilitate Such Collaboration and Exchanges

157.     As detailed above, the Processor Defendants collaborated on what should have been individual decisions about poultry processing plant worker compensation. As reflected by in-person meetings, correspondence, and the regular exchange of compensation information, the Processor Defendants and their co-conspirators had a mutual understanding that they would

contact each other for advice, discussion, and competitively-sensitive compensation information to help each other make decisions about worker compensation at the nationwide and local level. This agreement undermined the competitive process, distorted the ordinary, free-market bargaining and compensation-setting mechanisms, and suppressed competition and compensation for poultry processing plant workers.

158.    The Processor Defendants' exchanges of current and future, disaggregated, and identifiable information about poultry processing plant worker wages and benefits, through the facilitation provided by the Consultant Defendants and through direct exchanges with each other, supported this conspiracy to collaborate. However, even standing alone, these exchanges allowed each participant to more closely align its wage and benefit offerings with its competitors, harmed the competitive process, distorted the competitive mechanism, and suppressed competition and compensation for their poultry processing plant workers.

**B.      Primary Poultry Processing Plant Employment is a Relevant Labor Market**

159.    The market for primary poultry processing plant labor is a relevant antitrust labor market. If a single employer controlled all the primary poultry processing plant jobs in a geographic market, it could profitably suppress compensation (either in wages or benefits) by a small but significant and non-transitory amount. In other words, if a poultry processing employer with buyer market power (monopsony power) chose to reduce or forgo raising its workers' wages and benefits, or otherwise worsen the compensation offered to workers, too few poultry processing workers would switch to other jobs to make the employer's choice unprofitable.

160.    Labor markets are inextricably connected to the most personal choices workers make: how and where to live, work, and raise a family. In labor markets, employers compete to

purchase labor from a pool of potential and actual workers by setting wages, benefits, and working conditions.

161.    In choosing among potential employers, workers who may be different from each other – for example, who fill different types of jobs – may be similarly positioned with respect to potential employers. While hourly and salaried poultry processing jobs may attract different job applicants, poultry processing plants may constitute potential employers for those workers because of commonalities shared among hourly and salaried workers (and among workers filling different roles within those categories).

162.    To poultry processing plant workers, all of the Processor Conspirators are close competitors for their labor. From the perspective of workers, poultry processing jobs are distinguishable from, and not reasonable substitutes for, jobs in other industries. Many processing plant workers share common constraints that make poultry processing plant jobs accessible to them while other year-round, full-time jobs are not. Poultry processing plant workers also share common attributes and learn job-specific skills, which the poultry industry compensates more than other industries would. Thus, these particular employers compete to offer jobs to this pool of labor that these workers both have access to and that offer value for their common attributes in a way that other industries might not. Many of these workers are able to find work in the poultry industry but not in other industries that seek workers with different skills, experience, and attributes.

163.    Although poultry processing plants employ varied types of workers, they occupy a common labor market. All the workers were the target of a single overarching information-sharing conspiracy. All the workers have thus had their compensation information distributed without their consent by their employer to other employers who might hire them. All the workers

have developed experience, familiarity, and expertise in poultry processing plants, and all or nearly all the workers have located their households near poultry processing plants, acquired friends or colleagues in poultry plants, and have or have developed the types of personal characteristics that enable them to tolerate the harsh conditions of poultry processing plants. As a result, workers who are unsatisfied with their current employer would normally seek, or at least consider, alternative employment in the poultry processing plants owned by their employer's co-conspirators.

164.    Each of the Processor Conspirators sees poultry processing workers as sufficiently alike to find it worthwhile to place them in a common worksite, creating a cluster of jobs associated with particular market activity (poultry processing), just as grocery stores sell multiple products to customers who prefer the convenience of one-stop shopping. The common characteristics of the employees as required by the logistics of processing poultry explain why Defendants treat the employees together in the conspiracy. For these reasons, it is appropriate to consider all the workers as a common group of victims for the purpose of this action, even though the jobs in poultry processing plants differ.

165.    Both chicken processing plants and turkey processing plants compete to purchase labor in this market because the jobs they seek to fill are similar. These industries use similar facilities, materials, tools, methods, job categories, and vertically-integrated processes to produce downstream products. These industries also exhibit similar difficult working conditions.

166.    In addition, the poultry industry itself recognizes that poultry processing workers are a distinct market. The Processor Defendants' and Processor Conspirators' agreement to collaborate on compensation decisions included the exchange of information about both hourly and salaried plant jobs. The WMS Survey Group set criteria for membership that permitted both

chicken and turkey processors to participate, but not other meat processors or other employers. When one member of the WMS Survey Group proposed including processors of red meat, this idea was rejected by the group "because the poultry processing labor market is distinct from the red meat processing labor market." Informed by their knowledge and experience, the Processor Conspirators chose to include poultry processors in the WMS Survey Group and exclude other industries.

### C.    The Geographic Markets for Poultry Processing Plant Labor

167.    The relevant geographic markets for poultry processing plant labor include both local submarkets and a nationwide market.

168.    Local markets for poultry processing plant labor are relevant geographic markets. Many poultry processors adjust wages and benefits at a local level and based on local factors, meaning that a particular processor's compensation for job categories between different plants in different locations may differ. The Processor Conspirators made decisions affecting competition and competed on a local basis. Poultry processing workers reside within commuting distance from their plants.

169.    The Processor Conspirators' anticompetitive agreement to collaborate on compensation decisions included the exchange of local data through the Consultant Defendants and Consultant Co-Conspirator 1 and the direct exchange of such data with the other Defendants and co-conspirators. For example, as Processor Co-Conspirator 18 noted in describing the CHIWI survey, "With this information, we feel that we are in a better position to strategically evaluate wages on a location by location level."

170.    Employed poultry processing plant workers reside within commuting distance from the plant at which they work. In addition, many applicants to these jobs reside within

commuting distance from the plant to which they have applied, at the time they have applied.
Thus, if multiple processing plants are located within a worker's commuting boundary, those
plants are potential competitors for that worker's labor.

171.     The relevant local submarkets can be identified according to workers' willingness
and ability to commute.  The local submarkets here are those in which, according to data from
the United States Department of Agriculture, at least two Processor Conspirators compete with
each other for primary poultry processing plant workers. In these relevant local submarkets, it is
likely that the Processor Conspirators together hold market power, because they control over 80
percent, and in many local submarkets, control 100 percent, of primary poultry processing plant
jobs. A hypothetical monopsonist of poultry processing plant labor jobs in each local labor
submarket would likely be able to suppress compensation for poultry processing plant workers
by a small, but significant, amount.

172.     The local labor submarkets in which the Processor Defendants and Processor
Conspirators have suppressed competition, which suppressed poultry processing plant workers'
compensation, include:

a.      the "Eastern Shore Poultry Region": containing eleven primary poultry
processing facilities[7] in Hurlock, MD; Salisbury, MD; Princess Anne, MD; Harbeson, DE;
Millsboro, DE; Selbyville, DE; Georgetown, DE; Milford, DE; Norma, NJ; Accomac, VA; and
Temperanceville, VA, four of which are owned by Processor Co-Conspirator 14, five of which
are owned by other Processor Conspirators, and two of which are owned by other poultry
processors;

---

[7] The number of primary poultry processing facilities in the Complaint is based on data from the
United States Department of Agriculture on chicken and turkey slaughtering from 2022 and
excludes facilities designated as "Very Small."

b.      the "Central Valley Poultry Region": containing three primary poultry processing facilities in Fresno, CA and Sanger, CA, two of which are owned by Processor Co-Conspirator 7, and one of which is owned by another Processor Conspirator;

c.      the "West-Central Missouri Poultry Region": containing two primary poultry processing facilities in California, MO and Sedalia, MO, one of which is owned by Defendant Cargill, and one of which is owned by another Processor Conspirator;

d.      the "Ozark Poultry Region": containing nineteen primary poultry processing facilities in Huntsville, AR; Ozark, AR; Springdale, AR; Fort Smith, AR; Clarksville, AR; Dardanelle, AR; Green Forest, AR; Waldron, AR; Danville, AR; Carthage, MO; Cassville, MO; Southwest City, MO; Monett, MO; Noel, MO; Heavener, OK; and Jay, OK, three of which are owned by Processor Co-Conspirator 3, one of which is owned by Processor Co-Conspirator 17, one of which is owned by Defendant Wayne, one of which is owned by Defendant Cargill, twelve of which are owned by other Processor Conspirators, and one of which is owned by another poultry processor;

e.      the "Ouachita Poultry Region": containing five primary poultry processing facilities in De Queen, AR; Grannis, AR; Hope, AR; Nashville, AR; and Broken Bow, OK, one of which is owned by Processor Co-Conspirator 15, and four of which are owned by another Processor Conspirator;

f.      the "East Texas Poultry Region": containing four primary poultry processing facilities in Lufkin, TX; Nacogdoches, TX; Carthage, TX; and Center, TX, two of which are owned by Processor Co-Conspirator 15, and two of which are owned by another Processor Conspirator;

g.      the "River Valley Poultry Region": containing three primary poultry processing facilities in Union City, TN; Humboldt, TN; and Hickory, KY, one of which is owned by Processor Co-Conspirator 15, and two of which are owned by another Processor Conspirator;

h.      the "Western Coal Fields Poultry Region": containing two primary poultry processing facilities in Cromwell, KY and Robards, KY, one of which is owned by Processor Co-Conspirator 14, and one of which is owned by another Processor Conspirator;

i.      the "North/South Carolina Poultry Region": containing seven primary poultry processing facilities in Lumber Bridge, NC; Rockingham, NC; Marshville, NC; St. Pauls, NC; Monroe, NC; and Dillon, SC, two of which are owned by Processor Co-Conspirator 14, two of which are owned by Processor Co-Conspirator 15, one of which is owned by Defendant Sanderson, two of which are owned by other Processor Conspirators, and one of which is owned by another poultry processor;

j.      the "Northern Georgia Poultry Region": containing eleven primary poultry processing facilities in Cornelia, GA; Murrayville, GA; Gainesville, GA; Athens, GA; Canton, GA; Ellijay, GA; Cumming, GA; Bethlehem, GA; Marietta, GA; and Pendergrass, GA, two of which are owned by Processor Co-Conspirator 7, four of which are owned by Processor Co-Conspirator 15, one of which is owned by Defendant Wayne, two of which are owned by other Processor Conspirators, and two of which are owned by other poultry processors;

k.      the "Central Georgia Poultry Region": containing two primary poultry processing facilities in Perry, GA and Vienna, GA, one of which is owned by Processor Co-Conspirator 14, and one of which is owned by another Processor Conspirator;

l.      the "Chattanooga Poultry Region": containing two primary poultry processing facilities in Chattanooga, TN, one of which is owned by Processor Co-Conspirator 15, and one of which is owned by another Processor Conspirator;

m.      the "Central North Carolina Poultry Region": containing two primary poultry processing facilities in Sanford, NC; and Siler City, NC, one of which is owned by Processor Co-Conspirator 15, and one of which is owned by another Processor Conspirator;

n.      the "Southern Alabama/Georgia Poultry Region": containing seven primary poultry processing facilities in Enterprise, AL; Dothan AL; Jack AL; Union Springs AL; Bakerhill, AL; Montgomery AL; and Bluffton, GA, one of which is owned by Processor Co-Conspirator 15, three of which are owned by Defendant Wayne, two of which are owned by other Processor Conspirators, and one of which is owned by another poultry processor;

o.      the "Northern Alabama Poultry Region": containing eleven primary poultry processing facilities in Guntersville, AL; Russellville, AL; Albertville, AL; Decatur, AL; Blountsville, AL; Collinsville, AL; Gadsden, AL; Jasper, AL; Cullman, AL; and Tuscaloosa AL, two of which are owned by Processor Co-Conspirator 15, two of which are owned by Defendant Wayne, five of which are owned by other Processor Conspirators, and two of are owned by other poultry processors;

p.      the "Western North Carolina Poultry Region": containing four primary poultry processing facilities in Dobson, NC; Wilkesboro, NC; Morganton, NC; and Winston-Salem, NC, one of which is owned by Defendant Wayne, two of which are owned by other Processor Conspirators, and one of which is owned by another poultry processor;

q.      the "Virginia/West Virginia Poultry Region": containing eight primary poultry processing facilities in Timberville, VA; Moorefield, WV; Dayton, VA; Edinburg, VA;

Harrisonburg, VA; New Market, VA; and Hinton, VA, two of which are owned by Processor

Co-Conspirator 15, one of which is owned by Defendant Cargill, two of which are owned by

other Processor Conspirators, and three of which are owned by other poultry processors;

r.      the "Laurel Poultry Region": containing six primary poultry processing

facilities in Collins, MS; Laurel, MS; Hattiesburg, MS; Bay Springs, MS: and Moselle MS, two

of which are owned by Defendant Sanderson, one of which was owned by Defendant Wayne

until 2021 and is now owned by another Processor Conspirator, one of which is owned by

another Processor Conspirator, and at least two of which are owned by other poultry processors;

and

s.      the "Southern Georgia Poultry Region":  containing three primary poultry

processing facilities in Moultrie, GA; Camilla, GA; and Bluffton, GA, one of is was owned by

Defendant Sanderson, one of which is owned by another Processor Conspirator, and one of

which is owned by another poultry processor.

173.    The United States is also a relevant geographic market for primary poultry

processing plant labor. Poultry processing plant jobs outside the United States are not reasonable

substitutes for workers seeking employment in the United States.

174.    Many poultry processors make significant compensation decisions at a nationwide

level. The executives in charge of such decisions often set nationwide policies or budgets for

processors' wages and benefits. These nationwide decisions then influence local decisions, such

as setting different wage base rates between particular local plants. At least one Processor

Conspirator, Defendant Sanderson, sets its processing plant workers' wages at a nationwide

level, meaning workers in the same position at different plants in different local areas receive the

same base compensation.

175.    Poultry processors also sometimes recruit workers from beyond the local regions where particular plants are located. For example, they may make use of their current workers' personal connections to recruit their friends or family members internationally, such as by giving referral bonuses to current workers. And some workers move between states or internationally to take processing plant jobs.

176.    The Processor Defendants also viewed themselves as part of a nationwide market for poultry processing plant work. They gave significant time, expertise, and money over at least two decades to participate in the nationwide WMS Survey Group, including traveling to Florida (or another resort destination) to meet in person and swap compensation information about both hourly and salaried workers with poultry processors from across the country. The Steering Committee of the WMS Survey Group restricted the Group's membership to poultry processors with at least three plant locations nationwide.

177.    Informed by their knowledge of and experience with their labor pool of potential and actual poultry processing plant workers, the Processor Conspirators chose to compose the WMS Survey Group to include poultry processors nationwide. The Processor Conspirators are not likely to have wasted their time and money on useless information exchanges. Thus, the Processor Conspirators, with the help of Defendants WMS and Meng and Consultant Co-Conspirator 1, formed their agreement to collaborate on compensation decisions, including through the anticompetitive exchange of compensation information, at a nationwide level.

178.    The Processor Conspirators together control more than 90 percent of poultry processing plant jobs nationwide. A hypothetical monopsonist of poultry labor jobs nationwide would likely be able to suppress compensation for poultry workers by a small, but significant, amount.

62

D.     **Market Power**

179.    Together, the Processor Conspirators control over 90 percent of poultry processing plant jobs nationwide; the four largest of the Processor Conspirators control about half of that share. The Processor Conspirators also control at least 80 percent of poultry processing jobs in relevant local submarkets.

180.    Further, many poultry processing plants are located in rural areas near poultry grower operations. The processors likely have even greater buyer market power in these markets, in which there are often fewer full-time, year-round jobs available than in more heavily populated areas.

181.    Finally, the nature of labor markets generally means employers have market power at far lower levels of market share than the Processor Conspirators have here. Labor markets are matching markets—employees cannot simply switch jobs like a customer switches from one beverage to another. Finding a new job takes time, effort, and often, money. The new employer has to offer the job to the worker, while the employee must overcome the inertia provided by an existing job, even if it is an unfavorable one, to seek out and find, interview for, and accept the new job. Employees often have less freedom to move to take a new job due to family commitments such as their spouse's employment, their children's education, or the need to provide care to family members. Thus, workers are more likely to stay in the jobs they already have than consumers are to continue to buy the same product; labor markets come with a level of "stickiness" that many product markets do not.

E.     **Anticompetitive Effects: Processor Conspirators' Conspiracy Anticompetitively Affected Decisions About Compensation for Plant Processing Workers**

182.    The Processor Conspirators' pervasive and decades-long conspiracy and anticompetitive exchange of current and future, disaggregated, and identifiable information,

facilitated and furthered by the Consultant Defendants, suppressed compensation for poultry processing plant workers nationwide. This anticompetitive agreement distorted the competitive mechanism for wage-setting and robbed poultry processing plant workers of the benefits of full and fair competition for their labor.

183.    In labor markets, reductions to absolute compensation are unusual. Thus, the anticompetitive effects of agreements in such markets are most likely to be reflected in compensation remaining flat or increasing at a lower rate than would have occurred without the anticompetitive conduct.

184.    The Processor Defendants' anticompetitive information sharing about poultry processing plant worker compensation supported their larger conspiracy to collaborate with competitors on their own compensation decisions. Both their broader conspiracy to collaborate and their information sharing suppressed competition among them and led to compensation that was lower than it would have been without either the larger conspiracy or the information sharing alone.

185.    As the Processor Defendants themselves admitted to each other in emails, they used the current and future, disaggregated, and identifiable compensation data they exchanged directly and through consultants when making compensation decisions company-wide and for specific positions and plant locations. Because the shared information allowed the Processor Defendants to understand how their competitors currently compensated plant workers, or were planning to in the future, the information they exchanged allowed the Processor Defendants to offer lower compensation than they would have had to absent their agreement. The Processor Defendants' collaboration distorted the typical competitive process in which they would have

had to fully and fairly compete by making their own independent choices about what wages and benefits to offer workers.

186.    Further, because of the length of time the Processor Defendants were able to engage in their conspiracy and their financial interest in keeping their labor costs below competitive levels, they are likely to continue collaborating and exchanging compensation information unless they are enjoined from doing so.

187.    Conduct by multiple Defendants in 2009 illustrates the types of effects likely to have occurred as a result of the Defendants' conduct.

188.    In January 2009, an executive at Processor Co-Conspirator 14 emailed Defendants Cargill, Sanderson, and Wayne and Processor Co-Conspirators 6, 7, 8, 15, and 18 seeking her competitors' help on the question of "plant and merit increases" for the next year. She described to her competitors that "Our fiscal year begins 03/30/09, and, we have recently started talking about delaying." She asked these competitors, "I am curious to find out if anyone has (or is in discussions) about postponing plant or merit increases." In addition, in the same email, she noted, "I know there has been some previous dialogue about plant and merit increases." This correspondence both makes clear that Processor Co-Conspirator 14 was seeking its competitors' assistance in making its own wage decisions and suggests that the competitors had held similar discussions before. The Processor Co-Conspirator 14 executive sent her email directly in response to a question from an executive for Processor Co-Conspirator 6 about making travel and scheduling arrangements to meet in person for the annual WMS Survey Group meeting.

189.    In July 2009, a strikingly similar discussion took place between Processor Co-Conspirator 17 and Processor Co-Conspirators 8 and 18. Processor Co-Conspirator 8's Vice

President of Human Resources emailed at least two of Processor Co-Conspirator 8's competitors, Processor Co-Conspirator 17 and Processor Co-Conspirator 18, disclosing to Processor Co-Conspirator 17 that "we are working on budgets for our next fiscal year. . . . We are looking at a raise in September/Oct. and have not decided on the amount yet…we're surveying the other poultry companies to get a feel for what they are going to do." As a result, he asked Processor Co-Conspirator 17, "Do you know what [Processor Co-Conspirator 17] is planning on giving in the way of % or $ amount for your processing plants? What month will the raise go into effect?" He concluded, "I will be happy to let you know our decision within the next week." Processor Co-Conspirator 17's VP of People Services responded to the Processor Co-Conspirator 8 executive that "We have no plans at this time to give increases."

190.    The Processor Co-Conspirator 8 executive made a similar disclosure to Processor Co-Conspirator 18— "We are budgeting for our next fiscal year"—as well as a similar request— "and was wondering what [Processor Co-Conspirator 18] is going to do as far as Plant Wages in November? Do you know the % amount or $ amount that [Processor Co-Conspirator 18] will be giving in Springdale and Monett, MO?" The Processor Co-Conspirator 8 executive also, as he did with Processor Co-Conspirator 17, promised an exchange: "I will be able to give you ours within the next week or so as well." The Processor Co-Conspirator 18 executive responded, "Sorry, we don't know yet what we are going to do," to which the Processor Co-Conspirator 8 executive replied "will you please share with me once you know?"

191.    A later document from July 2010 states that the effective date of Processor Co-Conspirator 18's last plant-wide wage raise was in November 2008, suggesting that Processor Co-Conspirator 18, like Processor Co-Conspirator 17, did not raise its wages in 2009.

192.    While in the years before and after 2009, Processor Co-Conspirator 8 typically raised its hourly plant worker wages, in 2009 itself, after hearing directly from its competitor Processor Co-Conspirator 17, and potentially also from its competitor Processor Co-Conspirator 18, Processor Co-Conspirator 8 chose not to raise its hourly worker wages. Thus, because Processor Co-Conspirator 8 collaborated with its competitors through the direct sharing of future compensation information, and received comfort from those competitors that they did not plan to raise their employees' wages, Processor Co-Conspirator 8's processing plant employees suffered a harmful effect.

193.    Evidence of harmful effects from an information-sharing conspiracy is not restricted to denials of wage raises or choices not to grant benefits. If each participant in a labor market is suppressing its compensation levels by using information about its competitors' compensation plans to make smaller and more targeted wage increases than it would have absent such information sharing, wages will rise more slowly, and for fewer workers, than they would have without the conspiracy.

194.    For example, in 2013, Processor Co-Conspirator 18's Director of Labor Compensation informed her coworkers that in preparation for internal decision-making about plant wages, Processor Co-Conspirator 18 "completed a third-party survey with competing poultry companies. With this information, we feel that we are in a better position to strategically evaluate wages on a location by location level." Attached to this email are charts using data exchanged about competing processors' base wage rates through the WMS Survey Group, as well as other documents to which "We [Processor Co-Conspirator 18] have added the [Consultant Co-Conspirator 1] wages and ranking" and "maintenance start and base rates by [Consultant Co-Conspirator 1] region." At least three of these charts marked specific plants for

which Processor Co-Conspirator 18, as compared to the averages of other processors' plants in that region, was paying below median wages for the industry.

195.   The information exchange informed Processor Co-Conspirator 18 exactly where and by how much it would have to increase wages to match its competitors; the exchange deprived plant workers, who lack any comparable information, of an independent effort by Processor Co-Conspirator 18 to recruit and hire workers by competing against other processors.

196.   Defendant Wayne has admitted that it used its collaboration with the Processor Conspirators, and the information they exchanged with each other, in this way. Wayne's compensation strategy was to pay wages at or near the midpoint of compensation (i.e. 50%) for its workers as compared to its competitors. Wayne's discussions and exchange of compensation information with the Processor Conspirators allowed it to more precisely target what the mid-point of compensation would be, suppressing the rise in compensation that might otherwise have occurred if Wayne had less ability to target that mid-point.

197.   Similarly, Defendant Cargill used discussions and exchange of compensation information with the Processor Conspirators to assist in determining the "salary bands" it would set for salaried worker positions. Cargill sent these band amounts to local plant managers to inform the setting of local wages. Cargill admitted that on at least one occasion the WMS Survey Group compensation data influenced Cargill's decision to lower the salary band range for plant supervisors from where it had originally set that band.

198.   The Processor Conspirators' compensation information exchanges therefore distorted compensation-setting processes in the poultry processor plant worker labor market and harmed the competitive process.

## VII.   VIOLATIONS ALLEGED

### A.   COUNT I:  SHERMAN ACT SECTION 1 (ALL DEFENDANTS)

199.   The United States repeats and realleges paragraphs 1 through 198 as if fully set forth herein.

200.   The Processor Defendants violated Section 1 of the Sherman Act, 15 U.S.C. § 1, by agreeing to collaborate with and assist their competitors in making poultry processing worker compensation decisions, to exchange current and future, disaggregated, and identifiable information about their compensation of poultry processing plant workers, and to facilitate this collaboration and such exchanges. This agreement suppressed compensation for poultry processing workers for decades.

201.   This agreement included more than 20 years of discussions between and among these competitors about wage and benefit policies and amounts, which went well beyond the sharing of information and included consultation and advice-giving—as one processor put it, "a collaborative working relationship"—on decisions that were competitively sensitive and should have been made independently.

202.   The agreement also included exchanging (or, for the Consultant Defendants, facilitating the exchange of) competitively sensitive information about poultry processing plant workers' wages and benefits at both local levels and the national level. Such exchanges allowed these competitors to understand wages and benefits paid or planned by specific competitors, in specific places, to specific types of workers. (Standing alone, these exchanges of information would constitute a violation of Section 1 of the Sherman Act.)

203.   The Processor Defendants themselves understood that their anticompetitive agreement likely raised serious legal concerns. They went to great lengths to keep their

exchanges confidential. Some expressed their concerns explicitly; others abandoned some of the larger-group exchanges once antitrust investigations and private lawsuits began to uncover their behavior. The Processor Defendants and Processor Conspirators nonetheless continued exchanging information through less observable methods, for example through Consultant Co-Conspirator 1.

204.    The Processor Conspirators' market power increases their agreement's likely anticompetitive effects. In relevant local labor submarkets, they control more than 80 percent of poultry processing jobs—in some areas, likely 100 percent of poultry processing jobs—and thus have market power in local markets for poultry processing plant workers. They enjoy outsize market power over the supply of poultry processing plant jobs in these local areas, in which they are often among the largest employers. In the national market, they control over 90 percent of poultry processing jobs nationwide, and thus have buyer market power in the nationwide market for poultry processing plant workers. Their choice to collaborate on compensation decisions and to exchange information, even though they had buyer market power, disrupted the competitive mechanism for negotiating and setting wages and benefits for poultry processing plant workers and harmed the competitive process.

205.    As described in more detail in paragraphs 1 through 204 above, from 2000 or earlier to the present, Defendants Cargill, Sanderson, Wayne, WMS, and G. Jonathan Meng agreed to collaborate with and assist their competitors in making compensation decisions and to exchange current and future, disaggregated, and identifiable compensation information, or to facilitate this anticompetitive agreement, an unlawful restraint of trade under Section 1 of the Sherman Act, 15 U.S.C. § 1.

206.     There is no justification, procompetitive or otherwise, for large, profitable, and sophisticated competitors collaborating with the effect of suppressing wages and benefits for their workers.

207.     The Defendants' agreement to collaborate on compensation decisions, exchange current and future compensation information, and facilitate those collaborations and exchanges suppressed poultry processing plant worker compensation. It constitutes an unreasonable restraint of interstate trade and commerce in the nationwide and in local labor markets for hourly and salaried poultry processing plant workers. This offense is likely to continue and recur unless this court grants the requested relief.

## B.     COUNT II: PACKERS AND STOCKYARD ACT SECTION 202(a) (DEFENDANTS SANDERSON AND WAYNE ONLY)

208.     The United States repeats and realleges paragraphs 1 through 207 as if fully set forth herein.

209.     Defendants Sanderson and Wayne violated Section 202(a) of the Packers and Stockyards Act, 1921, as amended and supplemented, 7 U.S.C. § 192(a), by engaging in deceptive practices regarding their contracts with growers. These deceptions deprived growers of material information necessary to make informed decisions about their contracting opportunities and to compare offers from different poultry processors.

210.     Defendants Sanderson and Wayne are "live poultry dealers" under 7 U.S.C. § 182(10), because each is engaged in the business of obtaining live poultry under a poultry growing arrangement for the purpose of slaughtering it.

211.     Defendants Sanderson's and Wayne's grower contracts concern "live poultry" under 7 U.S.C. §§ 182(6), 192, because the contracts concerned the raising of live chickens.

212.    Defendants Sanderson and Wayne each engaged in deceptive practices through their grower contracts, which omitted material disclosures about how each compensates growers. Those disclosures would have provided information the grower needs to effectively compete in the tournament system and allowed growers to evaluate their likely return and risks, including, among other things the variability of inputs the grower would receive, the risks regarding downside penalties for underperforming relative to other growers in the tournament system.

213.    Defendants Sanderson's and Wayne's deceptive practices are ongoing and likely to continue and recur unless the court grants the requested relief.

## VIII.   REQUESTED RELIEF

214.    The United States requests that this Court:

a.    rule that Defendants' conspiracy to collaborate on processing plant compensation decisions, including through the exchange of compensation information, has unreasonably restrained trade and is unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1;

b.    rule that Defendants' exchange of compensation information itself, without more, has unreasonably restrained trade and is unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1;

c.    permanently enjoin and restrain all Defendants from collaborating on decisions related to worker wages and benefits with any other company engaged in poultry growing or processing or the sale of poultry products;

d.    permanently enjoin and restrain all Defendants from sharing, or facilitating the sharing of, information about compensation for their workers with any

other company engaged in poultry growing or processing or the sale of poultry products, whether that sharing is direct or indirect;

e.      require all Defendants to take such internal measures as are necessary to ensure compliance with that injunction;

f.      impose on all Defendants a Monitoring Trustee to ensure compliance with the antitrust laws;

g.      grant equitable monetary relief;

h.      permanently enjoin and restrain Defendants Sanderson and Wayne from engaging in deceptive practices regarding their contracts with growers;

i.      require Defendants Sanderson and Wayne to make appropriate disclosures to growers before entering into contracts concerning live poultry, in order to provide sufficient information for the growers to understand the scope of the contract and the potential risks;

j.      require Defendants Sanderson and Wayne to modify their grower compensation systems to eliminate the harm arising from each firm's failure to disclose to growers all of the potential risks associated with that firm's compensation system;

k.      grant other relief as required by the nature of this case and as is just and proper to prevent the recurrence of the alleged violation and to dissipate its anticompetitive effects, including such structural relief as may be necessary to prevent the anticompetitive effects caused by the challenged conduct and described in this Complaint;

l.      award the United States the costs of this action; and

m.      award such other relief to the United States as the Court may deem just

and proper.

Dated: July 25, 2022

Respectfully submitted,

FOR PLAINTIFF UNITED STATES OF AMERICA,

DOHA MEKKI
Principal Deputy Assistant Attorney General

MICHAEL KADES
Deputy Assistant Attorney General

RYAN DANKS
Acting Director of Civil Enforcement

CRAIG CONRATH
Director of Litigation

LEE F. BERGER
Chief, Civil Conduct Task Force

MIRIAM R. VISHIO (USDC Md. Bar No. 17171)
Assistant Chief, Civil Conduct Task Force

SEAN AASEN
DAVID KELLY
KARL D. KNUTSEN
NATALIE MELADA
Trial Attorneys

United States Department of Justice
Antitrust Division

EREK L. BARRON
United States Attorney

By: _____/s/_____
ARIANA WRIGHT ARNOLD
USDC Md. Bar No. 23000
Assistant United States Attorney
36 S. Charles St., 4th Floor
Baltimore, Maryland 21201
Tel: 410-209-4813
Fax: 410-962-2310
Ariana.Arnold@usdoj.gov

KATHLEEN SIMPSON KIERNAN
(Special Appearance Pending)
JESSICA TATICCHI
(Special Appearance Pending)
WILLIAM FRIEDMAN
(Special Appearance Pending)
EUN HA KIM
(Special Appearance Pending)
JACK G. LERNER
(Special Appearance Pending)
United States Department of Justice
Antitrust Division
Civil Conduct Task Force
450 Fifth Street NW, Suite 8600
Washington, DC 20530
Tel: 202-353-3100
Fax: 202-616-2441