# EXHIBIT 1

██████████████

October 11, 2022

Via email and regular mail

To: Lee F. Berger
     Chief, Civil Conduct Task Force,
     Antitrust Division, Department of Justice

From: Peter C. Carstensen
      Fred W. & Vi Miller Chair in Law Emeritus
      University of Wisconsin Law School

Re: **Comments on United States v. Cargill Meat Solutions Corp., et al.; Proposed Final Judgments**

**Background**:

I am a retired professor of law who has spent his entire professional career practicing and studying antitrust law. Since the late 1990s one of my primary areas of interest has been competition issues in agricultural markets on both the input and output side. My CV can be accessed at https://secure.law.wisc.edu/profiles/pccarste@wisc.edu.

**My Positive Reactions to the Case**:

1) The DOJ deserves credit for challenging this information exchange without claiming express agreement on specific elements of competition (e.g., price fixes). This is one of a few recent cases that have identified exchanges of confidential competitive business information as being in themselves anticompetitive. This is significant because the DOJ investigated the information exchange activities of "Consultant Coconspirator Number 1"[1] starting in 2010 and closed that investigation in 2012.[2] This complaint now establishes that within that period that Coconspirator Number 1 was engaged in unlawful collusion.[3] Hence, it is evident that there were either flaws in the earlier investigation or that the DOJ has moved to a stricter view of the legality of such

---

[1] Based on the internal information in the complaint, see. e.g., ¶22 and ¶32, it is undoubtedly the case that this party is Agri Stats. Agri Stats is also a defendant in a number of pending damage cases for its participation in information pooling in the poultry, turkey and pork industries not only with respect to employment but also with respect to many other aspects of competition in these markets.

[2] "Beginning in September 2010, the United States' Department of Justice Antitrust Division ("DOJ") embarked on an investigation of Agri Stats. That investigation concluded on October 3, 2012." In re Broiler Chicken Antitrust Litig., 2018 WL 3586183 (N.D. Ill. 2018).

[3] See, e.g., Complaint ¶48.

conduct. My hope is that regardless of any errors in the earlier investigation, the DOJ now recognizes that such information exchanges are very likely to be anticompetitive and so unlawful.[4] It would be helpful to the businesses generally if the DOJ and FTC would revisit their outdated guidance on information exchange to emphasize that such conduct among rivals is likely to be unlawful absent specific, limited justifications.

2) Another important and positive element of this case and settlement is that the DOJ has concluded that it has standing to enforce the Packers and Stockyards Act (7 U.S.C. § 181 et seq.) and Cargill has agreed with that conclusion. This authority is likely to be important in dealing with a variety of competitive issues involving livestock and poultry. Further, the specific remedy achieved by enforcing the Packers and Stockyard Act, eliminating the tournament system,[5] is itself significant because that system of compensation is harmful to growers and is not necessary for efficient poultry production. That Cargill has agreed to abandon the tournament system is powerful evidence that a sophisticated, well-informed market participant has determined that it does not need to employ the tournament system to be efficient and competitive.

**My Concerns with the Settlement:**

1) Based on the complaint, the DOJ has an abundance of evidence that a large number of poultry integrators over a long period of time have participated in these unlawful information exchanges. The results have been harmful to integrator employees. But to date, the DOJ has not brought lawsuits against the other conspirators that it has identified although it states in the complaint that it has a continuing investigation concerning these other parties. See, Complaint ¶22 ftn. 4. Nevertheless, the Court should ask for assurance that the DOJ will pursue the other participants it has identified as co-conspirators in a timely fashion.

2) As presently drafted, the proposed settlement only forbids Cargill from exchanging competitively sensitive information related to employees. See, Proposed Final Judgement, Part IV A and B. Such relief is too narrowly focused. The public records of private lawsuits involving poultry, turkeys, and pork show that the information exchanges related to many dimensions of competition in those industries.[6] Indeed, even in the absence of such a public record, the standard for relief should be that any similar conduct ought to be forbidden. Hence, given Cargill's implicit admission that it has engaged in a long lasting, unlawful information exchange, the decree ought to forbid any exchange of confidential business information of any kind. If there are any legitimate reasons for such an exchange, Cargill can request advanced approval for such an exchange from the Monitor to be named by the court.

---

[4] See, Peter C. Carstensen, *Information Exchange – An Underappreciated Anticompetitive Strategy*, CPI ANTITRUST CHRONICLE, Jan. 2019.

[5] The tournament system places a group of growers into a pool and distributes a set total compensation among them based on the integrators assessment of their relative performance. Thus, the lump sum is allocated among this group of growers in ways that can deny some even the minimum compensation needed to cover costs while others receive premiums.

[6] See, e.g., Broiler Chicken Antitrust Litig, supra note 2; Olean Wholesale Grocery Coop, v. Agri Stats, 2020 WL 61344982 (N. D. Ill. 2020) (turkeys); In re Pork Antitrust Litigation, 495 F. Supp. 3d 753 (D. Minn. 2020).

**Farm Action**

November 15, 2022

*Delivered via e-mail to Lee.Berger@usdoj.gov*

Lee Berger
Chief | Civil Conduct Task Force
Department of Justice Antitrust Division
450 Fifth Street NW, Suite 8600
Washington, DC 20530

Re:    *Comment on Proposed Final Judgments, Stipulations, and Competitive Impact Statement in United States v. Cargill Meat Solutions Corp., et al, Civil Action No. 22-cv-01821, Published in Federal Register (87 FR 57028) on Sept. 16, 2022*

Dear Mr. Berger:

Farm Action is a farmer-led advocacy organization dedicated to building a food and agriculture system that works for everyday people instead of a handful of powerful corporations. Our network includes farmers, ranchers, rural community leaders, food system workers, and policymakers across the country. We submit this comment in support of the Proposed Final Judgments, Stipulations, and Competitive Impact Statement filed by the Justice Department's Antitrust Division in *United States v. Cargill Meat Solutions Corp.*, Civil Action No. 22-cv-01281, on September 16, 2022 (collectively, the "**Consent Decree**").

The Consent Decree resolves violations of the Sherman Act and the Packers and Stockyards Act alleged by the United States in its Complaint (the "**Complaint**") filed in Maryland District Court (the "**Court**") on July 25, 2022, against three poultry processors (the "**Processing Defendants**"), a consulting firm, and its principal (collectively, the "**Defendants**").[1] Before entering the Consent Decree, the Court must evaluate its resolution of Count One of the Complaint for violations of the Sherman Act (the "**Antitrust Claim**") and its resolution of Count Two of the Complaint for violations of the Packers and Stockyards Act (the "**P&S Act Claim**") under different standards. On the one hand, the Court must find that entry of the Consent Decree's

---

[1] The Processor Defendants are Cargill Meat Solutions Corp. and Cargill, Inc. (collectively, "**Cargill**"), Wayne Farms, LLC ("**Wayne**"), and Sanderson Farms, Inc. ("**Sanderson**"). The remaining Defendants are Webber, Meng, and Company, Inc., d/b/a WMS & Company, Inc. ("**WMS**"), and G. Jonathan Meng ("**Meng**").

resolution of the Antitrust Claim "is in the public interest" under the Tunney Act.[2] On the other hand, since the Tunney Act does not cover claims under the Packers and Stockyards Act,[3] the Court must find that the Consent Decree's resolution of the P&S Act Claim is "fair, adequate, and reasonable" and "is not illegal, a product of collusion, or against the public interest."[4]

Although this comment will focus primarily on the P&S Act Claim, we wish to also emphasize our view that the Consent Decree's resolution of the Antitrust Claim is firmly "within the reaches of the public interest" under the Tunney Act.[5] Since consolidation began increasing in the poultry- and other meat-processing industries in the 1980s, the average hourly wage for poultry-processing workers has declined by nearly 40 percent — amounting to a meager $11 an hour in 2015.[6] At that level, the average poultry-processing worker's wage was nearly half the average manufacturing worker's wage in 2020[7] — even as poultry-processing workers endured dramatically worse working conditions than other workers in the private sector. Between 2015 and 2018, meat- and poultry-processing workers faced twice the risk of amputations as the average worker in private industry — and more than 50 percent reported other injuries such as carpal tunnel syndrome, "trigger finger," tendinitis, rotator cuff injuries, lower back injuries, and chronic pain and numbness.[8] The exploitation of these workers even extends to rampant abuse by plant managers, who have been reported to routinely deny workers bathroom breaks, use racial slurs, deride workers for complaining about pain or illness, and even place

---

[2] See 15 U.S.C. § 16(e).

[3] The Tunney Act only applies to "consent judgment[s] submitted by the United States" in "civil proceedings brought . . . under the antitrust laws[.]" See 15 U.S.C. § 16(b); See also 15 U.S.C. § 16(a-b, e-f). As the term "antitrust laws" is defined under 15 U.S.C. § 12, it does not include the Packers and Stockyards Act. 15 U.S.C § 12. Accordingly, consent decrees resolving claims brought under the Packers and Stockyards Act are not subject to the Tunney Act. Cf. FTC v. Circa Direct LLC, 2012 WL 2178705, at *4 (D.N.J. June 13, 2012) (consent decree for FTC Act UDAP claims not subject to Tunney Act).

[4] See United States v. North Carolina, 180 F.3d 574, 581 (4th Cir. 1999).

[5] See United States v. Microsoft Corp., 56 F.3d 1448, 1461 (D.C. Cir. 1995).

[6] OXFAM, LIVES ON THE LINE: THE HUMAN COST OF CHEAP CHICKEN 19 (Oct. 2015).

[7] See Eli Hoff, GRAPHIC: Meat Processing Workers earn an Average of $15.53 Per Hour, THE COUNTER (July 23, 2021) (noting average manufacturing employee earned $20.08 an hour in 2020) https://thecounter.org/graphic-meat-processing-workers-average-15-53-per-hour/.

[8] Between January 2015 and August 2018, the Department of Labor's Occupational Safety and Health Administration (OSHA) received 770 reports of amputations, in-patient hospitalizations, or eye loss from meat and poultry plants. These figures do not cover injuries from employers in the 22 states which have state-based OSHA programs covering private sector workers. HUMAN RIGHTS WATCH, "WHEN WE'RE DEAD AND BURIED, OUR BONES WILL KEEP HURTING: WORKERS RIGHTS UNDER THREAT IN US MEAT AND POULTRY PLANTS (Sept. 4, 2019). Of the tens of thousands of companies who report injuries to OSHA, Tyson Foods is ranked fifth, Pilgrim's Pride is thirteenth, Cargill Meat Solutions is sixteenth, and JBS USA is seventeenth. Smithfield, National Beef, and Koch Foods round out the top thirty. HUMAN RIGHTS WATCH, "WHEN WE'RE DEAD AND BURIED, OUR BONES WILL KEEP HURTING: WORKERS RIGHTS UNDER THREAT IN US MEAT AND POULTRY PLANTS (Sept. 4, 2019). Workers are often exposed to noxious chemicals, environmental contaminants, and biological hazards, such as feces, blood, and pathogens. Workers have even been known to develop antibiotic resistance from absorbing antibiotics from chicken flesh. HUMAN RIGHTS WATCH, "WHEN WE'RE DEAD AND BURIED, OUR BONES WILL KEEP HURTING: WORKERS RIGHTS UNDER THREAT IN US MEAT AND POULTRY PLANTS (Sept. 4, 2019); OXFAM, LIVES ON THE LINE: THE HUMAN COST OF CHEAP CHICKEN 26 (Oct. 2015).

bets on how many workers will get Covid-19 following their refusal to implement health-protective measures during the pandemic.[9]

No one chooses to work for bosses like these. The workers of the poultry processing industry only labor under ever-worsening conditions for ever-worsening wages because their ability to choose their employer has been severely limited by the Defendants and their co-conspirators throughout the poultry processing industry, who have consolidated power over local and national labor markets as amply described in the United States' Complaint. If entered, the Consent Decree would break up the collusive arrangements between dominant poultry processors that have suppressed workers' wages and benefits; destroy the infrastructure of consulting firms and information exchanges that facilitated those arrangements; and impose stringent monitoring and collaboration requirements on the Defendants that will enable enforcers to root out collusive conduct in this evidently corrupt industry and secure compliance with the law going forward. In other words, this Consent Decree would provide efficacious — and properly tailored — remedies that would end the antitrust violations alleged by the United States and prevent their recurrence. That, in principle, is more than enough for the Consent Decree to deserve the Court's approval under the Tunney Act — and we hope the Court acts accordingly.[10]

For the reasons detailed more fully below, we believe the Consent Decree's resolution of the P&S Act Claim likewise deserves the Court's approval.

---

[9] *See* Oxfam, Lives on the Line: the Human Cost of Cheap Chicken 35 (Oct. 2015); Human Rights Watch, "When We're Dead and Buried, Our Bones Will Keep Hurting: Workers Rights Under Threat in US Meat and Poultry Plants (Sept. 4, 2019); Katie Shepherd, "Tyson Foods managers had a 'winner-take-all' bet on how many workers would get covid-19, lawsuit alleges", Washington Post (Nov. 19, 2012). Being denied a bathroom break is so common that workers often intentionally reduce their fluid intake, or wear diapers at work to avoid urinating on themselves. Oxfam, Lives on the Line: the Human Cost of Cheap Chicken 35 (Oct. 2015). One survey of 266 slaughter workers in Alabama found that nearly 80 percent were not allowed to take bathroom breaks when needed. Another survey of Minnesota slaughter workers revealed that 86 percent of workers were allowed fewer than two bathroom breaks per *week*, on average. Oxfam, No Relief: Denial of Bathroom Breaks in the Poultry Industry 3 (May 2016).

[10] *Cf. United States v. Apple, Inc.*, 889 F.Supp.2d 623 (S.D.N.Y. 2012) (finding ample factual foundation for government's decision regarding proposed final judgment in civil antitrust suit against publishers of trade electronic books (e-books) alleging a conspiracy to raise, fix, and stabilize prices of e-books in violation of Sherman Act, as required for court's approval of consent decree pursuant to Tunney Act, because government provided detailed allegations as to existence of conspiracy, described contents of agreements between defendants and their effect on market, and explained how proposed judgment would end price-fixing and prevent its recurrence).

## I.      Legal Standard for Evaluating Consent Decree Under Packers and Stockyards Act

In *United States v. North Carolina*,[11] the United States Court of Appeals for the Fourth Circuit endorsed "the general principle that settlements are encouraged."[12] Even so, a district court is not required to blindly accept a proposed settlement's terms.[13] "Rather, before entering a consent decree the court must satisfy itself that the agreement is 'fair, adequate, and reasonable' and 'is not illegal, a product of collusion, or against the public interest.'"[14] In deciding whether a proposed settlement is fair, adequate and reasonable, a district court is required to assess the strength of the plaintiff's case.[15] In making this assessment, the court need not conduct "a trial or a rehearsal of the trial," but it must still "take the necessary steps to ensure that it is able to reach an informed, just, and reasoned decision."[16] Factors bearing upon this determination include the extent of discovery that has occurred, the stage of the proceedings, the absence of collusion in the settlement, and the experience of counsel who negotiated the settlement on behalf of the plaintiffs.[17]

## II.     The Consent Decree Is Fair, Adequate, and Reasonable

The fairness, adequacy, and reasonableness of a proposed consent decree are judged "by weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement."[18] In conducting this analysis, the Court should, "absent any showing of collusion or bad faith," give "the opinion of competent counsel . . . great weight."[19] The opinion of counsel for the government, specifically,

---

[11] *See United States v. North Carolina*, 180 F.3d 574 (4th Cir. 1999). The Fourth Circuit's decision in this case, *id.* at 581 n. 5, indicated that the controlling Fourth Circuit cases that should guide a district court in determining whether to enter a consent decree are *Flinn v. FMC Corp.*, 528 F.2d 1169 (4ᵗʰ Cir. 1975), and *Carson v. American Brands, Inc.*, 606 F.2d 420, 430 (4th Cir.1979) (en banc) (Winter, Circuit Judge, dissenting), *adopted by Carson v. American Brands, Inc.*, 654 F.2d 300, 301 (4th Cir.1981) (en banc) (per curiam).

[12] *See United States v. North Carolina*, 180 F.3d 574, 581 (4th Cir. 1999).

[13] *See id.*

[14] *See id.* (quoting *United States v. Colorado*, 937 F.2d 505, 509 (10th Cir. 1991)).

[15] *See id.*

[16] *See id.* (quoting *Flinn v. FMC Corp.*, 528 F.2d 1169, 1172–73 (4th Cir. 1975)).

[17] *See id.*

[18] *See United States v. Baltimore County, Maryland*, 2021 WL 2000480, at *4 (D. Md. May 19, 2021) (quoting *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981)). *See also Carson v. American Brands, Inc.*, 606 F.2d 420, 430 (4th Cir.1979) (en banc) (Winter, Circuit Judge, dissenting), adopted by *Carson v. American Brands, Inc.*, 654 F.2d 300, 301 (4th Cir.1981) (en banc) (per curiam).

[19] *See Carson v. American Brands, Inc.*, 606 F.2d 420, 430 (4th Cir.1979) (en banc) (Winter, Circuit Judge, dissenting), *adopted by Carson v. American Brands, Inc.*, 654 F.2d 300, 301 (4th Cir.1981) (en banc) (per curiam). *See also Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4ᵗʰ Cir. 1975) ("While the opinion and recommendation of experienced counsel is not to be blindly followed by the trial court, such opinion should be given weight in evaluating the proposed settlement.").

is entitled to "particularly strong" deference where "a consent decree has been negotiated by the Department of Justice on behalf of [itself] or [another] federal administrative agency specially equipped, trained, or oriented in the field [at issue in the case]."[20] Although the Court must develop an "adequate" record to "reach an intelligent and objective opinion of the probabilities of ultimate success should the [settled] claim be litigated," it should "view the merits of the decree in the light most favorable to its entry."[21]

### A. The United States Is Likely to Succeed on the Merits

The United States is likely to succeed on the merits because its Complaint states a *prima facie* claim under the Packers and Stockyards Act that is unlikely to be rebutted at trial.[22] Specifically, the United States has alleged that Sanderson and Wayne have violated Section 202(a) of Packers and Stockyards Act's prohibition on

---

[20] *See United States v. Westvaco Corp.*, 2016 WL 4492704, at *4 (D. Md. Aug. 26, 2016) (quoting *United States v. City of Welch, W. Va*, 2012 WL 385489, at *2 (S.D.W. Va. Feb. 6, 2012) (quoting *United States v. Cannons Eng'g Corp.*, 720 F.Supp. 1027, 1035 (D. Mass. 1989))). *See also United States v. Baltimore County, Maryland*, 2021 WL 2000480, at *9 (D. Md. May 19, 2021) (quoting *Am. Canoe Ass'n, Inc. v. EPA*, 54 F. Supp. 2d 621, 625 (E.D. Va. 1999) (quoting *Bragg v. Robertson*, 54 F. Supp. 2d 653, 660 (S.D.W.Va.1999))) ("[I]n a complex case settled by consent decree, 'where a government agency charged with protecting the public interest has pulled the laboring oar in constructing the proposed settlement,' the court 'accord[s] substantial weight to the agency's expertise and public interest responsibility.'").

[21] *See Flinn v. FMC Corp.*, 528 F.2d 1169, 1172-73 (4th Cir. 1973) ("So long as the record before [the district court] is adequate to reach an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated and form an educated estimate of the complexity, expense and likely duration of such litigation, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise, it is sufficient."); *Carson v. Am. Brands, Inc.*, 606 F.2d 420, 421–22 (4th Cir. 1979) (describing *Flinn* as "posit[ing] a rule that, when a district court is presented with a consent decree, it should view the merits of the decree in light favorable to its entry."), *rev'd on other grounds in*, 450 U.S. 79, 101 S. Ct. 993, 67 L. Ed. 2d 59 (1981).

[22] *See United States v. Baltimore County, Maryland*, 2021 WL 2000480, at *4 (D. Md. May 19, 2021) (quoting *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981)) (finding that claim resolved by consent decree would "be likely to succeed on the merits" were the case to proceed to trial because "the [defendant] would be unlikely to rebut the United States' *primary facie case*").

"unfair, unjustly discriminatory, or deceptive practice[s] or device[s]"[23] by engaging in deceptive practices "regarding" and "through" their contracts with poultry growers for the raising of poultry for slaughter.

        i.    *The Applicable Law*

The elements of a "deceptive practices" claim under Section 202(a) have not received authoritative construction in binding Fourth Circuit or Supreme Court precedent.[24] Therefore, the Court has a "responsibility to attempt to reach the correct result based on the well-established methods of statutory interpretation."[25] In doing so, the Court may — and, in our opinion, ought to — follow the United States Department of Agriculture's (USDA's) interpretation of the governing provision in its recent Proposed Rule entitled "Inclusive Competition and Market Integrity under the Packers and Stockyards Act" (the "**ICMI Rule**").[26]

As indicated in the Notice of Proposed Rulemaking it published in conjunction with the ICMI (the "**ICMI Notice**"), the USDA conducted a comprehensive analysis of Section 202(a) of the Packers and

---

[23] Section 202 of the Packers and Stockyards Act of 1921, as amended and supplemented, is codified in 7 U.S.C. 192, which provides in relevant part:

> It shall be unlawful for any packer or swine contractor with respect to livestock, meats, meat food products, or livestock products in unmanufactured form, or for any live poultry dealer with respect to live poultry, to:

> (a)    Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device; or

> (b)    Make or give any undue or unreasonable preference or advantage to any particular person or locality in any respect, or subject any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect; or

> (c)    Sell or otherwise transfer to or for any other packer, swine contractor, or any live poultry dealer, or buy or otherwise receive from or for any other packer, swine contractor, or any live poultry dealer, any article for the purpose or with the effect of apportioning the supply between any such persons, if such apportionment has the tendency or effect of restraining commerce or of creating a monopoly; or

> (d)    Sell or otherwise transfer to or for any other person, or buy or otherwise receive from or for any other person, any article for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce; or

> (e)    Engage in any course of business or do any act for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce; or

> (f)    Conspire, combine, agree, or arrange with any other person (1) to apportion territory for carrying on business, or (2) to apportion purchases or sales of any article, or (3) to manipulate or control prices; or

> (g)    Conspire, combine, agree, or arrange with any other person to do, or aid or abet the doing of, any act made unlawful by subdivisions (a), (b), (c), (d), or (e).

[24] *See M&M Poultry, Inc. v. Pilgrim's Pride Corp.*, 2015 WL 13841400, at *9 (N.D.W. Va. Oct. 26, 2015).

[25] *See Wheeler v. Pilgrim's Pride Corp.*, 591 F.3d 355, 382 (5th Cir. 2009) (Garza, J., dissenting).

[26] *See* Agriculture Marketing Service, USDA, Proposed Rule: Inclusive Competition and Market Integrity Under the Packers and Stockyards Act, 87 FR 60010, 60031-33 (October 3, 2022).

Stockyards Act — which ranged over the Section's text, its statutory context, its legislative history, the case law that has developed under it, and the USDA's own administration of the Act over the past century — to determine what "deceptive practices" fall within the prohibition of Section 202(a).[27] Based on this analysis, the agency found that the Act "reaches beyond common-law fraud" and "is not limited to false statements and omissions," but also "requires honest dealing" and imposes "affirmative duties to be truthful" on regulated entities. Further, particularly in cases dealing with ensuring the integrity of payment systems reliant on equipment or information wholly within the control of the processor, "the Act does not require proof of particularized intent."[28] Against this background, the agency concluded that "violative deceptions under the Act include false statements or omissions that prevent or mislead [a reasonable recipient] from making an informed decision" or otherwise adversely "affect the conduct or decision of [such] recipient."[29]

Pursuant to its delegated authority to promulgate implementing regulations under Section 407 of the Packers and Stockyards Act, the USDA proposed the following regulation to identify certain practices in the formation and performance of contracts that it "considers deceptive in violation of Section 202(a) of the Act":

§ 202.306 Deceptive practices.

(a) *Prohibited Practices*. A regulated entity may not engage in the specific deceptive practices prohibited in paragraphs (b) through (e) of this section with respect to any matter related to livestock, meats, meat food products, livestock products in unmanufactured form, or live poultry.

(b) *Contract formation*. A regulated entity may not make or modify a contract by employing a pretext, false or misleading statement, or omission of material fact necessary to make a statement not false or misleading.

(c) *Contract performance*. A regulated entity may not perform under or enforce a contract by employing a pretext, false or misleading statement, or

---

[27] *See* Agriculture Marketing Service, USDA, Proposed Rule: Inclusive Competition and Market Integrity Under the Packers and Stockyards Act, 87 FR 60010, 60031-33 (October 3, 2022).

[28] *See* Agriculture Marketing Service, USDA, Proposed Rule: Inclusive Competition and Market Integrity Under the Packers and Stockyards Act, 87 FR 60010, 60033-34 (October 3, 2022) (citing *Parchman v. U.S. Dep't of Agric.*, 852 F.2d 858, 864 (6th Cir. 1988)) ("Even if a regulated entity does not intentionally set out to deceive with respect to the weight of the livestock, the Act does not require proof of a particularized intent. . . . The live poultry dealer's honesty is vitally important to poultry growers. Because much of the payment system relies on information that is wholly within the live poultry dealer's control, deception is particularly dangerous [in that context].").

[29] *See* Agriculture Marketing Service, USDA, Proposed Rule: Inclusive Competition and Market Integrity Under the Packers and Stockyards Act, 87 FR 60010, 60031-33 (October 3, 2022).

omission of material fact necessary to make a statement not false or misleading.[30]

In describing some of the "general circumstances" that fall within the "focus" of the proposed rule, the USDA suggested they would include instances "where a live poultry dealer's poultry nutrition adviser provides misleading advice to a contract grower, where a swine production contract provides false information regarding manure compliance procedures, or where a packer provides false or misleading information about cash market trading in livestock." A live poultry dealer's provision of unfavorable inputs to certain producers — despite making statements denying differences in treatment — is also flagged. All these examples of potentially prohibited conduct under the ICMI Rule correspond to violative deceptions raised in the case law and existing regulations — which the USDA found to include not only "obvious falsehoods," but also instances of regulated entities failing to disclose potential conflicts of interest, leveraging asymmetries in market intelligence against farmers, employing sales tactics that omit relevant information, and making secret payments or commercial bribes.

Given the thoroughness of consideration evident in the ICMI Notice, the validity and expertness of its reasoning, and its consistency with the USDA's longstanding interpretation of the Packers and Stockyards Act, we urge the Court to follow the USDA's lead in defining "deceptive practices" under Section 202(a).[31] As described in the ICMI Notice, these include (i) any practice that satisfies the elements of a prohibited practice under the proposed 9 CFR § 201.306; and (ii) all other false statements or omissions that prevent or mislead a reasonable recipient from making an informed decision or that otherwise adversely affect the conduct or decision of such recipient.

ii. *Competitive Injury Is Not Required*

The USDA has consistently taken the position that neither anticompetitive intent, anticompetitive harm, nor a likelihood of anticompetitive harm is an essential element of a valid Section 202(a) claim.[32]

---

[30] *See* Agriculture Marketing Service, USDA, Proposed Rule: Inclusive Competition and Market Integrity Under the Packers and Stockyards Act, 87 FR 60010, 60055 (October 3, 2022) (Proposed 9 CFR 201.306 in relevant part).

[31] *See United States v. Mead Corp.*, 533 U.S. 218, 228, 121 S. Ct. 2164, 2172, 150 L. Ed. 2d 292 (2001) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)) ("The weight [accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.").

[32] *See Been v. O.K. Indus., Inc.*, 495 F.3d 1217, 1239 (10th Cir. 2007) (Hartz, J., concurring in part, dissenting in part) ("[T]he USDA has consistently taken the position that in order to prove that a practice violates the broad prohibitions in §§ 202(a) and (b) . . . of the PSAA, it is not necessary to prove predatory intent, competitive injury, or likelihood of injury.") (quoting 1 John H. Davidson et al., Agricultural Law § 3.47, at 244 (1981)). *See also In Re: Ozark Cnty. Cattle Co., Inc.*, 49 Agric. Dec. 336 (U.S.D.A. Mar. 19, 1990) ("The Department has consistently taken the position that in order to prove [a claim under] § 202(a) or § 312(a) of the Act, it is not necessary to prove predatory intent, competitive injury, or likelihood of injury; and that it is the Department's duty to stop unlawful practices in their incipiency prior to actual injury.") (citing *In re ITT Continental Baking Co.*, 44 Agric. Dec. (748, 781 (1985), final order, 44 Agric. Dec. 1971 (1985)); *In re Walti, Schilling & Co.*, 39 Agric. Dec. 119, 149-50 (1978); *In re Hines*, 35 Agric. Dec. 113,

Importantly, in the ICMI Notice, the USDA indicates that the "specific prohibitions" set forth in the proposed regulation are, in its considered judgment, sufficient to demonstrate a violation of Section 202(a). This judgment is unequivocally entitled to substantial *Skidmore* deference.

To determine "[t]he fair measure of deference [owed] to an agency [interpreting] its own statute," courts may "look to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position."[33] The proposed ICMI Rule and corresponding Notice are part of an ongoing, formal notice-and-comment rulemaking process. The USDA interpretation of Section 202(a) expressed in these agency pronouncements is the direct product of a year-long series of investigations, hearings, and studies — which was itself informed by the USDA's experience with more than half a dozen rulemakings under the Packers and Stockyards Act launched since 2010.[34] Perhaps most importantly, the ICMI Rule reflects the agency's century-old interpretation of the essential elements of a deceptive-practices claim under Section 202(a)[35] — and it was proposed as part of a package of interlacing rulemakings the USDA has proposed in recent months to revitalize the Packers and Stockyards Act for the 21st Century.[36] All of these facts tip the *Skidmore* factors in favor of deference to the USDA.

If objectors to the Consent Decree argue that the Fourth Circuit's opinion in *Philson v. Goldsboro Milling Company*[37] binds the Court to find that "harm to competition" is an essential element of a valid Section 202(a) claim, their argument is meritless. To begin with, *Philson* is an unpublished decision from 1998. Under Fourth Circuit Court of Appeals Local Rule 32.1: "Citation of this Court's unpublished dispositions issued prior to January 1, 2007, in briefs . . . in the district courts within this Circuit is disfavored[.]" Moreover,

---

123-24 (1976); *In re Central Coast Meats, Inc.*, 33 Agric. Dec. 117, 161-76 (1974), rev'd, 541 F.2d 1325 (9th Cir. 1976) (2-1 decision); *Swift & Co. v. United States*, 393 F.2d 247, 253 (7th Cir. 1968); *Bowman v. USDA*, 363 F.2d 81, 85 (5th Cir. 1966); *Wilson & Co. v. Benson*, 286 F.2d 891, 895 (7th Cir. 1961); *Hyatt v. United States*, 276 F.2d 308, 312 (10th Cir. 1960); *Daniels v. United States*, 242 F.2d 39, 41- 42 (7th Cir.), cert. denied, 354 U.S. 939 (1957)).

[33] *See United States v. Mead Corp.*, 533 U.S. 218 (2001).

[34] *See* Agriculture Marketing Service, USDA, Proposed Rule: Inclusive Competition and Market Integrity Under the Packers and Stockyards Act, 87 FR 60010, 60010-15 (October 3, 2022).

[35] *See* 1 John H. Davidson et al., Agricultural Law § 3.47, at 244 (1981)) ("[T]he USDA has consistently taken the position that in order to prove that a practice violates the broad prohibitions in §§ 202(a) and (b) . . . of the PSA, it is not necessary to prove predatory intent, competitive injury, or likelihood of injury."). *See also In Re: Ozark Cnty. Cattle Co., Inc.*, 49 Agric. Dec. 336 (U.S.D.A. Mar. 19, 1990) ("The Department has consistently taken the position that in order to prove [a claim under] § 202(a) or § 312(a) of the Act, it is not necessary to prove predatory intent, competitive injury, or likelihood of injury; and that it is the Department's duty to stop unlawful practices in their incipiency prior to actual injury.")

[36] *See* Agriculture Marketing Service, USDA, Proposed Rule: Inclusive Competition and Market Integrity Under the Packers and Stockyards Act, 87 FR 60010, 60010-15 (October 3, 2022); Agriculture Marketing Service, USDA, Proposed Rule: Transparency in Poultry Grower Contracting and Tournaments, 87 FR 34980 (June 8, 2022); Agriculture Marketing Service, USDA, Proposed Rule: Poultry Growing Tournament Systems: Fairness and Other Concerns, 87 FR 34814 (September 6, 2022). *See also* Executive Order 14036 of July 9, 2021, "Promoting Competition in the American Economy," 86 FR 36987 (July 14, 2021).

[37] *See* 1998 WL 709324 (4th Cir. 1998).

"unpublished opinions have no precedential value in the Fourth Circuit."[38] *Philson* is only entitled to the weight it generates by the persuasiveness of its reasoning[39] — and, as district courts in the Fourth Circuit have now repeatedly held, *Philson*'s reasoning is threadbare and unpersuasive.[40]

The leading case evaluating the persuasiveness of *Philson*'s reasoning — which consists entirely of a single paragraph[41] — is *M&M Poultry, Inc. v. Pilgrim's Pride Corporation*. In that case, Judge Bailey provided a thorough, scholarly analysis to show: (1) that the *Philson* court failed to undertake a meaningful analysis of Section 202(a) under settled principles of statutory interpretation in the Fourth Circuit; (2) that a construction of Section 202(a) which requires a plaintiff to prove anticompetitive effects is irreconcilable with the specific text of Section 202(a), its immediate context, and the structure of the Act as a whole; and, finally, (3) that the legislative history provides no actual support for reading into Section 202(a) a requirement of anticompetitive effects not indicated by its text. Notably, the defendant in *M&M Poultry* — Pilgrim's Pride, which is surely as sophisticated and deep-pocketed a litigant as they come — declined to appeal Judge Bailey's decision. We hope the Court will review Judge Bailey's well-considered opinion, as well as the numerous other district, circuit, and administrative decisions that have rejected the notion that "harm to competition" is an essential element of a Section 202(a) claim.[42]

---

[38] *See M&M Poultry, Inc. v. Pilgrim's Pride Corp.*, 2015 WL 13841400, at *9 (N.D.W. Va. Oct. 26, 2015) (citing *Hentosh v. Old Dominion Univ.*, 767 F.3d 413, 417 (4th Cir. 2014)).

[39] *See M&M Poultry, Inc. v. Pilgrim's Pride Corp.*, 2015 WL 13841400, at *9 (N.D.W. Va. Oct. 26, 2015) (citing *Hentosh v. Old Dominion Univ.*, 767 F.3d 413, 417 (4th Cir. 2014)).

[40] *See M&M Poultry, Inc. v. Pilgrim's Pride Corp.*, 2015 WL 13841400, at *6-10 (N.D.W. Va. Oct. 26, 2015); *Triple R Ranch, LLC v. Pilgrim's Pride Corp.*, 456 F. Supp. 3d 775, 778 (N.D.W. Va. 2019).

[41] This paragraph constitutes the entirety of the *Philson* court's analysis:

> According to the Philsons, the trial court inaccurately stated the law when it instructed the jury that the Philsons were required to prove that the defendants' conduct was likely to affect competition adversely in order to prevail on their claims under the Packers and Stockyard Act, 7 U.S.C. § 192(a). This argument is without merit. Section 192(a) prohibits live poultry dealers from engaging in or using "any unfair, unjustly discriminatory or deceptive practice or device." While the Philsons correctly observe that it is unnecessary to prove *actual* injury to establish an unfair or deceptive practice, a plaintiff must nonetheless establish that the challenged act is *likely* to produce the type of injury that the Act was designed to prevent. *See, e.g., Farrow v. United States Dep't of Agriculture*, 760 F.2d 211, 215 (8th Cir.1985) ("The Packers and Stockyards Act does not require that the Secretary prove actual injury before a practice may be found unfair. '[T]he purpose of the Act is to halt unfair trade practices in their incipiency, before harm has been suffered.' Accordingly, the Secretary need only establish the likelihood that an arrangement will result in competitive injury to establish a violation." (citations omitted)); *see also Parchman v. United States Dep't of Agriculture*, 852 F.2d 858, 864 (6th Cir.1988) (quoting *Farrow*). The district court's instruction that the Philsons needed to prove the defendants' conduct was likely to cause injury was therefore a correct statement of the law.

*Philson v. Goldsboro Mill. Co.*, 1998 WL 709324, at *4 (4th Cir. 1998).

[42] *See M&M Poultry, Inc. v. Pilgrim's Pride Corp.*, 2015 WL 13841400, at *6-10 (N.D.W. Va. Oct. 26, 2015); *Schumacher v. Tyson Fresh Meats, Inc.*, 434 F.Supp.2d 748, 753-54 (D.S.D. 2006) (holding that "Section 202 of the PSA is broader than its antecedent antitrust legislation" and, in reference to § 202(a) specifically, "does not prohibit only those unfair and deceptive practices which adversely affect competition"); *Kinkaid v. John Morrell & Co.*, 321 F.Supp.2d 1090, 1103 (N.D. Iowa 2004) ("[O]nly a strained reading of the statute could require that practices that are 'unfair' or 'deceptive' within the meaning of § 192(a) must *also* be 'monopolistic' or 'anticompetitive' to be prohibited."); *Gerace v. Utica Veal Co., Inc.*, 580 F.Supp. 1465, 1469–70

Beyond the arguments that Judge Bailey and others have made against following *Philson* and the three similar decisions in other circuits,[43] we will add that each of these decisions follows a freewheeling approach to statutory construction that is dramatically out-of-step with — and impermissible under — current interpretive doctrine. Instead of "beginning by examining the key statutory terms,"[44] all of these decisions ignored the terms of Section 202(a) as all but "empty vessels" and reasoned the requirement of anticompetitive harm into existence based on threadbare, practically ahistorical arguments about the "antitrust ancestry" of the Act and

---

(N.D.N.Y.1984) (holding it is unnecessary to allege anticompetitive harm under § 202(a)); *Swift & Co. v. United States*, 393 F.2d 247, 253 (7th Cir. 1968) ("However, the statutory prohibitions of Section 202 of the Packers and Stockyards Act are broader and more far-reaching than the Sherman Act or even Section 5 of the Federal Trade Commission Act. Section 202(a) of the Act does not require the Government to prove injury to competition. The Act is remedial legislation and is to be construed liberally in accord with its purpose to prevent economic harm to producers *and* consumers at the expense of middlemen.") (emphasis added) (internal citations omitted); *Wilson & Company v. Benson*, 286 F.2d 891, 895 (7th Cir. 1961) ("[T]he language in Section 202(a) of the Act does not specify that a 'competitive injury' or a 'lessening of competition' or a 'tendency to monopoly' be proved in order to show a violation of the statutory language. To repeat, that section provides it shall be unlawful for any packer to 'engage in or use any unfair, unjustly discriminatory, or deceptive practice or device in commerce.'). *See also In re Ozark County Cattle Co., Inc.*, 49 Agric. Dec. 336, 365 (1990), 1990 WL 320312; *In Re: W. States Cattle Co.*, 47 Agric. Dec. 992, 1050 (U.S.D.A. June 23, 1988); *In Re: Corn State Meat Co., Inc.*, 45 Agric. Dec. 995, 1023 (U.S.D.A. May 8, 1986).

[43] In addition to the Fourth Circuit in *Philson*, only three other Circuit Courts — the Fifth, Sixth, and Eleventh Circuits — have categorically held that anticompetitive harm is an essential element of any Section 202(a) claim. Of those, only the Fifth and Eleventh carefully considered the issue and explained their reasoning.

The Seventh Circuit has only held that anticompetitive harm is required to prove a Section 202(a) claim that is analogous to a price discrimination claim under the Clayton Act (and, perhaps, other claims that are likewise prohibited under the antitrust laws). *See Armour & Co. v. United States*, 402 F.2d 712, 717 (7th Cir. 1968) ("Our conclusion, drawn from case law and legislative history, is that a coupon program of this nature does not violate Section 202(a), absent some predatory intent or some likelihood of competitive injury."). The Eighth Circuit has held that proving anticompetitive harm is sufficient to make out a Section 202(a) claim, but has not held that it is necessary to make such a claim. *See IBP, Inc. v. Glickman*, 187 F.3d 974 (8th Cir. 1999); *Farrow v. U.S.D.A.*, 760 F.2d 211 (8th Cir. 1985). *See also Schumacher v. Tyson Fresh Meats, Inc.*, 434 F.Supp.2d 748, 753-54 (D.S.D. 2006) (discussing above-mentioned 8th Circuit cases). The Ninth Circuit has held similarly, affirming a district court's finding that collusive conduct between Washington State beef packers that created a likelihood of competitive harm violated Section 202(a), but not that such a likelihood is required for conduct to violate the Section. *See De Jong Packing Co. v. U.S. Dept. of Agriculture*, 618 F.2d 1329 (9th Cir. 1980). To the extent these cases contained more general expressions on the interpretation of Section 202(a), "[i]t is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used." *See* In Re: Corn State Meat Co., Inc., 45 Agric. Dec. 995, 1025 (U.S.D.A. May 8, 1986) (quoting *Cohens v. Virginia*, 6 Wheat. 264, 399 (1821)). *See also Humphrey's Executor v. United States*, 295 U.S. 602, 626-27 (1935) (applying *Cohens* "maxim" to limit numerous expressions in *Myers v. United States*, 272 U.S. 52 (1926) to "narrow point actually decided"); *Osaka Shosen Kaisha Lina v. United States*, 300 U.S. 98, 102-04 (1937) (likewise with respect to *Taylor v. United States*, 207 U.S. 120, 124-125 (1907)).

Although the Tenth Circuit held in *Been v. O.K. Industries, Inc.*, that anticompetitive harm is required for claims of unfair practices under Section 202(a), it expressly indicated that its opinion in *Been* does not extend to claims of deceptive practices nor disturb earlier decisions affirming deceptive-practice claims without requiring anticompetitive harm. *See* 495 F.3d 1217 (10th Cir. 2007) (distinguishing earlier case that was "silent" on competitive injury because "it involved an act alleged to be deceptive, as opposed to unfair," and stating "[w]e are concerned here only with whether *unfairness* requires a showing of a likely injury to competition, not whether deceptive practices require such a showing").

[44] *See Bostock v. Clayton County*, 140 S.Ct. 1731, 1737 (2020) ("[We] begin by examining the key statutory terms in turn" before "confirming our handiwork against this Court's precedents.").

11

monopolization being the only "evil" that motivated Congress to pass it.[45] This kind of "antitrust antitextualism"[46] turns legitimate statutory interpretation on its head.

Notwithstanding ongoing debate over the merits of competing theories of statutory interpretation in academia, federal court practice has moved decidedly in a textualist direction.[47] Before the 1990s, the default paradigm for statutory interpretation was the one articulated in *Holy Trinity Church v. United States* — that the "letter" (text) of a statute must yield when it conflicts with its "spirit" (purpose). Over the past three decades, however, the Supreme Court's cases have advanced a new paradigm,[48] instructing judges not only to start with the statutory text, but also to follow an increasingly structured process for determining whether the text's meaning is plain or ambiguous, whether it leads to "absurd results," and when, how, and why, to resort to legislative history.[49]

---

[45] *See Wheeler v. Pilgrim's Pride Corp.*, 591 F.3d 355 (5th Cir. 2009) (conducting no textual analysis); *Id.* at 364 (Jones, C.J., concurring) ("The words of the act are, on their face, empty vessels[.]"); *London v. Fieldale Farms Corp.*, 410 F.3d 1295 (11th Cir.2005) (conducting no textual analysis and relying on the PSA's legislative history, "antitrust ancestry," and "policy considerations"); *Terry v. Tyson Farms, Inc.*, 604 F.3d 272 (2010) (following other circuits in holding that "the purpose of the Packers and Stockyards Act of 1921 is to protect competition and, therefore, only those practices that will likely affect competition adversely violate the Act" without further analysis).

[46] Daniel A. Crane, *Antitrust Antitextualism*, 96 Notre Dame L. Rev. 1205 (2021) ("[In implementing the antitrust laws,] [t]he courts have not merely abandoned statutory textualism or other modes of faithful interpretation out of a commitment to a dynamic common law process. Rather, they have departed from text and original meaning in one consistent direction—toward reading down the antitrust statutes in favor of big business. . . . This Article uses 'antitextualism' as shorthand for the phenomenon of ignoring any bona fide construction of what a statute means, whether in the plain meaning of its words, linguistic or substantive interpretive canons, legislative history, or other ordinary markers of legislative meaning.").

[47] *See* Thomas R. Lee & Stephen C. Mouritsen, *Judging Ordinary Meaning*, 127 Yale L. J. 788, 793 (2018) (underscoring the influence of textualism in the courts) (citing John F. Manning & Matthew C. Stephenson, Legislation and Regulation: Cases And Materials 60 (2d ed. 2013) ("Over the last quarter-century, textualism has had an extraordinary influence on how federal courts approach questions of statutory interpretation. When the Court finds the text to be clear in context, it now routinely enforces the statute as written.")). *See also* Jonathan T. Molot, *The Rise and Fall of Textualism*, 106 COLUM. L. REV. 1, 3, 32-34 (2006) (noting that "textualism has so succeeded in discrediting strong purposivism that it has led even nonadherent to give great weight to statutory text" and citing empirical and anecdotal evidence in support); Abbe Gluck, *Symposium: The Grant in King—Obamacare subsidies as textualism's big test*, SCOTUSblog (Nov. 7, 2014) ("Textualists have spent three decades convincing judges of all political stripes to come along for the ride, and have had enormous success in establishing 'text-first' interpretation as the general norm."); Thomas W. Merrill, *Textualism and the Future of the Chevron Doctrine*, 72 WASH. U.L. REV. 351, 353, 354–57 (1994) (reviewing existing and offering new contributions to the empirical evidence of textualism's influence and concluding that "there can be no doubt that textualism has asserted a powerful hold over the Supreme Court's statutory interpretation jurisprudence").

[48] A number of studies corroborate the trends of reduced reliance on legislative history and enhanced reliance on textual cues at the Supreme Court. *See, e.g.*, James J. Brudney & Corey Ditslear, *The Decline and Fall of Legislative History? Patterns of Supreme Court Reliance in the Burger and Rehnquist Eras*, 89 JUDICATURE 220, 222 (2006) (documenting that in workplace cases, "the Court's reliance on legislative history declined from 51 percent during the Burger years to 29 percent in the Rehnquist era"); Michael H. Koby, *The Supreme Court's Declining Reliance on Legislative History: The Impact of Justice Scalia's Critique*, 36 HARV. J. ON LEGIS. 369, 386 (1999) (reporting that in the six years before Justice Scalia's appointment, the Court averaged 3.47 citations of legislative history per opinion and that the average in the twelve years after his appointment dropped to 1.87); Thomas W. Merrill, *Textualism and the Future of the Chevron Doctrine*, 72 WASH. U. L.Q. 351, 356-63 (1994) (discussing the Rehnquist Court's shift toward arguments based on semantic meaning and linguistic canons); Samuel A. Thumma & Jeffrey L. Kirchmeier, *The Lexicon Has Become a Fortress: The United States Supreme Court's Use of Dictionaries*, 47 BUFF. L. REV. 227, 252-60 (1999) (documenting a dramatic increase in the Court's citation of dictionaries in the Rehnquist era).

[49] *See infra* notes 54-71.

Under this framework, "statutory texts are not just common law principles or aspirations to be shaped and applied as judges think reasonable."[50] Judges are "bound, not only by the ultimate purposes Congress selected" for a statute, but also "by the means it has deemed appropriate — and prescribed — for the pursuit of those purposes" in the statutory text.[51] This elevation of the text as the touchstone of legislative meaning cuts against both expansive and crabbed interpretations of statutes. On the one hand, the Supreme Court has emphasized that "the purpose of a statute includes not only what it sets out to change, but also what it resolves to leave alone" in the statutory text.[52] On the other hand, it has recognized "that the reach of a statute often exceeds the precise evil to be eliminated" and, accordingly, that judges may not "restrict the unqualified language of a statute to the particular evil [they believe] Congress was trying to remedy[.]"[53]

Today, the proper starting point for interpreting a statutory provision is the plain meaning of the provision's text.[54] A court may look beyond a statute's words to legislative history or to canons of interpretation only if the statute's words are ambiguous or if their plain meaning leads to absurd results.[55] Otherwise, the court must enforce the provision as written.[56]

Even when a court finds ambiguities in a provision's text, the court may resort to the legislative history of the provision and apply the various canons of interpretation only to resolve those specific ambiguities.[57] The task of the judge in this context is not to go on a freewheeling search for the unexpressed intentions of legislators

---

[50] *See* Brett M. Kavanaugh, *Fixing Statutory Interpretation*, Book Review, 129 Harv. L. Rev. 2118, 2135 (2016) ("Under the structure of our Constitution, Congress and the President — not the courts — together possess the authority and responsibility to legislate. As a result, clear statutes are to be followed. Statutory texts are not just common law principles or aspirations to be shaped and applied as judges think reasonable.").

[51] *See* John F. Manning, *Second-Generation Textualism*, 98 Calif. L. Rev. 1287, 1316-17 (2010) (quoting *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 231 n.4 (1994) (Scalia, J.)).

[52] *See W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98 (1991).

[53] *See Brogan v. United States*, 522 U.S. 398, 403 (1998) (Scalia, J.). *See also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998) (Scalia, J.) ("[S]tatutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.").

[54] *See, e.g., Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004); *Barnhardt v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 450 (2002).

[55] *See, e.g., Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253 (1992).

[56] *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000).

[57] *See Lamie v. U.S. Trustee*, 540 U.S. 526, 531, 534 (2004) (declining to resort to legislative history of statutory provision even though the provision was "ungrammatical," because the provision was clear on the question at hand); *Blum v. Stenson*, 465 U.S. 886, 896 (1984) (noting that courts look beyond statutory text only when "resolution of a question of federal law turns on a statute" and "the statutory language is unclear" on that question); *United States v. Donruss Co.*, 393 U.S. 297, 303 (1969) (examining legislative history because "the language of the statute does not provide an answer to the question before us"). *See also Exxon Mobil Corp. v. Allapatah Services, Inc.*, 545 U.S. 546, 568 (2005) ("[T]he authoritative statement is the statutory text, not the legislative history or any other extrinsic material. Extrinsic materials have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of *otherwise ambiguous terms*.") (emphasis added).

and imaginatively reconstruct the text's semantic import to capture those background intentions — it is simply to "find the meaning of the words used."[58] Accordingly, a court may examine and rely upon legislative history in interpreting a statutory text only to the extent it "shed[s] a reliable light on the enacting legislature's understanding of otherwise ambiguous terms."[59]

The "absurdity doctrine" provides no more hospitable grounds for courts to "read[] additional terms into unambiguous statutory language[.]"[60] Formally, a provision's plain meaning leads to "absurd results" if it produces results that "no reasonable person could intend"[61] or, at a minimum, results that "are demonstrably at odds with the intentions of [the provision's] drafters."[62] In its broadest sense, the absurdity doctrine may permit the courts to reject the plain meaning of a statutory text if its effect would "subvert an important state or federal interest,"[63] or would render other provisions of the statutory scheme unworkable.[64] In recent decades, however, the Supreme Court has endorsed progressively narrower interpretations of this doctrine. On the one hand, it has made clear that the absurdity doctrine does not permit the courts to "soften the clear import of Congress' chosen words" simply because "those words lead to a harsh outcome"[65] — much less because they lead to

---

[58] *See* Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 394, 391-96 (2012) (Section 67 on "the false notion that the purpose of interpretation is to discover intent"). *See also Lamie v. U.S. Trustee*, 540 U.S. 526, 538 (2004) (declining to "read an absent word into the statute" where the statute evinces a "plain, nonabsurd meaning"); *Bates v. United States*, 522 U.S. 23, 29 (1997) (holding that courts "ordinarily" should "resist reading words or elements into a statute that do not appear on its face"); *United States v. Sisson*, 399 U.S. 267, 297 (1970) (noting that courts are not "free to pour [into vague statutory terms] a vintage that we think better suits present-day tastes"); *Iselin v. United States*, 270 U.S. 245, 251 (1926) (quoted in *Lamie v. U.S. Trustee*, 540 U.S. 526, 538 (2004)) ("What the government asks is not a construction of [the] statute, but, in effect, an enlargement of it by the court, so that what was omitted, presumably by inadvertence, may be included within its scope. To supply omissions transcends the judicial function.").

[59] *See Exxon Mobil Corp. v. Allapattah Services, Inc.*, 545 U.S. 546, 568-69 (2005) ("As we have repeatedly held, the authoritative statement is the statutory text, not the legislative history or any other extrinsic materials. Extrinsic materials have a role to play in statutory construction only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms.").

[60] *See M&M Poultry, Inc. v. Pilgrim's Pride Corp.*, 2015 WL 13841400, at *8 (N.D.W. Va. Oct. 26, 2015) (quoting *Lamie v. U.S. Trustee*, 540 U.S. 526, 538 (2004) and citing *Bates v. United States*, 522 U.S. 23, 29 (1997)) ("Under well-settled principles, however, courts must refrain from reading additional terms into unambiguous statutory language such as this. if the text of the statute evinces 'a plain, nonabsurd meaning,' then the court should not 'read an absent word into the statute.').

[61] *See* Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 235-239 (2012) (Section 37 on the Absurdity Doctrine). *See also Sebelius v. Cloer*, 569 U.S. 369, 381 (2013); *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 527-28 (1989) (Scalia, J., concurring).

[62] *See Lamie*, 540 U.S. 526, 536-38 (2004); *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242-43 (1989).

[63] *See, e.g., Lamie v. U.S. Trustee*, 540 U.S. 526, 537 (2004) (examining whether implementing plain meaning of bankruptcy code provision would "undermine the prompt and effectual administration of federal bankruptcy law").

[64] *See, e.g. Johnson v. Sawyer*, 120 F.3d 1307, 1319 (5th Cir. 1997). *See also Lamie v. U.S. Trustee*, 540 U.S. 526, 536-38 (2004).

[65] *See Lamie v. U.S. Trustee*, 540 U.S. 526, 538 (2004) (quoting *U.S. v. Locke*, 471 U.S. 84, 95 (1985)) ("Our unwillingness to soften the import of Congress' chosen words even if we believe the words lead to a harsh outcome is longstanding.").

outcomes that are merely "anomalous," "odd," or "counterintuitive."[66] On the other hand, the Court has refused to apply the absurdity doctrine where a plain meaning's effect was flagged or anticipated by the legislative history — and even where contemporaneously-enacted provisions simply show that Congress was "thinking about" the implications embedded in the statutory text.[67] All in all, the Court has described the absurdity doctrine as one of last resort — "rarely" to be invoked "to overturn unambiguous legislation."[68]

Fundamentally, under prevailing statutory interpretation doctrine, the courts have an obligation to give effect to Congress's legislative intent, and absent ambiguity in its words or absurdity in its results, the language of a statute is Congress's "authoritative statement" of its intent.[69] Within this framework, "even the most formidable policy arguments cannot overcome a clear statutory directive."[70] For, in the end, the task of judges is "to discern and apply the law's plain meaning as faithfully as [they] can — not to assess the consequences of each approach and adopt the one that produces the least mischief."[71]

All of this cuts deeply against the validity of the Fourth Circuit's decision in *Philson* as well as against the validity of the decisions from other Circuits that have read a requirement of anticompetitive harm into Section 202(a). In other areas of law, the textualist turn discussed above has, in recent years, spurred a majority of the Supreme Court to adopt novel statutory interpretations,[72] to reject long-established statutory

---

[66] *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 565 (2005). *See also Reiter v. Sonotone Corp.*, 442 U.S. 330, at 342-45 (1979) (finding that potentially "ruinous" effect on small businesses "cannot govern our reading of the plain language of [antitrust provision]").

[67] *See Exxon Mobil Corp. v. Allapath Servs., Inc.*, 545 U.S. 546, 571 (2005) ("This is not a case where one can plausibly say that concerned legislators might not have realized the possible effect of the text they were adopting. Certainly, any competent legislative aide who studied the matter would have flagged this issue if it were a matter of importance to his or her boss, especially in light of the Subcommittee Working Paper. There are any number of reasons why legislators did not spend more time arguing over [the statute], none of which are relevant to our interpretation of what the words of the statute mean. "); *Demarest v. Manspeaker*, 498 U.S. 184, 185 (1991) (finding plain meaning of witness-fee provision mandating payment of witness fees to incarcerated witnesses in *habeas* trials not absurd where statutory provisions enacted around the same time explicitly denied payments to prisoners called as witnesses, which showed that "Congress was thinking about incarcerated individuals when it drafted the statute").

[68] *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 441 (2002).

[69] *See United States Chamber of Commerce v. Whiting*, 563 U.S. 582, 599 (2011) (quoting *Exxon Mobil Corp. v. Allapattah Services, Inc.*, 545 U.S. 546, 568 (2004)).

[70] *See BP P.L.C. v. Mayor of Baltimore*, 141 S. Ct. 1532, 1542 (2021). *See also Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1486 (2021) ("[N]o amount of policy-talk can overcome a plain statutory command. Our only job today is to give the law's terms their ordinary meaning. . . . [W]ords are how the law constrains power.").

[71] *See BP P.L.C. v. Mayor of Baltimore*, 141 S. Ct. 1532, 1542 (2021). *See also Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1494 (2020) ("[T]he place for reconciling competing and incommensurable policy goals like [the ones advanced by the parties] is before policymakers. This Court's limited role is to read and apply the law those policymakers have ordained[.]"); *United States v. Rodgers*, 466 U.S. 475, 484 (1984) ("Even if we were more persuaded than we are by these policy arguments, the result in this case would be unchanged. Resolution of the pros and cons of whether a statute should sweep broadly or narrowly is for Congress.").

[72] *See* Tara Leigh Grove, *Which Textualism?*, 134 Harv. L. Rev. 1, (2020) (explaining that the majority's textualist interpretation of Title VII to prohibit discrimination based on sexual orientation in *Bostock v. Clayton County* "disregard[ed] over 50 years of uniform judicial interpretation of Title VII," including the unanimous holdings of all ten circuit courts that had previously considered the issue) (citing *Bostock v. Clayton County*, 140 S. Ct. 1731, 1833 (2020) (Kavanaugh, J., dissenting) ("In the first 10 Courts of Appeals to consider the issue, all 30 federal judges agreed that Title VII does not prohibit sexual orientation discrimination. 30 out of 30 judges.")).

implementation rules among the Circuit Courts,[73] and even to overturn its own controlling statutory precedents.[74] We hope the Supreme Court will do the same in the context of the Packers and Stockyards Act sometime soon. Until then, we urge the District Court to follow the USDA's construction of Section 202(a) as the only one that accords with well-established methods of statutory interpretation.

      iii.    *The Complaint States a* Prima Facie *Claim Under Section 202(a)*

      Evaluated under the proper statutory standard for "deceptive practices," the Complaint states a *prima facie* claim for relief under Section 202(a). Specifically, the Complaint alleges that Sanderson and Wayne's contracts with growers compensate growers using a payment system known as the "tournament system."[75] Under this system, the grower's base level of compensation is adjusted up or down by the processor depending on how the grower performs relative to other growers on defined metrics in the judgment of the processor.[76] The growers' contracts entitle Sanderson and Wayne to select and modify those metrics at their discretion. The contracts also entitle Sanderson and Wayne to select, provide, and require growers to use the chicks, feed, and other major inputs that determine, in large part, how a grower will perform.[77] Finally, Sanderson and Wayne are entitled to determine both the number of flocks they will place with a grower and the stocking density of such flocks.[78]

      According to the Complaint, Sanderson and Wayne do not adequately disclose the risks inherent in these one-sided contractual arrangements — both at contract formation and during contract performance.[79] In particular, the United States alleges that:

- First, the processors' contracts with growers "omit or inadequately describe material key terms and risks" — such as the minimum number of placements or the minimum stock density the grower is

---

[73] *See Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1494 (2020) (Gorsuch, J.) (overturning a longstanding "willfulness" requirement adopted by several circuits in implementing the Lanham Act because it could not "be reconciled with the statute's plain meaning"); *Cooper Indus., Inc. v. Aviall Servs. Inc.*, 543 U.S. 157, 125 S. Ct. 577 (2004) (relying on the plain text to reverse scores of contrary circuit decisions).

[74] *See* Margaret L. Moses, *The Pretext of Textualism: Disregarding* Stare Decisis *in* 14 Penn Plaza v. Pyett, 14 Lewis & Clark L. Rev. 825 (2010) (examining the Supreme Court's decision in *14 Penn Plaza LLC v. Pyett*, which overturned *Alexander v. Gardner-Denver Co.*' and reinterpreted the Federal Arbitration Act on textualist grounds to permit employers to enforce forced-arbitration clauses in collective bargaining agreements).

[75] *See* Antitrust Division, U.S. DOJ, *Notice: United States v. Cargill Meat Solutions Corp., et al; Proposed Final Judgments and Competitive Impact Statement*, 87 FR 57028, 57029, 57033, 57042-43, 57047-48 (2022) (pages 212-217, 225-226, 260-262, and 279-280 of Complaint).

[76] *See id.*

[77] *See id.*

[78] *See id.*

[79] *See id.*

guaranteed — in a manner that "camouflage[s]" or "conceal[s]" the financial risks implicated in a contract, and that "mislead[s]" growers or "otherwise inhibit[s]" their ability to reasonably assess expected returns on investment.[80]

- Second, the contracts fail to disclose information at the processors' disposal about actual levels of compensation for poultry growers within their respective tournament systems — creating an asymmetry of information between the processor and the grower with respect to the "financial impact of the grower's investment."[81]

- Finally, the processors "omit," both in the growers' contracts and in other interactions with growers, "material information relating to the variability of inputs that can influence grower performance" and other information growers need to "determine the fairness of the tournament" according to which they get paid.[82]

As a result of these deceptions by the processors, growers have been unable to reasonably assess the range of financial outcomes to expect from contracts with Sanderson and Wayne; anticipate and manage the risks that arise from Sanderson and Wayne's actions under those contracts; or properly compare contracts from competing processors.[83] The Complaint concludes by alleging that Sanderson and Wayne engaged in deceptive practices both "regarding" and "through" their grower contracts.[84] Specifically, the Complaint alleges that the processors failed to "disclose material information" that (1) is "necessary [for growers] to make informed decisions about their contracting opportunities" before entering them; and that (2) "the grower needs to effectively compete in the tournament system and . . . evaluate their likely return and risks" during a contract's performance.[85]

Taking the detailed allegations in the Complaint as true, no reasonable argument can be made that the information which the processors failed to disclose to growers was immaterial or that growers could make informed decisions without this information. Accordingly, under the USDA's well-considered interpretation of the governing statute, the United States has alleged a *prima facie* claim for a violation of Section 202(a) of the Packers and Stockyards Act.

---

[80] *See id.* at 57042.

[81] *See id.*

[82] *See id.*

[83] *See id.*

[84] *See id.* at 57042, 57047.

[85] *See id.*

**B.    The Proposed Relief is Fair, Adequate, and Reasonable Under the Circumstances**

The relief proposed in the Consent Decree is fair because it was the product of extensive, arms-length bargaining between sophisticated parties and counsel. It is adequate because it rectifies the adverse aspects of the growers' contracts about which growers were deceived and ensures the integrity of the tournament payment system operated by the processors going forward. Finally, it is reasonable because, in the context of the power imbalance between growers and processors, the proposed relief is required to appropriately remedy the processors' alleged deceptions and secure compliance with the law.

Under the terms of the Consent Decree, Sanderson and Wayne are prohibited from reducing the base compensation made to any grower as a result of that grower's performance or as a result of the grower's performance in comparison with that of other growers.[86] The processors are allowed to offer incentive payments over base compensation based on grower performance, but those are capped to 25% of the sum of total payments paid for broiler flocks processed at a single facility on an annual basis.[87] Within 75 business days after entry of the Consent Decree, the processors must offer each grower a modification of their contract reflecting these terms. Finally, Sanderson and Wayne must comply with the disclosure requirements in Section V of a proposed rule by the USDA entitled "Transparency in Poultry Grower Contracting and Tournaments,"[88] which was specifically designed by the agency to "improve transparency and forestall deception in the use of poultry growing arrangements."[89]

To ensure Sanderson and Wayne's compliance with these terms, the Consent Decree provides for the appointment of a court monitor and requires the processors to cooperate with investigation requests by the Antitrust Division.[90] Further, it prohibits the processors from retaliating against any employee, grower, or third party for disclosing information to the monitor, an antitrust enforcement agency, or a legislature.[91]

---

[86] *See* Antitrust Division, U.S. DOJ, *Notice: United States v. Cargill Meat Solutions Corp., et al; Proposed Final Judgments and Competitive Impact Statement*, 87 FR 57028, 57050-54 (2022) (Sections IV through IX of Proposed Final Judgment).

[87] *See* Antitrust Division, U.S. DOJ, *Notice: United States v. Cargill Meat Solutions Corp., et al; Proposed Final Judgments and Competitive Impact Statement*, 87 FR 57028, 57050-54 (2022) (Sections IV through IX of Proposed Final Judgment).

[88] *See* Antitrust Division, U.S. DOJ, *Notice: United States v. Cargill Meat Solutions Corp., et al; Proposed Final Judgments and Competitive Impact Statement*, 87 FR 57028, 57050-54 (2022) (Sections IV through IX of Proposed Final Judgment).

[89] Agriculture Marketing Service, USDA, Proposed Rule: Transparency in Poultry Grower Contracting and Tournaments, 87 FR 34980, 34981 (June 8, 2022).

[90] *See* Antitrust Division, U.S. DOJ, *Notice: United States v. Cargill Meat Solutions Corp., et al; Proposed Final Judgments and Competitive Impact Statement*, 87 FR 57028, 57050-54 (2022) (Sections IV through IX of Proposed Final Judgment).

[91] *See* Antitrust Division, U.S. DOJ, *Notice: United States v. Cargill Meat Solutions Corp., et al; Proposed Final Judgments and Competitive Impact Statement*, 87 FR 57028, 57050-54 (2022) (Sections IV through IX of Proposed Final Judgment).

i.    *Fairness*

The fairness of the Consent Decree to Sanderson and Wayne is unimpeachable. First, although no formal discovery has occurred in this litigation, the parties reached an agreement on the Consent Decree after a multi-year investigation by the United States and months of settlement negotiations between the United States and the Defendants.[92] These negotiations almost certainly included the exchange of sufficient information for the Defendants — undoubtedly represented by capable and sophisticated counsel — to evaluate the strength of the United States' claims and the appropriate relief.[93] Even if the Court has concerns about whether the United States has insufficiently alleged an injury to competition as part of its Section 202(a) claim, the Court may presume that "those expert attorneys on the defense side would not have agreed to the proposed terms [of the Consent Decree] if they were not convinced of a real and powerful probability" that Sanderson and Wayne would be found liable.[94] As the Second Circuit stated in its influential opinion in *SEC v. Citigroup*, it is neither necessary nor proper for a district court to be concerned with "protect[ing] a private, sophisticated, counseled litigant" such as Sanderson or Wayne "from a settlement to which it freely consents."[95]

---

[92] *See United States v. Baltimore County, Maryland*, , 2021 WL 2000480, at *9 (D. Md. May 19, 2021) (finding consent decree was fair because, *inter alia*, "[al]though no formal discovery occurred in this litigation, the parties reached the Agreement after a multi-year investigation by the United States and over a year of settlement negotiations, which included the exchange of sufficient information to evaluate the strength of the United States' claims and the appropriate relief"); *United States v. City of Welch, W. Va.*, 2012 WL 385489, at *3 (S.D.W. Va. Feb. 6, 2012) (finding proposed consent decree was fair because, *inter alia*, it was "based on months of arm's length negotiations" during which "the United States, the State, counsel for [City of] Welch, and engineers and representatives from the City government of Welchange have engaged in numerous settlement discussions prior to the filing of the Complaint"); *United States v. Westvaco Corp.*, , 2016 WL 4492704, at *5 (D. Md. Aug. 26, 2016) (finding proposed consent decree was fair because, *inter alia*, it was "reached with the assistance of a magistrate judge through an arms-length negotiation by Westvaco and the Government" and was "reviewed and approved by Westvaco's management as well as the Assistant Attorney General . . .").

[93] *See United States v. Baltimore County, Maryland*, , 2021 WL 2000480, at *9 (D. Md. May 19, 2021) (finding consent decree was fair because, *inter alia*, "[al]though no formal discovery occurred in this litigation, the parties reached the Agreement after a multi-year investigation by the United States and over a year of settlement negotiations, which included the exchange of sufficient information to evaluate the strength of the United States' claims and the appropriate relief"); *United States v. Baltimore Police Dep't.*, 249 F. Supp. 3d 816, 818 (D. Md. 2017) (finding consent decree was fair because, *inter alia*, although "no discovery has occurred as part of the instant litigation" and "Defendants [had not] admitted wrongdoing or liability," the fairness of the consent decree "can be inferred from Defendants' evident cooperation in [the United States'] investigation of Baltimore policy practices and their ready embrace of a negotiated resolution of this case based upon that investigation"); *United States v. Westvaco Corp.*, , 2016 WL 4492704, at *5 (D. Md. Aug. 26, 2016) (finding proposed consent decree was fair because, *inter alia*, it was "counsel for both parties are experienced and well-versed in the issues of this specific litigation as well as CAA enforcement cases generally").

[94] *See United States v. Baltimore Police Dep't.*, 249 F. Supp. 3d 816, 818 (D. Md. 2017).

[95] *See U.S. S.E.C. v. Citigroup Glob. Markets Inc.*, 673 F.3d 158, 165 (2d Cir. 2012) (questioning "whether it is a proper part of the [district] court's legitimate concern to protect a private, sophisticated, counseled litigant from a settlement to which it freely consents" and "doubt[ing]" that "a court's discretion extends to refusing to allow such a litigant to reach a voluntary settlement in which it gives up things of value without admitting liability").

  *ii.  Adequacy*

  The adequacy of the amount and form of relief proposed in the Consent Decree must be evaluated in light of the purposes of the Packers and Stockyards Act and the remedies it provides for plaintiffs.[96] It is well recognized that the purpose of the Act is to ensure "fair competition *and* fair trade practices in livestock marketing and in the meatpacking industry."[97] If this case were litigated and the United States were to prevail, Sanderson and Wayne would be "liable to the person or persons injured thereby for the full amount of damages sustained in consequence of [their] violation" of the Act.[98] The United States would also be entitled to seek all other remedies "existing at common law or by statute" in addition to those provided by the Act, including equitable relief.[99]

  By prohibiting Sanderson and Wayne from reducing growers' base compensation based on performance, the Consent Decree would cure the fundamental risk embedded in the growers' contracts and about which Sanderson and Wayne deceived growers. It would also prevent Sanderson and Wayne from abusing their control over the tournament payment system — and the asymmetry of information that control creates — to further deceive or otherwise injure growers with respect to the compensation they are entitled to under their contracts. By also capping the amount of "incentive" compensation that Sanderson or Wayne may provide as a percentage of the total compensation paid to growers at any one processing facility, the Consent Decree also provides a simple way to prevent the processors from sidestepping the Consent Decree by substituting large amounts of incentive compensation for across-the-board reductions in base compensation.

  The provisions of the Consent Decree requiring Sanderson and Wayne to comply with the USDA's proposed transparency regulations, cooperate with the court-appointed monitor and the Antitrust Division, and provide regular compliance reports, will help secure the processors' compliance with the Consent Decree. The relief proposed in the Consent Decree restructures the relationship between growers and the processors to remedy its primary deceptive features and deprive the processors of opportunities for future abusive conduct against growers. It is also worth noting that entry of the Consent Decree would not affect the rights of private growers to bring their own deceptive-practice claims against Sanderson, Wayne, and other poultry processors.

---

[96] *See United States v. Baltimore County, Maryland*, , 2021 WL 2000480, at *6 (D. Md. May 19, 2021) (finding the relief proposed in consent decree was adequate, *inter alia*, because "[i]t is clear that the agreed upon injunctive and individual relief, including priority hiring, back pay, and retroactive seniority, outlined above, comports with the purposes of Title VII in that it is intended to cure the discriminatory effect of the challenged exams and prevent future discrimination in the County's hiring for entry-level police officer and cadet positions").

[97] *See H.R. 85–1048 at 1 (1957), reprinted in 1958 U.S.S.C.A.N. 5212, 5213 (emphasis added).*

[98] *See* 7 U.S.C. § 209(a).

[99] *See* 7 U.S.C. § 209(b).

Therefore, we believe the Consent Decree sufficiently advances the purpose of the Act to secure fair trade practices in poultry markets and should be considered adequate by the Court.[100]

      *iii.    Reasonableness*

The relief proposed in the Consent Decree is "within the range of reasonableness."[101] Although movants for the entry of a Consent Decree are certainly not required to show that the proposed relief is narrowly, or even exclusively, tailored to cure the alleged violations,[102] in this case the proposed restructuring of the contractual relationship between Sanderson/Wayne and their growers is necessary to remedy the processors' alleged deceptions — particularly in the context of the "power of the [processors] over their vertical relationships" with growers.[103]

Poultry processors like Wayne and Sanderson control nearly every aspect of the poultry supply chain, from genetic lines and hatcheries, to feed mills and medication, to transportation and processing — essentially every activity except raising the birds. These poultry processors (called "integrators" in the industry) have used a combination of horizontal concentration and vertical integration to exercise near-complete control over contract growers. Nationally, poultry processing has a four-firm concentration ratio of around 60 percent following the recent merger involving the Processing Defendants, but at the regional level poultry farmers generally have only one or, at most, two processors they can access.[104] This essentially strips them of any bargaining power and forces them to accept the terms of whatever processing contract is offered. More than 95 percent of poultry production[105] occurs under contract for integrators. There is no open market for live poultry ready for

---

[100] *Cf. United States v. Baltimore County, Maryland*, , 2021 WL 2000480, at *9 (D. Md. May 19, 2021) ("In sum, the Court is satisfied that the Agreement provides adequate relief in the form of a detailed process that will replace the challenged exams [for county police], comply with Title VII without compromising public safety, and provide appropriate make-whole relief to individuals adversely affected by the use of the challenged exams.").

[101] *United States v. Westvaco Corp.*, 2016 WL 4492704, at *5 (D. Md. Aug. 26, 2016).

[102] *See Fed. Trade Comm'n v. Circa Direct LLC*, 2012 WL 3987610, at *3 (D.N.J. Sept. 11, 2012) ("In the consent decree context, the source of the court's authority to award relief is the agreement of the parties, not the complaint upon which the action was originally based, and a court may even order broader relief than could have been awarded after a trial on the merits.") (citing *City of El Paso, Tex. V. El Paso Entertainment, Inc.*, 2012 WL 874675, at *8 (5th Cir. Mar. 5, 2012); *People Who Care v. Rockford Bd. of Educ. School Dist. No. 205*, 961 F.2d 1335, 1337 (7th Cir.1992); *Harris v. Pernsley*, 820 F.2d 592, 603 (3d Cir.1987)).

[103] *See* Agriculture Marketing Service, USDA, Proposed Rule: Inclusive Competition and Market Integrity Under the Packers and Stockyards Act, 87 FR 60010, 60031 (October 3, 2022).

[104] Mary K. Hendrickson et al., The Food System: Concentration and Its Impacts: Special Report to Family Farm Action Alliance 9 fig. 4 (2020) https://farmaction.us/concentrationreport/.

[105] *See, e.g.,* James M. MacDonald, Econ. Res. Serv., U.S. Dep't of Agric., Econ. Info. Bull. No. 126, Technology Organization, and Financial Performance in U.S. Broiler Production (June 2014) https://www.ers.usda.gov/webdocs/publications/43869/48159_eib126.pdf?v=7733.2 (97 percent of broilers raised under contract in 2011 in U.S.); *Broiler Chicken Industry Key Facts 2021*, Nat'l Chicken Council https://www.nationalchickencouncil.org/about-the-industry/statistics/broiler-chicken-industry-key-facts/ (last visited Apr. 19, 2022) (Approximately 95 percent of broiler chickens are produced on [contract] farms, with the remaining 5-= percent raised on company-owned farms); Dan Nosowitz, *After a*

processing, so commercial (*i.e.*, non-specialty) poultry growers have no viable alternatives to the contract growing system.[106] While contract growers own everything that depreciates, such as infrastructure and equipment, integrators own the one thing on the poultry farm that accrues value: the actual bird. Contract growers incur significant debt to build facilities to the integrators' exacting standards.[107] In 2016, the average loan to a beginning chicken farmer was $1.4 million,[108] most commonly used to construct and update chicken housing. A report by the Small Business Administration found that, without an integrator contract, the value of the grower's facilities plummeted anywhere from 62–94 percent, making the facilities themselves "worthless."[109] Without a contract, growers have no reasonable methods for making money with the highly specialized facilities they have gone into debt to construct.

The disparity between the level of commitment required by a contract grower (who frequently cannot walk away without facing bankruptcy) and the commitment offered by an integrator is startling. While the growers take on millions of dollars in debt, most contracts are very short-term, with 42 percent of them being only flock-to-flock, and only 31 percent being longer than five years.[110] Because broiler genetic lines, hatcheries, and feed are all owned by the integrator, growers have little control over the health or growth outcomes of their birds, and by extension, little control over their end income in the tournament system.[111] Almost a quarter of all growers only have one integrator doing business in their area,[112] but even where multiple integrators are available, options are limited. A new integrator may require a grower to construct expensive updates to existing facilities, or simply refuse to deal. At least one lawsuit has alleged that overlapping integrators have informal

---

*Decade, the USDA 'Addresses' Unfairness in Meat Production*, Modern Farmer (Jan. 23, 2020) https://modernfarmer.com/2020/01/after-a-decade-the-usda-addresses-unfairness-in-meat-production/ ("In the poultry sector, the big producers—Tyson, Pilgrim's, Perdue—have an incredible amount of control over the farmers who actually raise their chickens. Those farmers aren't technically employees; usually, they're contract growers, theoretically independent but in practice totally dependent on the whims of the big corporations. These companies provide the chicks, the feed and the medicine; the farmers raise the birds. Roughly 97 percent of chicken in the US is raised this way.").

[106] C. Robert Taylor & David A. Domina, Restoring Economic Health to Contract Poultry Production 3 (May 13, 2010) (Report prepared for Joint U.S. Dep't of Just. and U.S. Dep't of Agric./ GIPSA Public Workshop on Competition Issues in the Poultry Industry, May 21, 2010).

[107] *What Debt in Chicken Farming Says About American Agriculture*, Rural Advancement Found. Int'l (July 12, 2016) https://www.rafiusa.org/blog/what-debt-in-chicken-farming-says-about-american-agriculture/.

[108] Off. of Inspector Gen., Evaluation Rep. No. 18-13, Evaluation of SBA(A) Loans Made to Poultry Farmers 5 (Mar. 6, 2018).

[109] Off. of Inspector Gen., Evaluation Rep. No. 18-13, Evaluation of SBA(A) Loans Made to Poultry Farmers 8 (Mar. 6, 2018).

[110] Rural Advancement Found. Int'l, Under Contract: Farmers and the Fine Print, Viewers Guide 17 (2017).

[111] It is worth noting that broiler genetics itself is a highly concentrated industry. Only two companies supply more than 91 percent of commercial breeding stock for broilers globally: Tyson subsubsidiary Cobb-Vantress, and EW Group/ Aviagen. *See* Pat Mooney, ETC Group, Blocking the Chain: Industrial Food Concentration, Big Data Platforms and Food Sovereignty Solutions 20 (2018).

[112] Off. of Inspector Gen., Evaluation Rep. No. 18-13, Evaluation of SBA(A) Loans Made to Poultry Farmers 2 (Mar. 6, 2018).

no-poach agreements, whereby each integrator declines to do business with a grower contracted with another integrator in the region.[113]

The near-complete control exercised by integrators like Sanderson and Wayne over their tournament systems creates intractable asymmetries of information about market prices, poultry inputs, and poultry grading that leave growers powerless to police — or even catch — deceptive conduct by integrators. While the USDA publishes expanses of statistics on most agricultural industries, the hyper-vertically integrated character of the poultry market has come to elude capture because of the reduced opportunity for commercial exchanges where data can be gathered.[114] This has made access to adequate information about market conditions highly exclusive. Using pay-to-play weekly reports produced by the data consultancy Agri Stats, integrators have until recently been able to access (purportedly anonymous) information on farmer pay, flock size, processing statistics, market prices, and other proprietary information. Growers, however, had not been granted similar access to the consultancy's data.[115]

In the context of these deep inequalities of power and information between integrators and growers, any remedy that falls short of prohibiting Sanderson and Wayne from reducing the base compensation of growers would be hollow and unenforceable. On the one hand, a less far-reaching remedy that allows Sanderson and Wayne to retain the discretion to reduce payments to growers based on performance would leave undisturbed all the fundamental mechanisms in growers' contracts "regarding" and "through [which]" the processors have allegedly deceived growers. On the other hand, any such remedy would require the Antitrust Division and the Court to police individual payment reductions for specific flocks to determine whether any deceptive or unfair practices went into the growing process that produced them. Such an enforcement process would be akin to a game of "Whac-A-Mole," and frankly, neither the Antitrust Division nor the Court have enough hands. Moreover, because integrators like Sanderson and Wayne exercise integrated control over their growers, the growing process, and the tournament systems they operate[116] — indeed, so much control that in 2018 the Small Business Administration determined that a contract poultry grower had no independence and operated as an employee of their processor[117] — it is difficult to see how enforcers would even find out about the "moles" of deception in the supply chain to "whack" them in the first place.

---

[113] *See, e.g.,* Complaint, *In re* Broiler Chicken Grower Litigation, No. 6:17-CV-00033-RJS (E.D. Okla. 2017).

[114] Christopher Leonard, *Is the Chicken Industry Rigged?* Bloomberg: Businessweek (Feb. 15, 2017) https://www.bloomberg.com/news/features/2017-02-15/is-the-chicken-industry-rigged.

[115] *See generally* Pat Mooney, ETC Group, Blocking the Chain: Industrial Food Concentration, Big Data Platforms and Food Sovereignty Solutions (2018).

[116] C. Robert Taylor & David A. Domina, Restoring Economic Health to Contract Poultry Production 1 (May 13, 2010) (Report prepared for Joint U.S. Dep't of Just. and U.S. Dep't of Agric./ GIPSA Public Workshop on Competition Issues in the Poultry Industry, May 21, 2010).

[117] Off. of Inspector Gen., Evaluation Rep. No. 18-13, Evaluation of SBA Loans Made to Poultry Farmers 7, 9 (Mar. 6, 2018).

23

Because the proposed relief is reasonably tailored to remedy the alleged violations in an enforceable manner, the Court should find that the Consent Decree is reasonable.[118]

## III.    The Consent Decree Is Not Illegal, a Product of Collusion, or Against the Public Interest

The Consent Decree is based on an allegation of "a probable violation of the law" and no contention can be made that any of its provisions are illegal.[119] Nothing remotely suggests that the settlement was a product of collusion. Finally, taking into account the information in this comment, the Competitive Impact Statement filed by the United States, and the USDA's recent notices of proposed rulemaking regarding the ICMI and transparency regulations, we believe the Consent Decree is manifestly in the public interest. It enforces the law against brazen violations that had gone unchecked for decades. It ends an unjust payment system that Sanderson and Wayne have used to deprive poultry growers of their independence and extract untold wealth from rural communities. Most importantly, it vindicates the will of Congress, and the public it represents, that farmers and ranchers should not be "submerged" into "cogs in the wheel" of giant corporations with distant headquarters — that the people who toil on the land in this country will not be subjugated into "mere servant[s]" who have "no voice in shaping business policy" and are "bound to obey orders issued by others."[120]

---

[118] *Cf. Maryland, Dep't of the Env't v. GenOn Ash Mgmt., LLC*, 2013 WL 2637475, at *5 (D. Md. June 11, 2013) (finding "[t]he $1.9 million penalty agreed upon [in consent decree] is reasonable, particularly insofar as it includes separate remedial requirements and additional penalties if those requirements are not met. Moreover, the settlement agreement closes three pending federal lawsuits, as well as a counterclaim pending in the Circuit Court for Charles County relating to the Faulkner site, thus resolving four separate litigations."); *United States v. City of Welch, W. Va.*, 2012 WL 385489, at *3 (S.D.W. Va. Feb. 6, 2012) (finding consent decree under Clean Water Act was "adequate and reasonable" because it was "designed to penalize Welch appropriately for the violations of the CWA and to serve as a deterrent to future similar conduct by Welch" in a manner consistent with statutory requirements, and because "it requires a comprehensive injunctive relief program designed to substantially reduce and eliminate CSO discharges"); *United States v. Westvaco Corp.*, 2016 WL 4492704, at *5 (D. Md. Aug. 26, 2016) ("The agreement reached by the parties results in Westvaco paying $1.6 million to fund projects that will address the harm in areas that suffered from the excess emissions. Had the case proceeded through the scheduled evidentiary hearing, the Court would have required Westvaco to pay an amount determined by the Court for remedial actions. This is the result achieved by the Consent Decree. The Court finds no principled basis upon which to find that the agreed amount of $1,600,000 is not within the range of reasonableness. Moreover, the agreement provides for prompt remedial actions and avoids the delay and uncertainty of appellate proceedings.").

[119] *See League of Women Voters of Virginia v. Virginia State Board of Elections*, 458 F.Supp.3d 442, 451 (2020) (citing *Kasper v. Board of Election Comm'rs of the City of Chicago*, 814 F.2d 332, 342 (1987)) (considering it "significant" to legality of proposed consent decree that "Plaintiffs have pleaded a probable violation of federal law"). *See also L.J. v. Wilbon*, 633 F.3d 297, 311 (4th Cir. 2011) (rejecting objection to district court's entry of consent decree for "fail[ure] to ensure that there was a substantial federal claim supporting the decree" because plaintiffs had "a valid cause of action" under the applicable law).

[120] *See* Peter C. Carstensen, *Concentration and the Destruction of Competition in Agricultural Markets: The Case for Change in Public Policy*, 2000 Wis. L. Rev. 531, 532 (2000) (quoting *United States v. Trans-Missouri Freight Ass'n*, 166 U.S. 290 (1897)) (explaining that, "in the first substantive decision interpreting the Sherman Act, Justice Peckham, no liberal or protectionist" noted that the antitrust laws reflected the wisdom that "It is not for the real prosperity of any country that such changes should occur which result in transferring an independent business man . . . into a mere servant or agent of a corporation . . . having no voice in shaping the business policy . . . and bound to obey orders issued by others"); William E. Rosales, Comment, *Dethroning Economic Kings: The Packers and Stockyards Act of 1921 and Its Modern Awakening*, 2004 Wis. L. Rev. 1497, 1497-98 ("Congressmen on both sides of the aisle during the debates on the legislative proposal — now known as the Packers and Stockyards Act of 1921 ('P&S Act') — expressed concerns about the increasing consolidation in the agricultural sector and fear of a rising food dictator. Congressman Marvin Jones proclaimed that, although a food dictator would be efficient in its centralized control of the channels of trade of meat products and might be desirable in order to sustain life in the country, it would be unwise for the same reasons that it would be unwise for this country to have a dictator or a king as its head of government. Congressman Jones argued that the 'primary necessity' of government was the 'making of men' and posited the theory that 'if every line of endeavor had

**IV.     Conclusion**

For the reasons set forth above, we hope the Court will enter the Consent Decree in its entirety. Thank you for giving us the opportunity to comment on this important matter.

Sincerely,

Joseph Van Wye
Policy and Outreach Director
Farm Action

---

one dictator at its head with all other men working for him, the manhood of [the] country . . . and vital force of the men who make up this country would be submerged and would become mere cogs in the wheel.'").

November 15, 2022

Lee Berger
Chief, Civil Conduct Task Force
Antitrust Division
Department of Justice
450 Fifth Street NW
Suite 8600
Washington, DC 20530

RE: United States v. Cargill Meat Solutions Corp., et al.; Proposed Final Judgment and
Competitive Impact Statement; Federal Register Vol. 87, No. 179, Pg. 57028-57066.

Dear Chief Berger,

The Campaign for Family Farms and the Environment (CFFE) is a coalition of state and national
organizations, including Dakota Rural Action (SD), Iowa Citizens for Community Improvement,
Land Stewardship Project (MN), Missouri Rural Crisis Center, Food & Water Watch and
Institute for Agriculture and Trade Policy. We work together to support family farmers, rural
communities and a vibrant, sustainable food system. We appreciate the opportunity to comment
on the proposed Final Judgement in the case of United States v. Cargill Meat Solutions Corp. et
al. We are pleased to see long overdue enforcement action focused on the efforts of companies to
suppress poultry processing workers. Because our work is focused on farm policy, our comments
address the aspects of the settlement that relate to Packers and Stockyards Act violations due to
the companies' treatment of contract growers.

Before commenting on the proposed final judgement, we would like to express our
disappointment that the companies involved in this case were allowed to proceed with their
merger without any intervention by antitrust regulators. In 2021, CFFE expressed our concern to
the Antitrust Division about the potential negative impacts of the acquisition of Sanderson Farms
by Cargill and Continental Grain, outlining both horizontal and vertical impacts of a deal to
create a firm that will control approximately 15 percent of the U.S. broiler chicken market.
In addition to the increased consolidation in broiler production in several regions of the country,
we urged the Department to scrutinize implications for grain farmers nationwide. If the goal of
this acquisition was to reduce feed costs through vertical integration, regulators should have
examined the impact of that loss of margin on other players in the current supply chain,
including grain producers across the country. The horizontal and vertical impacts of this proposal
warranted action by regulators.

The context of extreme consolidation that is already present in the poultry sector motivated our
objections to this merger. Like other sectors of agriculture, the poultry industry has suffered
decades of increasing consolidation that has led to extreme levels of control by just a handful of
players in each region, with devastating consequences for farmers, rural communities, public
health and the environment, and the ability of supply chains to bounce back quickly from a
shock. This consolidation reduces farmers' pay, restricts consumer choice and contributes to a
widening farm to retail price spread.

National consolidation trends in poultry processing are even more pronounced at the regional level where logistical constraints limit farmers' mobility in the market. The business model of vertically integrated broiler chicken production is based on contract growers being located within a limited geographic area near their integrator's "complex" (the feed mills, hatcheries, and processing plants that complete the various steps in the production of chickens owned by the integrator.) In some parts of the country, complexes run by different integrators may overlap, but contract growers have reported to the U.S. Department of Agriculture that they do not have viable options to switch to another integrator if their current arrangement ended. Nearly half of respondents to the USDA's Economic Research Service who had two integrators in their area, and over a third of those with three integrators in their area, reported they could not shift to another integrator. The USDA assessment of the level of regional consolidation in the industry sums it up bluntly: "By any measure, local markets for growers are highly concentrated."[1]

This lack of mobility for contract growers due to regional concentration not only limits their ability to find higher pay for their services by switching to a different integrator, but also makes it possible for integrators to engage in anticompetitive practices. The lack of choices for contract growers once they are signed up with an integrator enables the companies to offer poor contract terms and threaten contract termination to minimize complaints by growers or publicity about unfair practices.

Because the tournament system determines grower income based on factors not within their control, including input quality and the composition of their tournament group, it unfairly shifts costs to contract growers, stifles knowledge sharing between growers, and enables retaliation by the integrators if contract growers object to how they are being treated or paid. This imbalance of power allows integrators to treat growers as if they are disposable.

While we are disappointed that the Department did not act to curtail the acquisition of Sanderson Farms by Cargill and Continental Grain, we are pleased to see long overdue enforcement action with respect to how poultry companies treat both processing plant workers and contract poultry growers. In particular, we are pleased to see enforcement of the Packers and Stockyards Act's prohibition on deceptive practices. We agree that Sanderson's and Wayne's failure to disclose information about the financial risk and basis for grower pay through the tournament system is a deceptive practice. We agree that "the Defendants Sanderson's and Wayne's deceptive practices are ongoing and likely to continue and recur unless the court grants the requested relief." Therefore, we believe it is absolutely in the public interest for the Court to:

- Permanently enjoin and restrain Defendants Sanderson and Wayne from engaging in deceptive practices regarding their contracts with growers;
- Require Defendants Sanderson and Wayne to make appropriate disclosures to growers before entering into contracts concerning live poultry, in order to provide sufficient

---

[1] James M. MacDonald. USDA Economic Research Service. "Technology, Organization, and Financial Performance in U.S. Broiler Production." Economic Information Bulletin Number 126. June 2014. P. 29.
https://www.ers.usda.gov/webdocs/publications/43869/48159_eib126.pdf?v=41809.

information for the growers to understand the scope of the contract and the potential risks;

- Require Defendants Sanderson and Wayne to modify their grower compensation systems to eliminate the harm arising from each firm's failure to disclose to growers all of the potential risks associated with that firm's compensation system.

We urge the Department and the Court-appointed monitor assigned as part of this settlement to pay particular attention to the terms laid out in section C of Prohibited Conduct. The intent of this provision is to prevent the defendants from using the deceptive practice of reducing grower base pay based on their "performance" relative to other growers, because grower performance is largely based on factors that are out of the growers' control. Therefore, with regard to section C(3), we believe extra scrutiny is needed to ensure that the companies do not attempt to create a variety of unnecessarily specialized sub-categories of products to create different settlement groups, in an attempt to evade the prohibition on reducing base payments to growers.

We also appreciate that the settlement addresses the antitrust implications of industry data sharing activities with regard to wages for processing plant workers. But the impact of these types of data sharing activities are not isolated to processing plant workers, and we urge the Department to also consider the implications of data sharing arrangements on pay and other conditions for contract growers.

Finally, the tournament system for grower payment is ubiquitous in the poultry sector and not unique to Sanderson and Wayne. Therefore, we urge the Department to pursue similar enforcement action to bring other companies referenced in the complaint into compliance with the Packers and Stockyards Act, as well as investigating violations of the Act by companies in other sectors of the meat industry.

We appreciate the opportunity to comment on this important issue. Please contact Patty Lovera, ████████████████████████, if you have questions about our comment.

Sincerely,

Campaign for Family Farms and the Environment

# CAMPAIGN FOR CONTRACT AGRICULTURE REFORM

*a voice for contract farmers, ranchers, and their communities*

November 16, 2022

Lee Berger
Chief
Civil Conduct Task Force
Antitrust Division
Department of Justice
450 Fifth Street NW
Suite 8600
Washington, DC 20530

> RE: United States v. Cargill Meat Solutions Corp., et al.; Proposed Final Judgments and Competitive Impact Statement; **Document Citation:** 87 FR 57028 **Pages:** 57028-57066 **Document Number:** 2022-20014

On behalf of the Campaign for Contract Agriculture Reform, I am submitting these comments on the proposed Final Judgement in the case of United States v. Cargill Meat Solutions.  Given CCAR's expertise regarding poultry production and the implications of the tournament system used by poultry companies to pay contract growers, our comments are focused primarily on the aspects of the proposed Final Judgement that relate to Packers and Stockyards Act violations by Sanderson and Wayne.

## **What is the Campaign for Contract Agriculture Reform (CCAR)**

CCAR represents farmers, ranchers, and poultry growers across the United States with a personal stake in this rule and its implications. Each CCAR member organization engages livestock farmers, ranchers, and poultry growers to inform our policy recommendations and facilitate engagement between Congressional members, representatives of federal government agencies, and those farmers, ranchers, and poultry growers. Together, CCAR advocates for bringing equity to the contract negotiating process and against the exploitation of farmers, ranchers, and poultry growers in the meat and poultry industry.

**CCAR believes:**

- Producers, communities, and our country do better when we have a diversity of independent farmers and ranchers on the land.

- Fair, open, and competitive markets are essential to a democratic and equitable food system.

- The impact of market concentration and monopoly power in the livestock and poultry sectors is harmful to our country's farmers and ranchers, rural communities, and consumers.

- Sound oversight is critical, and regulatory agencies have an obligation to farmers and ranchers, as well as consumers, to ensure a fair, open and competitive livestock and poultry sector.

- The U.S. Department of Agriculture (USDA), other agencies and Congress should work to increase competition; empower farmers to secure a fair price for their products; and protect farmers from unfair, deceptive, and abusive practices in livestock and poultry markets.

CCAR is comprised of the following organizations:

Farm Aid
Farm and Ranch Freedom Alliance
Government Accountability Project Food Integrity Campaign
National Family Farm Coalition
National Farmers Union
National Sustainable Agriculture Coalition
Ranchers-Cattlemen Action Legal Fund (R-CALF)
Rural Advancement Foundation International - USA

**<u>The Combined Negative Impacts of Market Concentration and Vertical Integration</u>**

The overlapping and compounding trends of market concentration and vertical integration in livestock and poultry markets have contributed negatively to the economic wellbeing of our nation's farmers and ranchers.  In a perfect world, where markets are highly competitive, farmers have leverage in negotiating price and fair contract terms for the products they produce and the services they provide. Unfortunately, in many areas of agriculture, we no longer have competitive markets. For poultry, the concentration ratio of the top 4 poultry companies nationally is 54-56 percent. However, when analyzed from the perspective of the power that poultry companies have over the contract poultry growers that provide the growout services to raise the company's chickens to processing weight, these markets are far more concentrated on a regional basis.

As explained by the Agricultural Marketing Service of the U.S. Department of Agriculture in the explanatory text of their proposed rule regarding "Transparency in Poultry Grower Contracting and Tournaments":

"Live poultry dealers often operate as monopsonists [or oligopsonists in a local market. According to MacDonald and Key,[1] about one quarter of contract growers reported that there was just one live poultry dealer in their area; another quarter reported two; another quarter reported three; and the rest reported four or more. Owing to their greater negotiating power than that of the poultry growers with whom they contract, live poultry dealers set the terms of the contracts. Consequently, most poultry growers have little or no influence over the frequency of individual flock placements they receive over any particular time period. A growout period is based on the target weight of finished poultry, as determined by the live poultry dealer. The amount of time between flocks is also decided by the dealer.

Grower payments are also influenced by live poultry dealer market power. In the study cited above, grower payments (per pound, controlling for bird size) were lower in markets with fewer dealers: going from four integrators to one lowered grower payments by eight percent (8%). This imbalance of negotiating power also exposes poultry growers to other risks."

The Administration's focus on competition issues in agriculture, as evidenced by the President's July 2021 Executive Order on Promoting Competition in the American Economy,[2] has signaled a recognition by the Administration of the problems faced by our nation's farmers because of dwindling competition and a commitment to address those issues:

"Sec. 5.  Further Agency Responsibilities.

***

    (i)  The Secretary of Agriculture shall:
     (i)   to address the unfair treatment of farmers and improve conditions of competition in the markets for their products, consider initiating a rulemaking or rulemakings under the Packers and Stockyards Act to strengthen the Department of Agriculture's regulations concerning unfair, unjustly discriminatory, or deceptive practices and undue or unreasonable preferences, advantages, prejudices, or disadvantages, with the purpose of furthering the vigorous implementation of the law established by the Congress in 1921 and fortified by amendments.  In such rulemaking or rulemakings, the Secretary of Agriculture shall consider, among other things:
        (A)  providing clear rules that identify recurrent practices in the livestock, meat, and poultry industries that are unfair, unjustly discriminatory, or deceptive and therefore violate the Packers and Stockyards Act;
        (B)  reinforcing the long-standing Department of Agriculture interpretation that

---

[1] 39.  MacDonald, James M., and Nigel Key. "Market Power in Poultry Production Contracting? Evidence from a Farm Survey". *Journal of Agricultural and Applied Economics* 44 (November 2012): 477-490. See also, MacDonald, James M. *Technology, Organization, and Financial Performance in U.S. Broiler Production, EIB-126,* U.S. Department of Agriculture, Economic Research Service, (June 2014): 29-30.

[2] https://www.whitehouse.gov/briefing-room/presidential-actions/2021/07/09/executive-order-on-promoting-competition-in-the-american-economy/

it is unnecessary under the Packers and Stockyards Act to demonstrate industry-wide harm to establish a violation of the Act and that the "unfair, unjustly discriminatory, or deceptive" treatment of one farmer, the giving to one farmer of an "undue or unreasonable preference or advantage," or the subjection of one farmer to an "undue or unreasonable prejudice or disadvantage in any respect" violates the Act;

     (C)  prohibiting unfair practices related to grower ranking systems — systems in which the poultry companies, contractors, or dealers exercise extraordinary control over numerous inputs that determine the amount farmers are paid and require farmers to assume the risk of factors outside their control, leaving them more economically vulnerable;

     (D)  updating the appropriate definitions or set of criteria, or application thereof, for undue or unreasonable preferences, advantages, prejudices, or disadvantages under the Packers and Stockyards Act; and

     (E)  adopting, to the greatest extent possible and as appropriate and consistent with applicable law, appropriate anti-retaliation protections, so that farmers may assert their rights without fear of retribution;

    (ii)  to ensure consumers have accurate, transparent labels that enable them to choose products made in the United States, consider initiating a rulemaking to define the conditions under which the labeling of meat products can bear voluntary statements indicating that the product is of United States origin, such as "Product of USA";

    (iii)  to ensure that farmers have greater opportunities to access markets and receive a fair return for their products, not later than 180 days after the date of this order, submit a report to the Chair of the White House Competition Council, with a plan to promote competition in the agricultural industries and to support value-added agriculture and alternative food distribution systems through such means as:

     (A)  the creation or expansion of useful information for farmers, such as model contracts, to lower transaction costs and help farmers negotiate fair deals;

     (B)  measures to encourage improvements in transparency and standards so that consumers may choose to purchase products that support fair treatment of farmers and agricultural workers and sustainable agricultural practices;

     (C)  measures to enhance price discovery, increase transparency, and improve the functioning of the cattle and other livestock markets;

     (D)  enhanced tools, including any new legislative authorities needed, to protect whistleblowers, monitor agricultural markets, and enforce relevant laws;

     (E)  any investments or other support that could bolster competition within highly concentrated agricultural markets; and

     (F)  any other means that the Secretary of Agriculture deems appropriate;

    *** "

Ultimately, agricultural markets are already too concentrated. Not only is it critical to stop the trends of future consolidation, but we believe that past mergers should be reconsidered as well, to determine whether those mergers were inappropriately permitted in violation of antitrust laws. Indeed, the President's Executive Order speaks to this issue directly:

"This order affirms that it is the policy of my Administration to enforce the antitrust laws to combat the excessive concentration of industry, the abuses of market power, and the harmful effects of monopoly and monopsony — especially as these issues arise in labor markets, agricultural markets, Internet platform industries, healthcare markets (including insurance, hospital, and prescription drug markets), repair markets, and United States markets directly affected by foreign cartel activity.

It is also the policy of my Administration to enforce the antitrust laws to meet the challenges posed by new industries and technologies, including the rise of the dominant Internet platforms, especially as they stem from serial mergers, the acquisition of nascent competitors, the aggregation of data, unfair competition in attention markets, the surveillance of users, and the presence of network effects."

Whereas decades of industry consolidation have often led to excessive market concentration, this order reaffirms that the United States retains the authority to challenge transactions whose previous consummation was in violation of the Sherman Antitrust Act (26 Stat. 209, 15 U.S.C. 1 et seq.) (Sherman Act), the Clayton Antitrust Act (Public Law 63-212, 38 Stat. 730, 15 U.S.C. 12 et seq.) (Clayton Act), or other laws.  See 15 U.S.C. 18; Standard Oil Co. v. United States, 221 U.S. 1 (1911)."

In August of 2021, when the joint venture between Cargill and Continental Grain (and its subsidiary Wayne Farms) to acquire Sanderson Farms was announced, we raised concerns about the potential negative impacts of the merger, and the horizontal and vertical implications thereof. Therefore, we have very strong concerns that the merger and acquisition was allowed to proceed, despite the strong directives of the President's Executive Order. This merger was the first major merger in the agricultural sector that has come forward since the publication of the Executive Order, and it was our hope that the outcome would be different.

## The Proposed Final Judgement Regarding Packers and Stockyards Act Violations by Sanderson Farms and Wayne Farms, and the Proposed Remedies

While the outcome of the merger itself was not significantly different than pre-Executive Order merger and acquisition outcomes, what is significantly different is the proposed Final Judgement regarding Packers and Stockyards Act violations by Sanderson Farms and Wayne Farms and their deceptive practices related to the use of a tournament system to pay contact poultry growers.

We greatly appreciate the agency's finding that Sanderson's and Wayne's use of the tournament system to pay poultry growers is a deceptive practice and a violation the Packers and Stockyards Act. CCAR has long argued that the poultry tournament system is unfair and deceptive, so we are very pleased to see the agency formally recognize that fact. However, the tournament system is the grower payment system used by most other poultry companies in the country, not just Sanderson and Wayne, and similar action should be taken against those companies as well to bring them into compliance with the Packers and Stockyards Act.

We are very supportive of the following proposed Final Judgement provisions that prohibit conduct that directly affects poultry growers:

> C. From and after the date that is 10 business days after entry of this Final Judgment, Sanderson and Wayne must not reduce the Base Payment made to any Grower supplying broiler chicken to the Settling Defendants as a result of that Grower's performance or as a result of the Grower's performance in comparison with the performance of other Growers supplying the Settling Defendants. This Section IV does not prohibit the Settling Defendants from:

> 1. offering Incentive Payments, so long as total Incentive Payments paid for flocks processed at a single complex do not exceed 25% of the sum of total Base Payments and total Incentive Payments paid for flocks processed at that complex on an annual basis;

> 2. offering payments other than Incentive Payments to Growers for any lawful reason, including offering payments based upon the Grower's investments in improved facilities or technology or payments to subsidize the costs of utilities; or

> 3. offering contracts with a lower Base Payment if the Grower will be rearing different types of flocks (*e.g.,* based on sex, breed, method of raising, target market weight, etc.) so long as the Base Payment offered is consistent with the base rates offered to other Growers in the complex rearing those types of flocks.

> **Raise concern about the above, cautiously.**

> D. The Settling Defendants must not retaliate against any employee or third party, such as a Grower, for disclosing information to the monitor described in Section VI, a government antitrust enforcement agency, or a government legislature."

We read the intent of paragraph C to be to prevent the defendants from using the deceptive practice of reducing grower base pay based on their "performance" relative to other growers, because grower performance is largely based on factors, such as company-provided inputs, that are out of the control of the growers. Therefore, with regard to paragraph C(3) above, we urge the Court-Appointed Monitor to ensure that Wayne and Sanderson do not attempt circumvent the letter and intent of the proposed Final Judgement by adjusting the flock compositions to nullify the prohibition on reducing base payments to growers.

As we noted in the comments we submitted to USDA's Agricultural Marketing Service Advanced Notice of Proposed Rulemaking on "Poultry Growing Tournament Systems: Fairness and Related Concerns" (Docket Number: AMS-FTPP-22-0046), most growers agree that the tournament system as currently structured is unfair and deceptive. They hope for a system that gives them a reasonable minimum pay to allow them and their lenders to predict their base income for the year. Many growers also express an interest in having the opportunity to earn above the minimum base pay, to reward them for their managerial expertise. The struggle we have is that it is very difficult to imagine any type of bonus payment system that would fairly and transparently reward growers without merely replicating the deceptions, unfair cost shifting, and

retaliation threats that are inherent in the current tournament system, if the bonuses are still based on inputs and decisions that are controlled of the poultry company.

Through the decades of CCAR's work in advocating for a more transparent and fair system of poultry production, the nation's poultry companies, and their advocates have steadfastly argued that the current tournament system is the only way to ensure that growers are doing their job adequately and tending to their duties. This paternalistic attitude by poultry companies toward their contract growers has been a smoke screen for the true purpose of the tournament system, which is to allow poultry companies to minimize their costs of live poultry production through cost shifting and deception. Poultry companies do this by:

- Inducing growers (and their lenders) to put up all the capital and land to build the facilities to raise the company's chickens for them, without providing any commitments for a reasonable return on that investment;
- Forcing growers to make periodic modifications to their facilities and equipment, at their own expense, as a way to research the efficiency of different facility configurations, without having to pay for that research;
- Creating false expectations to induce growers to commit to providing the labor to raise the company's chickens for them, without providing any commitment to minimum pay or income predictability.
- Controlling all the inputs used by the grower to raise the chickens (chicks, feed, medicine), without acknowledging to growers that those inputs will be of variable quality relative to the inputs provided to other growers.
- Creating the false expectation that a grower's managerial skills are the main factors determining the performance of their flock, when research has shown that the quality of the inputs provided to the grower by the poultry company are the dominant factor in determining feed conversion performance.
- Ranking growers against each other for compensation based on the performance of their flocks, which allows the poultry company to insulate themselves from the risk of input quality variability, and to opaquely shift that risk to the growers.
- Writing contracts in a manner that allows the companies to provide fewer flocks to growers based on market conditions, without compensating the growers for the downtime, thereby insulating themselves from market conditions such as oversupply.
- Aggressively discouraging growers from communicating with each other about their operations and their contract relationships with their poultry companies, or from communicating with their legislators or federal regulators about these factors. This often takes the form of intimidation and retaliation against growers who do so.
- Maintaining detailed data about all aspects of the poultry production process and sharing that data with their competitors through confidential data collection firms.

Given the longstanding defense by the poultry industry of the current poultry model and the tournament payment system that undergirds it, we were very interested to see a recent *Politico* article about the letter that the newly merged Wayne-Sanderson Farms poultry company sent to their growers announcing what appear to be significant changes in the way they pay their growers. Specifically, the Wayne-Sanderson letter promises the following payment system changes:

7

- a consistent base pay per pound with additional incentives scaled to performance and farm investment;
- once broiler weekly settlements are calculated, the base pay stated in a grower's contract will become the new "floor" or minimum base price per pound, and downward adjustments will no long occur;
- while the new base payment rate will limit financial risk to growers, it will not restrict financial benefit for excellent performance;
- providing growers access to capital for farm improvement and expansion.

These announced changes appear to being made because of the U.S. Department of Justice proposed Final Judgement with the parties related to the Continental Grain-Cargill merger and related acquisition of Sanderson Farms. But the Wayne-Sanderson letter to their growers seems to be including changes that go beyond the minimum changes required under the DOJ consent decree. We are not arguing that the new Wayne-Sanderson payment system reforms resolve all our concerns about poultry grower payment structures. In fact, the summary explanation of the new payment system in the Wayne-Sanderson grower letter begs many questions about the details. The company promised to provide those details ``in the near term." That information will determine if the changes are significant or mere window dressing. However, the announcement confirms what CCAR has long argued, that the tournament system is not sacrosanct and should be abandoned.

We are pleased that the actions taken by the U.S. Department of Justice proposed Final Judgement regarding mandatory changes to grower payment systems go beyond what USDA has proposed through proposed Poultry Transparency rule. We hope that the Final Judgement, and the related Wayne-Sanderson payment reforms, signal the beginning of the end of the tournament system, which we view as inherently flawed, unfair, and deceptive.

We are also pleased that pursuant to paragraph VII(H) of the proposed Final Judgement, Sanderson and Wayne will be required to comply with the "Transparency in Poultry Grower Contracting and Tournaments," regulation as proposed by USDA's Agricultural Marketing Service, even if that rule is not finalized. If the rule if finalized, the proposed Final Judgement requires Sanderson and Wayne to comply with that version of rule. CCAR's extensive comments on that rule can be found at https://contractagreform.org/wp-content/uploads/2022/09/AMS-FTPP-21-0044-0479_attachment_1.pdf

Lastly, we note that the proposed Final Judgement addresses the anti-trust implications of industry data sharing activities with regarding to processing labor wages. We recommend the agency also consider the anti-trust implications of such data sharing arrangements regarding poultry growers and production details as well.

Thank you for consideration of these comments.

Respectfully,

Steven D Etka, Policy Director

Lee Berger
Civil Conduct Task Force, Antitrust Division
Department of Justice
450 Fifth Street NW, Suite 8600
Washington, DC 20530

Final Judgments, Stipulations, and a Competitive Impact Statement have been filed with the United States District Court for the District of Maryland in *United States of America* v. *Cargill Meat Solutions Corp., et al.,* Civil Action No. 1:22-cv-01821. On July 25, 2022

"As an alternative to the proposed Final Judgments, the United States considered a full trial on the merits against the Settling Defendants. The United States could have commenced contested litigation and brought the case to trial, seeking relief including an injunction against the collaboration on compensation decisions, sharing of compensation information, and facilitation of this conduct, as well as the imposition of a monitor. The United States is satisfied, however, that the relief required by the proposed Final Judgments will remedy the anticompetitive effects alleged in the Complaint against the Settling Defendants, preserving competition in the poultry processing plant labor markets and in the poultry processing industry at large, given the relief secured, including the poultry-business-wide monitor. Thus, the proposed Final Judgments achieve all or substantially all of the relief the United States would have obtained through litigation against the Settling Defendants but avoids the time, expense, and uncertainty of a full trial on the merits."

My name is Trina B. McClendon, I am owner/operator of an eight-house poultry farm in Amite County, Mississippi. I have been growing chickens for Sanderson Farms for the last 20 years.  I am submitting these comments against the buyout of Sanderson Farms by Cargill and Continental Grain and merging Wayne Farms with Sanderson to create a new poultry integrator. I wish to express my support for upholding the current laws governing antitrust and monopoly of our food. This judgment is crucial to protect the American people. To do this we must protect the country's food supply and the farmers who grow it. Most importantly, I encourage you to curb the unmitigated concentration by food companies which allow them to create a false narrative of food shortages, increase food prices and, therefore, increase corporate profits.

I appreciate the time and effort that's gone into seeking justice for farmers and consumers against companies that have been deceitful in their business practices. In the proposed Final Judgment text above, I respectfully disagree with the last two statements. I do not believe the Consent Decree and the proposed Final Judgements will remedy the anticompetitive behavior that the Settling Defendants have practiced for the last thirty years nor will it preserve competition in the labor markets. To claim that the proposed Final Judgements achieves all or substantially all of the relief the United States would have obtained through litigation is false. After, myself, being in business with a poultry integrator for the past 20 years, I see many ways that these companies can and will manipulate this proposed Final Judgment to their benefit.

These companies are experts at manipulating the markets, the people they employ and the growers who invest millions for the benefit of the company. If considering the number of years these top integrators conspired to fix prices for consumers, suppress wages for their laborers, and manipulated growers with one-sided contracts and wages that do not even allow farmers to operate at a profit, then an $84 million fine is like a mild reprimand. It, in no way, remedies the years that these companies profited millions and billions of dollars on the backs of American consumers and farmers.

So it was with great disappointment that I learned about the approval of the buyout two weeks before your department made the official announcement to the public. In this last year, I have become an advocate and like the voice of one crying in the wilderness against this type of consolidation of America's food.  As I look at and study the disproportionate allocation of monies made by corporate ag giants like Cargill and Continental as compared to the money hardworking farmers make; I find myself disappointed that my government has chosen to side with the giant corporate Goliath's against me and farmers like me who represent the David's of the farming world.  As a David fighting against Goliath all I have are a few small stones to fling. But I will fling them at Goliath and continue to stand up and cry out for justice and fair pay for America's farmers.  We are the BACKBONE of these giants and without us they would have no company for it starts with the farmer.

Earlier this year, I spoke against the buyout of Sanderson. In my testimony to the U.S. House Subcommittee on Antitrust, Commercial and Administrative Law, Reviving Competition, Part 5: Addressing the Effects of Economic Concentration on America's Food Supply, I spoke about the treatment I had experienced by Sanderson as one of their contract growers. Later I spoke to the Department of Justice directly and again expressed my concerns and my opposition to this buyout.

Less than 1% of the American population are farmers, and of those, 89% are small family farms like me. These farms mortgage everything they own so that they can farm. Only .16 cents of every dollar spent on food in 2020 went back to the farmer. I know these statistics because I feel the impact of them every day. Over the years I struggled to feed my family when every dollar that my farm made went either to pay the farm loan or back into the daily operations of the farm. For years while I was indebted to the bank, I was paying my household bills with credit cards just to buy food to feed my family.

There is something wrong in this country when a farmer who grows the food cannot afford to put food on their own table to feed their family. I have worked hard, since the death of my husband, to get this farm paid off.  After 20 years of debt, I feel I can now breathe a little easier knowing that I no longer owe the bank. I have survived, but I am not thriving. The reason I am not thriving is because Wayne-Sanderson holds the keys to my success, and nothing has changed in the way they poorly treat farmers.

**The Problem with the Tournament Pay System**

On grower settlement summaries, we are charged 0.22c for each chick and 0.10c per pound of feed. This is so Sanderson has a total cost which will allow them to calculate my grower production cost for ranking below or above average. If my cost is below average, I will be paid bonus money; if my cost is above average, I will have money taken away from me and given to the farmers who ranked better than me.

The tournament system will always be unfair to the growers as we are not only competing against each other but against other divisions within the Sanderson complex. These divisions have variable input across the state and can, and do, get better chicks and feed. The only advantage to this system is that Sanderson has the advantage of keeping costs low.

With fewer and fewer companies in the marketplace, farmers lose the freedom to choose which companies they can grow birds for. Because the poultry and other livestock industries are already so highly concentrated, farmers face several barriers, the largest being geographic, in choosing one company over another which reduces their bargaining power.

A USDA study on the impacts of concentration on growers' pay found that growers in an area with only one integrator earned about 8% less than growers in an area with four or more integrators. Over 50% of chicken growers already face a highly concentrated and non-competitive marketplace.

Farmers struggle with transparency in growing birds which impair their ability to run their farming business. Examples include: Are farmers getting chicks from a good breeder farm? Did the company bring the amount of feed they charged them for? Are their birds being weighed fairly? Was there a disease issue at the company hatchery?

Farmers are treated as equals by integrators only when it comes to putting up $1.4 million of capital to offset Sanderson's cost of production, but farmers are not provided even basic information by their corporate business partner once the deal is signed.

Even as company profits have skyrocketed into the billions of dollars annually, farmer pay is decreasing over time. As farmers are asked to invest more and grow more, they are earning fewer cents per pound produced in proportion to square feet of housing provided. As the poultry industry becomes more concentrated and power is reduced to the hands of a few CEOs, real return on investment for poultry farmers is decreasing despite the significant growth and record-breaking profits of these corporations.

The tournament system, as a model of compensation for integrators to pay the grower, is simply designed to allow integrators to suppress growers' wages. By using an average bird weight during each selling week, the integrator has developed a method to deceive and rival growers against each other and sets an average margin of pay for itself. This allows the integrator to control and fix costs to its benefit.

There are many examples of grower pay extortion by integrators. That is, input variabilities, which are solely controlled by the integrator, are used for retaliation and discrimination against the growers.

    A.  First, the grower does not control the quality of chicks that are placed in their farm. These chicks start as eggs on a different farm and are then hatched in the integrator's hatchery. Each of these processes has multiple variables which could result in low-

quality chicks. As a result, sick chicks result in high mortality which causes a reduction in grower pay.

B. Farmers have no input or control of the type of feed delivered, and feed quality can vary between deliveries. On occasion, farmers can even experience going without feed for hours at a time or being delivered moldy feed. I have personally experienced finding hardware in my feed (i.e., bolts, tape measures, parts, etc.) that have jammed up or destroyed my feed equipment. These repairs are not covered by the integrator but instead by the growers. Farmers lose feeding hours while working to repair equipment that was damaged because of feed mill mistakes. These feed-related inputs cause the birds stress and keep them from eating which reduces their weight. Because the tournament system is directly tied to bird weight, these factors reduce grower pay.

C. After the birds are collected and taken to the processing plant, farmers can not verify the accuracy of bird weight and must rely on the integrator to deliver the weight receipt. Due to the structure of catching and processing birds, it is impossible for farmers to record trucks, trailers, the number of cages per truck, and the number of birds per cage to verify total bird weight against the integrator's total reported amount. In other instances, the birds are often exposed to the elements (hot, cold, rain) before processing and sit without food or water for sometimes hours.

D. Lastly, growers cannot control the total number of birds placed on a farm (density) or number of days that birds are raised.  Catching birds before or past 60 days affects final weight and feed conversion which affects average weight and ranking.

My examples above have made clear that growers are continually experiencing a lack of transparency which keeps them from earning accurate and fair wages. This is a direct result of the imbalanced nature of the contract poultry grower model. This model, which perpetually keeps the farmer from getting ahead, should be overhauled and reconstructed by enforcing strict rules that threaten serious and effective penalties on these corporate giants.

**The Problem with Pay Decreases**

Since the McComb, MS, division is now becoming a tray pack division, growers' base pay will be lowered from .0740 to .0710 cents per pound resulting in a decrease in income. When the McComb division was placed on tray packs in 2018, growers were paid a base pay of .0765 with a placement of 24,700 – understanding that the base payment was higher due to the lower density of birds. However, due to costs associated with inflation and the rising costs of propane, electricity and supplies, the new company has an opportunity to offer their contract growers a living wage. An October internal memo from Wayne-Sanderson noted that the new company planned on, "addressing the concern for predictable income for broiler growers." Wayne-Sanderson executives could fulfill this claim by paying growers a wage which allows them to pay off farm debt in a timely manner, pay for expenses incurred to run farms, and pay for the housing, food and living expenses for our families.

Over the past ten years, grower pay has not risen with inflation or cost of living adjustments experienced by workers in multiple industries across the U.S. A 2001 study from the National Contract Poultry Growers Association and the U.S. Department of Agriculture found that if poultry growers' sole income is from poultry production, then 71% of growers will live below the poverty level in the U.S. While contract growers are not hourly or salaried employees but, instead, business owners, we only have approximately 3% control over the final product.

Based on my estimates which factors the age and weight of birds, number of birds sold, percent livability and price paid per pound, raising tray pack birds at a lower pay level than previously raised would result in a pay decrease of $4,600 per flock or $26,200 per year. When comparing the averages of raising big bird flocks over the last two years (10 flocks gross averaging $106,000), this would be a loss of approximately $37,000 per year. Even if our performance remains in the top tier with performance pay, we could still recognize a loss of $10,000 to $20,000 overall.

Since the grower pool will reduce from 20 or more growers to just 5-8 growers within a sell week in my division, this will reduce the point spread between the weighted average. This model of payment still looks like a tournament system but with a bottom floor pay of .0710 cents per pound. I would recommend a pay model based on a square-foot system which would place growers on a more equal rating. Instead of paying growers a performance bonus, the company would absorb grower energy costs per year.

I suggest that, instead of the grower taking a pay loss for birds mortality, the number of birds lost per flock be added back into the weighted average, and growers receive mortality pay as if those birds had been raised. Alternatively, growers could be given a percentage of pay for the pounds lost due to poor bird quality and feed quality.

**Proposed Rules**

I submitted comments concerning USDA Transparency in Poultry Grower Contracting and Tournaments [Doc. No. AMS-FTPP-21-0044] and USDA Poultry Growing Tournament Systems: Fairness and Related Concerns [Doc. No. AMS-FTPP-22-0046] These rules are the steps in the right direction, but if the Department of Justice does not or will not uphold the current antitrust laws, then why have rules and laws?

The Department of Agriculture has undertaken multiple initiatives concerning the sustainability of the American food system, and there have been billions of dollars earmarked for President Biden's Executive Order on Promoting Competition in the American Economy. Press Release No. 0205.22, Issued September 26, 2022, made an announcement that the White House Competition Council along with USDA would support fair and competitive meat and poultry markets by publishing the proposed Inclusive Competition and Market Integrity Rules Under the Packers and Stockyards Act to protect farmers and ranchers from abuse and earmark $15 million dollars for the Agricultural Competition Challenge to ramp up collaboration with the State Attorneys General to enforce the competition laws, such as the laws against price-fixing. This press release went on to quote Secretary Tom Vilsack who said "Highly concentrated local markets in livestock and poultry have increasingly left farmers, ranchers, growers and producers vulnerable to a range of practices that unjustly exclude them from economic opportunities and undermine a transparent, competitive and open market - which harms producers' ability to deliver the quality, affordable food working families depend upon." The second part of this memo assists state AGs in tackling anticompetitive practices in the agricultural sector and

related industries that are contributing to heightened inflationary pressures, lack of choices for consumers and producers and conflicts of interest and anticompetitive barriers across the food and agriculture supply chains.

I applaud the Administration's actions and USDA's work to get these much-needed rules into the Packers and Stockyards Act. However, what I do not understand is when the Department of Justice had an opportunity to protect growers who "have been vulnerable to a range of practices that unjustly exclude us from economic opportunities and undermine a transparent competitive and open market," why didn't the DOJ step up to protect the grower by stopping the buyout between the responsible parties.  One thing is clear - the DOJ passed on their duty and now state AGs will not have the same resources to bring these corporations to justice and bring justice to the growers.

I am disappointed that my government has chosen to side with big Ag, big money, and the monopolization against farmers. Unless these rules are enforced—and they were not in the United States of America v. Cargill Meat Solutions Corporations, Cargill, Inc, G. Jonathan Meng, Sanderson Farms, Inc., Wayne Farms, LLC and Webber, Meng, Sahl and Company, Inc.—then what good are the rules?

**Enforcing the Rules**

The majority of growers are good, honest, hard-working Americans who want to earn an honest wage at something they love. Farmers love working the land, working for themselves, and growing food to feed America. Mega-corporations have held farmers hostage by exploiting their passion to feed America they have kept farmers from thriving, instead farmers merely survive. We are not thriving because integrators bully growers under the threat of bankruptcy, force growers to lie about bird mortality and fear monger grower into not speaking out about the abuses of the contract grower model.

Integrators have been allowed to do business unchecked and unreported for decades, and it is time for these abuses to be addressed and alleviated. Contract growers desperately need the U.S. government to enforce strict laws and smart regulations in order to protect small business farmers from mega-corporate monoliths like Cargill, Continental, Wayne-Sanderson and all the others that have been named in multiple lawsuits by individuals, growers, restaurant chains, and small grocers.  These corporations have paid out hundreds of millions of dollars in settlements but have not admitted wrongdoing. Stop the consolidation of America's food and put the farmer first.

Again, I say, farmers are the backbone of America.  We feed hundreds of millions of people each year. It is time that our government recognizes and supports the farmer, the most precious resource of this country. We are not asking for handouts, but we are asking for support to protect us from corporate suppression and ensure that we are compensated fairly for the product we produce.  The laws that have been written to address these very issues need to be upheld in order to protect farmers like myself.  Only when these laws are enforced will this

ensure that Americans will continue to be fed and that farming will continue for future generations.

Farmers are leaving the field; they are tired, poor, and no longer have the heart to continue working as hard as they once did. It is evident that future generations no longer wish to take up the mantle of farming. Farming is a time-honored profession; however, unless the government seeks justice for farmers, this time-honored profession will be a dim memory as we source food that is not grown in fields but in foreign countries or produced in food factories.

Are we going to allow corporate giants like Cargill, Continental, Wayne Farms, Sanderson Farms, Tyson, Peco and Pilgrims, to name a few at the top, to regulate themselves while seeking maximum profit? Or is my government, who is charged with protecting me and farmers like me, going to hold Cargill, Continental and Wayne-Sanderson accountable for my poverty?

Thank you for hearing my plea to reverse this proposed Final Judgment.  I am asking you to stop this buyout and strip these companies of their right to continue doing business unchecked. I also ask that, in addition to the $84 million fine that you assessed to these companies for wage suppression, an additional fine be assessed to directly aid all growers that have suffered for the last thirty years under the weight of undue and unfair pressure brought to bear by these corporate Goliath's.  I cast my stone at your feet and pray that you will use it to fail a giant.

Sincerely & Humble,
Trina B. McClendon
Trinity Poultry Farm, LLC
Est. 2003

Attachment: Rural Advancement Foundation International Comment on Poultry Growing
              Tournament System Fairness

**RURAL ADVANCEMENT FOUNDATION INTERNATIONAL – USA**

| **ADDRESS** | **PHONE** | **WEB** |
|---|---|---|
| P.O. BOX 640 | 919.542.1396 | RAFIUSA.ORG |
| PITTSBORO, NC 27312 | | |

S. Brett Offutt

Packers and Stockyards Division, USDA AMS Fair Trade Practices Program,

1400 Independence Ave. SW,

Washington, DC 20250-0201

Docket Number: AMS-FTPP-22-0046

September 26, 2022

Rural Advancement Foundation International - USA (RAFI-USA) is a nonprofit organization based in North Carolina that challenges the root causes of unjust food systems, supporting and advocating for economically, racially, and ecologically just farm communities. We envision a thriving, sustainable, and equitable food system: where farmers and farmworkers have dignity and agency; where they are supported by just agricultural policies; and where corporations and institutions are accountable to their community. We help farmers find markets, advocate for and with farmers who are experiencing financial crisis, convene a Farmers of Color Network (primarily in the Southeastern United States), work with farmers markets and rural faith communities to increase food access, provide infrastructure and emergency grants to farmers, and help coordinate a seed breeding cooperative. The following recommendations for addressing corporate consolidation within the food system emerge directly from this work.

Our Challenging Corporate Power Program (formerly known as Contract Agriculture Reform program) has worked primarily with contract poultry growers for more than 30 years to fight for better treatment from, and regulation of, giant meatpacking corporations. In that time period we have seen the trend of corporate consolidation (both vertical and horizontal) within industrial animal agriculture continue unchecked. RAFI-USA now works with both contract and independent livestock and poultry producers to reverse the rampant negative effects of corporate concentration across the food system.

From their on-the-ground vantage point, contract poultry growers see the skewed reality of the tournament system more clearly than anyone. It is vital that USDA listen to the voices of current and former contract poultry growers who are directly impacted by the practices of the poultry industry that this rule seeks to address. However, these same contract growers also face the greatest retaliation risks for making their voices heard. In our advocacy on these issues over the past decade, we have consistently observed growers we partner with experience retaliation from the poultry corporations they contract with, in many cases to the point of losing their farms.

For this reason, we have conducted an anonymous contract grower survey in preparation for submitting these comments, which received responses from 105 current and former contract poultry growers from 17 states. Our comments are directly informed by these growers' narration of their own experiences to us, and it is our hope that these comments will channel their feedback directly to USDA about what the department should do to secure fairness on their behalf. We are grateful for this opportunity to provide these comments in response to USDA's advanced notice of proposed rulemaking, "Poultry Growing Tournament Systems: Fairness and Related Concerns," on badly needed improvements to fair competition and antitrust enforcement in today's poultry industry. In our following comments, we will define the tournament system's true purpose, and situate it within its wider anti-competitive context, while also putting that system in conversation with the voices of the contract growers we surveyed. We will then describe the rules that contract growers need to secure fair future markets, while addressing all of USDA's relevant questions.

Sincerely,

Edna Rodriguez
Executive Director
edna@rafiusa.org

Margaret Krome-Lukens
Policy Director
margaret@rafiusa.org

Aaron Johnson
Challenging Corporate Power Program Manager
aaron@rafiusa.org

# Table of Contents

**Manipulative By Design** — 1

  The Context of the Tournament System: Anticompetitive Regional Monopsony Power — 2

  The Purpose of the Tournament System: Manipulative Control of Cost and Price — 5

    Unfair Externalization of Mundane Production Costs — 6

    Facilitation of Retaliation Against Grower Solidarity and Self-Advocacy — 10

    Enablement of Price Control and Undue Preference Through Tournament Group Composition — 11

  The Verdict on The Tournament System: An Illegal Course of Business — 12

**Contract Poultry Growers Speak Up: Our Grower Survey Analysis** — 15

**Designing a Fair Framework** — 18

  *Proposed Production Contract and Cooperative Bargaining Rule* — 19

    Impact on Grower Welfare — 21

    Impact on Grower Income Variability and Degradation of Base Pay Rates — 22

    Ensuring Growers are Compensated Based on Variables They Control — 23

  *Further Regulation of Contract Provisions and Discontinuation in the Poultry Industry* — 24

  *Further Regulation of Lending in the Poultry Industry* — 25

*These comments and recommendations were authored by Aaron Johnson, RAFI-USA Challenging Corporate Power program manager Aaron Johnson, and edited by RAFI-USA Policy Director Margaret Krome-Lukens and RAFI-USA Executive Director Edna Rodriguez. Special thanks to the contract growers who entrusted us with their feedback in the survey conducted in preparation for this comment.*

*Rural Advancement Foundation International - USA*

## Manipulative By Design

*Regional Poultry Monopsonies Use Tournament Systems to Externalize Costs and Control Growers*

USDA begins its request for comments regarding the fairness of poultry tournament systems with a critical question. What is the tournament system's intended purpose? The poultry industry has its answer to this question:

> *The current compensation system rewards family farmers for putting in the hard work to raise the best birds as efficiently as possible. It features fair, honest contracts that reward growers for superior, efficient performance, resulting in lowered costs of raising chickens that benefit the grower, our integrator, and the consumer…the current poultry grower compensation system… encourages innovation and investment in the best equipment and practices.*[1]

The cornerstones of this answer - rewarding hard work, incentivizing innovation and investment, and shared benefits for all - are intuitively compelling. They are also deceptive and false.

Contrary to the statement above, today's poultry industry features contracts that might not even be legally legitimate contracts, too often forced upon growers under duress, whose "independent contractor" status probably doesn't meet the legal definition of an independent contractor. Payment outcomes within these contracts' tournament payment systems fluctuate drastically, not based on grower effort, but based on the numerous variables controlled by the poultry corporations they contract with (their "integrators"), including the quality of the inputs they provide, when they choose to pick up flocks, and how they organize their growers into tournament groups. Contrary to integrators' claims, the arbitrariness of tournament system outcomes disincentivizes growers to innovate or invest in infrastructure upgrades, because growers know their incomes are not truly within their control. Furthermore, the tournament system affords integrators unchecked coercive control over their contract growers, a convenient variety of ways to retaliate against growers deemed inconvenient or troublesome, and a means of pitting those growers against each other to undermine any attempts by growers to organize or find solidarity.

To some, the problems outlined above would be indicative of a system designed with the purpose of rewarding grower effort, innovation, and investment gone horribly awry - but this is a mistake. If the poultry industry's definition of the tournament system's purpose is accepted at face value, the answers to all of USDA's further questions in this request for comments will be distorted. The tournament system was never designed to reward growers or incentivize innovation. Instead its purpose is to manipulatively control the prices that growers receive so as to externalize as many corporate costs and extract as much corporate profit as possible - and it is

---

[1] https://www.regulations.gov/comment/AMS-FTPP-21-0044-0080

*Rural Advancement Foundation International - USA*

working exactly as intended, while also giving integrators the ability to retaliate against growers who resist their control. Even the source of the statement above is indicative of this reality - after all, it was quoted from an industry form letter, circulated to growers in an attempt to use their voices as "support" for the continuation of the same scheme that makes them feel manipulated in the first place.[2]

The comments and recommendations below summarize input entrusted to us by growers who felt it was safe to speak their mind freely to us in our grower survey - and they have a lot to say. However, to fully understand how today's tournament systems are possible, what their purpose is, and how they harm growers, they must be understood in their wider context. That context is one of autocratic corporate power abuse, made possible by the rampant regional monopsony control that poultry corporations have over their regional markets.

### The Context of the Tournament System: Anticompetitive Regional Monopsony Power

Today, a "big four" cluster of giant corporations exert coordinated oligopolistic[3] and oligopsonistic control over 54% of the poultry market.[4] Giant meatpacking "integrators" shape the structure and rules of our food system by design to secure the greatest possible profits for themselves, while treating people, land, and animals as disposable units of production in the name of efficiency. Unfortunately, this efficiency cuts two ways; while efficiently producing meat, the industry also efficiently harms farmers and workers, their communities, and the land, air, and water we all rely on.

The antitrust lens that has been applied to the agriculture sector over the past 40 years of antitrust enforcement has been woefully shallow in its narrow, national level focus on consumer prices, and the result has been massive downstream harms in the form of thousands upon thousands of lost farms, inequitable environmental harm, and the hollowing out of rural communities throughout the country. Monopsony and oligopsony, or concentrated buyer power (as opposed to monopoly, concentrated seller power) has historically been less of a focus for antitrust regulators. However, the regional constraints that farmers and ranchers face by virtue of their reliance on long-term land ownership and their production of perishable commodities make them particularly vulnerable to regionalized monopsony power. Thus, the abusive exercise of monopsony power has outsized impacts on farmers, including contract poultry growers, and is core to the incredible power imbalance they experience. The permissive nature of merger enforcement policy over the past 40 years has allowed regional monopsony power to become commonplace in food economies, resulting in a wide range of economic, social, and environmental harms.

---

[2] https://www.reuters.com/world/us/big-us-chicken-company-mountaire-asks-contractors-oppose-transparency-rule-2022-08-05/
[3] Oligopolies or oligopsonies arise when just a few buyers or sellers operate in a market. In oligopolies and oligopsonies, the few companies operating in a market can more easily act as price setters by coordinating with each other to dictate prices and the quantity of goods and services they sell or buy. (Rebecca Boehm, Tyson Spells Trouble for Arkansas, Published Aug 11, 2021)
[4] https://www.whitehouse.gov/briefing-room/blog/2021/09/08/addressing-concentration-in-the-meat-processing-industry-to-lower-food-prices-for-american-families/

For example, in the wake of last year's announcement Cargill/Continental intended to acquire Sanderson Farms, industry supporters were quick to respond to criticisms of the proposed acquisition by pointing out that the resultant national Herfindahl-Hirschman Index for the U.S. poultry industry would be 1,080,[5] well below the 2,500 HHI threshold over which the FTC and DOJ consider an industry to be highly concentrated.[6] Leaving aside whether the current HHI threshold should be retained, this analysis sidesteps the fact that *regional concentration, rather than national concentration, is the key factor that determines the impact of industry concentration upon farmers and ranchers.* It is vital that any analysis of the impacts of corporate concentration within our food system devote careful attention to regional monopsony power.

A recent report published by the Union of Concerned Scientists[7] (UCS) on the concentration of the Arkansas poultry industry since the 1980s provides an instructive example of how national consolidation trends in poultry processing are even more pronounced on regional levels. The Arkansas poultry industry is dominated by Tyson Foods, which controls 67% of the state's market today. In 2020, the Arkansas poultry industry had an HHI value of 6,930, and the last time that the sector had an HHI value below the Department of Justice Antitrust Division's 2,500 threshold was in 1994.



Concentration in the Arkansas Poultry Industry Is on the Rise, with Tyson on Top

Sources: NETS Database 2020; USDA FSIS 2021; WattPoultry USA 2021; Wayne Farms, Inc. 2021.
© 2021 Union of Concerned Scientists

---

[5] https://www.wattagnet.com/blogs/14-food-safety-and-processing-perspective/post/43457-us-broiler-industry-not-as-concentrated-as-15-years-ago
[6] https://www.justice.gov/atr/herfindahl-hirschman-index
[7] The remainder of this case study heavily relies on the following online report by the Union of Concerned Scientists: "Tyson Spells Trouble for Arkansas," Rebecca Boehm, Published Aug 11, 2021. https://www.ucsusa.org/resources/tyson-spells-trouble#read-online-content

*Rural Advancement Foundation International - USA*

The impacts of this precipitous rise of industry concentration within Arkansas have had profound downstream effects on farm level concentration. UCS found that since 1978, 50% of Arkansas broiler farmers went out of business, even as the state's overall poultry production has more than doubled.

The regional effects of this high level concentration on poultry growers ability to competitively negotiate their contracts become even more pronounced when analyzed on a county by county level. To understand why this level of regional analysis is necessary, it is vital to understand the practical constraints that limit farmers' ability to negotiate between more than one or two buyers. On average, live chickens are trucked just 34 miles from farms to processing plants to minimize the transportation costs and associated economic losses that may incur due to chicken injury or death during transit. This means that the radius within which a poultry grower can practically seek other buyers or contracts is extremely limited; according to a 2011 USDA study, half of all contract growers reported only two integrator options in their region, while 21% only had one.[8] USDA research shows that "growers facing a single integrator are paid 7–8% less on average."[9] In Arkansas, UCS found that 11 of the state's 14 poultry producing counties had only one integrator available to contract growers, with Tyson being the exclusive option in 7 of those counties. Thus, the vast majority of poultry growers in Arkansas operated within a 100% monopsony environment in practical terms.

In addition to the obvious anti-competitive effects of such monopsony power, the realities of regional agribusiness concentration also create ripe opportunities for tacit collusion between regional players. Over the years that RAFI-USA has spent advocating for contract poultry growers, it has become evident that it is commonplace for such regional monopsonies to operate in conscious parallelism, with integrators refusing to contract with growers in each others' perceived "territory." The impact of this is that a farmer has no, or very few, other options for making money with the facilities they have gone into debt to construct.  Even in areas with multiple integrator companies, shifting between integrators is not always a good or viable option: new integrators may require expensive updates to equipment, and many farmers report informal no-poach agreements, where companies decline to take on "each other's" growers - which is one focus of the lawsuit by growers filed in Oklahoma.[10] Thus, even growers that might find themselves within range of more than one processing option must operate functionally under total monopsony, because integrators tacitly collude to limit growers' alternative contracting options.

When poultry growers are forced to operate in such monopsonistic markets, with little to no ability to choose between multiple integrators to contract with, their precarity is profound. Knowing that their contract growers' ability to find a different integrator is extremely limited or impossible in such market conditions, integrators like Tyson Foods have free reign to

---

[8] https://www.ers.usda.gov/webdocs/publications/43869/48159_eib126.pdf?v=7182
[9] https://www.researchgate.net/publication/305948391_Market_Power_in_Poultry_Production_Contracting_Evidence_from_a_Farm_Survey
[10] https://www.harvestpublicmedia.org/post/tyson-perdue-farms-shell-out-36-million-settle-antitrust-claims

*Rural Advancement Foundation International - USA*

unilaterally dictate base prices, offer one-sided contracts (often under duress), and utilize manipulative payment schemes like the tournament system; in short, to treat growers like they are disposable. In our own decades of organizing poultry growers, RAFI-USA has repeatedly observed integrators coercing growers to accept degraded contract terms or incur further debt loads to finance mandatory infrastructure upgrades though take-it-or-leave-it contract revisions. In cases where growers resist, the lack of competitive options affords dominant integrators the ability to retaliate against resistant growers either in the form of being dropped from their contract, or by delivering poor quality chicks or feed which — because of the tournament payment system[11] — will reduce their earnings, impacting their farm's ability to stay afloat.

**The Purpose of the Tournament System: Manipulative Control of Cost and Price**

What then is the purpose of the tournament system? The tournament system is a manipulative scheme designed by poultry processing corporations to stabilize and control their own production expenses—in the form of prices paid to farmers—while transferring as much of the financial risk involved with growing chickens as possible onto growers they contract with. Contract poultry growers do not own the chickens they raise, nor do they control what feed or medicine is provided to their flock — these are all provided by the integrator. Contract poultry growers are tasked with achieving the most efficient possible growth of their flocks for the least amount of feed - which is expressed, in performance terms, in their statistical feed conversion efficiency. It is vital at this point to note that the the final weight and feed conversion efficiency of a broiler flock depends largely on the initial health and gender of the chicks, the quality and reliable availability of their feed, and the timing of flock pick-up - all factors that are controlled by the integrator, not the contract grower.

When these growers' flocks of fully grown chickens are picked up by their integrator for processing, the corporation does a detailed analysis of the feed conversion performance of each grower in that week's "tournament group." It then averages these statistics, docks the pay of the growers whose flocks were found to be below average, and transfers that money to growers of above-average flocks as bonuses. In essence, the effect of this system is to stabilize and externalize the costs of the integrator, while accomplishing an extractive transfer of bonuses to some growers by penalizing others - all within a system that is heavily influenced by integrator controlled inputs and actions.

Within this system, a grower can perform exactly the same functions and make exactly the same managerial decisions for one flock of birds as they do for the next flock of birds, and receive significantly different compensation between the two flocks relative to other growers in the settlement group. This could be a result of the quality of the inputs or the pick-up timing decisions made by their integrator, or this could be impacted by the group of other growers that they are put into competition with by their integrator within any given tournament group. Consider, for example, this account:

---

[11] https://rafi-usa.medium.com/eight-questions-you-might-not-know-you-have-about-the-packers-and-stockyards-act-80b0af5054ea

*Rural Advancement Foundation International - USA*

> *The grower pays for all of his mistakes and all of the integrator's mistakes. It is not uncommon for several houses to have feed outages every grow out. Also, the service tech "looks better" if there is little to no feed left over at the end of the growout, so they tend to short the grower on the last load(s) of feed resulting in the birds being off feed an additional 10-14 hours earlier than they should be. Any time during the growout the birds are without feed negatively impacts performance - and thus our income.* - Alabama poultry grower

While integrators cast this system as encouraging healthy competition, in reality, the outcome of this competition is never in the control of growers. The most decisive variables that lead to a flock performing above or below average, like the health and quality of chicks, feed, and medicine or the timing of when flocks are picked up for processing, are all controlled by the integrator.

*Unfair Externalization of Mundane Production Costs*
It is additionally important to note that the tournament system functions to allow integrators to externalize many of the mundane systemic costs of poultry production onto their contract growers. Poultry production, like any agricultural venture, does not operate like a Swiss clock - there are biological and human factors that introduce variability and error into the system, and these manifest as costs.

The most prominent example is the quality of the chicken flocks themselves. It is well documented that the age[12][13][14] and health of the breeder flocks that produce broiler chicks affect the final performance[15][16] of broiler chickens, and thus grower income. Additionally, the health status of the provided broiler flocks themselves can also obviously have major impacts on mortality, final weight, and feed conversion efficiency. Growers are not able to control whether they will receive a flock with these issues, while integrators have every ability to decide which growers receive more or less optimal flocks. In our grower survey, grower after grower provided accounts illustrating the impact of flock quality on their income stability and inability to fairly compete:

> *You have those farms that tend to get the better chicks and when you have 15% mortality the first couple of days there's no way to compete with that. Integrators deliver sickly chicks but offer no products to try to help those chicks and expect you to take the loss.* - Alabama poultry grower

---

[12] Washburn, K.W., and R.A. Guill. "Relationship of Embryo Weight as a Percent of Egg Weight to Efficiency of Feed Utilization in the Hatched Chick." Poultry Science 53.2 (1974):766-769.

[13] Weatherup, S. T. C., and W. H. Foster. "A Description of the Curve Relating Egg Weight and Age of Hen." British Poultry Science 21.6 (1980): 511-519.

[14] Wilson, H. R. "Interrelationships of Egg Size, Chick Size, Posthatching Growth and Hatchability." World's Poultry Science Journal 47.1 (1991): 5-20.

[15] Goodwin, K. "Effect of Hatching Egg Size and Chick Size Upon Subsequent Growth Rate in Chickens." Poultry Science 40 (1961): 1408-1409.

[16] Morris, R.H., D.F. Hessels, and R.J. Bishop. "The Relationship Between Hatching Egg Weight and Subsequent Performance of Broiler Chickens." British Poultry Science 9.4 (1968): 305-315.

6

*Rural Advancement Foundation International - USA*

*I have gotten really small chicks from a flock of hens of an age of only 26 weeks old, which is known and verified by veterinarians that they will grow smaller in weight and size compared to "prime chicks of 32-50 week old hens…then you sell/settle against farmers who have prime chicks that beat you and you receive a minus and have to give money to the "better grower"* - North Carolina poultry grower

*Chick quality (genetics) accounts for 90% of the performance of the flock (feed 5% health 2%) and the environment (which the grower controls) only 3%. Studies published show these statistics. This means the integrator is responsible for 97% of the chicken's performance. If they send the grower poor chicks then the performance and productivity of the farm will be poor.* - Alabama poultry grower

*We receive birds from several hatcheries in Alabama. Birds from different hatcheries definitely are not the same. We have seen the difference time and time again yet we still settle against the other farms with far superior chick quality. It's impossible to compete with growers who get the good chickens vs those who get all the culls.* - Alabama poultry grower

*Seven years ago [our integrator] started bringing us birds with severe genetic disadvantages. The chick quality was terrible and there was no way to make these birds perform, it was a nightmare and totally out of my control but I was blamed for it like so many other growers and my income suffered severely. They threatened to put me in a high management program where we had to perform better over the next three flocks or our contract would be terminated. I ended up selling that farm due to the impossible standards.* - Missouri poultry grower

*I have gotten a different breed before. All the other growers got a higher performing breed than I received but I was required to sell against the other farms. There is no way you can be competitive when you are raising a totally different breed from those you are selling against!* - North Carolina poultry grower

*I was given sick birds, and I finished so poorly that I could not even make a bank payment. My integrator acknowledged they gave me sick birds and that was the reason for my poor performance, but they still took over half of my check to offset their losses. When I asked about my losses I was told that this is how the business works. I had to get an extra loan to pay for my gas and electricity. In another example, I was brought a bad batch of feed 3 days before my flock was picked up. The birds stopped eating and drinking. My integrator acknowledged the mistake. My birds were the lightest I ever grew. They died a lot towards the end. The company did nothing to offset my losses.* - Georgia poultry grower

*We grow and our barns are set up for tray packs. In August 2020 we were required to grow big birds. We are in south Mississippi and August is the hottest part of the year. Of course we did not meet weight requirements for big birds and we were 30 points above cost. When we discussed our*

*Rural Advancement Foundation International - USA*

*concerns about our settlement our division manager said, and I quote, "y'all did better than we thought you would.'* - Mississippi poultry grower

Discrepancies and disputes surrounding feed quality and delivery was one of the most consistently reported issues highlighted by the growers who completed our grower survey. Flock performance - and thus grower pay - can be significantly impacted by a diverse range of feed discrepancies beyond a simple lack of feed for a period of time. For example, if a portion of the feed in delivery is inadvertently or carelessly not fully deposited on a grower's farm, their feed efficiency metrics will suffer. Or, because flocks are progressively transitioned from a finer ground feed to a pelleted feed to maximize feed efficiency, if flocks are, at some point during their growth, provided with the incorrect feed mix, feed efficiency metrics will suffer. From their on-the-ground vantage point, contract growers are best positioned to identify when these issues arise - and according to our surveying and interviewing, these issues are pervasive. 96% of growers in our survey reported experiencing a negative impact on their income due to one or more of the following feed issues:

- Having a feed disruption of at least 6 hours (90%)
- Having a feed disruption of at least 12 hours (83%)
- Receiving an incorrect feed mix for my flock's growth stage during grow-out (75%)
- Receiving less feed than stated on my feed load receipt (59%)

One story in particular that was relayed to us is an excellent example of the type of issue that requires further structures to account for. A poultry grower we spoke to described a time when he observed an issue with one of his feed deliveries. The feed truck driver stopped the truck's auger when the truck had been emptied, but before all of the grain in the auger had been transferred to the grower's grain bins. This resulted in the grower not receiving several thousand pounds of feed that his integrator thought he had received. Despite the flock being, in his estimation, a well performing flock with chickens that had put on more than average weight, he came in last place in that flock's tournament group, likely due to the feed discrepancy he experienced. He "asked [his] representative if there was any way they could catch that a feed truck's auger didn't run completely," and was told there was no recourse for the issue.

Growers in our survey had other detailed comments about these issues:

> *I am on flock 26 with my integrator. In 25 flocks I have yet to be able to match the feed tickets to what they show in my settlement. This results in an average of 250,000 pounds per flock of feed that they say I used that I don't have tickets for. This greatly affects my feed conversion…One flock I actually found a ticket they had in my settlement twice. When I called they did admit the problem but they found another ticket that supposedly wasn't added and it was for 11,000 pounds which was supposedly just enough to not change my feed conversion.* - Arkansas poultry grower

8

*Rural Advancement Foundation International - USA*

*My integrator made me take the chicken off feed for 12 hours five days before they were picked up - it killed my feed conversion* - Arkansas poultry grower

*We had a flock down the road that got pellets too early - the birds were scratching the feed out terribly and wasting it. They replaced the feed for that farm. I asked the supervisor how they were going to be paid? She said she honestly didn't know.* - North Carolina poultry grower

*Our complex has two feed mills. One mill feed generally delivers correctly, but when we receive feed from the other mill we either run out all the time or have feed that sits nearly the whole flock because of overshipments. I personally had two loads that were shorted because they were whole loads I got credited for, but I have no way to know if I got credit for the overshipped feed that was hauled back.* - Alabama poultry grower

*Feed delivery is another issue. Sometimes when we receive split loads of feed we do not get the feed that we supposed to because when they deliver, the first farm gets more of the feed because the doors on the truck leak* - Louisiana poultry grower

Similarly, the age of a flock at pick-up can significantly impact grower income. Poultry feed conversion efficiency peaks at a certain age, after which their feed conversion efficiency starts to lag. Consequently, there is an ideal flock pick-up time range in a flock's life cycle. When integrators choose to pick up flocks before or after this ideal range, for whatever reason (often pick-up time is determined based on integrator complex supply needs), growers end up being penalized for their flock's less optimal weight or efficiency metrics, even though pick-up time is not in their control. As several growers told us,

*Your birds go out on different days. It is a known genetic fact that birds' feed conversion ratio changes daily as they age. I might sell my birds today at 46 days old and you sell tomorrow and your birds are 49 days old. There is no way you can compete fairly when your birds are 3 days different in age.* - North Carolina poultry grower

*Some farms are moved at 49 days and others moved at 53 days. You can't compete with farms that are moved at 49 days when you are moved at 53 days."* - Maryland poultry grower

Herein lies the perverse brilliance of the tournament system: instead of sharing these inherent costs equitably, integrators pit their growers against each other and extract these costs from whoever happens to fall below the arbitrary tournament average. Thus, instead of a legitimate competition, the tournament system functions as a way for poultry companies to transfer the risk and cost of any problems with the chicks, feed, or medicine they provide onto the growers with whom they contract. Given that these costs are externalized onto growers in the form of penalties assessed within the tournament system that can result in a reduction in prices below contractually stated base pay rates, the cost externalization of the tournament system can be understood as a price manipulation scheme and deceptive practice.

9

*Rural Advancement Foundation International - USA*

*Facilitation of Retaliation Against Grower Solidarity and Self-Advocacy*

In addition to its role in externalizing integrators' costs onto growers, the tournament system also affords integrators a myriad of ways of retaliating against growers whom they want to pressure into silence or compliance with their wishes, or whom they want to drive out of the industry. With their control over so many of the variables that affect poultry growers tournament system performance - from flock and input quality, to correct feed provision, to flock pick-up time, to tournament group composition - integrators have many ways in which they can hold down the incomes of their growers. This ability can be used to compel growers to comply with upgrade requests, threaten growers who speak out against their integrator, or drive growers into debt, bankruptcy, and even suicide. As one North Carolina contract poultry grower told us, "They don't have to cut you off, they can just bleed you dry. The barn we're sitting in here hatched flocks with salmonella issues. They can send those compromised flocks to growers they want to bleed." Multiple growers in our survey conveyed their experiences of these toxic dynamics:

> *My main concern is that [my integrator] operates on fear and threatening tactics to make every grower they have scared they are going to lose their contract every single day. No human being should have to live every single day in fear that their livelihood and only source of income can be taken away from them. I am sick of it, someone needs to do something to help us! I love to grow chickens and feed the world, but I do not like to live as if under a dictatorship.* - Mississippi poultry grower

> *When I filed a complaint with the Packers and Stockyards Division about a weight issue, in which I was proven right, I was punished with bad tournament grouping for a year. Also, I have been told by my integrator, after receiving a really bad flock of birds, that they would be sure to not let it happen next time- so they know how to make it happen!* - Alabama poultry grower

> *We were shut off in 2012 due to massive updates that the company required. They used the tournament system to shut growers down. Because of the system we were shut off earlier than we should have. We only had three years left on our loan.* - Arkansas poultry grower

> *I was the number four ranked grower in my complex, and then went all the way to the bottom. When I asked my service tech about it, she said I had "help" to go to the bottom.* - Texas poultry grower

Integrators' ability to intentionally leverage their control over the quality and reliable provision of inputs to their contract growers constitutes a major undue preference, discrimination, and retaliation concern. This overall imbalance of power allows integrators to treat farmers like they are disposable. We repeatedly observe integrators cutting off farmers' contracts (often in retaliation after farmers speak out against unfair practices), leaving them with millions of dollars of debt tied up in single-use structures which do not have the ability to generate

revenue, or contribute to a property's value, in the absence of an active contract. The abandoned poultry houses that litter the rural landscape across the Southeast testify to this pattern.

*Enablement of Price Control and Undue Preference Through Tournament Group Composition*
One of the most egregious methods of price manipulation available to integrators is found in their control over the composition of tournament groups themselves. In the current tournament system, growers generally compete against other growers whose flocks have been delivered for processing within the same week. Depending on the timing of flock delivery or pickup, contract growers may find themselves competing against completely different growers from flock to flock. This can result in a grower who delivers two substantially similarly performing flocks making very different income on each, based on the arbitrarily different competition they face.

While this arbitrary level of tournament group composition risk is concerning enough, income losses due to tournament group composition effects are also possible due to direct integrator manipulation of tournament groups. Integrators have multiple ways to intentionally and unilaterally control how growers are grouped into tournaments, and they can use this control to strategically manipulate the performance average and competition sample size and composition against which any given grower is compared, functionally manipulating or controlling the price that any given grower or group of growers receives. This can have drastic effects, as one grower relayed to us:

> *We've always been in the same tournament group with about 25 growers from the surrounding area. In the past few years, I was placed in a much smaller division with only three other growers. We're all top growers, but after that change one of us was always average, one was above, and one was below. How fair is that?"* - Mississippi poultry grower

In this example, the growers' integrator essentially manipulated the price that it had to pay to four of its top growers. In their initial, larger tournament group, these growers would have all placed above average and received bonuses, and thus a higher final price. By sectioning these growers off into a separate tournament group, two of these growers subsequently received final prices below base pay, based solely on the integrator's power to control how their tournament group was composed. This should be considered both an example of unlawful undue preference, and an example of unlawful manipulative control of grower prices, under the Packers and Stockyards Act.

**The Verdict on The Tournament System: An Illegal Course of Business**

Integrators designed the tournament system as a mechanism to control the price they pay for poultry production through cost and risk externalization and direct grower price manipulation through tournament group composition. Given the true nature of the tournament system as a price manipulation scheme, it can be argued that the tournament system is an illegal course of business under Section 202(e) of the Packers and Stockyards Act. Section 202 (e) [7 U.S.C. 192]

states that it is unlawful to "engage in any course of business or do any act for the purpose or with the effect of manipulating or controlling prices."

As established above, integrators utilize their current contract structures, most prominently the tournament system, to manipulate the real prices they pay growers for poultry production. Variable input quality and unreliable feed provision represent mundane operational costs that are both stabilized and externalized onto growers through this manipulation. More nefariously, the manipulation of grower tournament group placement or sample size, flock pick-up time, and layout times all represent methods of integrator price control. Most fundamentally, contractual base prices themselves are totally and noncompetitively controlled by integrators, who exercise ubiquitous regional monopsony power to depress grower prices relative to historical inflation.

In his 2022 paper "*Protecting Livestock Producers and Chicken Growers*, Michael Kades, now Deputy Assistant Attorney General in the Antitrust Division of the Department of Justice, argues that for the livestock and poultry industries, the Packers and Stockyards Act fills a gap in the broader regime of antitrust law found in the Sherman and Clayton Acts that allows for the unilateral exercise of market power within oligopolies and oligopsonies. He notes that,

> *Section 202 (e) says that "any act or course of business" that, among other things, restrains commerce" applies to single firm conduct that would not "constitute single firm monopolization under §2 of the Sherman Act.'* [17] *As the 7th Circuit explains in Swift and Co. v. United States, "Under the Sherman Act, it is true that a simple refusal to deal is permissible,"* [18] *but "an individual refusal to buy may be within the prohibitions of the Packers and Stockyards Act."* [19] [20]

While the *Swift* case pertained to firms' refusal to buy within the context of an oligopsonistic market without inter-firm agreement, the key point, in this case, is that agreement between firms is not required to prove that a course of business is unlawful under the Packers and Stockyards Act. Under this logic, the usage of oligopsony power to unilaterally impose contracts that enable price manipulation and control would be unlawful; "even if there is no agreement, a packer or integrator may have violated Section 202 (e) if the individual contract provision reduces price competition." [21]

The imposition of contracts that contain provisions like the tournament system that can be shown to afford integrators the ability to manipulate and control prices should be considered an anticompetitive form of single-firm conduct. On price manipulative conduct, Kades argues,

---

[17] Been v. O.K. Industries, 495 F.3d, p. 1231 ("The antitrust requirement that monopoly power be acquired willfully and include the power to exclude competitors does not apply in the context of the PSA"; Hovenkamp, "Does the Packers and Stockyards Act Require Antitrust Harm?" p. 3–4
[18] Swift & Co. v. United States, 393 F.2d 247, 253 (7th Cir. 1968).
[19] Ibid., p. 253.
[20] Kades, Michael. *Protecting Livestock Producers and Chicken Growers*. Washington Center for Equitable Growth, May 5, 2022, 76.
[21] Kades, 76.

> *Conduct can manipulate or control price if it is "anticompetitive" or "illegitimate." In defining manipulation, the court looked to the Securities and Exchange Act, which focuses on conduct that artificially affects prices."Manipulating or controlling" should include market manipulation. Market manipulation is "the creation of an artificial price by planned action" by one or more actors. It undermines market integrity and transparency. Although market manipulation can be an antitrust violation and may be more likely when a firm has market power (either monopoly or monopsony power), neither is required. Rather, market manipulation involves exploiting market frictions, bargaining leverage, and information asymmetry to artificially increase or decrease the market price. These tactics are most likely to harm smaller participants—retail investors in securities markets, for example.[22]*

It should be noted here that "market price" in this case need only refer to the price that contract growers receive for the animals they raise under contract, not to the wholesale or retail price of those livestock or poultry commodities. Kades explains that,

> *In claims involving monopsony harms, there is no requirement to show that prices increased in the packers' market or at the retail level…In cases involving monopsony, the focus is solely on the impact within the seller's market. The plaintiff has no obligation to prove any effect—actual, likely, or tendency to cause an effect—in the market in which the packer sells. The U.S. Supreme Court precedent is clear: Harm to the seller is sufficient for an antitrust violation.[23] As a matter of economics, in cases involving a traditional monopsonist, the buyer will not pass lower costs on to its customers. Even in situations where a buyer with bargaining power were to pass along the benefits of an artificially low purchase price to the monopsonist's customers, the buyer would simply be sharing the anticompetitive benefit with its customers. That scenario is no different than if a cartel raised prices to customers (obviously bad) and justified it by saying that they shared their newfound profits with their suppliers. Therefore, harm to the producer should be sufficient for a Packers and Stockyards Act violation.[24]*

The tournament system is pervasively used across poultry markets, and in aggregate, its externalization of cost and ability to control prices offered through tournament group composition manipulation in effect creates an artificial price by planned action. Kades notes that when the USDA used to administer the Commodities Exchange Act, it had a four part test for illegal price manipulation:[25]

1. The accused had the ability to influence market prices.
2. They specifically intended to do so.
3. Artificial prices existed.
4. The accused caused the artificial prices.

"At a minimum," he contends, "manipulating or controlling prices should apply to any conduct that satisfies those four elements." When considering the externalization of production costs or

---

[22] Kades, 70.
[23] Mandeville Island Farms Inc. v. American Crystal Sugar Co., 334 U.S. 219, 235 (1948).
[24] Kades, 77 - 78
[25] Ibid.

*Rural Advancement Foundation International - USA*

the effects of tournament group composition, it seems clear that integrators have the ability and intention to cause artificial prices, and in fact do so. According *Live Chicken Production Trends*, a report prepared by the National Chicken Council in March of 2022, contract poultry growers made 6.33 cents per pound  in 2012 dollars in 1990, by 2012 their pay had fallen by over 8% when considering inflation, to 5.81 cents per pound. They received 6.13 cents per pound in 2012 dollars in 2020, for a net decline of 3.1% in their prices relative to inflation.

*Rural Advancement Foundation International - USA*

## <u>Contract Poultry Growers Speak Up: Our Grower Survey Analysis</u>

In preparation for our comments below, CCAR-member RAFI-USA conducted a survey of active and former contract growers that sought stories of their experiences of unfair or deceptive practices in the poultry industry, as well as their feedback on USDA's proposed rule. This survey was conducted anonymously, in response to widespread grower concerns about retaliation should they speak up about their experiences or support of reform.



A total of 105 contract poultry growers from 17 states responded to our survey. 90% of respondents were active growers while 10% were former growers. Only three grower respondents agreed that tournament systems "are generally fair and foster healthy competition," while 94% of grower respondents expressed at least one of the following sentiments regarding tournament systems:

1. Tournament systems are generally unfair and pit growers against each other (75%)
2. Tournament systems are too often used to retaliate or discriminate against growers (70%)
3. Tournament systems often negatively impact grower income (68%)

When we asked growers about a range of rule proposals, we received the following feedback:



*Rural Advancement Foundation International - USA*

The most popular proposed rule provisions amongst those growers we surveyed were new requirements for contract length guarantees to match the length of capital investment loans (89%) and for contracts to provide minimum guarantees for annual flock placements and flock stocking density (83%). Over 70% of growers would like to see rules that resulted in the prohibition of the usage of the current industry standard tournament system, and nearly that number would like to see any future contractual incentive formulas dynamically account for variable input quality. When combined, 90% of growers favored either prohibition of the tournament system or a mandate that formulas dynamically account for variable input quality.

We also asked our grower survey respondents whether they had experienced any of a range of commonly reported issues, which are within the control of integrators rather than poultry growers, that can negatively impact their income:

Adverse Experiences of Contract Growers



*Rural Advancement Foundation International - USA*

As can be seen above, sub-optimal flock health and layer flock lineage have pervasive impacts on over 90% of contract growers, as do a range of feed provision and quality issues. A striking 83% of growers had experienced a 12-hour feed disruption (with even more - 90% - experiencing a 6-hour disruption),  75% had received incorrect feed mixes for their birds' age (which can have a major impact on feed conversion efficiency), and 59% had experienced an incorrect feed delivery that differed from their feed load receipt. Additionally, 63% had been arbitrarily placed in a tournament group with a composition in which they were disadvantaged, which can arbitrarily change a grower's fortunes from profit to loss. Cumulatively, our survey results clearly demonstrate that adverse grower income impacts caused by integrator controlled variables are pervasive across today's poultry industry.

*Rural Advancement Foundation International - USA*

# Designing a Fair Framework

*Regulating Production Contracts to Promote Fairness and Innovation*

The purpose of today's tournament system is unacceptable and unlawful, and regulatory intervention is needed to remove integrators' ability to manipulate their prices and their growers. New regulatory standards and contract forms are needed to ensure livestock and poultry markets that reward effort, efficiency, and innovation with integrity. The purpose of USDA's regulatory activity should be to protect growers from the abusive exercise of market power, ensure that growers are paid and incentivized for what is in their control, and foster innovation.

Current industry-standard production contracts tie both base pay thresholds and performance incentive premiums or penalties on the weight or performance of integrator-owned animals that receive integrator-provided inputs. Within this paradigm, contract growers currently have meaningful control over only a small minority of the factors currently determinative of the final prices they receive, and no meaningful competitive bargaining power in relation to their integrators. It is vital to understand that within the current industry structure, contract livestock and poultry producers are not, in reality, independent economic entities selling livestock into markets, but rather are going into debt to contract their *labor, land, and built infrastructure* to integrator corporations to grow livestock they do not own. The contract grower's relationship to all of the variables that currently impact their final price is fundamentally different from that of a truly independent producer. When an independent producer has a problem with a feed delivery, the company with which they must resolve that issue is likely not associated with the company they will sell their animals to, or the company they purchase their medicine from. In this way, the independent producer does not face the pervasive and multi-vectored control and perverse corporate incentives that contract producers face when contracting with vertically integrated corporations. There are simply too many variables that are unavoidably controlled by integrators, and within such a dynamic, it is fundamentally impossible to structure a payment system predicated on input-to-output performance with fairness and integrity.

USDA should issue a new framework of rules, grounded in the authority of the Packers and Stockyards Act, to correct this dynamic and ensure that production contracts compensate and incentivize growers based on what they, as independent contractors, actually control. Corporations should not be allowed to design contract provisions that allow them to unilaterally manipulate the real prices they deliver to their contract producers, as they currently do through their control of tournament group composition. Furthermore, contract growers need regulations that strictly mitigate the impact of integrator-owned inputs on contract producer income. Ultimately, such regulations should seek to structure a new power dynamic in contract animal agriculture, in which the agency and bargaining power of contract producers is protected in the face of the current industry's pervasive regional monopsony power.

*Rural Advancement Foundation International - USA*

**Proposed Production Contract and Cooperative Bargaining Rule**

The following proposed rule framework is designed to increase grower agency and protection by offering integrator corporations a choice: be willing to pay truly independent contract growers for what they actually control, most likely (and preferably) through square footage contracts, or be willing to negotiate with grower cooperatives or associations on contracts that tie base price to integrator-owned animal performance fairly. In either case, production contracts may retain performance-based payment formulas under this proposal, provided they comply with new, stricter guardrails and guarantee minimum prices.

*Definitions*:
- **Livestock or Poultry Production Contract:** Any contract established between a meatpacker or live poultry dealer and an independent contract producer in which the independent contract producer provides their land, farm infrastructure, and/or management labor to house and raise livestock or poultry owned by the meatpacker or live poultry dealer.
- **Independent Contract Producer:** Any agricultural producer that enters into a contract to manage the production of an agricultural commodity owned by another contracting party, whose status within the contract is that of an independent contractor under the Fair Labor Standards Act, and who is not a member of a cooperative association of producers that has engaged in bargaining with the other contracting party.
- **Cooperative Association of Producers:** The term "association of producers" means any association of producers of agricultural products engaged in marketing, bargaining, shipping, or processing as defined in Section 1141j(a) of Title 12, or Section 192 of Title 7.
- **Base Price:** The price established within a livestock or poultry production contract that corresponds to the stated value provided by the independent contract producer within the contract's terms, prior to the assessment of any performance-based premiums or penalties. Common ways of establishing a contractual base price include but may not be limited to price per square foot of contracted farm infrastructure or price per pound of livestock or poultry production.
- **Minimum Price:** A contractually guaranteed price floor within a livestock or poultry production contract below which the final price delivered to a contract producer may not be reduced, even by performance-based penalties.
- **Expected Performance Standard:** An established standard for the growth and health performance of livestock or live poultry while under the management of an independent contract producer, which may include but may not be limited to expected mortality, weight gain, or feed conversion efficiency.
- **Performance-Based Incentive Formula:** A formula designed to compare the real performance of livestock or poultry being managed by a contract producer relative to an expected performance standard.
- **Premium:** The percentage of additional compensation added to a contract producer's base pay based on their performance relative to an expected performance standard.

19

- **Penalty:** The percentage of compensation subtracted from a contract producer's base pay based on their performance relative to an expected performance standard.
- **Complex:** A collection of contract producers who supply the same livestock or poultry processing plant.

### *Regulation of Base Pricing in Production Contracts*

A livestock or poultry production contract established with an independent contract producer may not utilize a base price that is contingent on the weight or growing performance of livestock or poultry not owned by the independent contract producer. Production contracts that utilize a base price that is contingent on the weight or performance of animals not owned by individual contract producers may only be established within or negotiated with a cooperative association of producers.

### *Regulation of Performance-Based Incentive Formulas in Production Contracts*

Any livestock or poultry production contract that incorporates a performance-based incentive formula to calculate premiums or penalties based on production performance relative to an expected performance standard must comply with the following conditions:

- The contract must guarantee a minimum price floor.
- The expected performance standard must be based on at least a six month rolling performance average of all producers in the contract producer's complex.
- No performance-based incentive formula may assess a premium or penalty percentage that exceeds the percentage difference between a grower's performance and the expected performance average.
- The expected performance standard must be mathematically adjusted to account for expected performance, with regards to expected mortality, weight, or feed conversion efficiency, with differences relative to:
  - Layer flock age and health
  - Pre-delivery health issues
  - Flock breed
  - Flock pick-up age
  - Feed type
  - Feed disruption of 6 hours or more
  - Medical care protocols
- Contracts must include a clearly elaborated procedure for settling payment outside of the performance-based payment formula, through a performance average of at least the last five flocks of the grower in question,  in cases where growers bring an appeal related to input quality or provision issues.

For clarity, the chart below provides a concise breakdown of the rule framework articulated above:

20

*Rural Advancement Foundation International - USA*

| Production Contract Rule Framework | | |
|---|---|---|
| Grower Status | Base Pricing Allowed | Performance Incentive System Allowed |
| Independent | $/lb pricing option not allowed<br>$/Square Foot preferred | Must comply with all  requirements under "Performance-based Incentive Formulas" above |
| Member of Co-Op or Association | $/lb pricing option allowed when negotiated with the cooperative or association | |

According to the Agricultural Fair Practices Act (AFPA), it is already illegal for integrator corporations to coerce growers to join or not join a cooperative or association of growers. It is also illegal for buyers to retaliate against producers who form a cooperative under the AFPA. However,  further rulemaking should specifically reinforce this protection for contract growers currently under contract with an integrator who might choose to join, or not join a cooperative or association. Any retaliation against growers with existing contracts based on their cooperative or association membership status should be considered unlawful undue preference and discrimination under the Packers and Stockyards Act. In the context of the rules we propose, growers should have the free choice to opt for square-footage contracts, or to voluntarily form local cooperatives or associations for the purpose of bargaining for standardized production contracts. Furthermore, for the purposes of bargaining for performance-based poultry contracts, a poultry grower cooperative or association must be fully autonomous from the integrator, only consist of poultry farmers, and comply with the Capper-Volstead Act.

It is also important to note that our rule framework is designed to work in conjunction with USDA's proposed rule on transparency in poultry contracting. Transparent disclosure of provided input quality will be an important prerequisite for ensuring compliance with our proposed requirements for performance-based incentive formulas, especially with regards to the required dynamic adjustments to account for the various input quality variables stipulated.

*Impact on Grower Welfare*

In 2001, Theofanis Tsoulouhas and Tomislav Vukina examined the regulation of broiler contracts, comparing industry-standard contracts with tournament systems to a hypothetical regulation mandated fixed-performance contract, in their paper *Regulating Broiler Contracts: Tournaments versus Fixed Performance Standards*. In their study, they note that "the crux of growers' complaints about tournaments is the problem of group composition risk," which they acknowledge as a risk borne by growers, but argue that existing tournament system contracts provide growers protection from "common production risk," since growers are paid relative to

*Rural Advancement Foundation International - USA*

a common performance average.[26] Tsoulouhas and Vukina proceed to analyze the effects of mandated fixed performance contracts on grower welfare, compared to the industry status quo.

It should be noted that Tsoulouhas and Vukina's study has a glaring blindspot: it generally assumes that growers receive inputs of equal quality, and does not account for more intentionally manipulative integrator behavior. Nonetheless, their modeling leads them to the conclusion that a fixed-performance incentive system in which bonus systems have a maximum cap increase grower welfare. "Income insurance and grower welfare can simultaneously be increased provided that the slope of the bonus payment scheme, the so-called "piece rate," is also regulated."[27]

Our proposed regulatory framework differs from that posed by Tsoulouhas and Vukina in several important respects. Unlike a simple fixed-performance standard, our proposal requires expected performance standards to be determined based on an average of real grower outcomes, retaining a degree of risk protection against common shocks. However, by requiring the sample pool of outcomes to be expanded to at least a six month rolling average of the performance of all growers supplying the same complex, our framework eliminates the tournament group composition risk faced by growers generally, and specifically removes integrators' opportunity to manipulate performance through their control of tournament group composition. Overall, our proposed framework should provide greater risk protection for growers against common shocks than the contract form modeled by Tsoulouhas and Vukina, while retaining the same elimination of tournament group composition risk.

Nonetheless, our proposed framework is also informed by the analysis and recommendations of Tsoulouhas and Vukina. Our framework prohibits performance-based incentive formulas from providing premiums or penalties that exceed, in percentage terms, the percentage difference of the grower's performance relative to the expected performance average. For example, if a grower were to perform 10% better or worse than the expected performance average, they could only receive a 10% premium or penalty relative to their contract's base pay rate. Thus, our framework restricts the "piece rate" grower contracts, consistent with the primary recommendation of Tsoulouhas and Vukina.

*Impact on Grower Income Variability and Degradation of Base Pay Rates*
An additional benefit of the two rule provisions discussed above - a mandated expected performance standard based on at least a six-month rolling average, and the restriction of premiums and penalties relative to real variation of grower outcomes relative to the expected performance standard - are these provisions' stabilization of grower income variability. On the one hand, the significant expansion of the outcome sample pool provided by six-month rolling average performance standards should, by the law of averages, smooth the relative variability of the expected performance average itself. Growers will no longer be likely to be compared to

[26] Tsoulouhas, Theofanis and Tomislav Vukina, *Regulating Broiler Contracts: Tournaments versus Fixed Performance Standards.* Amer. J. Agr. Econ. 83(4) (November 2001): 1062–1073 Copyright 2001 American Agricultural Economics Association, 1063.
[27] Ibid., 1064.

wildly different performance standards from flock to flock based on their tournament group composition or an input quality or provision issue. On the other hand, the extent to which a growers' performance-based incentive may vary their final income will also be restricted relative to the real percentage of difference between their performance and the expected performance standard. According to growers in our networks, incomes within today's tournament system contracts can be cut by 50% or more if one places at or near the bottom of one's tournament group. It is highly unlikely that such growers are, in fact, delivering half of average value to their integrators on such flocks. Overall, these provisions should appropriately narrow the impact of performance incentive provisions in production contracts. Performance incentives should incentivize contract producers, but they should never make or break them.

In addition to the measures previously described, our proposed framework also requires contracts to directly limit the degradation of growers' base pay rate by requiring a contractually guaranteed minimum price. Significantly, our framework does not require that a contractually guaranteed minimum price threshold be equivalent to the contract's base pay, allowing but not requiring the option of explicitly restricted performance-based penalties. This will allow integrators and independent or associated growers the flexibility to negotiate appropriate base and minimum pay thresholds and performance incentive systems without incentivizing a depression of base pay rates to a lower common denominator to account for below-average grower performance, while still guaranteeing that the guaranteed minimum price provided by production contracts can be accurately assessed by growers, lending institutions, and USDA.

It may be helpful to note that the terms of the Department of Justice's recent consent decree with Cargill, Wayne Farms, and Sanderson Farms regarding poultry production contracts would be consistent with, but not required, under our proposed framework, provided that Wayne-Sanderson growers choose to form a cooperative association to continue such terms. However, for any growers who do not consent to join a cooperative or association of growers, new square-footage based contracts would be required.

*Ensuring Growers are Compensated Based on Variables They Control*
Perhaps the most important goal of our proposed framework is that contract producer income be more directly aligned with factors under their operational or negotiational control. For independent contract producers, our framework will require base payment rates to be based not on integrator-owned animals or inputs, but instead on the factors that growers control: the provision and quality of the land and built infrastructure required for integrator-owned livestock or poultry production. In this respect, square-footage contracts are clearly the most optimally aligned contract form. It should further be noted that this proposed framework helpfully corrects industry standard contract terms to better comply with the correct classification status that independent contract producers should fall under within the Fair Labor Standards Act, anticipating any potential challenge to the industry's current potential misclassification of growers as independent contractors, as is alleged in Diaz et al. v. Amick Farms, LLC. Furthermore, our framework still accounts for the potential variability of the

*Rural Advancement Foundation International - USA*

management labor component of a contract producer's services through its tightly regulated provisions for performance-based incentives.

Our framework takes specific additional care to ensure that variability of quality or correct provision of integrator-controlled inputs is fairly accounted for, even within the more restrictive terms of the performance-based payment formulas we allow. We require that performance-based payment formulas mathematically adjust the final expected performance average to which any contract producer is compared based on expected mortality, weight gain, or feed conversion efficiency performance differentials that might be caused by layer flock age and health, pre-delivery broiler flock health issues, broiler flock breed, or broiler flock pick-up age. We also require mathematical adjustment of the expected performance standard based on significant differences in feed or medical care provided, to account for expected performance differences for growers assigned non-GMO or antibiotic-free flocks, as well as for feed disruptions of 6 hours or more. Additionally, nearly 90% of growers we surveyed expressed support for USDA explicitly protecting their right to install feed scales on their farms without retaliation, so that they can independently verify feed delivery accuracy.

Integrators, of course, need to place all of their flocks with a grower, whether they have ideal characteristics or not. The key point is that growers' performance-based payment formulas should assess whether or not they were able to achieve below or above average performance from their flock based on performance expectations *specific to that flock*, rather than based on performance expectations for a flock with relative quality advantages. For example, a grower that receives a flock from a sub-optimal layer flock that is subsequently picked up later than is optimal for feed conversion efficiency should be evaluated in comparison to an appropriately customized expected performance standard. Live poultry dealers already collect a great deal of data about all aspects of the poultry production system, including data about grower, housing and flock performance, through industry data consulting firms. With this data, integrators should be able to catalog and predict expected performance for flocks based on their unique mix of the above listed characteristics, and easily comply with our framework's provisions.

*Facilitation of Collaborative Innovation and Infrastructure Competition*
Contrary to the false narrative of the poultry industry, the current tournament system often disincentivizes the spread of innovation. As one Alabama grower relayed to us, "the tournament system stifles advancements in poultry production…if a grower develops a technique that improves his performance, the last thing he will do is share that information because he is in constant competition with his fellow growers." Competition is not the only driver of innovation - collaboration is important as well. While our proposed framework retains competitive performance incentivization, it decreases the intensity of the zero-sum dynamic found between individual growers relative to the current system. This should free growers to share knowledge about best practices and good infrastructure investments more freely.

24

*Rural Advancement Foundation International - USA*

**Further Regulation of Contract Provisions and Discontinuation in the Poultry Industry**

As detailed previously, the poultry industry currently exercises its pervasive regional monopsony power to extend incomplete and unconscionable contracts to current and prospective contract producers. Unconscionability in contracting was defined in *Been v. O.K. Industries* as "an absence of meaningful choice on the part of one of the parties, together with contractual terms which are unreasonably favorable to the other party" in contracts established under a "gross inequality of bargaining power."[28] This dynamic in the poultry industry was further acknowledged by USDA's own recent "Transparency in Poultry Grower Contracting and Tournaments" rule, which spoke to the "incompleteness" of industry standard poultry production contracts:

> *A contract may be viewed as complete if the terms include the substantive legal, practical, and economic promises, obligations, and contingencies needed to operate in a poultry growing arrangement…Incomplete contracts may arise when practically important terms do not meet those conditions. Incomplete contracts may magnify risks with respect to the performance of the contractual counterparty and lead to other potential inefficiencies. In particular, at least one party may have discretionary latitude to deviate from expectations. For example, poultry production contracts often do not guarantee the number of flocks a grower will receive, even under long-term contracts, although this is a critical datapoint for understanding the value of the contract to the grower.*

At the end of their paper on poultry production contracts, Theofanis Tsoulouhas and Tomislav Vukina also acknowledged this power, specifically in reference to "hold-up" risk that growers face due to their integrators leverage of market power to coerce growers under threat, rather than incentivize growers with increased prices:

> *One of the more interesting issues is the problem of regional competition on the market for growers, and the related problem of a potential "hold-up." It is certainly conceivable that, by making growers incur large specific investments, integrators can increase grower incentives without increasing grower compensation, because the risk of losing his investment will increase a grower's fear of low performance. Because asset specificity has such an effect on distribution, integrators have an incentive to insist on investments that are unnecessarily specific. Thus, especially in geographical regions where the integrator enjoys market power, grower complaints about excessive investments may be theoretically justified.[29]*

Under these conditions, integrators have the power to offer or renew contracts with prospective and current contract poultry producers with unconscionable terms, including contracts guaranteed for fewer years than the lengths of the loans contract growers take out to finance their on-farm infrastructure, flock-to-flock contracts that do not guarantee sufficient flocks and

---

[28] *Been v. O.K. Indus., Inc.,* 495 F.3d at 1236.
[29] Tsoulouhas et al, 1072.

25

*Rural Advancement Foundation International - USA*

stocking density annually to keep up with loan payments and/or standard expenses. Furthermore, integrators are known to coerce growers into taking on additional debt to finance integrator preferred upgrades, under the threat of losing contracts or flock placements. Contracts that allow for this type of behavior should be considered incomplete and unconscionable, and the use of any incomplete or unconscionable contracts should be considered an unlawful deceptive practice under the Packers and Stockyards Act. **Perhaps most importantly, USDA should specifically clarify that it is unlawful for an integrator to coerce, intimidate, or break contract with a contract producer based on their unwillingness to implement integrator desired upgrades to their on-farm infrastructure, provided that their infrastructure is in good working order, and compliant with state and federal law.**

**Further Regulation of Lending in the Poultry Industry**

In addition to unfair contract provisions and discontinuation, integrators' ability to easily proliferate new poultry operations, backed by FSA or SBA-7(a) guaranteed loans that they share no liability in, is a significant factor in their ability to leverage their market power against their existing contract growers. The overall imbalance of power allows integrators to treat farmers like they are disposable, because it is easy and low-risk for the integrator to add new growers to replace those cut off. We repeatedly observe integrators cutting off farmers' contracts - often in retaliation after farmers refuse to implement desired upgrades or speak out against unfair practices - leaving them with millions of dollars of debt tied up in specialized, single-function structures which do not have the ability to generate revenue, or contribute to a property's value, in the absence of an active contract. As a result, it is increasingly common for us to hear feedback from current or former contract growers in our network about the need for strengthened rules to ensure fair contract terms and protect growers from contract discontinuation, as well as reforms to current lending practices that currently allow integrators to proliferate new poultry operations at will and without sufficient scrutiny.

USDA should enact reforms regarding the Farm Service Agency's lending practices in the poultry industry to ensure that live poultry dealers are not able to exploit their regional monopsony control to extend unconscionable contracts. Our recommendations are primarily directed at lending policy reforms for *new poultry operation applications*. One common practice of integrators in the industry is to require existing growers to implement expensive upgrades (which perpetuates the debt cycle) under threat of losing their contracts. Indeed, this often begins to happen to existing growers after new poultry operations are constructed nearby. For this reason, it is important that FSA take a more nuanced approach to approving loan guarantees for existing contract growers who need to secure capital for upgrades to avoid losing their contracts. RAFI-USA recommends the following reforms to the FSA Guaranteed Loan Making and Servicing Handbook:

- For contract income to be considered dependable, FSA should require that the contract be guaranteed not just for three years, but for the entire length of the loan term.
- For contract income to be considered dependable, FSA should require contracts to include sufficient minimum guarantees of animal placement and stocking density to

*Rural Advancement Foundation International - USA*

ensure dependable annual income. Flock-to-flock contract structures should not be considered dependable income.

- Income and expense projections considered during appraisal should be based on USDA required poultry contract transparency disclosures.

- FSA should not consider a loan application based on contract income to be viable unless the contract includes provisions guaranteeing that the contract cannot be revoked if upgrades aren't made (aside from upgrades required to comply with state and federal law). Appraisals should seek to evaluate that the life of the equipment funded by the loan has an expected service life (with standard maintenance) that extends past the term of the loan.

- For approval of applications for new poultry operations, FSA should require integrators to supply written justification for their need for overall capacity increase within a complex as a component of market analysis obligations, to ensure that new operations are not being sought to allow integrators to discriminate against or shutter other existing poultry operations within a given region.

*These comments and recommendations were authored by Aaron Johnson, RAFI-USA Challenging Corporate Power program manager Aaron Johnson, and edited by RAFI-USA Policy Director Margaret Krome-Lukens and RAFI-USA Executive Director Edna Rodriguez. Special thanks to the contract growers who entrusted us with their feedback in the survey conducted in preparation for this comment.*