## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

*Plaintiff*,

v.

CARGILL MEAT SOLUTIONS
CORPORATION, *et al.*,

*Defendants*.

Civil Action No.: 1:22-cv-1821

## AGRI STATS' OPPOSITION TO UNITED STATES' MOTION TO ENFORCE THE FINAL JUDGMENT AGAINST WAYNE-SANDERSON FARMS

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 3

ARGUMENT ........................................................................................................................ 9

    I.      The United States' Motion is Inconsistent with the Terms of the Final
            Judgment ....................................................................................................... 9

    II.     The Court Should Not Further Modify the Final Judgment Without Notice
            and Public Comment Pursuant to the Tunney Act ................................................. 13

    III.    The United States' Motion Identifies No Violations of the Modified Final
            Judgment ..................................................................................................... 15

    IV.    The Relief the United States Seeks Violates Agri Stats' Commercial
            Speech Rights Under the First Amendment .......................................................... 21

         A.     The Information Wayne-Sanderson Provides To, and Receives
                From, Agri Stats Concerns Lawful Activity and Is Not Misleading......... 22

         B.     The Government's Proposed Remedy Does Not Directly and
                Materially Advance Its Asserted Interest and Is Vastly Overbroad. ......... 24

    V.     The Government's Proposed Remedy Would Deprive Agri Stats of Due
            Process in Violation of the Fifth Amendment ....................................................... 27

CONCLUSION.................................................................................................................... 29

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                      **Page(s)**

*Bd. of Regents of State Colls. v. Roth*,
  408 U.S. 564 (1972).................................................................................28

*Bd. of Trs. of S.U.N.Y. v. Fox*,
  492 U.S. 469 (1989).................................................................................27

*In re Broiler Chicken Antitrust Litig.*,
  1:16-cv-8637 (N.D. Ill. Sept. 2, 2016)............................................... *passim*

*In re Broiler Chicken Antitrust Litig.*,
  702 F. Supp. 3d 635 (N.D. Ill. 2023) .............................1, 5, 12, 23, 29

*Brown, et al. v. JBS USA Food Company, et al.*,
  1:22-cv-02946-PAB-STV (D. Colo. Nov. 11, 2022)..........................7

*Cent. Hudson Gas & Elec. Co. v. Public Serv. Comm'n*,
  447 U.S. 557 (1980)........................................................21, 22, 26

*Chickasaw Nation v. United States*,
  534 U.S. 84 (2001).................................................................................11

*Cleveland Bd. of Educ. v. Loudermill*,
  470 U.S. 532 (1985).................................................................................27

*Edenfield v. Fane*,
  507 U.S. 761 (1993)........................................................22, 24, 25, 26

*Educ. Media Co. at Va. Tech, Inc. v. Insley*,
  731 F.3d 291 (4th Cir. 2013) .............................................................22

*Greater New Orleans Broad. Ass'n, Inc. v. United States*,
  527 U.S. 173 (1999).................................................................26, 27

*Hayes v. N. State L. Enf't Officers Ass'n*,
  10 F.3d 207 (4th Cir. 1993) ...............................................................12

*Jien v. Perdue Farms, Inc.*,
  No. 19-CV-2521, 2020 WL 5544183 (D. Md. Sept. 16, 2020).............23

*Jien, et al. v. Perdue Farms, Inc., et al.*,
  1:19-cv-02521-SAG (D. Md. Aug. 30, 2019)............................... *passim*

*Ky. Dep't of Corr. v. Thompson*,
  490 U.S. 454 (1989).................................................................................28

*Meyer v. Neb.*,
 262 U.S. 390 (1923)..................................................................................28

*Ohio v. Am. Express Co.*,
 585 U.S. 529 (2018)..................................................................................23

*Ohralik v. Oh. State Bar Ass'n*,
 436 U.S. 447 (1980)..................................................................................26

*In re Pork Antitrust Litig.*,
 1:18-cv-1776 (D. Minn. June 28, 2018) ................................................5, 6

*Sorrell v. IMS Health Inc.*,
 564 U.S. 552 (2011)..............................................................................22, 24

*Tashjian v. Republican Party of Conn.*,
 479 U.S. 208 (1986)..................................................................................28

*In re Turkey Antitrust Litig.*,
 1:19-cv-8318 (N.D. Ill. Dec. 19, 2019)......................................................5

*United States v. Agri Stats*,
 23-cv-3009 (D. Minn. Sept. 28, 2023)................................................ *passim*

*United States v. Apple, Inc.*,
 889 F. Supp. 2d 623 (S.D.N.Y. 2012).......................................................15

*United States v. Microsoft Corp.*,
 56 F.3d 1448 (D.C. Cir. 1995).............................................................10, 14

*United States v. Penn*,
 No. 20-cr-00152-PAB (D. Colo. Dec. 8, 2021) .........................................5

*United States v. SBC Commc'ns, Inc.*,
 339 F. Supp. 2d 116 (D.D.C. 2004)..........................................................15

*United States v. U.S. Gypsum Co.*,
 438 U.S. 422 (1978).................................................................................23

*W. Va. Ass'n of Club Owners & Fraternal Serv., Inc. v. Musgrave*,
 553 F.3d 292 (4th Cir. 2009) ...................................................................22

**Constitutional Authorities**

U.S. Const. amend. I ............................................................................ *passim*

U.S. Const. amend V.................................................................3, 9, 27, 29

U.S. Const. amend. XIV ...........................................................................28

**Statutes**

Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)-(h) ("Tunney Act")................... *passim*

Hart-Scott-Rodino Act, 15 U.S.C. § 7A .......................................................................................6

Sherman Act...........................................................................................................................23, 29

**Other Authorities**

Sun Ling Wang, Eric Njuki, Roberto Mosheim, and Richard Nehring,
    Agricultural Productivity in the United States – Summary of Recent Findings,
    USDA Economic Research Service (updated January 7, 2025),
    https://www.ers.usda.gov/data-products/agricultural-productivity-in-the-
    united-states/summary-of-recent-findings; .............................................................................20

Sun Ling Wang, Eric Njuki, Roberto Mosheim, and Richard Nehring, U.S.
    Agriculture Production Grew Steadily from 1948 to 2021 as Productivity
    Increased, Amber Waves, USDA Economic Research Service (September 10,
    2024), https://www.ers.usda.gov/amber-waves/2024/september/u-s-
    agriculture-production-grew-steadily-from-1948-to-2021-as-productivity-
    increased ..................................................................................................................................20

## INTRODUCTION

Agri Stats seeks to intervene in this proceeding because the United States' requested relief—an injunction forcing Wayne-Sanderson, one of Agri Stats' largest customers, to cease doing business with the company—not only is inconsistent with the Modified Final Judgment ("MFJ") and the Tunney Act but would cause irreparable harm to Agri Stats in violation of the First and Fifth Amendments. The Government's Motion to Enforce should be denied.

Agri Stats is a data benchmarking firm that provides reports to broiler chicken producers to help them become more efficient. While Agri Stats has been under attack for almost a decade by both the Government and private plaintiffs, the only court actually to consider the merits of those antitrust claims has rejected them, finding that "Agri Stats reports did not reveal competitors' production and pricing data" and "there is scant evidence that the information Agri Stats itself provided to each individual producer was used in a manner that had an anticompetitive effect." *In re Broiler Chicken Antitrust Litig.*, 702 F. Supp. 3d 635, 678, 679 (N.D. Ill. 2023).

Two of Agri Stats' customers, George's and Wayne-Sanderson, entered into consent decrees in this Court prohibiting the companies from sharing information regarding how much they pay workers with other poultry processors, whether directly or "indirectly through" other companies like Agri Stats. Agri Stats has worked with both companies to comply with the MFJs and has implored the Antitrust Division—for *years* now—to engage with Agri Stats on any modifications the Government believes should be made to its reports. The Government refused to do so. In November 2024, Agri Stats even negotiated a comprehensive settlement with the class plaintiffs in the *Jien* case pending before this Court that would have resulted in extensive changes to the compensation information in Agri Stats reports, but that settlement fell apart after, once again, the Government *refused* to talk to Agri Stats about its proposed report modifications.

1

Agri Stats was shocked when the Government demanded that George's and Wayne-Sanderson "immediately terminate [their] subscriptions to Agri Stats." ECF No. 86-8 at 4. When the companies did not do so, the United States filed its Motion to Enforce alleging that Wayne-Sanderson violated the MFJ and asking that the Court effectively enjoin Wayne-Sanderson and Agri Stats from doing business with each other. ECF No. 86. The Government claims it learned of these violations from a Monitor report it received *five months ago*, yet the Motion to Enforce is the first time the Government explained how it believes Wayne-Sanderson is violating the MFJ. ECF No. 89-1 at n.6. The Court should deny the Motion to Enforce for at least four reasons.

*First*, the Government's primary argument is that the MFJ prohibits Wayne-Sanderson from sharing compensation information with Agri Stats, *even if* that information is not shared with other processors. But the MFJ does not say that, nor does it authorize the United States or the Court to order Wayne-Sanderson to cease sending data to, or receiving reports from, Agri Stats that have nothing to do with compensation.

*Second*, the Government therefore effectively seeks to modify the terms of the MFJ to prohibit conduct that was not previously prohibited and allow for new remedies, but the Court should not modify the MFJ without affording Agri Stats—and other interested third-parties—the opportunity to object to such modifications pursuant to the Tunney Act.

*Third*, even if the Government's proposed remedy did not violate the MFJ or the Tunney Act, it cannot show a violation of the MFJ itself. The Government's only actual example of an Agri Stats report even arguably identifying another processor's compensation information would have been addressed completely by the *Jien* settlement, but the Antitrust Division refused to discuss it.

2

*Fourth*, the Government's proposed remedy violates Agri Stats' First Amendment rights by prohibiting its commercial speech.

*Finally*, the proposed remedy also violates Agri Stats' Fifth Amendment rights by depriving the company of its liberty and property interests without due process of law. The Government should not be permitted to destroy Agri Stats' business and deprive Agri Stats of its day in court in Minnesota to defend itself against the Government's actual claims against the company. *United States v. Agri Stats*, 23-cv-3009 (D. Minn. Sept. 28, 2023) ("*Minnesota Litigation*").

Each of these arguments is addressed in more detail below.

## <u>BACKGROUND</u>

Agri Stats is a small benchmarking business based in Fort Wayne, Indiana. Ex. 2 ¶ 3-4. Since 1985, the company has provided reports to broiler chicken producers to help those producers become more efficient. *Id*. It began offering similar reports to turkey producers in 2001 and pork processors in 2007 but has not produced any pork or turkey reports since 2019. *Id*. ¶¶ 8-9. Agri Stats once had over 100 employees but has only about 70 United States employees today. *Id*. ¶ 3. Although, after almost a decade of litigation, no court has *ever* found that Agri Stats violated the law, that litigation has taken its toll. Agri Stats lost all of its customers in its pork processing and turkey programs shortly after lawsuits were filed in the broiler chicken industry. *Id*. ¶ 9. Legal defense costs consume an increasingly unsustainable proportion of its small annual budget, preventing the company from retaining employees or investing in its business. *Id*. ¶ 24. Now, on top of that, the United States—despite giving Agri Stats a clean bill of health in 2012—has not only sued the company and refused to tell Agri Stats what is wrong with its reports, but comes before this Court demanding that it order one of Agri Stats' important remaining customers to cease doing business with the company indefinitely while the Government conducts an investigation to see if that customer is violating a consent decree. Agri Stats simply wants its fair day in court.

When it has that fair day—like it did in the *Broilers* class action discussed below—the result is clear: Agri Stats reports do not violate the antitrust laws because they provide *enormous* benefits to consumers by helping protein producers improve their efficiency and reduce the cost of food for American families.

To produce its benchmarking reports, Agri Stats receives data from its customers, audits and anonymizes that data, and prepares reports that allow its customers to compare the efficiency of their respective operations with industry benchmarks. Ex. 2 ¶¶ 10-11. Although Agri Stats reports allow benchmarking on thousands of metrics, confidentiality is the hallmark of its business. Reports prepared for one customer contain no price or output information for any other customer. *Id*. ¶ 12. While Agri Stats does not consult with its customers on *how* to improve their metrics relative to benchmarks in the reports, the company does provide a yardstick to help customers *identify* those opportunities. *Id*. ¶¶ 4-5. Massive efforts by Agri Stats' customers to improve the efficiency of their operations over time have made the United States protein industry the envy of the world. For example, since Agri Stats' founding in 1985, per capita boneless skinless breast output has nearly quadrupled, while prices on an inflation-adjusted basis have dropped by nearly a factor of four. *Id.* ¶ 7, *see also* Ex. 5.

Agri Stats was therefore surprised when the United States commenced an investigation of the company back in 2010. *Id.* ¶ 15. Agri Stats cooperated with the investigation, which focused on whether its reports allowed producers to coordinate on output or price. *Id.* After a nearly two-year inquiry, and apparently finding no violation of the law, the Department of Justice issued a letter closing the investigation without seeking any changes whatsoever to Agri Stats' reports. *Id.*; Ex. 3.

In 2016, private plaintiffs filed a series of class actions in the Northern District of Illinois alleging, among other things, that Agri Stats conspired with chicken producers to reduce output and increase prices. *In re Broiler Chicken Antitrust Litig.*, 1:16-cv-8637 (N.D. Ill. Sept. 2, 2016) ("*Broilers*"). Class actions in the pork and turkey industries followed in 2018 and 2019, respectively. *In re Pork Antitrust Litig.*, 1:18-cv-1776 (D. Minn. June 28, 2018) ("*Pork*"); *In re Turkey Antitrust Litig.*, 1:19-cv-8318 (N.D. Ill. Dec. 19, 2019) ("*Turkey*"). *Broilers* has been resolved on the merits. On June 30, 2023, Judge Durkin granted Agri Stats summary judgment, concluding that "Agri Stats reports did not reveal competitors' production and pricing data" and "there is scant evidence that the information Agri Stats itself provided to each individual producer was used in a manner that had an anticompetitive effect." *Broilers*, 702 F. Supp. 3d 635, 678-79 (N.D. Ill. 2023). Summary judgment is pending in *Pork,* and *Turkey* is in merits expert discovery. Despite almost a decade of litigation, the only court to consider the actual *evidence* supporting any information exchange claim against Agri Stats has *rejected* that claim.

In 2020, the United States indicted ten poultry processor executives for alleged bid-rigging. *See United States v. Penn*, No. 20-cr-00152-PAB (D. Colo. Dec. 8, 2021). It tried all ten twice, once in 2021 and again in 2022, each time ending with a hung jury. The Government then dropped five defendants and proceeded to trial a third time against the remaining five. The jury acquitted all five. In closing arguments, the Government argued to the jury that Agri Stats reports "don't tell you your competitors' bids. They don't even tell you your competitors' current pricing for a customer. They are much more higher [sic] level than that. And they cannot be used to figure out this kind of information . . . ." Ex. 6 at 41 (Tr. 4788:5-9).

Although Agri Stats' reports have not changed materially since the United States closed its investigation over a decade ago—and despite its representations to the criminal jury—the United

States and several states sued Agri Stats in the District of Minnesota on September 28, 2023, shortly after Agri Stats' summary judgment victory in *Broilers*, alleging the same legal theories as *Broilers*, *Pork*, and *Turkey*. *Minnesota Litigation*. Ex. 1 ¶ 5. The *Minnesota Litigation* is in discovery and will be ready for trial in December 2025. Agri Stats denies the allegations and strongly believes that its reports are procompetitive and is steadfastly determined to comply with the antitrust laws. At every opportunity, Agri Stats asked the Government to identify any allegedly problematic data elements in the reports so that the company could avoid litigation. *See generally* Ex. 1. But, in what continues to be a troubling pattern, the Antitrust Division has repeatedly refused to identify any such data elements, including at in-person meetings between Agri Stats counsel and staff and the Front Office on December 16, 2022 and June 20, 2023. *Id.* ¶ 4. Agri Stats even served interrogatories in the *Minnesota Litigation* asking the Government to identify problematic data elements in the reports, but the Government flatly refused to respond, forcing Agri Stats to file a motion to compel that will be heard on February 6. *See* Ex. 1 ¶ 5, Ex. 4. The Government delayed making a settlement demand on Agri Stats until January 28, 2025—the court-ordered deadline in advance of mediation on February 11 and 12 and after bringing this proceeding. Ex. 1 ¶ 10.

Before its lawsuit against Agri Stats, the Government threatened various poultry processors and Webber, Meng, Sahl, and Co. ("WMS") with litigation unless they agreed to consent decrees related to alleged employee compensation. *Id.* ¶ 11. WMS and two poultry processors, George's and Wayne-Sanderson, did so, the latter because Wayne Farms and Sanderson sought to complete their merger and proposed joint venture with Cargill and Continental Grain which the Government was reviewing simultaneously under the Hart-Scott-Rodino Act, 15 U.S.C. § 7A. *Id.* Among other things, those consent decrees prohibit George's and Wayne-Sanderson from "[c]ommunicat[ing] Competitively Sensitive Information about Compensation for Poultry Processing Workers" to

competing processors, "including" doing so through a "Consulting Firm," which is defined to include WMS and Agri Stats. ECF No. 85 at § II.I. Agri Stats did not submit public comments opposing the consent decrees under the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)-(h) (the "Tunney Act") because the consent decrees did not prohibit George's or Wayne-Sanderson—important customers of Agri Stats—from sending data to Agri Stats or receiving reports that do not contain competitor compensation information. Ex. 2 ¶¶ 21-23.

Even though Agri Stats is not a party to the consent decrees, Agri Stats sought to engage with the parties, the Monitors, and the Government as necessary to address any concerns related to the Agri Stats reports. For example, Agri Stats worked with George's and Wayne Sanderson to make various changes to its reports to avoid even the appearance that the companies might disclose (or receive) compensation information. *Id.* ¶¶ 22-23. Agri Stats also met with the Monitors on September 26, 2024, to explain its reports and asked the Monitors to identify any data elements in Agri Stats reports they believed were problematic. They identified none. Ex. 1 ¶ 6.

About three years before the Government's action against Wayne-Sanderson, poultry industry employees filed a class action in this Court alleging price fixing based on information exchanged related to poultry processing wages. *Jien, et al. v. Perdue Farms, Inc., et al.*, 1:19-cv-02521-SAG (D. Md. Aug. 30, 2019). Some three years later, different private plaintiffs sued in Colorado making similar price-fixing allegations concerning wages for processing employees at beef and pork facilities. *Brown, et al. v. JBS USA Food Company, et al.*, 1:22-cv-02946-PAB-STV (D. Colo. Nov. 11, 2022). *All* defendants except Agri Stats have settled the *Jien* case pending before this Court. While Agri Stats cannot pay a financial settlement, it negotiated—and signed—a settlement on November 19, 2024, with the *Jien* plaintiffs that involved extensive modifications to Agri Stats' reports. Ex. 7. Because of the pendency of the *Minnesota Litigation* and the Monitor

inquiries under the consent decrees, Agri Stats could not agree to report modifications in the settlement without assurances that such modifications would resolve any concerns the Government might have. *Id.*; Ex. 2 ¶ 26. Surprisingly, on December 6, 2024, the United States *refused* to discuss the terms of the class action settlement, even though that settlement would not only end the *Jien* litigation before this Court but also resolve the primary issues raised in the Government's Motion to Enforce in this case. Ex. 8. As a result, Agri Stats was forced to rescind the settlement agreement, and Agri Stats, the class plaintiffs, and this Court will be forced to incur the burden of litigating a class action and a Motion to Enforce, both of which could have been resolved had the United States engaged.[1] Ex. 1 ¶ 8.

Given the Government's repeated refusal to engage with Agri Stats regarding the data elements in its reports, Agri Stats was shocked to learn that, on December 27, 2024, the United States, with no warning to the companies or notice to Agri Stats, demanded that both George's and Wayne-Sanderson "immediately terminate [their] subscriptions to Agri Stats." ECF No. 86-8; Ex. 1 ¶ 9, Ex. 8. Agri Stats promptly wrote the Government again, expressing its eagerness to engage regarding its reports, but, as with all similar requests, the United States ignored it. Instead of engaging on that question, the Government hastily filed its Motion to Enforce the Wayne-Sanderson decree on January 18, 2025, a holiday weekend and just hours before a change in Presidential administrations and Department of Justice leadership. ECF No. 86. That Motion for the first time identified the information that the Government believes that Wayne-Sanderson transmits to, or receives from, Agri Stats that violates the consent decree.

---

[1]     In light of Agri Stats' willingness to engage and the Government's refusal to do so, the Government misses the mark when it argues that Agri Stats' status as a "third party" is a practical barrier to confirming that the data received by Agri Stats is not being shared with other processors. *See* ECF No. 86-1 at 13. The Government cannot refuse to engage with Agri Stats and then complain that its purported concerns cannot be addressed absent engagement with Agri Stats.

As discussed below, none of the issues the Government identifies are consent decree violations, and all could have been addressed had the United States simply discussed the proposed *Jien* settlement with Agri Stats months ago. Nothing in the consent decree compels George's or Wayne-Sanderson to cease doing business *entirely* with Agri Stats, particularly given that the vast majority of the thousands of metrics in Agri Stats reports have nothing to do with employee compensation. The Government should not be permitted to take the law into its own hands and destroy Agri Stats' business before its actual claims against Agri Stats are resolved in the *Minnesota Litigation*. Agri Stats depends on George's and Wayne-Sanderson for the revenue necessary to pay its employees and keep the lights on at its Fort Wayne office. Ex. 2 ¶¶ 24-26. The remedy the Government seeks violates not only the consent decree and Tunney Act, but Agri Stats' independent constitutional rights under the First and Fifth Amendments.

## ARGUMENT

### I.     THE UNITED STATES' MOTION IS INCONSISTENT WITH THE TERMS OF THE FINAL JUDGMENT.

The Motion to Enforce rests on its argument that "the Final Judgment prohibits Wayne-Sanderson from, among other things, sending competitively sensitive compensation information *to* third party consultants such as Agri Stats, and receiving such information *from* such consultants." ECF No. 86-1 at 7 (emphasis in original). But that is not what the MFJ says. While the Government repeatedly touts the "plain language of Section IV.A.4," *e.g.*, *id.*, it fails to *quote* that section accurately, instead preferring the strategic use of insertions to alter its meaning. *See, e.g.*, *id.* at 5-6. The actual provision reads as follows:

> A.     Management and Human Resources Staff of each Settling Defendant must not, whether directly or indirectly, including through a Consulting Firm or other person:
>
> . . .

> 4. Communicate Competitively Sensitive Information about Compensation for Poultry Processing Workers to any Poultry Processor not owned or operated by one or a combination of Settling Defendants, including Communicating Competitively Sensitive Information about Compensation for Poultry Processing Workers to any Consulting Firm that produces reports regarding Compensation for Poultry Processing Workers that are shared with other Poultry Processors[.]

ECF No. 85 § IV.A.4. "Compensation" is defined as

> all forms of payment for work, including salaried pay, hourly pay, regular or ad hoc bonuses, over-time pay, and benefits, including healthcare coverage, vacation or personal leave, sick leave, and life insurance or disability insurance policies.

*Id*. § II.G.

The "plain language" of the MFJ thus prohibits Wayne-Sanderson from communicating information regarding how much it pays workers *"to any poultry processor*." The above provision simply says that Wayne-Sanderson cannot circumvent this prohibition on sharing information "directly" to poultry processors by doing so "indirectly, including through a Consulting Firm or other person." *Id.* § IV.A.4. This makes sense because the alleged antitrust violation was that the poultry processors were sharing information with *each other*. *See, e.g.*, ECF No. 1 ¶ 7 ("The poultry processors, both directly and through data consultants, shared compensation information…"). And, as the United States concedes, the Court must consider "the relationship between the remedy secured and the specific allegations in the government's Complaint" and may not "effectively redraft the complaint" to permit relief broader than the United States chose to pursue. Competitive Impact Statement ("CIS"), ECF No. 37 at 23, 25 (citing *United States v. Microsoft Corp*., 56 F.3d 1448, 1458-62 (D.C. Cir. 1995)).

Wayne-Sanderson does *not* share information with Agri Stats regarding how much it pays workers. But even if it did, nothing in the consent decree prohibits Wayne-Sanderson from sharing that information with "Consulting Firms" (defined to include Agri Stats) *unless* the Consulting

Firm then shares that information with other processors. The United States could have proposed language that actually prohibited sharing information with Consulting Firms *regardless* of whether it resulted in sharing information with other processors but did not do so.[2] Instead, the focus of the MFJ (like the focus of the Complaint and focus of the antitrust laws) is on sharing information with *competing processors*, "directly or indirectly, *including* through a Consulting Firm." ECF No. 85 § IV.A.4. The United States' ex-post re-interpretation would change the word "including" in Section IV.A.4 of the MFJ to "and." Such a change would "require seriously rewriting" the MFJ. *See Chickasaw Nation v. United States*, 534 U.S. 84, 89 (2001) (holding that the word "include means to contain" and that what follows the word "provid[es] an illustrative list of examples"). The Court must construe the MFJ "applying ordinary tools of interpretation." ECF No. 85 §§ XIII.B. The United States' position, however, would jettison cannons of construction because "[o]ne would have to read the word 'including' to mean what it does not mean, namely, 'including ... and.'" *Chickasaw Nation*, 534 U.S. at 89.

In addition, nothing in the MFJ gives the United States or the Court the authority to prohibit Wayne-Sanderson from doing *any* business with another company. Nevertheless, "[t]he United States now seeks an order enforcing the Final Judgment to prevent Wayne-Sanderson from sending nonpublic information to, and receiving *any* nonpublic information from, Agri Stats, Inc.", ECF No. 86 at 1 (emphasis added), *regardless* of whether that data is even covered by the MFJ, much less would violate the MFJ's terms. Because Agri Stats' entire business is selling benchmarking reports, Ex. 2 ¶¶ 6-7, this remedy would achieve the United States' stated objective of forcing

---

[2]    Such a restriction would have raised significant First Amendment issues, *see infra* Section IV, and prompted an objection from Agri Stats.

Wayne-Sanderson to "immediately terminate [their] subscriptions to Agri Stats." ECF No. 86-8 at 4. The United States cites no authority for this sweeping relief because none exists.

Instead, the MFJ says that "the Court may enforce, any provision of this Final Judgment that, as interpreted by the Court in light of these procompetitive principles and applying ordinary tools of interpretation, is stated specifically and in reasonable detail, whether or not it is clear and unambiguous on its face." ECF No. 85 § XIII.B. Even if the Court were to find, contrary to the arguments set forth herein, that Wayne-Sanderson has violated "any provision of this Final Judgment … that is stated specifically and in reasonable detail" by sending or receiving particular information to or from Agri Stats, the proper remedy is an order requiring Wayne-Sanderson to comply with the MFJ—not order it to cease sending and receiving *other* information having nothing to do with the MFJ. *See, e.g.*, *Hayes v. N. State L. Enf't Officers Ass'n*, 10 F.3d 207, 217 (4th Cir. 1993) ("An injunction should be tailored to restrain no more than what is reasonably required to accomplish its ends.") (citation and quotations omitted). There is no dispute that the *vast majority* of the information that Wayne-Sanderson submits to Agri Stats (and that is contained in the Agri Stats reports that Wayne-Sanderson receives) does not concern employee compensation. Moreover, the only court to consider the *legality* of the sharing of that information has found that it does *not* violate the antitrust laws. *Broilers*, 702 F. Supp. 3d at 678-79 ("Agri Stats reports did not reveal competitors' production and pricing data" and "there is scant evidence that the information Agri Stats itself provided to each individual producer was used in a manner that had an anticompetitive effect."). The MFJ does not give the United States or the Court the authority to enjoin the dissemination of reports that Judge Durkin has found lawful. The United States has identified particular data elements (discussed below) that it believes constitute MFJ

violations. The Government's requested relief—which extends far beyond these purported violations—is not authorized by the MFJ. The Motion to Enforce should be denied.

## II.    THE COURT SHOULD NOT FURTHER MODIFY THE FINAL JUDGMENT WITHOUT NOTICE AND PUBLIC COMMENT PURSUANT TO THE TUNNEY ACT.

Agri Stats reviewed the proposed MFJ before it was entered by the Court and did not object to it because Agri Stats interpreted the language consistent with the *actual* plain reading of its terms above. Agri Stats has no intention of sharing information regarding how much one processor pays workers with another processor. If the MFJ had, instead, prohibited Wayne-Sanderson from sharing information with Agri Stats *regardless* of whether Agri Stats shares that information with another processor—or, more importantly, permitted the United States to enjoin Wayne-Sanderson from sending or receiving *any* data to or from Agri Stats, including data that has nothing whatsoever to do with compensation—Agri Stats would have strenuously objected during the Court's public interest review under the Tunney Act. *See* Ex. 2 ¶ 26.

That statute prescribes the procedures for court approval of "consent judgments" like the MFJ at issue here. 15 U.S.C. § 16(b)-(h). Among other things, the Tunney Act requires a 60-day public comment period before the court may approve the consent judgment as well as a "competitive impact statement" describing for example "the anticipated effects on competition" of the consent judgment. *Id*. § 16(b). The court must then determine whether the consent judgment is "in the public interest," considering:

> (A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

> (B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from

13

the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

*Id.* § 16(e). The court may conduct an evidentiary hearing, *id.*, review any public comments and objections, *id.* § 16(f), and "authorize full or limited participation in proceedings before the court by interested persons or agencies," including "intervention as a party pursuant to the Federal Rules of Civil Procedure," *id.*, as Agri Stats seeks to do here.

Here, the Court *could not* have made a "public interest" determination as to either—(1) a prohibition on Wayne-Sanderson sharing Compensation information with Consulting Firms, *even if* the Consulting Firm does not share that information with other processors; or (2) a prohibition on Wayne-Sanderson sending to, or receiving from, a Consulting Firm *any* data, *even if* the data does not relate to Compensation—because, to date, there has not been an opportunity for any public comment addressing them. Had these prohibitions been set forth in the proposed consent decree, Agri Stats and other third parties would have objected that they exceed the scope of the Complaint; threaten to harm competition by both destroying Agri Stats' business and depriving Wayne-Sanderson of an important tool the company uses to improve the efficiency of its operations; and run afoul of the First Amendment.

The Court may not "effectively redraft the complaint" to permit broader relief than what the United States chose to pursue. *United States v. Microsoft*, 56 F.3d 1448, 1459. Here, the Complaint contains no allegations that could be used to support either of the above two remedies, and instead alleges that Wayne-Sanderson was "sharing data and other information—directly and through consultants—about their current and future *compensation* plans." ECF No. 1 ¶ 4.

Moreover, "[w]hen assessing a consent decree, a court should consider the relationship between the complaint and the remedy secured, the decree's clarity, whether there are any foreseeable difficulties in implementation, and *whether the decree might positively injure third*

14

*parties*." *United States v. Apple, Inc.*, 889 F. Supp. 2d 623, 631 (S.D.N.Y. 2012) (emphasis added).

The United States is effectively seeking modification of the MFJ terms and cannot avoid the

Tunney Act's requirement that such modification be in the public interest by effectively rewriting

it through a Motion to Enforce. *See United States v. SBC Commc'ns, Inc.*, 339 F. Supp. 2d 116,

117-18 (D.D.C. 2004) ("Under the Tunney Act, the Court must make an independent

determination of whether a consent decree, judgment, or *modification* thereof is in the public

interest.") (emphasis added). Indeed, "[s]pecific objections from third parties, and the degree to

which the consenting parties address them in their motion for modification, are an important factor

to be considered in making the public interest determination." *Id.*

For the reasons set forth herein, Agri Stats requests that the Court deny the United States'

requested relief. In the event that the Court considers potential modification of the MFJ provisions

consistent with the United States' Motion to Enforce, the Court should propose a new public

comment period to allow Wayne-Sanderson, Agri Stats, and other interested third-parties the

opportunity to explain why such modifications would be inconsistent with the United States'

Complaint and the public interest. *See, e.g., id.* at 117 (noting that court "issued an order

establishing procedures for modification of the Final Judgment," including public notice and a

"30-day notice and comment period").

## III.    THE UNITED STATES' MOTION IDENTIFIES NO VIOLATIONS OF THE MODIFIED FINAL JUDGMENT.

The Motion to Enforce should be denied because, for the reasons set forth above, it seeks

to bypass the Tunney Act and impose a remedy on Wayne-Sanderson and Agri Stats beyond the

scope of the actual MFJ. The Government's Motion fails for the separate reason that it identifies

no actual violation of the MFJ that would not be remedied by the terms of the *Jien* settlement, had

the Government simply engaged in discussing those terms.

The United States is wrong that "the onus lies on Wayne-Sanderson to pause its information exchanges with Agri Stats until it can assure the Monitors and the Court of its compliance with the decree." ECF 86-1 at 2. Instead, the onus lies on the *Government* to "establish a violation of this Final Judgment and the appropriateness of a remedy therefore." ECF No. 85 § XIII.A. The Monitor apparently reported its alleged "violations" to the United States back on August 28, 2024. Yet the Government waited almost *five months*—until the filing of its Motion—to actually identify the underlying bases for those purported violations to Wayne-Sanderson or Agri Stats. In stark contrast, Agri Stats and Wayne-Sanderson were *not* sitting on their hands. As the United States acknowledges, the companies made numerous changes to Wayne-Sanderson's reports to eliminate *all* labor cost statistics for other processors from the reports that Wayne-Sanderson receives. Ex. 2 ¶ 22. The companies did so even though the labor cost statistics were both anonymized and did not reveal the *actual* wages that any employee was paid—they instead simply reflected the aggregate of *all* employee compensation (wages, salaries, benefits, overtime, vacation, bonuses, etc.) divided by the total hours worked.

But Agri Stats went even further. It repeatedly pressed the Antitrust Division to engage with the company to discuss what, if any, data elements in Agri Stats reports the Government believed harm competition over and over again: on phone calls; at in-person staff and Front Office meetings; in letters; in discovery requests; and in court-ordered settlement discussions. But, to date, the Government has, in its own words, "decline[d] to identify specific data points or columns in Agri Stats or EMI reports that have caused or are likely to cause anticompetitive effects." Ex. 1 ¶ 5. Because the United States would not engage, Agri Stats negotiated a settlement with the plaintiffs representing the putative employee class in the *Jien* case pending before this Court involving comprehensive changes to hundreds of data fields across dozens of Agri Stats reports,

and signed that agreement on November 19, 2024. Ex. 7 The *Jien* plaintiffs were poised to represent to this Court that the report modifications were "fair, reasonable, adequate, and beneficial to, and in the best interests of, the Settlement Class," *id.* at 2, to resolve claims that the Government admits overlap to such a degree with those resolved by the MFJ that it deems settlement payments in *Jien* "restitution" for the violation the United States alleges, ECF No. 85 § X.

Agri Stats anticipated that the Antitrust Division would engage with Agri Stats to ensure that any changes resolved any concerns that the Government might have about the compensation information in Agri Stats' reports, both for purposes of the Government's lawsuit against Agri Stats and also for purposes of George's and Wayne-Sanderson's compliance with the MFJ. But the Antitrust Division *refused to even discuss* Agri Stats' proposed modifications. Because Agri Stats could not risk entering into a binding settlement with the *Jien* plaintiffs that might be inconsistent with the Government's position with respect to the MFJ or the *Minnesota Litigation*, Agri Stats was forced to rescind it. The *Jien* plaintiffs were then forced to file their motion for class certification on December 13, 2024, and Agri Stats will be forced to respond on May 16, 2025. There are no other remaining defendants in *Jien*, and the entire lawsuit could have been resolved had the Government engaged with Agri Stats regarding the settlement.

This backdrop matters because, not only would the settlement have resolved the *class action*, it also would have resolved the Government's alleged violations of the *MFJ* as well. The United States argues that Wayne-Sanderson receives compensation data in violation of the MFJ. ECF No. 86-1 13-18. However, for all its bluster, the United States identifies only *one actual example* of a way in which Wayne-Sanderson could use Agri Stats reports to identify the compensation another processor paid to its employees. The Government concedes, as it must, that Agri Stats redacted "wage rate" statistics for other processors at Wayne-Sanderson's request. *Id.*

17

at 18. Nevertheless, the Government insists that Wayne-Sanderson theoretically could "multiply[] per-unit labor cost by units of output per manhour" to calculate a "wage rate." *Id.* at 19. But this "wage rate" is not an actual wage rate for any employee because, as discussed above, it is based on total compensation divided by total hours for an entire department. But, more fundamentally, the Government omits that the *Jien* settlement *completely resolved* this issue by placing "units per labor hour" data on an entirely different report from "labor cost per unit" data so that no hypothetical calculation could be performed. Ex. 7. Even though there is zero evidence that any Agri Stats subscriber ever performed this hypothetical calculation, the *Jien* plaintiffs and Agri Stats carefully considered any way in which the reports could even *theoretically* be used to determine competitor worker compensation and addressed them. There is no reason for the Court to order further relief. Instead, at most, the parties should be required to meet and confer to confirm that the terms of the *Jien* settlement resolve the Government's concerns.

The Government's other alleged violations are not violations at all because they do not involve sharing any compensation information with other processors.

*First*, the United States argues that Wayne-Sanderson has violated the MFJ by sharing compensation information with *Agri Stats*. ECF No. 86-1 at 11-15. However, as discussed above, the plain language of the MFJ prohibits sharing compensation information with *other processors*, "including through" Agri Stats. ECF No. 85 § IV.A.4. In particular, the Government argues that Wayne-Sanderson "continues to provide Agri Stats with 'access to its general ledger and payroll systems'" and that "the reports that Agri Stats provides to Wayne-Sanderson also demonstrate[] the kind of detailed compensation data Wayne-Sanderson sends to Agri Stats," ECF No. 86-1 at 11, 13. None of these allegations constitute a violation of the MFJ because the information is not provided to *other processors*. Indeed, Agri Stats *must* receive aggregate labor cost data because

Agri Stats' efficiency metrics evaluate, for example, total processing or total plant costs per pound—statistics that are vital to customers seeking to improve the efficiency of their operations and produce more chicken at a lower cost, but that would be impossible to measure without aggregate labor cost data. Ex. 2 ¶ 20.

But the Government is wrong about the information that Agri Stats receives. For example, it argues that Wayne-Sanderson "provides sufficiently granular information about payments made to workers that Agri Stats can calculate 'labor costs' for specific positions at the company." ECF No. 86-1 at 14. Not so. If one does the math and divides "dollars" by "hours" for the positions identified in in the document referenced in footnote 12 and Figure 3, it results in the *identical* purported "labor cost"—$30.82 per hour for *every* position in the same department. That is because Agri Stats does *not* receive Wayne-Sanderson data regarding "specific positions at the company" and instead simply allocates total compensation for an entire department proportionately across *all* positions. Thus, the Government's own example disproves the allegation that Agri Stats *receives* information about how much Wayne-Sanderson pays workers.

*Second*, the Government argues that Agri Stats reports show (on an anonymized basis) "total employee compensation at a particular processor divided by the number of pounds those employees produced." *Id.* at 6. The United States is correct that Agri Stats reports Wayne-Sanderson's total labor cost "per-pound or per-bird," *id.*, because these are *efficiency* metrics that assist Wayne-Sanderson (and all Agri Stats customers) in improving labor *productivity*. As the USDA explains, "increased productivity is the main contributor to the growth of U.S. farm output" and "improved agricultural productivity may benefit consumers in the form of lower prices."[3]

---

[3]     Sun Ling Wang, Eric Njuki, Roberto Mosheim, and Richard Nehring, Agricultural Productivity in the United States – Summary of Recent Findings, USDA Economic Research Service (updated January 7, 2025), https://www.ers.usda.gov/data-products/agricultural-

Improving labor efficiency (and moving up the efficiency rankings in Agri Stats reports) requires processors to invest in training, processes, technology, and facilities to generate more output at a lower labor cost. None of the reported efficiency metrics (e.g., $/lb or $/bird) convey a processor's compensation to employees because *no employees are compensated per pound or bird*. Neither the Government's Complaint nor the MFJ can plausibly be read to prohibit Wayne-Sanderson from seeking to improve the efficiency of their operations.

*Finally*, the Government's remaining arguments appear to relate to statistics that just provide Wayne-Sanderson's "rank" relative to other processors' plants. Specifically, the United States alleges that Wayne-Sanderson reports:

- identify "where a specific Wayne-Sanderson plant's [statistic] *ranks* among competing plants on a monthly basis over the prior year," ECF No. 86-1 at 16 (emphasis added); and

- identify where Wayne-Sanderson "*ranks*" with respect to "over 100 poultry processing plants," *id*. at 17, as well as the "[t]he numerical *ranking*" of the company for various operations, *id*.

The Government neglects to mention that *none* of these reports actually disclose the compensation paid by any other processor to their employees. Instead, the reports provide a single number ranking Wayne-Sanderson's facilities (e.g., 15/100) with no actual data on any other competing processor. Nothing in the MFJ prohibits rankings that do not disclose any compensation paid by any processor. ECF No. 85 at § 2.G (the definition of "Compensation" does not include rankings). Regardless, if the United States had concerns about these statistics, it should have simply raised the issue with Wayne-Sanderson or Agri Stats so that the parties could work to address any

---

productivity-in-the-united-states/summary-of-recent-findings; Sun Ling Wang, Eric Njuki, Roberto Mosheim, and Richard Nehring, U.S. Agriculture Production Grew Steadily from 1948 to 2021 as Productivity Increased, Amber Waves, USDA Economic Research Service (September 10, 2024), https://www.ers.usda.gov/amber-waves/2024/september/u-s-agriculture-production-grew-steadily-from-1948-to-2021-as-productivity-increased.

concerns. The Government's requested relief—forcing Wayne-Sanderson to stop doing business with Agri Stats and jettisoning efficiency metrics unrelated to compensation—is extraordinarily overbroad.

Nothing in Agri Stats reports violates the MFJ because Agri Stats neither sends nor receives information regarding how much any processor pays any employee. Even if that were not true, the Government could have easily resolved its concerns months ago had the Government simply engaged with Agri Stats and Wayne-Sanderson regarding the terms of the *Jien* settlement.

## IV.    THE RELIEF THE UNITED STATES SEEKS VIOLATES AGRI STATS' COMMERCIAL SPEECH RIGHTS UNDER THE FIRST AMENDMENT.

The Government's proposed relief also seeks to impose unlawful speaker-based and content-based restrictions on Agri Stats' communications with Wayne-Sanderson. Agri Stats's benchmarking business can exist only if there is a flow of information between Agri Stats and its subscriber customers, which is commercial speech and accordingly within the ambit of the First Amendment. *Cent. Hudson Gas & Elec. Co. v. Public Serv. Comm'n*, 447 U.S. 557, 561 (1980) (defining commercial speech as "expression related solely to the economic interests of the speaker and its audience"). Since the Government asks this Court to ban *all* commercial speech between Agri Stats and Wayne Sanderson for an indeterminate period, the relief it seeks must, at the very least, satisfy *Central Hudson*'s four-part test:

1.  The speech must concern lawful activity and not be misleading, *id*. at 566;

2.  The asserted governmental interest must be substantial, *id*.;

3.  The restriction must directly advance the asserted governmental interest, *id*.; and

4.  The restriction must not be more extensive than necessary to serve the asserted governmental interest. *Id.*

The Government must show that its proposed remedy satisfies the First Amendment. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571-72 (2011) ("Under a commercial speech inquiry, it is the State's burden to justify its content-based law as consistent with the First Amendment."); *Educ. Media Co. at Va. Tech, Inc. v. Insley*, 731 F.3d 291, 298 (4th Cir. 2013) (placing burden on government to justify commercial speech regulation). The Government's motion makes no attempt to do so, and for good reason: the speech the Government seeks to ban is well within the scope of the First Amendment and fails *Central Hudson*'s third and fourth elements.[4]

### A.    The Information Wayne-Sanderson Provides To, and Receives From, Agri Stats Concerns Lawful Activity and Is Not Misleading.

*Central Hudson*'s first element has two components: (1) the speech must concern lawful activity; and (2) the speech must not be misleading. The second is easily satisfied here because Wayne-Sanderson provides accurate information to, and receives accurate information from, Agri Stats. Thus, the information exchanged between Agri Stats and Wayne-Sanderson is within the First Amendment as long as it *concerns* lawful activity. *Insley*, 731 F.3d at 299 (advertisements for alcoholic beverages concern lawful activity); *W. Va. Ass'n of Club Owners & Fraternal Serv., Inc. v. Musgrave*, 553 F.3d 292, 302 (4th Cir. 2009) (video lottery advertisements concern lawful activity). Benchmarking is lawful and common in any well-functioning market economy. As this Court itself has recognized, even exchanges of price information among competitors are "presumptively lawful" under Section 1 of the Sherman Act. *Jien v. Perdue Farms, Inc.*, No. 19-

---

[4]    The only interest the Government asserts in its motion is its interest in enforcing antitrust consent decrees. *See* ECF No. 86-1 at 21. Agri Stats concedes that the Government has an interest in the enforcement of antitrust consent decrees and thus does not challenge the second element of the *Central Hudson* test. The Court, however, is limited to applying *Central Hudson*'s requirements only to the interest that the United States has actually asserted. "Unlike rational-basis review, the *Central Hudson* standard does not permit [the Court] to supplant the precise interests put forward by the State with other suppositions." *Edenfield v. Fane*, 507 U.S. 761, 768 (1993).

CV-2521, 2020 WL 5544183, at *9 (D. Md. Sept. 16, 2020) (Gallagher, J.). Such exchanges have the potential to "increase economic efficiency and render markets more, rather than less, competitive." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978). To overcome this presumption under the rule of reason, plaintiffs must prove "a substantial anticompetitive effect that harms consumers in the relevant market." *Ohio v. Am. Express Co.,* 585 U.S. 529, 541 (2018). But the only court to evaluate the merits of claims challenging Agri Stats benchmarking reports rejected those claims and granted Agri Stats summary judgment because:

- "Agri Stats reports included only the production and pricing information of the recipient producer receiving the report, and not that of their competitors;" and

- "[T]here is scant evidence that the information Agri Stats itself provided to each individual producer was used in a manner that had an anticompetitive effect."

*Broilers*, 702 F. Supp. 3d at 675-79.

The Government cannot, and certainly has not in this proceeding, overcome the presumption of legality for Agri Stats reports or given this Court any other reason to prohibit Agri Stats' lawful commercial speech, which is not prohibited by the MFJ. This Court entered the MFJ "without the taking of testimony, without trial or adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence against or admission by any party relating to any issue of fact or law." ECF No. 85 at 1. No court has ever held that Agri Stats' benchmarking services are unlawful.[5] Those services, therefore, concern lawful conduct, and the communications necessary for them are protected by the First Amendment.

---

[5]     The Government sued Agri Stats in the District of Minnesota in September 2023 alleging that Agri Stats' benchmarking services constitute an unlawful information exchange. *See Minnesota Litigation*. Agri Stats denies the allegations, and the action is now in discovery. As Agri Stats notes below, the Government's demand that Wayne-Sanderson cease doing business with it

**B.    The Government's Proposed Remedy Does Not Directly and Materially Advance Its Asserted Interest and Is Vastly Overbroad.**

Because the First Amendment protects the communications between Agri Stats and Wayne-Sanderson, the Government must prove that its proposed remedy here—termination of Wayne-Sanderson's subscription to Agri Stats for an undefined period—directly and materially advances its asserted interest and does not suppress more speech than necessary to achieve that interest. The Government fails both.

To start, the Government aims its proposed ban of commercial speech at specific entities, making Agri Stats both a disfavored recipient of communications from Wayne-Sanderson and a disfavored speaker to Wayne-Sanderson. Moreover, the Government's only reason for such a targeted remedy is the content of the benchmarking information Agri Stats receives from and transmits to Wayne-Sanderson. ECF No. 86-1 at 21 (requesting order "prohibiting Wayne-Sanderson from sending *any* data to Agri Stats, and receiving *any* data from Agri Stats") (emphasis added). Such speaker-specific, content-based regulation is constitutionally suspect. *See Sorrell*, 564 U.S. at 567-71 (heightened scrutiny applicable to content and speaker-based regulations and declaring such regulations "presumptively invalid"). Accordingly, to meet *Central Hudson*'s third element, the Government must prove a direct and material connection between its asserted interest and the speech ban it seeks. *Edenfield*, 507 U.S. at 770. In doing so, the Government may not rely on speculation or conjecture. *Id*. Rather, it must establish that the "harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Id*. at 771.

The Government never makes any attempt to do so. Its motion concedes that the MFJ only prohibits Wayne-Sanderson from sharing or receiving certain *compensation* information. ECF No.

---

is an attempt to deprive it of its day in court in Minnesota by depriving it of customers and revenue needed to defend itself. *See infra* Section V.

86-1 at 11-20. The Government has never established that any information exchanged between Agri Stats and Wayne-Sanderson, even any compensation information, harms competition in any way. Even assuming that antitrust consent decrees permit the Government to extract from defendants a promise not to share or receive certain information with third parties, the Government's legitimate interests are only co-extensive with the information the decree specifically identifies and the harms it identifies in the underlying complaint. *Edenfield*, 507 U.S. at 771. The Motion to Enforce, however, turns that limitation on its head.

The First Amendment does not countenance the Government's ban-speech-first-and-prove-a-violation-later approach. In negotiating a consent decree in this matter, the Government did not bargain for any termination of Wayne-Sanderson's subscription to Agri Stats.[6] Rather than focusing on the narrow proscriptions of the decree this Court approved, the Government rushes to broader ground, seeking to enjoin far more communication than was even at issue under the Government's Complaint in this case, which was limited solely to compensation information. *See, e.g.*, ECF No.1 ¶ 4. That disconnect between the express terms of the MFJ and the Government's proposed remedy undermines any notion that the speech restriction the Government seeks here directly and materially advances its interest in enforcement of consent decrees. *Edenfield*, 507 U.S. at 768 (courts will not "turn away if it appears that the stated interests are not the actual interests served by the restriction").

That the Government frames its demand for an order compelling Wayne-Sanderson to terminate services from Agri Stats as "temporary" and a "pause" makes no difference. *First*, there is no time limit on the Government's proposed ban on lawful commercial speech, and the

---

[6]    Had it attempted to do so, Agri Stats would have commented during the Court's review of the decree under the Tunney Act and Wayne-Sanderson would have never agreed to it. ECF No. 89-1 at 18, n.10.

Government notes that the Monitor must complete "significant" work before the parties' speech may resume. That concession alone would be enough to reject the Government's overbroad remedy under *Central Hudson*'s third element. *Id*. at 770. *Second*, the fact that the Government delayed for *months* to bring purported violations to either the parties' or the Court's attention after receiving the Monitor's report on August 28, 2024, belies the notion that the Government is seeking a "temporary" ban. Were there a serious threat to competition from Wayne-Sanderson's relationship with Agri Stats, the Government would presumably not have proceeded at such a leisurely pace. *Third*, the First Amendment does not allow for broad prophylactic bans on commercial speech, no matter how temporary. *Id.* at 774 ("preventative rule [banning commercial speech is] justified only in situations 'inherently conducive to overreaching and other forms of misconduct'") (quoting *Ohralik v. Oh. State Bar Ass'n*, 436 U.S. 447, 464 (1980)). Whatever time the Government may believe it needs to investigate alleged violations of the MFJ do not justify a flat ban on all benchmarking communications between Wayne-Sanderson and Agri Stats. Thus, the Government fails the third prong of the *Central Hudson* test.

The same infirmities also doom the Government under the fourth prong of *Central Hudson*, which requires that any restrictions on commercial speech be narrowly tailored to serve the regulator's proven substantial interest. 447 U.S. at 566. While the Government need not use the least restrictive means to achieve its interest, *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 188 (1999), any regulation of commercial speech must be "reasonable" and its scope "in proportion to the interest served." *Id*. In short, there must be a reasonable fit between the ends of a commercial speech restriction and the means that Government uses. *Bd. of Trs. of S.U.N.Y. v. Fox*, 492 U.S. 469, 480 (1989) (First Amendment requires that scope of commercial

speech restriction be "narrowly tailored to achieve the desired objective"). The proposed remedy flunks that test as well.

The Government demands that Wayne-Sanderson *cease all benchmarking communications* with Agri Stats. ECF No. 86-1 at 21. But it has not explained, much less proved, why such an indiscriminate ban on *every* benchmarking communication between Agri Stats and Wayne-Sanderson serves any legitimate governmental interest in enforcing a MFJ limited to compensation information. In the *Minnesota Litigation*, the Government's complaint alleges that Agri Stats reports contain "thousands" of metrics unrelated to compensation. *Minnesota Litigation*, ECF No. 50 ¶ 16, 18, 28; *see also* Ex. 2 ¶¶ 10-14. The Government did not challenge those metrics in this case, and the MFJ that it seeks to enforce says nothing about them. Such communications are lawful. The Government's proposed remedy, therefore, is overbroad. It fails the fourth prong because it seeks to ban more speech than necessary to serve its narrow interest in enforcement of the MFJ. As such, the proposed remedy violates the First Amendment and the Government's request for relief should be denied.

## V.    THE GOVERNMENT'S PROPOSED REMEDY WOULD DEPRIVE AGRI STATS OF DUE PROCESS IN VIOLATION OF THE FIFTH AMENDMENT.

The proposed remedy also violates Agri Stats' Fifth Amendment right to due process. The Government may not deprive a litigant of a protected liberty or property interest without proper procedural safeguards, such as pre-deprivation notice and hearing. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985) ("[T]he Due Process Clause provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures."). Here, Agri Stats has both a protectable liberty interest in its communications with Wayne-Sanderson and a property interest in its continued business relationship. *See Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (source of protectable

27

liberty and property interests may arise from the Constitution itself or from state law). Agri Stats' commercial speech rights are a protectable liberty interest. *See Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214 (1986) (treating First Amendment rights as "an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment") (citation and quotation omitted). Agri Stats also has a protectable property interest in its business relationship with Wayne-Sanderson. "The right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge […] and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men'" is a protected property interest. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 572 (1972) (quoting *Meyer v. Neb.*, 262 U.S. 390, 399, (1923)). Agri Stats has provided benchmarking services to Wayne-Sanderson for more than 30 years. Ex. 2 ¶ 25. Absent the Government's demand that the relationship cease, it has a reasonable expectation that it would continue indefinitely. *Id*. That interest is entitled to constitutional protection.

The Government's proposed remedy deprives Agri Stats of its constitutionally protected interests in two respects. *First*, Agri Stats was not a party to the underlying case. Yet the Motion to Enforce runs directly against Agri Stats. The Government did not provide notice of its demand that Wayne-Sanderson cease doing business with Agri Stats, prove that any exchange of information has harmed competition, or otherwise provide a basis for halting legitimate commercial speech between Agri Stats and Wayne-Sanderson. Indeed, the Government would apparently have this Court terminate Agri Stats' commercial speech rights for an indeterminate period without hearing from Agri Stats at all and without satisfying the standards required for such an extraordinary remedy. The Constitution does not sanction such a procedure.

*Second*, the Government has sued Agri Stats in the District of Minnesota, alleging that Agri Stats has exchanged information in violation of Section 1 of the Sherman Act. Agri Stats is actively litigating that case and will defend its interests vigorously. The Government's proposed relief here is an attempted end-run around the *Minnesota Litigation*. Not only has it demanded relief not permitted under the MFJ, the Government aims to deprive Agri Stats of contractual relationships and resources that it needs to defend itself in Minnesota. Moreover, it seeks from this Court an order that grants it complete relief as to Wayne-Sanderson without first proving the violation of the antitrust laws that it must show to prevail in Minnesota. In short, the Government seeks, through the artifice of MFJ enforcement here, to deprive Agri Stats of its day in court in Minnesota. The Government's claim in Minnesota is not new; it repeats the private antitrust claims that the Northern District of Illinois rejected in *Broilers*, 702 F. Supp. 3d at 675-79. The Government will get its opportunity to persuade a different judge otherwise, but the Fifth Amendment does not permit it to engage in self-help by asking this Court to grant direct relief against Agri Stats without first proving entitlement to that relief by establishing a violation of the Sherman Act. The Court should deny the requested relief.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny the Government's Motion to Enforce.

Dated: January 30, 2025                                Respectfully submitted,

                                                   /s/ *Steven F. Barley*
                                                   Steven F. Barley (Bar No. 10049)
                                                   HOGAN LOVELLS US LLP
                                                   100 International Drive
                                                 Baltimore, MD 21202
                                                 Tel: (410) 659-2700
                                                 Fax: (410) 659-2701
                                                 steve.barley@hoganlovells.com

                                                 Justin W. Bernick (*Pro Hac Vice pending*)
                                                 William L. Monts III (*Pro Hac Vice pending*)
                                                 HOGAN LOVELLS US LLP
                                                 555 Thirteenth Street, N.W.
                                                 Washington, D.C. 20004
                                                 Tel: (202) 637-5600
                                                 Fax: (202) 637-5910
                                                 justin.bernick@hoganlovells.com
                                                 william.monts@hoganlovells.com

                                                 *Counsel for Agri Stats, Inc.*