# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff,*<br><br>v.<br><br>CARGILL MEAT SOLUTIONS CORPORATION, et al.,<br><br>*Defendants.* | Civil Action No.: 1:22-cv-01821-SAG |

# GEORGE'S OPPOSITION TO THE
# UNITED STATES' MOTION TO ENFORCE THE FINAL JUDGMENT

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   BACKGROUND .................................................................................................. 3

      A.    The Complaints ................................................................................... 3

      B.    The consent decrees and the monitors ............................................... 4

      C.    George's subscription to Agri Stats ................................................... 5

      D.    George's "abundance of caution" revisions to its subscription before
            settling with the DOJ ......................................................................... 8

      E.    The monitors' disputed construction of the consent decree ............. 9

      F.    George's willingness to make changes notwithstanding disagreement
            with the monitors ............................................................................. 11

      G.    Agri Stats' agreement to remove or revise labor-related data in its
            reports as part of a settlement with the poultry processing employees
            in *Jien* ............................................................................................. 12

      H.    The DOJ's refusal to discuss any resolution other than George's
            termination of its Agri Stats subscription ..................................... 12

III.  LEGAL STANDARD ........................................................................................ 14

IV.   ARGUMENT ................................................................................................... 15

      A.    George's is not violating the consent decree by sending aggregate
            labor cost data to Agri Stats that is not shared with other poultry
            processors ......................................................................................... 15

            1.    The prohibition upon which the DOJ relies is limited to sharing
                  competitively sensitive information about compensation for
                  poultry processing workers *with other poultry processors* ............. 15

            2.    The information George's sends to Agri Stats is not
                  "Competitively Sensitive Information about compensation for
                  Poultry Processing Workers" ........................................................... 18

      B.    Now that the DOJ is no longer playing "Hide the Ball" regarding its
            objections to the Agri Stats reports *received by* George's, it is evident
            that those issues can be easily resolved without litigation ......................... 22

      C.    The DOJ's proposal to terminate George's access to abridged Agri
            Stats reports while its competitors continue to have access to
            unmodified reports would be contrary to "the procompetitive purposes
            of the antitrust laws" ....................................................................... 23

V.    CONCLUSION ................................................................................................ 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Dole*,
  927 F.2d 771 (4th Cir. 1991) ...................................................................... 17

*Apatow v. Town of Stratford*,
  651 F. Supp. 3d 573 (D. Conn. 2023) .......................................................... 10

*Ariz. State Bd. for Charter Schs. v. U.S. Dep't of Educ.*,
  464 F.3d 1003 (9th Cir. 2006) ............................................................... 16, 17

*Chickasaw Nation v. United States*,
  534 U.S. 84 (2001) ....................................................................................... 16

*Food and Drug Admin. v. Brown & Williamson*,
  529 U.S. 120 (2000) ..................................................................................... 16

*J.S.G. ex rel. Hernandez v. Stirrup*,
  2020 WL 1985041 (D. Md. Apr. 26, 2020) ................................................. 14

*Ingersoll-Rand Co. v. McClendon*,
  498 U.S. 133 (1990) ................................................................................ 16, 17

*Jackson v. Los Lunas Cmty. Program*,
  880 F.3d 1176 (10th Cir. 2018) ................................................................... 14

*Jien v. Perdue*,
  Case No. 19-cv-02521 (D. Md.) ........................................................... *passim*

*Thompson v. U.S. Dep't of Hous. & Urb. Dev.*,
  404 F.3d 821 (4th Cir. 2005) ....................................................................... 14

*Tobar-Barrera v Napolitano*,
  2010 WL 972557 (D. Md. March 12, 2010) ................................................ 11

*U.S. v. Agri Stats Inc.*,
  0:23-cv-03009 (D. Minn. Sept. 28, 2023) ........................................ 10, 17, 24

*U.S. v. Cargill*,
  Case No. 1:22-cv-01821 (D. Md.) ........................................................... 3, 17

*United States v Agri Stats, Inc.*
    No. 0:23-CV-03009 (D. Minn. Sept. 28, 2023) ........................................................... 24

*W. Virginia Highlands Conservancy v. ERP Env't Fund, Inc.*,
    99 F.4th 194 (4th Cir. 2024) ........................................................................................ 14

## I.    INTRODUCTION

George's submits this memorandum in opposition to the Department of Justice's ("DOJ") motion to enforce the Final Judgment.

The DOJ's claim that George's has violated the Final Judgment is contradicted by the plain meaning of the Final Judgment.  The United States' Complaint alleged that poultry processors exchanged granular information about the wages they were paying employees with other poultry processors, either through direct communication with other poultry processors or through an intermediary.  Accordingly, the consent decree George's entered to settle this case prohibits only directly or indirectly sharing (1) "Competitively Sensitive Information about Compensation for Poultry Processing Workers" (2) with other Poultry Processors.  The DOJ's motion fails as to each of these required elements.

The DOJ raises two issues related to George's subscription to Agri Stats, a benchmarking service George's uses to increase efficiency in its operations and reduce costs.  First, the DOJ asserts that DOJ is violating the consent decree by ***sending*** Agri Stats cost data that includes ***aggregate*** labor cost data.  However, there is no violation because (1) the data is not shared with other poultry processors; and (2) the data, which bears no resemblance to the compensation information discussed in the Complaint, is not "Competitively Sensitive Information about Compensation for Poultry Processing Workers."  Second, the DOJ claims certain categories of information included in Agri Stats reports ***received by*** George's violate the Final Judgment (information that, for reasons unknown to George's, the DOJ had previously refused to disclose).  Once again, however, there is no violation, as the information finally identified by the DOJ is aggregate labor

1

cost data that is not "Competitively Sensitive Information about Compensation for Poultry Processing Workers." That being said, now that the DOJ has finally identified its purported concerns, it is evident that its concerns can be resolved without litigation and without the drastic punitive relief sought in the DOJ's motion.

Finally, the DOJ's demand that George's terminate its subscription to Agri Stats should be rejected for multiple reasons. Nothing in the Final Judgment permits the DOJ to obtain such relief. In fact, most of the metrics in the Agri Stats reports have no connection to compensation for poultry processing workers. The United States made no allegations about these non-labor-related metrics. Additionally, the DOJ has refused to engage regarding revisions to Agri Stats supported by the very poultry processing employees allegedly harmed by the challenged conduct—revisions that Agri Stats is willing to make. *See* discussion of *Jien* settlement, *infra.* Instead, the DOJ is demanding an order that would prevent George's, a processor with a 3% market share[1], from using a tool to improve its efficiency while its competitors have full access to that tool. Far from following the Final Judgment's mandate to give "full effect to the procompetitive purposes of the antitrust laws," the punitive relief sought by the DOJ for a non-existent violation, depriving George's of the opportunity to compete on a level playing field, would have an anticompetitive effect on competition in the poultry processing industry.

Accordingly, for these reasons, as fully discussed below, George's respectfully submits that the DOJ's motion should be denied.

---

[1]    R. George Decl. ¶ 4.

## II.    BACKGROUND

### A.    The Complaints

In 2019, a putative class of poultry plant employees brought an antitrust action in this very Court against eighteen poultry processors (including George's), Webber, Sahl & Company, Inc.  ("WMS"), and Agri Stats, Inc, alleging a conspiracy among Defendants to fix and depress poultry workers' compensation and an unlawful exchange of compensation data.  *Jien v. Perdue*, Case No. 19-cv-02521 (D. Md.)  In 2021, George's and the *Jien* plaintiffs reached a settlement, which was preliminarily approved on October 5, 2021.  *Jien* Docket No. 529.  The *Jien* plaintiffs continued to pursue their claims against the other processors, and have now settled with all of the processors.

In July of 2022, the DOJ sued Wayne Sanderson on allegations substantially similar to those contained in the *Jien* plaintiffs' Complaint. *U.S. v. Cargill*, Case No. 1:22-cv-01821 (D. Md.).   The DOJ Complaint against Wayne Sanderson, Docket No. 1, labeled eighteen producers as unnamed co-conspirators.  According to the Complaint:

- Through communications over decades, which occurred in large groups, small groups, and one-to-one, these poultry processors agreed that they would assist each other by discussing and sharing information about how to compensate their poultry processing plant workers. ¶ 5.

- The compensation information the poultry processors exchanged allowed them to make compensation decisions that benefited themselves as employers and suppressed competition among them for workers.  ¶ 7.

Although many of the allegations about sharing compensation information concern communications directly between human resources personnel of two or more poultry processors, the Complaint also alleges that such sharing occurred indirectly, through an

intermediary.  "Their conspiracy included sharing data and other information—directly and through consultants—about their current and future compensation plans."  ¶ 4.

The DOJ Complaint was filed with a proposed consent decree explicitly linked to the *Jien* case.  The consent decree, entered without any admission of liability, provided that the monetary amount to be paid by Wayne Sanderson to settle with the class of poultry processing employees in *Jien* would obviate the need for Wayne Sanderson to make any restitution payment in its settlement with the DOJ.  Docket No. 59, p. 25.

In December of 2022, George's entered into a similar settlement with the DOJ, again, without any admission of liability.[2]  As with the DOJ's settlement with Wayne Sanderson, George's payment obligation under the *Jien* settlement was deemed to satisfy any restitution requirement.   Docket No. 83, p. 21-22.[3]

### B.    The consent decrees and the monitors

As part of the above-referenced settlements, George's agreed to the terms of a Final Judgment, or consent decree.  Under the consent decree, George's "agree[d] to undertake certain actions and refrain from certain conduct for the purpose of remedying the anticompetitive effects alleged in the Amended Complaint."  Docket No. 83, p. 1.  The consent decree contained no admission of wrongdoing and provided that it was to be "interpreted to give full effect to the procompetitive purposes of the antitrust laws and to

---

[2]   The DOJ did not file the Amended Complaint and related settlement documents until May 2023.  Docket No. 48.
[3]   Citations to the Final Judgment are to the operative Modified Final Judgment dated April 9, 2024, ECF 83.  The differences between the Modified Final Judgment and the original Final Judgment are not material to the issues raised in the DOJ's motion.

restore competition the United States alleges was harmed by the challenged conduct." *Id.* § XIII.A.

The consent decree provided for the appointment of a monitor (which became two monitors) to review George's compliance with the terms of the Final Judgment. Final Judgment, § VI. George's must pay the Monitors' fees, billed at the Monitors' hourly rates. Apart from the issues related to Agri Stats that are the subject of this motion and disputed matters that were promptly resolved,[4] the Monitors have confirmed that George's has complied with all aspects of the Final Judgment. Among other things, the Monitors have reported that George's antitrust training is "robust" and that "[t]he Monitors are unaware of any participation by George's management or HR staff (or third parties under their direction) in any meetings with competitor processors regarding worker compensation." R. George Decl., Ex. 3.

### C.    George's subscription to Agri Stats

This dispute focuses on George's subscription to Agri Stats. Under the consent decree, WMS and Agri Stats, Inc. are included within the definition of "Consulting Firm," Final Judgment § II.G, even though only WMS was named as a defendant in the DOJ case. The description of WMS and the services it is alleged to have provided in the Complaint

---

[4]    In their August 21, 2024 Report, the Monitors faulted George's for participating in multi-industry benchmarking services that encompassed thousands of employers, almost none of which were poultry processors. Docket No. 108-3, Ex. 1 (filed under seal) p. 6, 8, 9, 12-17, 20-23. In its October 4 response to the report, George's demonstrated that there could be no violation for such participation because these multi-industry services do not produce "reports regarding Compensation for Poultry Processors." *Id.* at p. 8-11. "Despite the invalidity of the Monitor's conclusion," George's informed DOJ that it had suspended its data submission to these services to avoid more hourly charges from the Monitors." Docket No. 108-6 Ex. 4 (filed under seal)

does not remotely apply to Agri Stats.[5]  Unlike the consulting services allegedly provided by WMS, Agri Stats is a benchmarking company that collects data from subscribing chicken processors, audits and anonymizes that data, and then prepares benchmarking reports allowing customers to evaluate the efficiency of their respective operations against industry benchmarks.  Doc. 101-5, Ex. 2, Scholer Decl. ¶¶ 6-10, 19, 20.[6]

George's operations team uses Agri Stats to identify operational inefficiencies in how George's raises chickens and processes those birds into the products that it sells to its customers.  R. George Decl. ¶ 11.  George's participation in Agri Stats allows George's to evaluate topics like:

- whether the farms where George's birds are raised are inefficient as compared to others in the industry in converting the feed George's manufactures (i.e., feed conversion rates) this could signal a problem with the genetics of the breed of birds George's is raising or with the ingredients in its feed or with the flock management practices of the farmers caring for George's birds;

- whether George's "yields" (i.e., the percentage of various types of meat George's gets off a carcass or a portion of a carcass such as leg quarter) are falling behind what others in the industry are achieving—this could indicate problems with automated debone equipment or a need to better train the production workers assigned to a particular line or department; and

- whether George's is using more water in our plants compared to others in the industry—excess water use adds to the cost of goods and could be the result of water being wasted by a contractor responsible for the nightly

---

[5]    The Complaint alleges that WMS participated in "gathering, sorting, and disseminating disaggregated and identifiable information about current and future compensation for poultry processing plant workers," and also "facilitat[ing], supervis[ing], and participat[ing] in in-person meetings at which the Processor Conspirators assembled to discuss current and future, disaggregated, and identifiable poultry processing plant worker compensation decisions and information."  Docket No. 48 p. 13-14

[6]    As an illustration of Agri Stats' impact, since Agri Stats started offering its benchmarking reports in relation to the production of broiler chicken in 1985, the per capita production of boneless, skinless breast meet in the United States has nearly tripled, while the inflation adjusted price of breast meat has declined.  Doc. 101-5, Ex. 2, Scholer Decl. ¶¶ 6, 7.

> sanitation process required by USDA or a failure of a plant to implement water re-use technology now available to all industry participants.

*Id.* at ¶ 11.

Agri Stats reporting is critical to George's continuous improvement and innovation projects. As a small processor, George's does not have legions of data analysts. By ranking George's performance against others in the industry on a wide array of performance and cost metrics, and then quantifying the impact of each identified opportunity, Agri Stats's reports enable George's to direct the limited time and resources available for continuous improvement toward tackling those opportunities with the largest financial impact on its business. *Id.* at ¶ 12.

George's does not use Agri Stats in making compensation decisions. *Id.* at ¶¶ *6-8.* That is unsurprising, given that Agri Stats does not collect any information regarding the wages or salaries paid to any employee or category of employee grouped by the criteria that are used in setting compensation (e.g. position, shift, years of experience, etc.) *Id.* at ¶¶ 7-8. As a result, the information contained in Agri Stats reports would be of no use to HR personnel responsible for making those decisions. *Id.* The only labor-related data Agri Stats collects from George's are aggregated labor costs, such as the amount of all salary paid, in the aggregate, to everyone working in a department, without any information that would shed light on how different employees or groups of employees within a department are compensated. *Id.* at ¶ 9. Agri Stats collects this aggregated labor cost information so that it can calculate the metrics Agri Stats reports that reflect all costs. "Without aggregated plant and department-level labor cost data, no subscriber could meaningfully benchmark

their operations on a cost per pound basis for a variety of critical metrics in the reports, including First Processing Cost per pound, Second Processing Cost per pound…," etc. Docket No. 101-5, Ex. 2 Scholer Decl. ¶ 20.

### D. George's "abundance of caution" revisions to its subscription before settling with the DOJ

In the latter half of 2022, before George's agreed to a settlement with the DOJ, the DOJ made it clear that, as a condition of settlement, George's would be required to enter into a consent decree that prohibited conduct along the lines of the publicly filed consent decree to which Wayne Sanderson had agreed.  Greene Decl.  ¶ 2.  That consent decree prohibited Wayne Sanderson from communicating Competitively Sensitive Information about Compensation for Poultry Processing Workers to any other Poultry Processor, either "directly or indirectly." Wayne Sanderson Consent Decree Section IV.A.  As noted above, the consent decree also identified Agri Stats, Inc. as a "Consulting Firm."

None of the aggregated labor cost information contained in the Agri Stats reports is covered by a prohibition limited to "Competitively Sensitive Information about Compensation for Poultry Processing Workers," and, thus, it was not necessary for George's to make any changes to its Agri Stats subscription.  Nonetheless, George's took a conservative "abundance of caution" approach.  George's recognized that some of the column titles in the Agri Stats reports, such as "wage rate w/benefits," might create a misleading impression about the actual content and meaning of the statistics reported in those columns.  Because George's wanted to avoid sideshow controversies, it revised its subscription to avoid any conceivable issue.  In December 2022, as reflected in an email

exchange between counsel for Agri Stats and counsel for George's, Agri Stats confirmed that the reports received by George's would no longer include any wage rate average statistics, and that George's data would "not be used in the calculation of any wage rate average statistics provided to other subscribers." Docket No. 108-3, Ex. 1, Ex. C (filed under seal).  These revisions were made, and the DOJ acknowledges that "the 'wage rate w/benefits' information" is "redacted from [George's] report." DOJ Mem., Docket No. 108, p. 13.

### E.    The monitors' disputed construction of the consent decree

The Monitors launched this dispute when, on July 19, they advanced a construction of Section IV.A.4 of the Final Judgment premised on a misquotation that relied on the omission of crucial language.  The Monitors wrote:

> Section IV.A.4 of the Final Judgment provides that George's "must not, whether directly or indirectly [**Ellipsis indicating omission**] Communicat[e] Competitively Sensitive Information about Compensation for Poultry Processing Workers to any Consulting Firm that produces reports regarding Compensation for Poultry Processing Workers that are shared with other Poultry Processors."

Greene Decl., Ex.1.

In fact, Section IV.A begins "Management and Human Resources Staff of each Settling Defendant must not, whether *directly or indirectly*, including *through* a Consulting Firm or other person" (emphasis added), which language is then followed by four sections numbered 1 through 4. Final Judgment, § IV.A.1-4. Section IV.A.4, including the portion the Monitors omitted (indicated in underline) actually states:

9

> Communicate Competitively Sensitive Information about Compensation for Poultry Processing Workers to any Poultry Processor not owned or operated by one or both Settling Defendants, including Communicating Competitively Sensitive Information about Compensation for Poultry Processing Workers to any Consulting Firm that produces reports regarding Compensation for Poultry Processing Workers that are shared with other Poultry Processors;"

See *Apatow v. Town of Stratford*, 651 F. Supp. 3d 573, 589 n.2 (D. Conn. 2023) (criticizing tactic of "us[ing] an ellipsis to obscure a vital phrase" in a quotation and cautioning that "omitting damning language will not make those words disappear").

The Monitors' rewriting of Section IV.A.4 then became the foundation of their August 21, 2024 report to the DOJ, in which the Monitors purported to find violations by George's regarding the aggregated labor cost information George's provides to Agri Stats— information that Agri Stats does not share with other processors.  When George's finally received the report weeks later,[7] George's immediately notified DOJ that it disputed the findings and asked for an opportunity to provide a response, R. George Decl. ¶ 14, which George's ultimately submitted on October 4, 2024.

However, on September 27, without waiting for George's opposition to the Monitors' report, the DOJ effectively adopted the Monitors' findings.  *See* Docket No. 108, Ex. 2 ("The Division is committed to promptly remedying this and any other violations of the Final Judgment[.]").  In its letter prejudging the controversy, the DOJ invoked its lawsuit against Agri Stats in the District of Minnesota,[8] which was not filed until September

---

[7] Neither the Monitors nor DOJ provided this report to George's until George's discovered its existence by reviewing billing records.  R. George Decl. ¶ 13.

[8] *U.S. v. Agri Stats Inc.*, 0:23-cv-03009 (D. Minn. Sept. 28, 2023).

2023, long after DOJ and George's agreed on the terms of the consent decree. *But see Tobar-Barrera v Napolitano*, 2010 WL 972557, at *3-4 (D. Md. March 12, 2010) (parties cannot seek to change the construction of a consent decree by relying on developments post-dating the decree).

### F. George's willingness to make changes notwithstanding disagreement with the monitors

George's submitted its response to the Monitors' findings on October 4, 2024, communicating two distinct messages. First, George's refuted the conclusions reached by the Monitors for the reasons that will be discussed below. Second, George's made it clear that, even as it disagreed with the Monitors, George's was open to making changes, without any admission, for the express purpose of avoiding litigation. Specifically, George's stated: "Even as George's continues to disagree with the Monitors' conclusions, in one instance, George's has suspended certain practices [related to multi-industry benchmarking services] that are in dispute in order to avoid unnecessary future defense costs and monitoring fees." Docket No. 108-6, Ex. 4 (filed under seal). George's willingness to make changes it did not believe it was obligated to make was also evident in its discussion of the changes it had made to its Agri Stats subscription. While noting that the cost data George's instructed Agri Stats to redact was beyond the scope of the consent decree, George's explained that it had nonetheless revised its subscription "to avoid any issue." Docket No. 108-6 Ex. 4 (filed under seal).

G.     **Agri Stats' agreement to remove or revise labor-related data in its reports as part of a settlement with the poultry processing employees in *Jien***

In November 2024, a breakthrough in the *Jien* case presented an opportunity to address all of the Agri-Stats related compensation and/or wage concerns raised in both *Jien* and the DOJ's motion in this case.  On November 19, 2024, the plaintiffs in *Jien*, having settled with all of the processor defendants, reached a settlement with Agri Stats, contingent on DOJ approval.  The settlement included detailed revisions to Agri Stats reports.  *See* Settlement Agreement dated November 19, 2024 Docket No. 101-10 at § II.A ("Conduct Relief by Agri Stats") (including Exhibit A to Settlement Agreement).  The employee plaintiffs, who have every incentive to obtain appropriate relief for the Class, were prepared to tell this Court that the revisions to the Agri Stats reports in the settlement agreement were sufficient to address any arguable compensation-related concerns.  By approving the settlement, the DOJ could have addressed any purported compensation-related concerns about Agri Stats in a way that would have allowed all processors, including George's, to compete on a level playing field.  Instead, the DOJ refused to even discuss the terms of the settlement.  Docket No. 101-4, Bernick Decl. ¶ 8.[9]

H.     **The DOJ's refusal to discuss any resolution other than George's termination of its Agri Stats subscription**

On December 27, 2024, after months without any follow-up to George's October 4 letter, the DOJ sent George's a letter:

---

[9]     Because of the DOJ's refusal to engage regarding the Settlement Agreement supported by the employees, the Settlement Agreement between the employees and Agri Stats was rescinded and is no longer binding.  Docket No. 101-4 Bernick Decl. ¶ 8.  However, the settling parties could re-enter the agreement if the DOJ were to engage.

- formally adopting the Monitors' finding of a purported violation based on the information George's **sends** to Agri Stats;

- announcing, for the first time, a finding that George's is also purportedly in violation of the Final Judgment based on the information George's receives **from** Agri Stats without any explanation about what the DOJ found objectionable about the modified Agri Stats reports George's continues to receive; and

- demanding that George's "immediately terminate" its Agri Stats subscription for some indeterminate period until the Monitors and DOJ are satisfied, in their sole discretion, that any information exchanged conforms to the DOJ's construction of the consent decree.

Docket No. 108, Ex 5.  George's responded to this perplexing letter on January 10, 2025, contending that "the Division should first provide George's with an explanation of the new accusation contained in the December 27 letter [regarding information **received by** George's], and then the Division and George's should meet-and-confer to discuss whether the issues of concern to the Division can be resolved without the need to litigate the dispute in Court."  Docket No. 108-8, Ex 6 (filed under seal).

The DOJ agreed to a perfunctory phone call on February 5, 2025, during which George's explained why it was optimistic that the issues in dispute could be resolved if only DOJ would agree to have a meaningful discussion about how to reach agreement on changes that would satisfy DOJ.  Greene Declaration ¶ 6.  The DOJ refused to engage in any such discussion, and within hours, filed its motion to enforce the final judgment as to George's.  *Id*.  The motion to enforce states:  "George's has committed violations of the decree it entered into by continuing (1) to send competitively sensitive compensation information about its poultry workers to Agri Stats, and (2) to receive reports from Agri

13

Stats that contain competitively sensitive information from its competitors."   DOJ Memorandum, Docket No. 108-1, p.2.

## III.   LEGAL STANDARD

Consent decrees are subject to traditional rules of contract interpretation.   *See Thompson v. U.S. Dep't of Hous. & Urb. Dev.*, 404 F.3d 821, 832 n.6 (4th Cir. 2005). Further, the district court's authority is "constrained by the language of the decree."   *Id. See also J.S.G. ex rel. Hernandez v. Stirrup*, 2020 WL 1985041, at *5 (D. Md. Apr. 26, 2020) (Gallagher, J.).  "[C]onsent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms," and therefore, a consent decree's scope "must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *W. Virginia Highlands Conservancy v. ERP Env't Fund, Inc.*, 99 F.4th 194, 199-200 (4th Cir. 2024) (quoting *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971)).  Further, the consent decree at issue adds that "[t]his Final Judgment should be interpreted to give full effect to the procompetitive purposes of the antitrust laws and to restore the competition the United States alleges was harmed by the challenged conduct."   § XIII.A. *Accord Jackson v. Los Lunas Cmty. Program*, 880 F.3d 1176, 1192 (10th Cir. 2018) (the "nature and scope" of a consent decree "depends on the nature and scope of the federal-law violation").  The burden is on the United States to establish a violation of the Final Judgment by a preponderance of the evidence.

## IV.    ARGUMENT

### A.    George's is not violating the consent decree by sending aggregate labor cost data to Agri Stats that is not shared with other poultry processors

#### 1.    The prohibition upon which the DOJ relies is limited to sharing competitively sensitive information about compensation for poultry processing workers *with other poultry processors*

The DOJ alleges that George's can violate Section IV.A. of the consent decree even if it does not, directly or indirectly, share any data covered by that provision with other poultry processors.  The DOJ's construction depends on reading the clause that follows the word "including" in the text (reprinted below) as if the clause constitutes a stand-alone prohibition.  Such a construction is not tenable.

As noted earlier, Section IV.A and IV.A.4 state in pertinent part:

> Management and Human Resources Staff of each Settling Defendant must not, whether directly or indirectly, including through a Consulting Firm or other person…[4] Communicate Competitively Sensitive Information about Compensation for Poultry Processing Workers to any Poultry Processor not owned or operated by one or both Settling Defendants, including Communicating Competitively Sensitive Information about Compensation for Poultry Processing Workers to any Consulting Firm that produces reports regarding Compensation for Poultry Processing Workers that are shared with other Poultry Processors

Read in its entirety, the section prohibits sharing Competitively Sensitive Information about Compensation for Poultry Processing Workers *with other Poultry Processors.*  The clause that appears at the end of the sentence reinforces the principle articulated at the beginning of Section IV.A. that the prohibition cannot be circumvented by using indirect means, i.e., sharing the subject information with other processors through an intermediary.

The DOJ, however, treats the subordinate[10] clause following the comma and the word "including" as an additional stand-alone prohibition, divorced from the context of the rest of the sentence the DOJ has once again omitted from its brief.  Isolating only this final clause, the DOJ contends that George's would violate the consent decree by transferring information covered by the section to Agri Stats, even though that information is ***not*** shared with other poultry processors. However, courts do not interpret portions of sentences in isolation.  "The meaning—or ambiguity—of certain words or phrases may only become evident when placed ***in context***."  *Food and Drug Admin. v. Brown & Williamson*, 529 U.S. 120, 132 (2000) (emphasis added).  The DOJ cannot unilaterally change the meaning of a clause by ignoring the context in which it appears.

Furthermore, to accept the DOJ's rewriting, "[o]ne would have to read 'including' to mean what it does not mean, namely, 'including…and.'" *Chickasaw Nation v. United States*, 534 U.S. 84, at 85. *See id.* at 90–89 (2001) (holding that the word " include' means to 'contain'" and that what follows the word "provid[es] an illustrative list of examples"); *see also Ariz. State Bd. for Charter Schs. vs. U.S. Dep't of Educ.*, 464 F.3d 1003, 1006-07 (9th Cir. 2006) construing the "including" term "not to contradict" the operative term and rejecting attempt to use "including" to "expand[]" the operative term).  The cases cited by DOJ are not to the contrary.  In *Ingersoll-Rand Co. v. McClendon*, the Court held that when a statute defines the "[t]he term 'State'" to "include[] a State, any political subdivisions thereof, or any agency or instrumentality of either," the term "state" would be construed to

---

[10]  *See Ariz. State Bd. for Charter Schs. v.  U.S. Dep't of Educ.*, 464 F.3d 1003, 1008 n.3 (9th Cir. 2006) (citing American Heritage Dictionary definition of "include" as, *inter alia*, "to contain as a secondary or subordinate element").

include "any agency or instrumentality of either." 498 U.S. 133, 141 (1990). This common sense acknowledgment that a definition that "includes A or B" includes both A and B is unremarkable and inapposite. The other case cited by the DOJ, *Adams v. Dole*, 927 F.2d 771, 776-77 (4th Cir. 1991), merely stands for a limited exception that applies "where the exclusivity of two or more terms requires a broader interpretation to avoid an irrational or absurd result." *Ariz. State Bd*. 464 F.3d at 1008 (discussing *Adams*).

Finally, unable to advance a credible "plain meaning" argument, the DOJ contends that even though there is no evidence that Agri Stats is sharing George's information with other processors, the Court should nonetheless rewrite the provision because of speculation that if, theoretically, there ever were evidence of such a violation, Agri Stats might not cooperate with the Monitors' investigation. *See* Mem. at 9 (complaining that the Monitors "cannot police a third party's use of information it receives from George's" without identifying any instance where Agri Stats has refused to cooperate with the Monitors). The short answer to this speculation is that it is irrelevant because there is no violation, and the plain meaning of the consent decree governs. But it is important to add that Agri Stats has repeatedly demonstrated that it is willing to do what is necessary to address concerns related to the *Cargill* and *Jien* litigations, including making wholesale revisions to its reports as part of a settlement in *Jien* that would have been included in an Order from this Court. It is the DOJ that has refused to engage with Agri Stats, not vice versa. The DOJ cannot lock Agri Stats out of any effort to address purported concerns and then justify a demand to terminate George's subscription to Agri Stats on the grounds that Agri Stats, a defendant in *Jien* and *U.S. v. Agri Stats*, is not also a defendant in this case.

**2.    The information George's sends to Agri Stats is not "Competitively Sensitive Information about compensation for Poultry Processing Workers"**

Because the data George's sends to Agri Stats is not being shared with other poultry processors, there can be no violation based on the data George's sends to Agri Stats. Although that fact is dispositive by itself, the DOJ's first claim fails for the additional reason that the data do not meet the definition of "Competitively Sensitive Information about Compensation for Poultry Processing Workers."

The data that George's sends to Agri Stats are aggregate labor cost data for an entire department.  For example, as reflected in the DOJ's memorandum at Figure 1, line 3, George's sends to Agri Stats the sum of all of the salary pay that George's paid in a specified period to all salaried employees in a department and presents it as an aggregate figure, without any indication as to how much money was paid to employees in different positions or with different years of experience.  Because George's sends only aggregate labor cost data for an entire department, the DOJ is simply wrong when, without any supporting evidence, it depicts Figure 3 as evidence that George's provides Agri Stats with "granular level of detail" regarding the compensation paid to different employees by position.  DOJ Mem. at 8.  Figure 3 merely performs a mathematical exercise *over department-wide labor cost information* that, contrary to reality, would produce the same the labor cost per hour figure for every position in a department.  *See* Docket No. 113-2  Agris Stat's Opposition to Motion to Enforce Final Judgment Against George's, p. 11; George Decl. ¶ 9.

George's HR department does not use any Agri Stats information in setting wage, salary and benefit compensation levels, and, indeed, it would be of no use for that purpose.

The reason Agri Stats collects this data is to facilitate the calculation of statistics unrelated to compensation that account for all costs. *See* Docket No. 101-5, Ex. 2 Scholer Decl. ¶ 20.

This aggregate labor cost data, which has no relevance to the compensation setting function, does not bear any resemblance to the type of information allegedly exchanged by HR professionals as described in the Complaint. Indeed, when the Complaint uses the term "compensation information," it provides examples of information with an obvious relevance to setting compensation levels:

> 5….The poultry processors' collaboration on compensation decisions, including their exchange of ***compensation information***, took many forms over the years of the conspiracy. For example:
>
> ….
>
> b. A group of competing poultry processors exchanged "***disaggregated raw [identifiable] data regarding the compensation of hourly-paid workers . . . broken down by plant and location"; base pay and bonuses "for each specific salaried position***" included in their survey; any "***planned increase in the salary range for the current budget year***"; any "***planned increase in the salary range for the next budget year***"; the dates of planned future increases; and "disaggregated, raw data for some benefits." Employees of these poultry processors then met in person and discussed ***specific compensation, including attendance bonuses and overtime work payments***.
>
> ….
>
> 7. ….The poultry processors, both directly and through data consultants, shared ***compensation information so detailed and granular that the poultry processors could determine the wages and benefits their competitors were paying—and planning to pay—for specific job categories at specific plants***. The compensation information the poultry processors exchanged allowed them to make compensation decisions that benefited themselves as employers and suppressed competition among them for workers.

Docket No. 48, pp. 2-4.

As Wayne Sanderson has demonstrated, the aggregate labor cost data collected by Agri Stats does not meet the definition of "Compensation" information under the consent decrees. Docket No. 105 p. 15-22. George's will incorporate those arguments rather than repeat them.

George's emphasizes, however, that "Competitively Sensitive Information" is a *separate* defined term. As a result, to prove a violation based on the exchange of "Competitively Sensitive Information about Compensation for Poultry Processing Workers," it would not be sufficient to argue that aggregate labor cost data qualifies as "Compensation" information, as invalid as any such argument would be. Instead, it would be necessary *also* to show that the information meets the definition of "Competitively Sensitive Information."

However, as George's pointed out in its October 4 response to the Monitors' report, "the Monitors *assume[d]* this element is met without offering any analysis." Docket No. 108-6, Ex. 4 (filed under seal). George's further challenged the Monitors: "If the Monitors have any basis to believe that sharing labor cost data with Agri Stats likely impacts or harms competition, they should present that evidence and give George's the opportunity to respond." *Id.* The Monitors presented no such evidence. In subsequent correspondence, George's continued to press the Monitors:

> An analysis of whether information is "Competitively Sensitive" would require an analysis of whether "the exchange" of that information "could harm competition." Such an analysis would involve asking questions such as: "Is the information actually being used by HR personnel to set wages and salaries?" If not, given the limitations of the aggregate statistics being discussed, is there

a real-world basis for a concern that it could be used to set wages or salaries or otherwise be used to harm competition in labor markets?" During our call on November 13, you acknowledged that you have not been conducting any such separate analysis. Instead, you have effectively treated "Competitively Sensitive Information" as a redundant term, such that if an Agri Stats aggregate statistic is compiled in a way that includes information arguably about "Compensation," then there is no need to separately analyze whether that statistic also meets the separate definition of "Competitively Sensitive Information."

Greene Decl. Ex. 2.

The DOJ does not address this deficiency. In its memorandum, apart from quoting the definition of Competitively Sensitive Information, the DOJ does not offer any analysis to sustain its burden of showing that the information at issue has any relevance to or likely impact on competition. Instead, in its February 5 letter to George's, Greene Decl. Ex. 3, the DOJ has gone one step further and rewritten the definition of "Competitively Sensitive Information about Compensation for Poultry Processing Workers" to encompass all "labor-related data," regardless of whether it is competitively sensitive, has anything to do with determining the compensation paid to employees, or bears any resemblance to the compensation information referred to in the complaint. See DOJ Letter dated February 5, 2025, Greene Decl., Ex. 3 (DOJ asserting that when George's stated that there is "labor-related data" included in the Agri Stats reports received by all subscribers, that statement constituted an admission that George's is in violation of the consent decree as a recipient of Agri Stats reports). According to the DOJ, notwithstanding that "Competitively Sensitive Information" is a defined term, any discussion related to competitive effects is "beside the point." Greene Decl. Ex. 3.

In sum, the aggregate labor cost data George's sends to Agri Stats is not "Competitively Sensitive Information about Compensation for Poultry Processing Workers."  For that additional reason, George's did not violate the Final Judgment by sending information to Agri Stats.

> **B.    Now that the DOJ is no longer playing "Hide the Ball" regarding its objections to the Agri Stats reports *received by* George's, it is evident that those issues can be easily resolved without litigation**

DOJ did not inform George's that it had any objections regarding the Agri Stats reports ***received by*** George's until December 27, when it demanded that George's terminate its subscription.  But even then, the DOJ would not disclose those objections so George's could respond to them.  After George's requested an explanation of the new accusation in its letter dated January 10, 2025, the DOJ refused, transforming the practice of holding a "meet and confer" before filing a motion into a meaningless formality.  Ultimately, the DOJ elected to "show its cards" for the first time in its motion to enforce the Final Judgment.

The DOJ takes issue with two categories of information included in the reports received by George's:

> (1) labor costs in cents per bird and birds (WOGS)/manhour, which, according to the DOJ, can be used in combination to recreate a column labelled "wage rate w/benefits" that no longer appears in George's reports (DOJ. Mem. at 13-14);[11] and

> (2)  Statistics derived from aggregate labor cost calculations that appear in Exhibit 8, at page 318, lines 148, 150 (*see* DOJ Mem. at 12 n.4).

---

[11]  As Agri Stats has pointed out in its opposition to the DOJ's motion as to George's, the DOJ does not appear to be arguing that labor cost "per pound" or "per bird" efficiency metrics that appear in the reports violate the consent decree.  Docket No. 113-2, p. 4 n.1. The motion addresses only the combination of the above-referenced columns.

George's reiterates that none of the aggregate labor cost data reflected in these calculations meets the definition of "Competitively Sensitive Information about Compensation for Poultry Processing Workers."  However, now that DOJ has finally disclosed its objections, it is evident that these issues can and should be resolved without litigation.  Indeed, Agri Stats and the *Jien* plaintiffs already reached agreement on how to eliminate the issue regarding the theoretical "combination of columns," which can be found in the settlement of the *Jien* case that the DOJ scuttled.  *See* Agri Stats Opposition, 113-2 at 6-7.  Furthermore, notwithstanding the parties' disagreement about the statistics that appear in Exhibit 8, at page 318, lines 148 and 150, these statistics are of little or no importance to George's.  The benchmarking statistics provided by Agri Stats on which George's ***does*** rely to operate more efficiently and reduce costs are unrelated to the particular reports now challenged by the DOJ.  Accordingly, there is every reason to believe that if DOJ would engage with George's to discuss changes to Agri Stats reports that would address DOJ's concerns without barring George's from using the non-labor-related information on which George's relies, the parties could arrive at a resolution.

## C.    The DOJ's proposal to terminate George's access to abridged Agri Stats reports while its competitors continue to have access to unmodified reports would be contrary to "the procompetitive purposes of the antitrust laws"

Neither the Monitors nor DOJ have attempted to create a record that would tie any of their complaints about George's Agri Stats subscription to any actual competitive impact in the real world.  Instead, the DOJ's position has been based on a combination of (a) absolute certainty regarding its supposed plain meaning of the consent decree and (b) a

punitive "you made your bed now lie in it" refusal to consider any constructive solution that does not include an acknowledgement of a violation. See Greene Dec. ¶ 7, Ex. 3 (DOJ dismissing negotiations based on George's "refusal to acknowledge ongoing, systematic and clear violations").

Against that backdrop, the DOJ's assertion that George's conduct is somehow operating "to the detriment of poultry plant workers across the country," Docket No. 108-1, p. 16, is not credible. The DOJ cannot simultaneously declare than any discussion of competitive effects in the real world is "beside the point," and then pretend, without any evidence and contrary to common sense, that poultry plant workers, "across the country" no less, are actually being harmed.

The reality is that it is the DOJ's conduct in this matter that ignores the consent decree's mandate to "give full effect to the procompetitive purposes of the antitrust laws." Agri Stats is a benchmarking tool that is used by poultry processors to improve the efficiency of their operations, thus lowering their cost of producing goods.[12] Terminating only *George's* subscription to its modified reports serves no procompetitive purpose. The only competitive effect of terminating George's access to Agri Stats would be to harm competition in the poultry processing market(s) by depriving George's, a small competitor,

---

[12] That the DOJ may take issue with this description, *see United States v Agri Stats, Inc.* No. 0:23-CV-03009 (D. Minn. Sept. 28, 2023) is of no consequence for present purposes. In the event the DOJ were to persuade the Court in *U.S. v Agri Stats, Inc.* that Agri Stats's reports should be altered in some way, the relief would affect *all* poultry processors that subscribe to Agri Stats *equally*. The focus here is on the *disparity* that the DOJ would create if the DOJ were to force George's to terminate its already-abridged subscription to Agri Stats while George's competitors continue to have access to this competitive tool.

of a valuable tool that enhances its operation efficiency and assists it in its competition with much larger processors.[13]

Furthermore, the anticompetitive effect of the DOJ's proposed punitive action against George's is all the more troubling in light of the DOJ's rejection of Agri Stats' agreement to make changes to its reporting of labor-related data that would have resolved the issues that are raised here. *See* discussion of *Jien* settlement, *supra*. By engaging with Agri Stats and the class of employees, the DOJ could have addressed any purported compensation-related concerns about Agri Stats in a way that would have allowed all processors, including George's, to compete on a level playing field. Instead, the DOJ refused to even discuss the employees' settlement, causing it to fall apart. Now, after scuttling the industrywide solution supported by the employees themselves, the DOJ has elected instead to demand that a single processor with a small market share terminate its modified Agri Stats subscription entirely while most of the industry continues to have access to unmodified reports. There is no conceivable universe in which this combination of positions gives "full effect to the procompetitive purposes of the antitrust laws."

Finally, once again leaving aside the absence of a violation, which is dispositive, any suggestion that the term of the Final Judgment should be extended is inappropriate for the reasons set forth in Wayne Sanderson's opposition, Docket No. 105 at 23-26, which George's incorporates by reference. As Wayne Sanderson explains, "[t]he DOJ has not come close to establishing substantial non-compliance," the high standard that would

---

[13] At no time during the DOJ's pre-settlement negotiations with George's did DOJ representatives suggest that George's would need to terminate its Agri Stats subscription as a condition of settling the lawsuit. Greene Decl. ¶ 2. If the DOJ had proposed such a condition, George's never would have agreed.

apply.  This is especially true in light of the Monitors' confirmation that, apart from this one dispute regarding Agri Stats, George's is complying with its obligations under the Final Judgment.  *See* discussion of October 3, 2024 Compliance Report, R. George Decl. Ex 3, *supra*.

## V.    CONCLUSION

Accordingly, for these reasons, as fully discussed below, George's respectfully submits that the DOJ's motion should be denied.


Dated:  February 19, 2025

*/s/ William L. Greene*

William L. Greene (*admitted pro hac vice*)
Stinson LLP
50 South Sixth Street, Suite 2600
Minneapolis, MN  55402
Telephone: (612) 335-1500
Facsimile: (612) 335-1657
william.greene@stinson.com

Brandon R. Nagy (D. Md. Bar No. 20834)
Stinson LLP
1775 Pennsylvania Ave. NW, Suite 800
Washington, DC  20006
Telephone: (202) 785-9100
Facsimile: (202) 572-9950
brandon.nagy@stinson.com

Victoria L. Smith (*admitted pro hac vice*)
Stinson LLP
1201 Walnut, Suite 2900
Kansas City, MO  64106
Telephone: (816) 842-8600
Facsimile: (816) 412.9306
vicki.smith@stinson.com

*Counsel for Defendants*
*George's Inc. and George's Foods, LLC*