**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      *Plaintiff*,<br><br> v.<br><br>CARGILL MEAT SOLUTIONS CORPORATION, *et al.*,<br><br>      *Defendants*. | Civil Action No.: 1-22-cv-01821-SAG |

**MEMORANDUM IN SUPPORT OF THE UNITED STATES' MOTION
TO ENFORCE THE FINAL JUDGMENT AGAINST GEORGE'S**

**TABLE OF CONTENTS**

**BACKGROUND** ...................................................................................................................2

    I.    United States' Complaint and the Final Judgment ............................................2

    II.   Violations of the Final Judgment .......................................................................2

           A.  The Monitors' Findings ............................................................................3

           B.  The United States' Efforts to Ensure George's Compliance .................3

**LEGAL STANDARD** ..........................................................................................................4

**ARGUMENT** ........................................................................................................................4

    I.    George's Is Violating the Final Judgment by Exchanging Competitively Sensitive Compensation Information with Agri Stats ......................................4

           A.  George's Continues to Send Compensation Data to Agri Stats in Violation of the Decree .........................................................................4

           B.  George's Receives Compensation Data from Agri Stats in Violation of the Decree .....................................................................................9

    II.   To Remediate George's Persistent and Systematic Decree Violations, the Court Should Order It to Pause Its Data Sharing with Agri Stats and Extend the Decree ...................15

**CONCLUSION** ..................................................................................................................16

George's (i.e., George's, Inc. and George's Foods, LLC), along with Wayne-Sanderson and others, freely entered a consent decree with the United States to settle claims that it conspired with other poultry processors to suppress workers' compensation by sharing compensation data through intermediaries. The George's decree, like the United States' consent decree with Wayne-Sanderson, prohibited the company from sending or receiving competitively sensitive compensation data about poultry plant workers, including with a consulting company called Agri Stats. But George's has flouted its legal commitments by continuing to send competitively sensitive compensation data to Agri Stats and to receive its competitors' data in return, much like Wayne-Sanderson. *See* ECF 86 Motion to Enforce ("DOJ WS Mot.").

George's violations are clear-cut and flagrant. George's does not dispute that it continues to send its payroll and general ledger data to Agri Stats, which on its own constitutes a violation of the decree. Similarly, it has continued to receive information about competing processors' labor costs and paid wages, making only cosmetic changes after entering its consent decree with the United States. Unable to dispute its conduct, George's is left to offer implausible interpretations of the decree's plain and broad terms.

To remedy George's egregious and ongoing breaches of its obligations, the Court should temporarily halt George's data exchanges with Agri Stats until the Monitor can confirm that any future exchanges will no longer violate the decree. George's should not be allowed to continue violating its obligations indefinitely while the Monitors and United States attempt to root out and remediate the full scope of the violations. Rather, as the party in breach, the onus lies on George's to bear the burden of remediating its conduct. In addition, to compensate for the time in which George's has been in breach of the decree, the United States asks for a commensurate extension of the decree.

1

## BACKGROUND

**I.     United States' Complaint and the Final Judgment**

The pertinent facts about the complaint and consent decree are set forth in the United States' Motion to enforce against Wayne-Sanderson, ECF 86 ("DOJ WS Mot."). Like Wayne-Sanderson, George's conspired to suppress poultry plant workers' compensation by sharing competitively sensitive information through consultants and other intermediaries. In May 2023, the United States filed an amended complaint adding George's as a defendant, along with a proposed consent decree. The George's and Wayne-Sanderson decrees contain identical prohibitions on exchanging competitively sensitive information, while the Wayne-Sanderson decree includes additional provisions resolving claims of unfair and deceptive treatment of poultry "growers" under the Packers and Stockyards Act that are not at issue in either motion to enforce.

Most importantly, George's agreed to the same relevant prohibition as Wayne-Sanderson on "Communicating Competitively Sensitive Information about Compensation for Poultry Processing Workers to any Consulting Firm," with the definition of "Consulting Firm" expressly naming "Agri Stats, Inc." ECF 45-2. After the conclusion of the notice-and-comment procedures under the Tunney Act, the Court entered the Final Judgment against George's on August 22, 2023. ECF 77. The Modified Final Judgment was entered on April 9, 2024. ECF 83.

**II.    Violations of the Final Judgment**

George's has committed violations of the decree it entered into by continuing (1) to send competitively sensitive compensation information about its poultry workers to Agri Stats, and (2) to receive reports from Agri Stats that contain competitively sensitive compensation information from its competitors.

### A. The Monitors' Findings

On August 21, 2024, the Court-appointed Monitors overseeing compliance with the Final Judgment reported to the United States that their "investigation has led to the conclusion that George's has violated the plain language of Section IV.A.4 of the Final Judgment by communicating information about its poultry worker compensation with Agri Stats, Inc." Ex. 1 at 3. As the Monitors found, "George's provided compensation data to Agri Stats on a monthly basis, from May 2023 to present" in a file named "AGRIPAY" that contained, among other things, hours worked, total wage amounts, and dollar figures for different types of compensation, such as salaries and bonuses. *Id.* at 11.

George's did not alter the granular data provided through AGRIPAY because George's had requested that Agri Stats (1) not use George's data in the calculation of wage rate average statistics provided to its competitors and (2) not provide George's with the wage rate average statistics for its competitors. *See id.* at 9. The Monitors concluded that George's could not share compensation information with Agri Stats regardless of George's requests and Agri Stats' promises not to use its compensation data. They explained that "George's interpretation would eviscerate the Final Judgment's purpose" and would "mean that compliance . . . depends entirely on trusting Agri Stats" even though Agri Stats is a third party not subject to monitoring. *Id.* at 19.

### B. The United States' Efforts to Ensure George's Compliance

After receiving the Monitors' reports, the United States attempted to resolve the ongoing violations by engaging directly with George's and requesting that it "propose remedies to ensure . . . compliance." Ex. 2 at 2. In response, George's asserted that the Final Judgment did not require *any* change to its relationship with Agri Stats. Ex. 3 at 3. Instead, George's merely reiterated its previous request of Agri Stats not to include wage rate average statistics in

George's reports and George's data "in the calculation of any wage rate average statistics provided to other subscribers." Ex. 4 at 3; *see also* Ex. 3 at 3. George's appears to have no formal written contract with Agri Stats. Ex. 3 at 2.

But as the Monitors had already informed George's, these superficial changes relating to wage rate average statistics fail to remove all of the competitively sensitive compensation information from Agri Stats reports as required by the Final Judgment. Because George's has continued to send compensation data to Agri Stats and to receive poultry worker compensation data in return, on December 27, 2024, the United States demanded that George's "immediately terminate [its] subscription to Agri Stats, including both the sending and receiving of information or data, unless and until the Monitors and the Department of Justice are comfortable that any information exchanged will not be in violation of the Final Judgment." Ex. 5 at 3. The United States also informed George's that a failure to meet this demand "may require the Division to move to enforce the Final Judgment to secure compliance." *Id.* George's refused to take any immediate action, instead demanding a protracted conferral process. Ex. 6 at 5. As a result, the United States now brings this motion to enforce the Final Judgment against George's.

## LEGAL STANDARD

The United States' Motion to enforce against Wayne-Sanderson sets forth the legal standard applicable to both motions. DOJ WS Mot. at 8-9.

## ARGUMENT

I. **George's Is Violating the Final Judgment by Exchanging Competitively Sensitive Compensation Information with Agri Stats**

    A.    **George's Continues to Send Compensation Data to Agri Stats in Violation of the Decree**

Under the Final Judgment, George's may not, *inter alia*, "disclose," "send," "transfer," or "provide" to Agri Stats any competitively sensitive information about "Compensation" of

4

workers, which broadly encompasses information about "all forms of payment for work." George's FJ §§ II.D, II.E, IV.A.4. Yet to this day, George's routinely provides to Agri Stats data that contain earnings information for specific pay groups, broken out both by each of George's plants and further by department. The data categorizes worker earnings—such as holiday pay, regular pay, or overtime—and identifies both the hours and earnings amount.

      The following figure (Figure 1) displays an example of the information from the "AGRIPAY" file that George's provides Agri Stats.[1] As demonstrated, the file contains highly detailed compensation data broken down by specific departments, months, hours of work, and wages earned. For example, the seventh row shows that during October 2024, a particular Department at George's ("6401") spent a specific amount in salary ("SAL") of $6343.86 for 160 hours worked, which is the equivalent of one individual's hours for four weeks of work.

---

[1] "AGRIPAY" is a text-delineated csv file, meaning that it uses certain characters to delineate different columns of data. To make the data more comprehensible, Figure 1 displays the same data converted into a spreadsheet.

Figure 1

| | A | B | C | D | E | F | G | H | I | J | K |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | FiscalYear | Period | Company | ProcessLevel | Department | PaySumGrp | Hours | WageAmount | AcctUnit | Account | SubAcct |
| 2 | 2024 | 10 | 3 | 1200 | 6301 | PTO | 44 | 3530.34 | 11144904300 | 521400 | |
| 3 | 2024 | 10 | 3 | 1200 | 6301 | SAL | 756 | 63721.86 | 11144904300 | 511020 | |
| 4 | 2024 | 10 | 3 | 1200 | 6302 | PTO | 96 | 4847.98 | 11144904810 | 521400 | |
| 5 | 2024 | 10 | 3 | 1200 | 6302 | SAL | 1344 | 71528.28 | 11144904810 | 511020 | |
| 6 | 2024 | 10 | 3 | 1200 | 6303 | SAL | 1280 | 69171.58 | 11144904820 | 511020 | |
| 7 | 2024 | 10 | 3 | 1200 | 6401 | SAL | 160 | 6343.86 | 11144304910 | 511020 | |
| 8 | 2024 | 10 | 3 | 1200 | 9901 | BON | | 50000 | 11190109101 | 511020 | |
| 9 | 2024 | 10 | 3 | 1200 | 9901 | PTO | 159 | 19384.71 | 11190109101 | 521400 | |
| 10 | 2024 | 10 | 3 | 1200 | 9901 | SAL | 2001 | 237722.02 | 11190109101 | 511020 | |
| 11 | 2024 | 10 | 3 | 1200 | 9901 | SEV | | 60653.84 | 11190109101 | 511020 | |
| 12 | 2024 | 10 | 3 | 1200 | 9902 | PTO | 188 | 16649.8 | 11190109102 | 521400 | |
| 13 | 2024 | 10 | 3 | 1200 | 9902 | SAL | 1892 | 116540.24 | 11190109102 | 511020 | |
| 14 | 2024 | 10 | 3 | 1200 | 9903 | FRG | | 10685.45 | 11190109103 | 582060 | |
| 15 | 2024 | 10 | 3 | 1200 | 9903 | PTO | 340 | 16785.04 | 11190109103 | 521400 | |
| 16 | 2024 | 10 | 3 | 1200 | 9903 | SAL | 3860 | 202066.01 | 11190109103 | 511020 | |
| 17 | 2024 | 10 | 3 | 1200 | 9905 | PTO | 472 | 20680.21 | 11190109104 | 521400 | |
| 18 | 2024 | 10 | 3 | 1200 | 9905 | REH | 0.01 | | 11190109104 | 511020 | |
| 19 | 2024 | 10 | 3 | 1200 | 9905 | SAL | 2728 | 119711.33 | 11190109104 | 511020 | |

Figure 2 below shows the key for the corresponding columns in the "AGRIPAY" file. "SAL" refers to "Salary pay." Other "Pay types" included in the "AGRIPAY" file include "PTO" (Paid time off), "BON" (Bonus), "HOL" (Holiday pay), "WEB" (Weekend bonus) among others.

Figure 2[2]

| PaySumGrp | Pay type |
|---|---|
| 401 | 401K loan reimbursement |
| ATT | Attendance bonus |
| BON | Bonus |
| BRV | Bereavement pay |
| CMP | Salaried comp day pay |
| DBN | Deboning bonus |
| DRV | Driver bonus |
| DSB | Driver safety bonus |
| FRG | Fringe-Taxable relocation expenses |
| GRS | CDL driver pay |
| HOL | Holiday pay |
| HRS | Hours only - CDL drivers, unpaid personal days |
| MSC | Van driver pay |
| OJT | On the job training pay |
| OTB | Other bonus |
| OVT | Overtime premium |
| PTO | Paid time off |
| REG | Hourly pay |
| REH | Hourly retro pay |
| SAL | Salary pay |
| SEV | Severance |
| SFB | Sunshine pay shift differential |
| SFP | Shift bonus for bereavement, PTO and holiday |
| SFT | Shift bonus for regular pay |
| STD | Short term disability pay |
| SUN | Sunshine pay |
| WEB | Weekend bonus |

All these fields qualify as "Competitively Sensitive Compensation Information," even if they do not, as George's contends, identify a particular individual employee's salary. Ex. 4 at 6. Under the decree, "Compensation" is defined broadly to encompass "all forms of payment for work, including salaried pay, hourly pay, regular or ad hoc bonuses, over-time pay, and benefits." George's FJ § II.E. "Competitively Sensitive Information," in turn, covers "information *that is relevant to*, or likely to have an impact on, at least one dimension of competition, including price," and continues by specifically covering "amounts and types of

---

[2] Figure 1 is a portion of Ex. AA to the Monitors' Compliance Report, Ex. 1.

7

Compensation" as well as "other information related to costs." *Id.* § II.F (emphasis added). Neither definition draws any distinction based on whether the data identifies a particular employee. Thus, George's continues to violate the decree by sending to Agri Stats, Inc. data about its plant workers' "salaried pay," "hourly pay," various bonuses and holidays, and benefits—which it has admitted is "labor cost data." George's FJ § II.F; *see* Ex. 3 at 5.

Another example that underscores the granular level of detail provided by George's to Agri Stats is an excerpt from an Agri Stats report to George's that shows "hours" and "labor dollars" for dozens of different jobs at George's processing plants, from "cutup graders" to "breast trimmers" to "meat washers." Ex. 7 at 14.

Figure 3[3]

```
                        TOTAL PROCESSING SECTION (1.X)
Dec 2, 2024 - 18:31        0055 - GEORGES - SPRINGDALE, AR, 10/24              BOOK PAGE: 14
                         (a.1)   (a.2)     (b)       (b.1)      (c)         (d.1)         (d.2)
                         CO STAFF        COMPANY    HOURS               LABOR COST / POUND
                         ---------       HOURS     USED-AGRI  AGRI STATS ---------------------
                         1ST     2ND      DEPT      STATS      LABOR      DEPT         CENTS
                         SHFT    SHFT     TOTAL     DEPT       DOLLARS    POUNDS       /POUND

 CO DEPT STAFFING-CUTUP
 *LEAD                   CUT     2/32    2/28      9,716       653        14,497
 *CUTUP GRADERS          CUT     4/32     -        9,716       577        12,258
 *PARTS WASHER           CUT     2/32    2/28      9,716       653        14,497
 *SAW HANDS / PARTS      CUT     1/32    1/28      9,716       326         7,248
 *BACK MAN               CUT     1/32    1/28      9,716       326         7,248
 *UTILITY / FLOOR WORKER CUT     3/32    3/28      9,716       979        21,745
 CO DEPT STAFFING-DEBONING
 *SHOULDER CUTTER        CUT    28/179  24/161    82,589     12,608       298,931
 *WING INSPECT/PACK/UTIL CUT     3/179   3/161    82,589      1,463        34,807
 *WING CUTTER/WING WHEEL CUT    14/179  12/161    82,589      6,304       149,466
 CO DEPT STAFFING-WHOLE LEG DEBONE
 *MISC CUTUP             CUT     2/140   2/140    50,079       715        16,747

 4.06 AS DEPT CUTUP              60      50         -        24,605      577,444    41,210,180    1.40

 4.07 AS DEPT BREAST DEBONING
 CO DEPT STAFFING-DEBONING
 *LEAD                   BDB     6/179   5/161    82,589      2,664       63,130
 *BREAST TRIMMERS        BDB    21/179  18/161    82,589      9,456      224,198
 *TENDER TRIMMERS        BDB     2/179   2/161    82,589        976       23,205
 *CONE LOADERS/FRONT HANGERS BDB 7/179   6/161    82,589      3,152       74,733
 *DEBONE TRAINEES        BDB     2/179   4/161    82,589      1,501       36,173
 *BONE INSPECTOR         BDB     9/179   6/161    82,589      3,602       84,969
 *FINAL INSPECTOR        BDB     8/179   6/161    82,589      3,377       79,851
 *FORKLIFT/JACK OPER/    BDB     1/179   1/161    82,589        488       11,602
 *CARCASS SCRAPER/PULLER BDB     2/179   2/161    82,589        976       23,205
 *DUMPER                 BDB     1/179   1/161    82,589        488       11,602
 *FLOOR PEOPLE           BDB     5/179   5/161    82,589      2,439       58,012
 *MEAT WASHERS           BDB     2/179   2/161    82,589        976       23,205
 *TENDER CUTTERS         BDB    21/179  18/161    82,589      9,456      224,198
```

---

[3] Figure 3 is an excerpt from page 14 of an October 2024 Agri Stats Processing Analysis prepared for George's and dated Dec. 2, 2024 from a file titled chartin-2024_10_Broiler-Processing-Analysis_USA_GEORGES_DEBON_PARTS.

8

George's cannot evade the decree's blanket prohibition by requesting that Agri Stats not *use* its data "in the calculation of any wage rate average statistics provided to other subscribers." Ex. 1 at 9 & Ex. C. The decree flatly prohibits George's from "Communicating . . . to" Agri Stats, Inc. any competitively sensitive compensation data. George's FJ §§ II.G, IV.A.4. This remains true even though the prohibition is preceded by the word "including"; a clause following the word "including" often broadens or clarifies a provision's scope. *See, e.g.*, *Adams v. Dole*, 927 F.2d 771, 776-77 (4th Cir. 1991) ("If we say that 'all licensed drivers, including *applicants* for driver's licenses, shall take an eye exam,' the word 'including' means 'and' or 'in addition to.'"); *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 141 (1990) (noting that a phrase beginning with the word "includes" "expands, rather than restricts, that definition"). Here, the decree imposes a bright-line prohibition against sending compensation data to consultants for good reason—as the Monitors point out, they cannot police a third party's use of information it receives from George's. Ex. 1 at 19; George's FJ § IV.A.4. This is particularly true considering Agri Stats does not limit its services to sending reports; it provides consulting services to processors.

### B. George's Receives Compensation Data from Agri Stats in Violation of the Decree

In addition to "provid[ing]" compensation data to Agri Stats, George's is also violating the Final Judgment by continuing to "receive" reports from Agri Stats that contain competitors' "Competitively Sensitive Information" about "Compensation." George's FJ §§ IV.A.4, II.D (defining "Communicate" to include "receive"), II.E, II.F. This constitutes a separate violation of the decree.

9

George's continues to receive from Agri Stats detailed compensation data for George's competitors. For example, the "First Processing Section Participants" for the October 2024 Agri Stats General Run includes the following list:

Figure 4

**FIRST PROCESSING SECTION PARTICIPANTS**

1. ALLEN HARIM - HARBESON, DE
2. AMICK FARMS - BATESBURG, SC
3. AMICK FARMS - HURLOCK, MD
4. AMICK FARMS - LAUREL, MS
5. BACHOCO USA - FT. SMITH, AR
6. BACHOCO USA - HEAVENER, OK
7. CASE FARMS - CANTON, OH
8. CASE FARMS - GOLDSBORO, NC
9. CASE FARMS - MORGANTON, NC
10. CASE FARMS - WINESBURG, OH
11. CLAXTON POULTRY - CLAXTON, GA
12. FIELDALE FARMS - CORNELIA, GA
13. FIELDALE FARMS - MURRAYVILLE, GA
14. FOSTER FARMS - BLGRV ST, FRESNO, CA
15. FOSTER FARMS - CHERRY ST, FRESNO, CA
16. FOSTER FARMS - FARMERVILLE, LA
17. FOSTER FARMS - KELSO, WA
18. FOSTER FARMS - LIVINGSTON, CA
19. GEORGE'S - BATESVILLE, AR
20. GEORGE'S - BATESVILLE, AR
21. GEORGE'S - CASSVILLE, MO
22. GEORGE'S - EDINBURG, VA
23. GEORGE'S - HARRISONBURG, VA
24. GEORGE'S - SPRINGDALE, AR
25. HARRISON POULTRY - BETHLEHEM, GA
26. HOLMES FOODS - NIXON, TX
27. HOUSE OF RAEFORD - ARCADIA, LA
28. HOUSE OF RAEFORD - COLUMBIA, SC
29. HOUSE OF RAEFORD - GREENVILLE, SC
30. HOUSE OF RAEFORD - ROSE HILL, NC
31. HOUSE OF RAEFORD - WALLACE, NC
32. KOCH FOODS - ASHLAND, AL
33. KOCH FOODS - CHATTANOOGA, TN
34. KOCH FOODS - COLLINSVILLE, AL
35. KOCH FOODS - GADSDEN, AL
36. KOCH FOODS - MONTGOMERY, AL
37. KOCH FOODS - MONTGOMERY, AL
38. KOCH FOODS - MORRISTOWN, TN
39. KOCH FOODS - MORTON, MS
40. KOCH FOODS - MORTON, MS
41. KOCH FOODS - PINE MOUNTAIN VALLEY, GA
42. MAR-JAC POULTRY - GAINESVILLE, GA
43. MAR-JAC POULTRY - HATTIESBURG, MS
44. MAR-JAC POULTRY - JASPER, AL
45. MOUNTAIRE - LUMBER BRIDGE, NC
46. MOUNTAIRE - MILLSBORO, DE
47. MOUNTAIRE - SELBYVILLE, DE
48. MOUNTAIRE - SILER CITY, NC
49. PECO FOODS - SEBASTOPOL, MS
50. PECO FOODS - TUSCALOOSA, AL
51. PERDUE FARMS - ACCOMAC, VA
52. PERDUE FARMS - CROMWELL, KY
53. PERDUE FARMS - DILLON, SC
54. PERDUE FARMS - GEORGETOWN, DE
55. PERDUE FARMS - LEWISTON, NC

```
 56. PERDUE FARMS - MILFORD, DE
 57. PERDUE FARMS - PERRY, GA
 58. PERDUE FARMS - ROCKINGHAM, NC
 59. PERDUE FARMS - SALISBURY, MD
 60. PILGRIM'S - ARCADIA, WI
 61. PILGRIM'S - ATHENS, GA
 62. PILGRIM'S - BROADWAY, VA
 63. PILGRIM'S - CANTON, GA
 64. PILGRIM'S - CARROLLTON, GA
 65. PILGRIM'S - CHATTANOOGA, TN
 66. PILGRIM'S - COLD SPRING, MN
 67. PILGRIM'S - DEQUEEN, AR
 68. PILGRIM'S - ELLIJAY, GA
 69. PILGRIM'S - ENTERPRISE, AL
 70. PILGRIM'S - GAINESVILLE, GA
 71. PILGRIM'S - GUNTERSVILLE, AL
 72. PILGRIM'S - LIVE OAK, FL
 73. PILGRIM'S - LUFKIN, TX
 74. PILGRIM'S - MARSHVILLE, NC
 75. PILGRIM'S - MAYFIELD, KY
 76. PILGRIM'S - MOOREFIELD, WV
 77. PILGRIM'S - MT. PLEASANT, TX
 78. PILGRIM'S - MT. PLEASANT, TX
 79. PILGRIM'S - NACOGDOCHES, TX
 80. PILGRIM'S - NATCHITOCHES, LA
 81. PILGRIM'S - RUSSELLVILLE, AL
 82. PILGRIM'S - SUMTER, SC
 83. SIMMONS FOODS - GENTRY, AR
 84. SIMMONS FOODS - SOUTHWEST CITY, MO
 85. WAYNE-SANDERSON - ALBERTVILLE, AL
 86. WAYNE-SANDERSON - BRYAN, TX
 87. WAYNE-SANDERSON - COLLINS, MS
 88. WAYNE-SANDERSON - DANVILLE, AR
 89. WAYNE-SANDERSON - DECATUR, AL
 90. WAYNE-SANDERSON - DOBSON, NC
 91. WAYNE-SANDERSON - DOTHAN, AL
 92. WAYNE-SANDERSON - ENTERPRISE, AL
 93. WAYNE-SANDERSON - HAMMOND, LA
 94. WAYNE-SANDERSON - HAZLEHURST, MS
 95. WAYNE-SANDERSON - KINSTON, NC
 96. WAYNE-SANDERSON - LAUREL, MS
 97. WAYNE-SANDERSON - MCCOMB, MS
 98. WAYNE-SANDERSON - MOULTRIE, GA
 99. WAYNE-SANDERSON - PALESTINE, TX
100. WAYNE-SANDERSON - PENDERGRASS, GA
101. WAYNE-SANDERSON - ST. PAULS, NC
102. WAYNE-SANDERSON - TYLER, TX
103. WAYNE-SANDERSON - UNION SPRINGS, AL
104. WAYNE-SANDERSON - WACO, TX
```

Ex. 8 at 87–88. Furthermore, the "Processing Analysis" reports provided to George's also compare the "hourly labor cost" and "supervisor cost" of over 100 poultry processing plants, including those of George's. The report ranks those plants, and it provides averages for the "top 50%," "top 25%," and "top 5" companies who participated, with "top" referring to the companies who pay their workers the *least*. *See*, *e.g.*, *id.* at 154. The reports also disclose, among other things:

- The numerical ranking of George's "maintenance wage rate" and "sewage tr. [treatment] wage rates" at Rogers, Arkansas, out of the over 100 participating plants in the month of December 2024.

- The 50% hourly wage paid to maintenance and sewage treatment workers.

- The top 25% hourly wage for each of these types of workers, with "top 25" referring to the 25% of companies who paid the *least* in wages for maintenance or sewage treatment workers.

- The average hourly wage for certain workers at the "top 5" companies, referring to the five companies who paid the *least* for that labor.[4]

Again, the Final Judgment does not apply only to compensation information that reveals what any specific employee is paid per hour or per year, as George's contends. *See* Ex. 4 at 6. The Final Judgment broadly prohibits the sharing of information about "all forms of payment for work," George's FJ § II.E, and information about processors' labor costs is information about what those processors' "pay[] for work." Moreover, the compensation information George's is receiving is traceable to narrow groups of workers, such as "cutup labor" or "deboning labor." *E.g.*, Ex. 7, at 167 ("labor cost in cutup"), 168 ("labor cost in breast debone"), 169 ("trimmed/sized/portioned breast labor cost"). Indeed, Agri Stats itself defines "labor costs" as a metric intended to assess wages paid to specific groups of workers. *See, e.g.*, Ex. 9 at 128 ("purpose" of "breast debone labor cost" section of Agri Stats report is "[t]o evaluate the wage rates in the breast debone department alone"), 131 (same for "trimmed/sized/portioned breast department").

Nor has George's satisfied the Final Judgment by simply asking Agri Stats to make cosmetic redactions to the labor data provided in the report. Not only do these redactions fail to

---

[4] *See* Ex. 8, at page 318, lines 148, 150.

address the separate violations arising from sending labor cost data to Agri Stats, these limited redactions are easily undone with simple arithmetic. For example, George's receives "Processing Analysis" reports that provide an estimated hourly "wage rate w/ benefits" for specific departments. *E.g.*, Ex. 7 at 167 ("cutup labor cost"), 168 ("breast debone labor cost"), 170 ("dark meat debone labor cost"). As Agri Stats' data manual explains, the "wage rate with benefits" statistic in the "cut-up" labor segment of these reports provides "[t]he total hourly wages paid including fringes, vacation pay, holiday pay and sick pay dollars divided by productive hours including both regular and overtime hours for cut up department labor." Ex. 9 at 125. Although the "wage rate w/ benefits" information itself is now redacted from the report at George's request, *see, e.g.*, Ex. 1 at 12, George's can still easily calculate it from other columns of data, namely by multiplying per-unit labor cost by units of output per manhour.

Figure 5 below shows an example from a recent Processing Analysis in which the hourly wage rates in column (c.1) ("$/HR") are redacted. Each line represents a processing plant; George's plant is underlined to distinguish it from competitor plants.

Figure 5[5]



---

[5] Figure 5 is an excerpt from Exhibit 2 to the Declaration of Eric Scholer, Vice-President of Operations for Agri Stats, attached to George's October 4, 2024 letter, responding to the Monitors' August 2024 report. Ex. 4 at 20. Exhibit 2 to the Declaration of Eric Scholer is a June 2024 Agri Stats Processing Analysis prepared for George's and dated June 28, 2024.

13

Although the data in (c.1) is redacted, it can be calculated within a rounding error by converting the labor costs per bird (a.2) into dollars and multiplying that by the number of birds (*i.e.*, WOGs) processed per manhour (b.2). The relationship between this calculation and the hourly wage rates can be seen by reviewing an older, unredacted report, as in Figure 6.

Figure 6[6]

[Figure 6: Excerpt from Agri Stats Cutup Labor Cost report for Georges, Group 16, dated Jun 1, 2022 – 01:45, Period: Month 4/22, Page 5.8-1, with columns (a), (a.1), (a.2), a.3, (b), (b.1), (b.2), (b.3), (b.4), (c), (c.1), (c.2), (d), (e), (e.1), (f), showing 10 LIN rows.]

As demonstrated in the chart below, multiplying the per bird wage rate ((a.2) converted from cents into dollars) by the number of birds processed per manhour (b.2) yields a figure within a few pennies of the hourly wage rate provided in column (c.1).

| Line No. LIN | Cents per Bird (a.2) | Birds (WOGs) / Manhour (b.2) | Calculated Wage Rate ((a.2/100)*(b.2)) | Reported Wage Rate ($/Hour) (c.1) |
|---|---|---|---|---|
| 1 | 1.07 | 2174 | $23.26 | $23.34 |
| 2 | 2.27 | 1056 | $23.97 | $23.93 |
| 3 | 2.53 | 1062 | $26.87 | $26.88 |
| 4 | 2.25 | 1011 | $22.75 | $22.80 |
| 5 | 3.6 | 636 | $22.90 | $22.89 |
| 6 | 3.72 | 668 | $24.85 | $24.85 |
| 7 | 2.69 | 962 | $25.88 | $25.83 |
| 8 | 6.23 | 414 | $25.79 | $25.76 |
| 9 | 6.99 | 328 | $22.93 | $22.95 |
| 10 | 7.07 | 398 | $28.14 | $28.11 |

---

[6] Figure 6 is an excerpt from Exhibit 1 to the Declaration of Eric Scholer, Vice-President of Operations for Agri Stats, attached to George's October 4, 2024 letter, responding to the Monitors' August 2024 report. Ex. 4 at 14. Exhibit 1 to the Declaration of Eric Scholer is a June 2022 Agri Stats Processing Analysis prepared for George's and dated June 1, 2022.

14

The same calculation yields the redacted information in Figure 5.

George's ongoing receipt of all this "Competitively Sensitive Information about Poultry Plant Worker Compensation" from Agri Stats violates the plain terms of the Final Judgment.

## II. To Remediate George's Persistent and Systematic Decree Violations, the Court Should Order It to Pause Its Data Sharing with Agri Stats and Extend the Decree

George's knowing and persistent violations of the Final Judgment require enforcement of the Final Judgment "to accomplish [the Final Judgments'] intended result," United States v. *W. W. Elec. Co.*, 46 F.3d 1198, 1202 (D.C. Cir. 1995); *see also Am. Rivers v. United States Army Corps of Eng'rs*, 274 F. Supp. 2d 62, 70 (D.D.C. 2003) ("If the rule of law is to be upheld, it is essential that the judiciary takes firm action to vindicate its authority and to compel compliance with lawfully issued directives.").

To remediate George's systemic violations of the decree, the Court should temporarily prohibit George's, like Wayne-Sanderson, from sending or receiving any data to and from Agri Stats until the Monitors and the United States verify that any future data exchanges comply with the Final Judgment. George's has not made good-faith efforts to comply with the decree. Instead, it has primarily argued that a decree specifically naming "Agri Stats" does not require it to alter its relationship with Agri Stats at all. And George's limited precautions do not evince a serious effort to comply with the decree: Since entering the decree, George's has not limited the labor cost information it regularly provides Agri Stats *at all*; it merely notified Agri Stats, a company which specializes in exchanging sensitive data among competing meat processors, not to disseminate specifically average wage statistics. Much the same, the minor redactions made to the reports it receives do not bespeak a real effort to comply with the decree. George's disregard means that the Monitors will likely have to weed through George's voluminous and complex data exchanges with Agri Stats to uncover and remediate the full scope of the violations.

15

Until it can assure the Monitors and the Court of its compliance going forward, the onus lies on George's as the party in breach to halt its violative conduct. Having systematically and continuously violated its freely accepted legal obligations, George's stands in no position to complain about the temporary burden that such a pause may place on it. Conversely, it would be unfair to allow George's to continue violating the decree to the detriment of poultry plant workers across the country while this remediation occurs.

An extension of the term of the Final Judgment by the duration of time George's has failed to be in compliance is also appropriate. *See Holland v. N.J. Dep't of Corr.*, 246 F.3d 267, 284 (3d Cir. 2001) ("Courts have extended a decree or parts of a decree when . . . one party was in substantial non-compliance with the decree."). George's agreed to a seven-year consent decree starting on May 17, 2023. ECF 45-2. As established above, George's has not complied with the Final Judgment for any part of that time period. An extension of the Final Judgment's duration is therefore necessary to ensure George's is held to its obligation of compliance for the agreed-to periods of time. *See, e.g.*, *David C. v. Leavitt*, 242 F.3d 1206, 1212-13 (10th Cir. 2001) (affirming grant of "relief from the four-year Termination Provision by extending the term of the Agreement" "to allow [the defendant] to fulfill the very obligations it voluntarily undertook when it entered into the Agreement").

## CONCLUSION

George's has disregarded the obligations it has agreed to in the Final Judgment. Therefore, the United States requests that the Court (a) order George's to cease sharing all information with Agri Stats until the Monitors and the United States, or this Court, can ensure compliance with the Final Judgment, (b) extend the term of the Final Judgment, and (c) order any additional relief as may be appropriate.

Dated: February 5, 2025

Respectfully submitted,

**FOR PLAINTIFF UNITED STATES OF AMERICA:**

DANIEL S. GUARNERA
Chief, Civil Conduct Task Force

KATE M. RIGGS
Assistant Chief, Civil Conduct Task Force

/s/ Jessica J. Taticchi
JESSICA J. TATICCHI
(special admission as government attorney)
Trial Attorney, Civil Conduct Task Force

/s/ Eun Ha Kim
EUN HA KIM
(special admission as government attorney)
Senior Trial Counsel

United States Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 8000
Washington, DC 20530
Telephone: (202) 812-4723
Facsimile: (202) 307-5802
Jessica.Taticchi@usdoj.gov
Eun-Ha.Kim@usdoj.gov